**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE, | ) | |
| | ) | |
| **EMERALD CASINO, INC.,** | ) | Chapter 7 |
| | ) | 02 B 22977 |
| Plaintiff, Debtor | ) | Bankr. Adv. No. 08 A 00972 |
| | ) | |
| _____ | ) | |
| | ) | |
| **FRANCES GECKER, not individually but** | ) | |
| **solely as chapter 7 trustee for the** | ) | |
| **bankruptcy estate of Emerald Casino, Inc.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 11 C 4714 |
| | ) | |
| **DONALD F. FLYNN, KEVIN F. FLYNN,** | ) | Judge Rebecca R. Pallmeyer |
| **KEVIN LARSON, JOHN P. McMAHON,** | ) | |
| **JOSEPH F. McQUAID, WALTER HANLEY,** | ) | |
| **and PEER PEDERSEN,** | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

i

# TABLE OF CONTENTS

**BACKGROUND**

I.  A "big to-do" ...................................................................................................3

    A.  Emerald Casino, Inc. is created and issued a license to operate a riverboat casino..............................................................................3

    B.  Donald Flynn takes control of Emerald...............................................6

    C.  Emerald lobbies for relocation..........................................................11

    D.  1999: Emerald's golden year.............................................................13

    E.  An unfortunate association: Emerald relocates in Rosemont ............16

    F.  The IGB doggedly investigates Emerald ...........................................20

    G.  The IGB revokes Emerald's license ..................................................23

    H.  Procedural History .............................................................................25

II. A casino in Rosemont ......................................................................................26

    A.  Emerald lays the groundwork to move to Rosemont .........................27

        1.  Kevin Flynn met with Mayor Donald Stephens in 1997 ...........28

        2.  The alleged agreement between Emerald, the Davis Companies, and Duchossois Industries..................................31

    B.  Emerald attempts to relocate to Rosemont .......................................40

        1.  Emerald's construction activities..............................................42

            a.  Construction progress.................................................42

            b.  Financing construction ...............................................47

            c.  Communication with the IGB ......................................49

                i.  The pre-approval construction requirement ...................49

                ii.  The IGB was aware of construction.................................51

        2.  Emerald failed to disclose preliminary agreements between Emerald and Rosemont to the IGB.........................................60

3.     The IGB found that the final Lease and Development Agreement between Emerald and Rosemont violated IGB rules..............................67

III.     Defendants' disclosures to the IGB...........................................................72

    A.     Emerald's September 24, 1999 Renewal Application ........................72

        1.     Question 16: public officials ...............................................74

        2.     Question 21: agreements ....................................................78

        3.     Question 31: threatened litigation .......................................81

        4.     Questions 46 & 47: agreements with municipalities..............85

    B.     Construction Agreements...................................................................87

        1.     Aria Architects .................................................................87

        2.     Degen & Rosato Construction Company/ Power Construction LLC, Joint Venture ("Joint Venture") ......................................88

        3.     Other agreements .............................................................90

        4.     Communication with the IGB ..............................................90

            a.     September 24, 1999 Renewal Application ...................91

            b.     September 30, 1999 meeting with the IGB...................92

            c.     Communications with the IGB after September 30, 1999...........93

    C.     Kevin Flynn ......................................................................................96

        1.     Pre-June 23, 1999 involvement in Emerald ...........................96

            a.     Pre-1999 meetings & agreements with third parties .................101

                i.     Lake County Riverboat ..................................101

                ii.     Meeting with Mayor Stephens ......................104

                iii.     Davis and Duchossois meetings and alleged agreement ...................................................104

                iv.     Meeting with Gary Armentrout......................107

            b.     Lobbying ...............................................................108

            c.     Emerald's management & Board meetings .................112

      2.      Field Street Agreement ......................................................119

IV.    Transfer of Emerald shares ........................................................124

    A.     Amendment to Emerald's Shareholders' Agreement ..........................124

    B.     Transfer of shares to Kevin Flynn, Joseph McQuaid, John McMahon, Kevin Larson, and Walter Hanley, the "Officer Defendants" ............128

           1.      Emerald's Restricted Stock Award Plan ...............................128

           2.      Amended and Restated Purchase Agreement .....................129

           3.      The Officer Defendants executed the Amended Shareholders' Agreement and were issued Emerald shares .....................130

    C.     Transfers of shares to and from Donald Flynn ................................134

    D.     Emerald sells shares to the Statutory Investors ................................142

    E.     Defendants' communication with the IGB about the transfers of shares..........146

           1.      Defendants failed to obtain IGB pre-approval for the transfers of shares ...........................................................146

           2.      Defendants disclosed the transfers of shares after the transfers were completed..................................................155

V.    Procedural History....................................................................160

    A.     IGB revocation proceedings........................................................160

    B.     Bankruptcy proceeding ..............................................................162

    C.     *Payton* Plaintiffs' litigation .........................................................166

    D.     District court............................................................................176

**DISCUSSION**

I.     Standard of Review ....................................................................176

II.    Count I: Fiduciary Duty ...............................................................177

    A.     The Trustee's fiduciary duty claim is barred by the statute of limitations ..........177

           1.      Adverse domination..........................................................177

2.     Pedersen's arguments against tolling ...................................180

3.     Flynn Defendants' arguments against tolling: rebutting the
       presumption of adverse domination......................................182

       i.     Knowledge183

       ii.    Ability...................................................................185

       iii.   Motivation ...........................................................187

III.   Count II: Breach of Contract ........................................................189

A.     The Trustee's breach of contract claim is not barred by *res judicata* ...............190

1.     Final Judgment on the Merits ...............................................191

2.     Same claims and same parties..............................................192

       a.     The *Payton* and estate breach of contract claims are
              the same...............................................................192

       b.     The parties may be the same......................................196

3.     Defendants are estopped from asserting *res judicata* .........................198

B.     Merits .......................................................................................205

1.     The Amended Shareholders' Agreement is a valid and enforceable
       contract ............................................................................205

       a.     Defendants are parties to the Amended Shareholders'
              Agreement .............................................................205

       b.     The "comply provision" of Paragraph Ten of the
              Amended Shareholders' Agreement is enforceable ................213

2.     Defendants breached their obligations under the Amended
       Shareholders' Agreement ......................................................214

       a.     The Amended Shareholders' Agreement imposes strict
              liability and does not require proof of Defendants' state
              of mind..................................................................214

       b.     Certain Defendants engaged in conduct that caused
              the IGB to revoke the license ....................................216

              i.     IGB Count I: Rule 140(a) ...............................216

                     (a)    Failure to disclose Kevin Flynn's involvement
                            in management and operation of Emerald .........216

(b)      Failure to disclose agreements between
Emerald and Rosemont ....................................217

(c)      Failure to disclose agreements between
Emerald and various construction professionals
and subcontractors ...........................................218

(d)      Rule 140(a) violations for which the Trustee
has not established Defendants' conduct..........218

ii.      IGB Count II: Rule 140(b)(3).........................................219

(a)      Failure to disclose agreements between
Emerald and Rosemont ....................................219

(b)      Failure to disclose agreements between
Emerald and various construction professionals
and subcontractors ...........................................219

(c)      Rule 140(b)(3) violations for which the Trustee
has not established Defendants' conduct..........219

iii.      The Trustee has not established that any Defendants
have violated IGB Count III, Rule 140(b)(7) ..................220

iv.      IGB Count IV: Rule 235(a).............................................220

(a)      Transfer of shares between Donald Flynn
and the Twelve Outsiders without IGB prior
approval.............................................................221

(b)      Transfer of shares between Donald Flynn
and the Five Insiders without IGB prior
approval ............................................................221

(c)      Transfer of shares between Emerald
and the Statutory Investors without IGB prior
approval ............................................................221

v.      IGB Count V: Rule 110(a).............................................222

(a)      Failure to fully, truthfully, timely, and
accurately disclose information to the IGB
..........................................................................222

(b)      Failure to disclose Kevin Flynn's involvement
in management and operation of Emerald .........223

(c)      Rule 110(a) violations for which the Trustee
has not established Defendants' conduct..........223

3.  Defendants' breach caused the loss of the license ............................224

    a.  Cause in fact..........................................................................225

    b.  Legal cause ............................................................................228

4.  The court denies Defendants' motion for leave to file third-party complaint against Eugene Heytow........................................................230

IV.  Count IV: Equitable Subordination .............................................................231

V.  Damages......................................................................................................233

A.  Defendants are severally liable ........................................................233

B.  The value of Emerald's license ........................................................237

1.  Testimony of Steven M. Rittvo............................................239

    a.  *Daubert* challenge remains pending.............................239

    b.  *Daubert* standards ......................................................241

    c.  Mr. Rittvo is qualified ..................................................241

    d.  Mr. Rittvo's testimony is relevant................................244

    e.  Mr. Rittvo's testimony is not sufficiently reliable........244

        i.  Flaws in base-year revenue calculations ......................246

            (a)  Use of the gravity model to predict attendance data ..................................................................247

                (1)  Mr. Rittvo did not specify his methods for calculating the propensity and frequency factors.......................................249

                (2)  Mr. Rittvo's method for calibrating the model is sufficiently reliable..............250

                (3)  The "Rittvo Effect" is not sufficiently reliable ...................................................251

            (b)  The win-per-visit amount is not sufficiently reliable ....................................................252

            (c)  The proprietary model for operating expenses is not sufficiently reliable ...................................254

ii.      Mr. Rittvo did not account for specific risks that existed as of February 2001, which would have reduced the value of Emerald's license at that time ................................................................254

iii.      Other alleged flaws in Mr. Rittvo's calculations..............256

    (a)      Improper factual underpinnings .........................256

    (b)      Improper inclusion of prejudgment interest................................................................257

2.      New business rule ...............................................................259

3.      Evidence showing the market value of Emerald's license ....................266

a.      Rosemont valuations .................................................269

i.      August 1999 EVI valuation ............................269

ii.      2000 valuation for the *Davis* litigation ..........................271

iii.      2001 MGM Mirage offer.................................271

iv.      2004 Rothschild auction and Isle of Capri bid...............272

b.      Non-Rosemont bid from Midwest Gaming in 2008 ...................273

4.      The Trustee proved damages with a reasonable degree of certainty.................................................................275

5.      The principles of equity do not support a reduction of damages ............................................................276

**CONCLUSION**....................................................................280

**APPENDICES**

Appendix A:  Procedural History Chart

Appendix B:  Selected IGB Rules

Appendix C:  Contract Liability Chart

# MEMORANDUM OPINION AND ORDER

A license to operate a casino in Illinois should have great value. In 1999, Emerald Casino, Inc. ("Emerald") held such a license, permitting it to operate a riverboat, but its East Dubuque location was not profitable. When the Illinois General Assembly passed legislation authorizing a land-based casino, it appeared Emerald's problems were in the past. But on January 30, 2001, the Illinois Gaming Board ("IGB") revoked the license after an unprecedented and aggressive investigation of Emerald and its officers, directors, and shareholders. The IGB's primary concern appears to have been that "organized crime" was somehow involved in Emerald's proposed new location—Rosemont, Illinois. Emerald was less than forthcoming in its communications with the IGB, which heightened regulators' suspicions. Ultimately, the IGB concluded that Emerald had violated several IGB rules and, for the first time in the IGB's history, revoked a gaming license as a sanction. Emerald appealed the revocation order, but the Illinois Appellate Court affirmed. The license was Emerald's only significant asset, and when Emerald was stripped of it, this bankruptcy proceeding swiftly followed.

Plaintiff in this case, Frances Gecker, is the Trustee appointed by the Bankruptcy Court on behalf of Emerald. Defendants are the former officers, directors, and shareholders of Emerald. The Trustee alleges that the individual Defendants were responsible for Emerald's loss of its license. The Trustee claims that Defendants' actions breached (1) their fiduciary duty to Emerald (Count I) and (2) Emerald's Amended Shareholders' Agreement (Count II), in which each Defendant had promised "to comply with the [Riverboat Gambling] Act, Rules, and orders of the IGB." In addition, the Trustee seeks equitable subordination of Defendants' claims against Emerald's estate (Count IV), and to recharacterize certain loans made by Donald Flynn and Peer Pedersen to Emerald as equity (Count V). Finally, the Trustee seeks to disallow claims that Defendants made against Emerald's estate; she argues that 11 U.S.C. § 502(d) bars recovery (Count III), and that a settlement agreement (under which Defendants claim an interest in Emerald) never became effective (Count VI). After a lengthy bench trial—initially before

1

Judge Eugene Wedoff in the Bankruptcy Court, followed by additional days of testimony before this court—the court sets forth its findings of fact and conclusions of law on Counts I, II and IV. The court reserves judgment on Counts III, V, and VI.

As explained below, the court concludes that the Trustee's breach of fiduciary duty claim is barred by the statute of limitations. She has established her claim of breach of contract, however, and the court finds Defendants Kevin Flynn, Donald Flynn, Joseph McQuaid, John McMahon, Kevin Larson, and Walter Hanley severally liable for breach of Emerald's Amended Shareholders' Agreement. The court awards the Trustee $272,000,000.00, and finds the Defendants severally liable for that amount, in equal proportions. Claims against Defendant Peer Pedersen are dismissed.

In addition, three motions remain pending: Donald Flynn's motion to dismiss the Trustee's claims for joint liability and punitive damages [64]; Defendants' motion to dismiss Count II (breach of contract) as duplicative of Count I (breach of fiduciary duty) [113]; and Certain Defendants' motion for judgment as a matter of law on Counts I and II as barred by the statute of limitations and *res judicata*, respectively [246]. Because the court has dismissed the breach of fiduciary duty claim and has declined to impose joint liability on the breach of contract claim, Donald Flynn's motion [64] is denied as moot, and Defendants' motion to dismiss the breach of contract claim [113] is denied. Certain Defendants' motion to dismiss on the basis of the statute of limitations and *res judicata* [246] is granted in part and denied in part. Finally, Defendants urge this court to reconsider their motion [72] for leave to file a third-party complaint against Eugene Heytow. Heytow's involvement was, however, similar to that of Peer Pedersen. As the court has dismissed claims against Peer Pedersen and has not imposed joint liability under the Amended Shareholders' Agreement, the request for reconsideration is also moot.

**BACKGROUND**

I.       A "big to-do"[1]

Defendants are former officers, directors, and shareholders of an Illinois corporation, now named Emerald Casino, Inc., which was created in 1991 to operate a riverboat casino. Until January 30, 2001, Emerald held one of the ten licenses issued by the Illinois Gaming Board ("IGB"). On January 30, 2001, the IGB voted to revoke Emerald's license, on findings that Emerald had repeatedly misled or misinformed the IGB about its activities and had violated several IGB rules. Emerald was forced into bankruptcy proceedings by its creditors on June 13, 2002. Plaintiff Francis Gecker is the Trustee on behalf of Emerald, appointed by the Bankruptcy Court. Ms. Gecker's central claims in this case are that Defendants (1) violated their fiduciary duty to Emerald and (2) breached a contract—the Amended Shareholders' Agreement—which obligated Defendants to comply with IGB rules, resulting in the loss of a license worth more than $500 million.

   A.      Emerald Casino, Inc. is created and issued a license to operate a
           riverboat casino

On December 17, 1991, Emerald Casino, Inc.[2] ("Emerald") was incorporated as an Illinois corporation to operate a riverboat casino. (Trustee's Proposed Findings of Fact & Conclusions of Law, *Gecker v. Flynn*, No. 08-ap-00972 [765], hereinafter "Trustee's SOF," ¶ 1; Certain Defs.' Proposed Findings of Fact & Conclusions of Law at 1 [252], hereinafter "C. Defs.' SOF," ¶ 63.) Emerald initially owned a 50% interest in the Jo Daviess Riverboat Joint Venture;

---

[1]      *See* Interview by Chicago Tribune with Barack Obama, United States Presidential Candidate (Mar. 16, 2008), http://www.chicagotribune.com/news/chi-obamafullwebmar16-archive-story.html#page=1 (Presidential Candidate Barack Obama noting that "there was a big to-do about [Emerald Casino]").

[2]      Emerald was originally incorporated under the name "HP, Inc." The initials represented the two founders, Eugene Heytow and Defendant Peer Pedersen. (C. Defs.' SOF ¶ 40.) On August 12, 1999, HP, Inc. changed its name to Emerald Casino, Inc. (Trustee's SOF ¶ 1; C. Defs.' SOF ¶ 151.) "Emerald" is used to refer to HP, Inc. throughout the opinion.

the Jo Daviess Corporation owned the remaining 50% interest. (Trustee's SOF ¶ 89; C. Defs.' SOF ¶ 64.) On July 9, 1992, the IGB issued one of ten gaming licenses then available in Illinois to the Joint Venture. (Trustee's SOF ¶ 89; C. Defs.' SOF ¶ 40.) The license authorized the Joint Venture to operate a casino on the Mississippi River, within Jo Daviess County, Illinois, for a period of three years. (Trustee's SOF ¶ 89; C. Defs.' SOF ¶ 64.) Beginning in 1992, the Joint Venture used that license to operate the Silver Eagle Casino Cruise ("Silver Eagle") riverboat on a waterway off the Mississippi River near East Dubuque, Illinois. (Trustee's SOF ¶ 90; C. Defs.' SOF ¶ 66.) On April 19, 1994, Emerald, with the approval of the IGB, purchased the Jo Daviess Corporation and became the sole owner of the license. (Trustee's SOF ¶ 91; C. Defs.' SOF ¶ 64.)

Emerald, then known as HP, Inc., was founded by Eugene Heytow and Peer Pedersen, both of whom served on the original Board of Directors. (Trustee's SOF ¶ 7; C. Defs.' SOF ¶ 63.) Peer Pedersen was the corporation's President and Gene Heytow was its Vice President. (PX1316 at 1.)[3] Heytow and Pedersen each brought in a group of original investors in addition to investing themselves. (Trustee's SOF ¶ 7; C. Defs.' SOF ¶ 63.) Defendant Donald Flynn was among the original investors in Peer Pedersen's group. (Trustee's SOF ¶ 13; C. Defs. SOF ¶ 63.) Shortly after Emerald was formed, on December 31, 1999, Defendants Pedersen and Donald Flynn, along with the other investors, entered into a Shareholders' Agreement. (Trustee's SOF ¶ 63; C. Defs.' SOF ¶ 239.) The Agreement included a provision that required compliance with IGB rules:

> Each shareholder shall cooperate with the Corporation and the Venture to provide any disclosure information to the IGB and take any actions necessary to secure the preliminary approval and license to operate the business of the Venture. Upon issuance of said license, each Shareholder further agrees to comply with the [Riverboat Gambling] Act and all rules and orders of the IGB and shall not commit any acts which would jeopardize the license or a renewal

---

[3]     Pinpoint cites for exhibits refer to the PDF page number and not any internal pagination.

thereof.

(PX1008 at 120, ¶ 10.)  At least initially, life on the Mississippi appeared to be profitable.  In 1993, Emerald's first full year of operation, the company generated $32 million in gross receipts. (Trustee's SOF ¶ 90.)

By 1994, however, problems emerged.  First, Emerald received a Disciplinary Complaint from the IGB on December 1, 1994 for failure to obtain IGB approval before changing the corporation's equity and debt capitalization.  (PX332; Trustee's SOF ¶ 94.)  Specifically, Emerald sought to restructure the debt it had acquired when it purchased the Jo Daviess Corporation (PX332; Trustee's SOF ¶ 94.)  Emerald entered into two new loan agreements to provide funds to pay off the corporation's outstanding debts.  (PX332 at 2, ¶¶ 8–10.)  Emerald did not seek or obtain the required IGB approval for the new loan agreements, however, and also failed to notify the IGB of the source of the funds.  (PX332 at 2, ¶ 11.)  In its Disciplinary Complaint, the IGB found that Emerald had violated two IGB rules.  (PX332 at 3.)  IGB also fined Emerald $30,000 for the violations.  (PX332 at 3.)  It was Defendant Joseph McQuaid, who later became a principal of Emerald but was at the time working for the IGB, who signed the Disciplinary Complaint on the agency's behalf.  (PX332 at 3; Trustee's SOF ¶ 94.)

A second source of concern for the corporation was competition:  The Iowa riverboat casinos and a dog track opened in Dubuque, Iowa.  (C. Defs.' SOF ¶ 69.)  The Silver Eagle remained subject to Illinois' cruise protocol, which required that a riverboat leave the dock and be floating in the Mississippi River before any gaming operations could take place.  (*Id.* at ¶ 70.) But in 1994, Iowa lifted its cruise protocol and began to allow dockside gambling, so that patrons could come and go freely, making Iowa casinos more attractive to potential patrons. (*Id.*)  Furthermore, the dog track in Iowa provided patrons with access to slot machines, creating still more competition.  (*Id.*)

On February 1, 1995, in response to these financial challenges, Emerald hired Joseph McQuaid, who had previously been employed at the IGB, to manage development and

compliance. (C. Defs.' SOF ¶ 6.) Emerald operated the Silver Eagle through Aerie Hotels & Resorts Management, which was owned by Pedersen. (Trustee's SOF ¶ 92.) McQuaid initially worked for Emerald through Aerie. (Trustee's SOF ¶ 55.) Tasked with addressing Emerald's deteriorating market position, McQuaid quickly concluded that the only remedy was to relocate the casino. (C. Defs.' SOF ¶ 118.) In 1995, McQuaid, on behalf of Emerald, petitioned the IGB to relocate the license to the Vermillion River at Danville, a market less vulnerable to competition from Iowa. (PX338 at 2; C. Defs.' SOF ¶ 118.) The IGB renewed Emerald's license in July of 1995 (Trustee's SOF ¶ 96), but determined that it lacked authority to authorize a relocation of the license. (Tr. at 508.) In September, in response to an inquiry from Senator James "Pate" Phillip, the Illinois Attorney General issued an opinion seconding the IGB's conclusion that it lacked authority to relocate Emerald's license. (PX338.) By December of 1995, confined to its East Dubuque location, the Silver Eagle's business languished and the company shut down its gaming operations. (Trustee's SOF ¶ 96.)

### B. Donald Flynn takes control of Emerald

In 1996, while the Silver Eagle was still shuttered, Donald Flynn took on a much more active role in Emerald and invested in a second of Pedersen's casino projects: HP of Indiana, Inc., an Indiana corporation. At the time, HP of Indiana was not operating a casino, but Donald Flynn's team eventually opened one, the Blue Chip, in Michigan City, Indiana. (*See* C. Defs.' SOF ¶¶ 73, 108.) Donald Flynn made significant investments in HP of Indiana to get the Blue Chip Casino up and running. (*See id.*)

According to Defendants, Donald Flynn was primarily interested in investing in HP of Indiana, but Peer Pedersen required that he invest in Emerald as well. (C. Defs.' SOF ¶ 73.) Donald Flynn, therefore, also entered into a series of agreements to provide capital to Emerald in exchange for Emerald stock or stock options. (Trustee's SOF ¶¶ 19–21; *see also* C. Defs.' SOF ¶ 73 ) ("in the summer of 1996, Donald Flynn increased his investment in HP"). Buoyed by the infusion of capital to Emerald, the Silver Eagle re-opened in May or June of 1996.

(Trustee's SOF ¶ 96; C. Defs.' SOF ¶ 71.) Donald Flynn's stock purchases increased his ownership to 40%. (Trustee's SOF ¶ 20.) In exchange for this investment in Emerald, Pedersen granted Donald Flynn control over Emerald's Board and discretion over the officers. (PX899 at 17, 19; Peer Pedersen Estate's Proposed Findings of Fact & Conclusions of Law [241], hereinafter "Pedersen's SOF," ¶¶ 3–4.) The Stock Purchase Agreement executed by Emerald and Donald Flynn specifically stated that so long as Donald Flynn was the largest shareholder, "the Company shall take all actions within its control to cause a majority of the Company's board of directors to be designees" of Donald Flynn. (PX899 at 17.) Furthermore, Emerald promised to deliver "the written resignations of the directors of the Company and the written resignations of such officers of the Company as may be requested by" Donald Flynn. (*Id.* at 19.) Donald Flynn did in fact proceed to replace Emerald's management team with his own. On June 7, 1996, Pedersen wrote a letter assuring Donald Flynn that Flynn would receive control of Emerald's management at the "earliest possible date." (PX528.) Later that month, on June 23, 1996, Pedersen resigned his position as President. (PX1316 at 69.) Donald Flynn also terminated Emerald's contract with Aerie Hotels & Resorts Management, which was Pedersen's company, and had been running the casino until then. (Trustee's SOF ¶ 101; C. Defs.' SOF ¶¶ 596-97.) After obtaining control of both Emerald and HP of Indiana, Donald Flynn installed essentially the same management team to run both corporations. (*See* C. Defs.' SOF ¶ 109.)

Although Pedersen had transferred management control to Donald Flynn, Pedersen did retain his own shares in the company and his position on the Board of Directors. (Trustee's SOF ¶¶ 9, 12.) On September 9, 1996, as part of the leadership transition, Donald Flynn also became a member of the Board of Directors, consisting at that time of Eugene Heytow, Peer Pedersen, and Donald Flynn. (Trustee's SOF ¶ 102; C. Defs.' ¶ 74.)

The management team at Emerald overlapped substantially with the team at Blue Chip. (*See* C. Defs.' SOF ¶ 109) ("Each of the Officer Defendants was a member of Blue Chip's

7

management team.") Defendant Kevin Larson was appointed President of both casinos and the Chief Operating Officer of Blue Chip Casino. (Trustee's SOF ¶¶ 42-43; C. Defs.' SOF ¶¶ 16, 21.) Joseph McQuaid, who was the Vice President of Development and Compliance at Blue Chip, became Vice President of Emerald (PX676 at 3; PX1316 at 67; Trustee's SOF ¶¶ 57, 102), and was tasked with development and compliance. (C. Defs.' SOF ¶ 6.) In 1996, Defendant John McMahon joined Emerald as Director of Finance and worked for Blue Chip as the Chief Financial Officer and Senior Vice President. (C. Defs.' SOF ¶¶ 1, 3.)[4] Donald Flynn stepped into the roles of Secretary, Treasurer, and Vice President of Emerald. (PX1316 at 67; Trustee's SOF ¶ 102.) The management staff for the two casinos also began sharing office space. (Trustee's SOF ¶ 28; C. Defs.' SOF ¶111.)

In 1996, Defendant Kevin Flynn, Donald Flynn's son, was named Blue Chip's Chief Executive Officer and the Chairman of the Board. (C. Defs.' SOF ¶ 29.) Emerald had no named CEO at this time. (PX1316 at 1) (listing original officers.) According to the Trustee, Kevin Flynn was actively managing Emerald's day-to-day operations and routinely acting on behalf of Emerald in negotiations, although he was not officially employed by Emerald. (Trustee's SOF ¶ 29.) Defendants acknowledge Kevin Flynn's presence and participation at several important meetings, but they maintain that he was simply attending on behalf of his father, Donald Flynn, who had entered partial retirement and was frequently traveling on his boat. (C. Defs.' SOF ¶ 77.) In a later investigation, the IGB concluded that Kevin Flynn had acted as Emerald's primary spokesperson in negotiations and entered into agreements on behalf of Emerald as early as 1997, and that Kevin Flynn's statements minimizing that activity

---

[4] The Trustee alleges that McMahon only officially worked for Blue Chip Casino, but in practice functioned as the Chief Financial Officer of Emerald from 1996 on. (Trustee's SOF ¶ 37.) The trial testimony suggests he was working for both Emerald and Blue Chip beginning in 1996. (*See* Bankr. Tr. at 1263-65 (McMahon stating that he worked at Blue Chip during the same time period); Tr. 91 (McMahon stating that he worked at Emerald in 1996).) It is undisputed that McMahon performed financial management functions for Emerald beginning in 1996. (Trustee's SOF ¶ 37; C. Defs.' SOF ¶ 1.)

constituted "dissembl[ing]." (PX162 at 16, 17.)

Finally, Defendant Walter Hanley worked for Blue Chip as Senior Vice-President, General Counsel, and Secretary. (Trustee's SOF ¶ 49; C. Defs.' SOF ¶ 109.) The Trustee asserts that Hanley, who attended all but one of Emerald's board meetings, was also a *de facto* manager of Emerald. (Trustee's SOF ¶ 52.) Defendants insist, however, that Hanley's only function at these meetings was to compile minutes. (C. Defs.' SOF ¶ 117.)

Shortly after Donald Flynn took control of Emerald, the IGB issued a second Disciplinary Complaint on July 24, 1996. (PX125; Trustee's SOF ¶ 103; C. Defs. SOF ¶ 99.) This Complaint charged Emerald with (1) failing to disclose or seek IGB approval for a stock option that Donald Flynn had received in exchange for his providing loans and capital to Emerald and (2) failing to disclose or seek IGB approval for loans from Pedersen and Heytow to Emerald. (PX125 at 2–3; Trustee's SOF ¶¶ 103–04; C. Defs. SOF ¶ 99.) On June 14, 1996, the IGB discovered Donald Flynn's receipt of this stock option, and on July 19, 1996, the IGB learned about the loans from Heytow and Pedersen, both as a result of Emerald's letters to the IGB disclosing those transactions. (PX125 at 2–3; Trustee's SOF ¶ 103.) The IGB concluded that Emerald had violated IGB Rule 230(d)(3), 86 ILL. ADMIN. CODE § 3000.230(d), which requires licensees to immediately inform the IGB of and obtain approval for a change in equity or capitalization.[5] (PX125 at 3.) The IGB fined Emerald $10,000 (PX125 at 3–4), which Emerald paid without contesting the Disciplinary complaint. (Trustee's SOF ¶ 105.) Because the infusion of capital had shored up the company's finances, however, the IGB agreed in July 1996 to renew Emerald's license for a period of one year beginning August 1, 1996. (PX 906; Trustee's SOF ¶ 108; C. Defs.' SOF ¶ 88.) In a Financial Obligation and Licensure Agreement with the IGB, Emerald agreed, among other conditions for the one-year renewal, to secure at least $3 million in credit to pay its other debt obligations. (Trustee's SOF ¶ 108.) After the

---

[5] For convenience, a list of IGB rules relevant here is attached as Appendix B to this opinion.

license was renewed, Larson, acting as President of Emerald, executed a $3 million Credit Agreement with Donald Flynn, Eugene Heytow, and Peer Pedersen as lenders. (Trustee's SOF ¶ 112.)

Unfortunately, the $3 million credit line was not enough to meet the needs of the Silver Eagle. By February 20, 1997, Kevin Larson sought IGB approval from Administrator Michael Belletire for two more loans from the shareholders to Emerald totaling $2.5 million dollars. (PX924; PX933; Trustee's SOF ¶¶ 116–17; C. Defs.' SOF ¶ 91.) Administrator Belletire approved Emerald's request for the loans on February 21, 1997 and April 22, 1997. (PX925; PX938; Trustee's SOF ¶¶ 116–17; C. Defs.' SOF ¶ 91.)

Also in the spring of 1997, Emerald sought to renew its license for an additional year, submitting a Renewal Application on April 10, 1997. (PX363 at 1; Trustee's SOF ¶ 121; C. Defs.' SOF ¶ 94.) The IGB initially cited deficiencies in the Renewal Application and requested additional information (PX363; Trustee's SOF ¶ 121); then on June 24, 1997, the IGB unanimously voted to deny Emerald's Renewal Application. (PX129; Trustee's SOF ¶ 122; C. Defs.' SOF ¶ 94.) In a letter from Administrator Belletire, the IGB cited six standards that Emerald had failed to meet: Emerald "[1] Submitted a non-responsive application. [2] Maintains an inadequate gaming operation. [3] Lacks financial viability. [4] Exhibits significant compliance shortcomings. [5] Does not provide for positive economic development and impact. [6] Does not adhere to the overall requirements of the Act." (PX129 at 2.) The IGB focused primarily on the Silver Eagle's financial difficulties, but also asserted that Emerald had violated IGB Rule 236(b)(5), 86 ILL. ADMIN. CODE § 3000.236(b)(5). (PX129 at 6.) One of the shortcomings was that Emerald "was subject to discipline during the past year for failing to disclose and obtain approval for certain financial transactions," a reference to the second Disciplinary Complaint. (PX129 at 6.) Following the notice of denial, Emerald ceased operations at the Silver Eagle on July 29, 1997; the casino never opened again. (Trustee's SOF ¶ 124; C. Defs.' SOF ¶ 101.)

In August of 1997, Emerald requested an administrative hearing to review the IGB's

decision to deny the Renewal Application. (Trustee's SOF ¶ 126.) Emerald retained the license during the pendency of the appeal (Trustee's SOF ¶ 123; C. Defs.' SOF ¶ 104), but had no plan to re-open the Silver Eagle in East Dubuque. Instead, Emerald's stated goal in pursuing the appeal was to delay the loss of the license long enough to obtain legislative approval for relocation of the license. (C. Defs.' SOF ¶ 104.)

### C. Emerald lobbies for relocation

Over the course of the next few years, until 1999, while the administrative hearings were ongoing, various members of Emerald's management team spent time lobbying the Illinois General Assembly to revise the Illinois Riverboat Gambling Act in order to allow Emerald to relocate its license. (*See* C. Defs.' SOF ¶ 119.) Donald Flynn provided funding for the lobbying activities. (*Id.* at ¶ 120.) Kevin Flynn, although not technically employed by Emerald, reported back to Donald Flynn, keeping him up to date on the lobbying activities and how the money had been spent. (C. Defs.' SOF ¶ 120.) Kevin Flynn also attended several meetings with lobbyists during this time. (Tr. 2660:17–20; Trustee's SOF ¶ 299.) Joseph McQuaid oversaw the lobbying efforts and traveled to Springfield to meet with the lobbyists Emerald had hired. (C. Defs.' SOF ¶ 122.)

Starting in November 1998, during the lobbying efforts, there were a handful of meetings between Kevin Flynn, Joseph McQuaid, Donald Stephens, the Mayor of the Village of Rosemont, and representatives of two other organizations, the Davis Companies and Duchossois Industries. (Trustee's SOF ¶ 260, 272, 274-75, 277-78; 285; 289; C. Defs.' SOF ¶ 133, 135, 495-96, 499-500, 504, 515.) Marvin Davis, a principal and owner of the Davis Companies, was an entrepreneur involved in real estate development and other businesses. (C. Defs.' SOF ¶ 488.) Richard Duchossois was the owner of Duchossois Industries, a company which owned Arlington International Racecourse, a horse racing track in Arlington Heights, Illinois. (C. Defs.' SOF ¶ 133.) The Trustee alleges that the Davis Companies and Duchossois Industries were interested in investing in a relocated casino, and that at these

meetings, McQuaid and Kevin Flynn, agreed, on behalf of Emerald, to move the license to Rosemont and that Kevin Flynn agreed to sell ownership interests in Emerald to Davis, Duchossois, and to the Mayor of Rosemont upon relocation of the casino. (Trustee's SOF ¶¶ 257, 330.) The Trustee also asserts that after the joint ownership deal was reached, in December of 1998, Davis and Duchossois worked with Kevin Flynn and other principals of Emerald on a joint lobbying strategy to obtain legislation that would permit relocation of Emerald's license. (Trustee's SOF ¶ 294.) The IGB, in its later investigation, found that although Emerald planned to move to Rosemont as early as 1998, Emerald's principals did not disclose that plan to the IGB until July 1999. (PX162 at 10.) The IGB found, further, that Kevin Flynn and McQuaid did enter into agreements to sell ownership interests, and further that Emerald did not inform the IGB of these agreements. (PX162 at 7-8.) Defendants maintain that no agreement to sell ownership interests ever existed and that the joint lobbying activities were no more than an effort to secure mutually beneficial legislation. (C. Defs.' SOF ¶¶ 506, 520.)

After several failed attempts in previous legislative sessions, in 1999 the lobbying activities bore fruit. On May 25, 1999, the Illinois General Assembly passed Public Act 91-40 which amended the Riverboat Gambling Act to allow relocation of Emerald's license. (Trustee's SOF ¶ 129; C. Defs.' SOF ¶¶ 141-42.) Governor Ryan signed the bill into law on June 25, 1999. (Trustee's SOF ¶ 129; C. Defs.' SOF ¶ 142.) The new legislation added Section 11.2 to the Act. In language directly beneficial to Emerald, Section 11.2 provided:

> (a) A licensee that was not conducting riverboat gambling on January 1, 1998 may apply to the Board for renewal and approval of relocation to a new home dock location authorized under Section 3(c) *and the Board shall grant the application and approval* upon receipt by the licensee of approval from the new municipality or county as the case may be, in which the licensee wishes to relocate pursuant to Section 7(j).

230 ILCS 10/11.2 (emphasis added). Emerald, the only licensee that was not conducting riverboat gambling on January 1, 1998, was the only entity who could take advantage of Section 11.2. (C. Defs.' SOF ¶ 144.) The legislation also imposed a requirement that the relocated

licensee provide investment opportunities for minority and female investors:

> (b) Any licensee that relocates its home dock pursuant to this Section shall attain a level of at least 20% minority person and female ownership at least 16% and 4% respectively, within a time period prescribed by the Board, but not to exceed 12 months from the date the licensee begins conducting gambling at the new home dock location. The 12-month period shall be extended by the amount of time necessary to conduct a background investigation pursuant to Section 6. For purposes of this Section, the terms "female" and "minority person" have the meanings provided in Section 2 of the Business Enterprise for Minorities, Females, and Persons with Disabilities Act.

230 ILCS 10/11.2. Just weeks before the legislation passed, on May 5, 1999, an Administrative Law Judge had upheld the IGB's decision to deny Emerald's 1997 Renewal Application. (Trustee's SOF ¶ 128; C. Defs.' SOF ¶ 139.) The IGB later determined that the new legislation rendered the ALJ's decision moot and instead began developing a new renewal application form to conform with the new statutory language. (Trustee's SOF ¶¶ 134–35.)

### D.    1999: Emerald's golden year

Just after passage of the legislation allowing Emerald to relocate, Emerald underwent several changes in leadership, at least on paper. On June 23, 1999, the Board of Directors approved a new management structure for Emerald. (PX1316 at 125–26.) Donald Flynn stepped down from his positions as Secretary, Treasurer, and Vice-President. (Trustee's SOF ¶ 22.) John McMahon, Kevin Larson, and Joseph McQuaid essentially retained their previous functions, but were awarded new titles: McMahon was named a Senior Vice President, the Chief Financial Officer, and Treasurer (PX1316 at 126), after serving as director of finance from 1996. (C. Defs.' SOF ¶ 1.) McQuaid was named Senior Vice President of Development and Compliance (PX1316 at 126) after being hired for development in compliance in 1995 and serving as Vice President starting in 1996. (PX1316 at 67; C. Defs.' SOF ¶ 6.) Larson maintained his position as President but was also named Chief Operating Officer of Emerald. (PX1316 at 126; Trustee's SOF ¶ 46; C. Defs.' SOF ¶ 151.) Larson and McQuaid were also elected to the Board of Directors. (PX1316 at 124.)

The Board of Directors officially named Kevin Flynn and Walter Hanley officers of

Emerald. Hanley was named Senior Vice President, Secretary, and General Counsel. (PX1316 at 126.) Kevin Flynn was named Chairman of the Board and was appointed to the new position of Chief Executive Officer. (PX1316 at 126; C. Defs.' SOF ¶ 151.) The addition of Kevin Flynn and Walter Hanley was a mere formality, according to the Trustee. She alleges that both Flynn and Hanley had been acting on behalf of Emerald in practice since 1996 when they started working for Blue Chip and sharing offices with Emerald. (Trustee's SOF ¶ 29.) According to the Trustee, Larson served primarily as a figurehead; Kevin Flynn had been managing the operations of Emerald since 1996. (Trustee's SOF ¶ 102.) The IGB itself later found in its Final Board Order that Kevin Flynn had been acting on behalf of Emerald prior to his appointment as CEO in 1999 and that he had misled the IGB about the extent of his involvement with Emerald. (PX162 at 18.) The IGB did not make any findings with respect to Walter Hanley. (*See* PX162.)

Also at the June 23, 1999 Board meeting, the Board of Directors approved a Restricted Stock Award Plan (PX1316 at 130), and several agreements to sell restricted stock under the Plan. (PX521; PX1316 at 113.) The Restricted Stock Award Plan was intended to provide "grants of awards of Restricted stock" to "key officers and employees" as part of their compensation. (PX521 at 2.) By its terms, the Plan would "become effective on June 23, 1999 (subject to approval, to the extent required, by the Illinois Gaming Board or its Administrator)." (PX521 at 2.) In a letter dated June 30, 1999, McQuaid notified the IGB of the Restricted Stock Award Plan and asked for prompt consideration of the Plan. (PX304 at 1.) McQuaid's letter also included a document titled "Proposed Awards on June 23, 1999," listing the amounts of shares issued to Emerald employees under the Restricted Stock Plan. (*Id.* at 14.)

Emerald did not, however, wait for IGB approval before executing the Stock Agreements with its "key officers and employees." John McMahon, Kevin Larson, Joseph McQuaid, Kevin Flynn, and Walter Hanley ("Officer Defendants") each signed a Restricted Stock Agreement on June 23, 1999, under which each was awarded Emerald stock subject to the terms of the Restricted Stock Award Plan. (PX521 at 14, 22, 26, 30, 34; Trustee's SOF ¶ 76; C. Defs.' SOF

14

¶ 155.) On July 26, 1999, after Emerald had issued the stock certificates, the IGB responded to McQuaid's letter. (PX521 at 43.) The IGB explained that Emerald did not need approval to adopt the Restricted Stock Award Plan, but did need to obtain IGB approval prior to transferring any ownership interests. (PX521 at 43.) IGB Rule 235(a) only permits the transfers of ownership interests in a gaming license "with leave of the Board." 86 ILL. ADMIN. CODE § 3000.235(a). Furthermore, any individual shareholder of a company with a gaming license must submit an application, called a Personal Disclosure Form 1 ("PDF 1") so that the IGB can investigate and determine the "suitability" of the prospective shareholder. 86 ILL. ADMIN. CODE § 3000.235(a)(1). The IGB recommended that the stock be put in escrow until the IGB had approved the shareholders. (PX521 at 43.) The IGB never approved the Defendants as shareholders. (C. Defs.' SOF ¶ 251.)

Instead of waiting for IGB approval, Emerald began treating Officer Defendants as all other existing shareholders. They were each issued certificates for their stock. (PX521 at 14, 22, 26, 30, 34; Trustee's SOF ¶ 76.) Defendants assert that the shares were held in escrow, but admit that they were not held by a neutral third party; instead, they were held in Hanley's own office. (C. Defs.' SOF ¶ 251; *see also* Bankr. Tr. 2745:19–2746:24 (Hanley testifying that the "corporation held the shares")).) Practically speaking, Hanley was therefore holding his own shares in "escrow." Hanley testified at the bankruptcy trial that he does not believe that "escrow" means third-party escrow. (Bankruptcy Tr. 2744:13–47:11; C. Defs.' SOF ¶ 319.) Officer Defendants were also allowed to attend shareholder meetings and vote their shares. (Trustee's SOF ¶ 81; C. Defs.' SOF ¶ 160 (acknowledging that Restricted Stock Plan participants would be allowed to vote their shares).) They also entered into the same Amended Shareholders' Agreement on August 6, 1999 that existing shareholders, including Donald Flynn and Peer Pedersen, had signed. (PX1008 at 36, 39–41, 43.) The parties do not dispute that Donald Flynn and Peer Pedersen are Emerald shareholders. (*See* PX880 ¶ 406; Donald F. Flynn Estate's Proposed Findings of Fact & Conclusions of Law [247], hereinafter "D. Flynn's

SOF," ¶¶ 275–79.)  In all material respects, McMahon, Larson, McQuaid, Kevin Flynn and Hanley were treated as shareholders, as well, despite lacking IGB approval.

The Amended Shareholders Agreement, signed by all Defendants, updated the provision in the original Shareholders' Agreement that required shareholders to comply with IGB Rules:

> Each Shareholder shall cooperate with the Corporation to provide any disclosure information to the IGB and take any actions necessary to secure the renewal of the Corporation's gaming license.  Each Shareholder further agrees to comply with the Act and all rules and orders of the IGB and shall not commit any acts which would jeopardize the license or a renewal thereof.

(PX1008 at 33 ¶ 10.)  Prior to finalizing the Amendments, Emerald's General Counsel, Walter Hanley consulted outside counsel from two law firms for advice on making amendments to the original Shareholders' Agreement.  (C. Defs.' SOF ¶¶ 240–42.)  One of these attorneys, Thomas Brett, testified that "it was important to include paragraph 10 because the operations of Emerald are going to be regulated by the IGB."  (Bankr. Tr. 2435:12-21.)  Officer Defendants nevertheless now assert that they are not bound by the Shareholders' Agreement because, absent IGB approval, they never became shareholders under the Agreement.  (C. Defs.' SOF ¶¶ 249–53.)  The Trustee contends that Defendants were indeed bound; they consistently represented themselves as shareholders after signing the Amended Shareholders' Agreement, and Emerald consistently treated Defendants as shareholders.  (Trustee's SOF ¶¶ 81–88.)

### E.    An unfortunate association: Emerald relocates in Rosemont

The new team installed by Donald Flynn in June of 1999 began to take significant steps towards building a casino in Rosemont almost immediately after Section 11.2 became law.  On June 30, only five days after the Governor signed Public Act 91-40 into law, Joseph McQuaid sent a letter to the Village of Rosemont, requesting approval to relocate Emerald.  (PX307 at 3; Trustee's SOF ¶ 131.)  Mayor Donald Stephens replied the same day, stating that Rosemont would be pleased to welcome Emerald.  (PX307 at 4; Trustee's SOF ¶ 133; C. Defs.' SOF ¶ 174.)  On July 7, 1999, the Village of Rosemont officially approved the relocation of the

16

casino.  (PX307 at 6-10; Trustee's SOF ¶ 133; C. Defs.' SOF ¶ 174.)

Defendants proceeded promptly to negotiate with Rosemont and initiate construction. As they read the language of Section 11.2 of the Riverboat Gambling Act, the use of the word "shall" in that provision meant that the IGB was required to grant the renewal application for the new location immediately once Emerald acquired approval from the new municipality.  (C. Defs.' SOF ¶ 148.)  Defendants also took note of Section 7(e) of the Riverboat Gambling Act, which provides: "the Board may revoke the owners' license of a licensee which fails to begin conducting gambling within 15 months of receipt of the Board's approval of the application if the Board determines that license revocation is in the best interests of the State."  230 ILCS 10/7(e). Although the statutory language implies that the 15-month clock starts upon IGB approval, Defendants, reading these two provisions together, assert that they believed the 15-month period would begin to run as soon as Emerald submitted its application to the IGB for renewal and relocation.  (C. Defs.' SOF ¶¶ 162–64.)  Larson also believed, based on his prior experience with the IGB, that the IGB would want Emerald to start making progress on the casino project as soon as possible in order to generate jobs and tax revenues.  (C. Defs.' SOF ¶ 168.)

The IGB spent several months revising the renewal application form after the passage of Section 11.2 in order to ensure the new form complied with the statute.  (C. Defs.' SOF ¶¶ 225–26.)  On September 22, 1999, the IGB sent a copy of the newly-revised renewal application form to Emerald, specifically to Joseph McQuaid in his capacity as Vice President of Emerald. (PX544; Trustee's SOF ¶ 136; C. Defs.' SOF ¶ 285.)  McQuaid prepared the second Renewal Application, with the assistance of Hanley, Larson, and McMahon.  (C. Defs.' SOF ¶ 287.)  On September 24, 1999, Emerald submitted a completed application for renewal of its license and for permission to move to Rosemont.  (Trustee's SOF ¶ 138; C. Defs.' SOF ¶ 287.)

Even before Emerald had submitted its Renewal Application, Defendants had been making arrangements with the Village of Rosemont to lease from Rosemont the land on which

Emerald wanted to build the casino. (Trustee's SOF ¶ 362.) From July to December of 1999, Emerald and Rosemont executed several documents, in the form of letters, that memorialized the terms of the lease agreement and allowed Emerald to start construction prior to finalizing that agreement. (PX192; PX365; PX367; PX377; PX380.) Emerald did not disclose these documents, created between July and December 1999, to the IGB until December 5, 2000. (PX1106; Trustee's SOF ¶ 403.) Defendants contend Emerald was not obligated to disclose them earlier because these documents were not binding or final agreements. (C. Defs.' SOF ¶ 305.) The IGB, however, ultimately concluded that Emerald had violated regulations by failing to disclose the draft agreements. (PX162 at 13–14.) Emerald and Rosemont executed a final Lease and Development Agreement on February 10, 2000 and did send a copy of that final agreement to the IGB, but did not ever obtain IGB prior approval. (PX188; Trustee's SOF ¶¶ 392, 394; C. Defs.' SOF ¶ 568.)

Emerald and Rosemont quickly began construction activities at the Rosemont site. Site clearing started in July and August 1999 (C. Defs.' SOF ¶ 227), and actual construction activities began in October of 1999. (Trustee's SOF ¶ 477; C. Defs.' SOF ¶¶ 383, 385) (citing DX782–84, DX786, DX788–89, DX791, photographs taken of the construction site at this time.) In order to complete this construction work, Emerald reached out to and entered into contracts with various construction companies, architects, and contractors. Some meetings occurred even before the legislation was passed. (Trustee's SOF ¶ 421.) After its passage, from June 1999 through January 2000, several of the Defendants, including Kevin Flynn, John McMahon, Joseph McQuaid, Kevin Larson, and Walter Hanley attended meetings with various companies and authorized contracts to perform construction, engineering, and architectural services. (Trustee's SOF ¶¶ 421–440.)

The Trustee alleges that Emerald failed to disclose these construction agreements to the IGB, despite the fact that McQuaid, Hanley, and McMahon attended several meetings with IGB staff and received several requests for disclosures of construction agreements between

September 30, 1999 and January 25, 2000.  (Trustee's SOF ¶ 441.)  Defendants claim that they disclosed the construction agreements when they submitted the Renewal Application on September 24, 1999.  (C. Defs.' SOF ¶ 304.)  The Renewal Application disclosed that Emerald had "engaged" several contractors, but McQuaid, who submitted it, did not include (1) an existing letter of intent that Emerald had executed with Aria Construction, (PX222 at 3; PX224 at 1), or (2) any documents that showed that two other contractors had performed services and that Emerald had incurred costs.  (PX245 at 3; PX402.)   The IGB found that merely disclosing that Emerald had "engaged" these contractors was insufficient and concluded that Emerald violated IGB rules by failing to disclose the actual agreements.  (PX162 at 31–32; PX418 at 54.) On January 31, 2000, after several rounds of requests from the IGB and unsatisfying disclosures by Hanley and McQuaid, the IGB sent Emerald a broadly-worded request for "all written and/or oral contracts, arrangements, work orders, change orders, engagements, hires, commissions of work, requests for performance, exchanges of mutual promises, letters of intent, etc. entered into since July 1, 1999 by Emerald Casino, Inc.," and specifically draft agreements. (PX72 at 1.)  Hanley, with the assistance of McQuaid, responded in a letter dated February 14, 2000, enclosing a list of "completed written agreements," "agreements not yet fully executed," and "other agreements." (PX405 at 10–11; Trustee's SOF ¶ 444; C. Defs.' SOF ¶ 423.)  Even in this communication, however, Hanley and McQuaid failed to disclose arrangements with several subcontractors.  (PX405 at 10–11.)

To provide financing for the expenses associated with constructing the casino, Emerald began to sell more shares.  (C. Defs.' SOF ¶ 257.)  In August and September 1999, Emerald sold stock to female and minority shareholders as called for by Section 11.2(b) (the "Statutory Investors") with unanimous Board approval.  (Trustee's SOF ¶¶ 603, 610; C. Defs.' SOF ¶ 257.) Joseph McQuaid was responsible for identifying the proposed Statutory Investors.  (C. Defs.' SOF ¶ 260.)  The Trustee contends that Pedersen was involved in preparing the documents necessary to effectuate the sales, (Trustee's SOF ¶ 607), and that Kevin Flynn also met with

some of the Statutory Investors. (Trustee's SOF ¶ 609.) Defendants deny Kevin Flynn's involvement. (C. Defs.' SOF ¶ 271.) Pedersen's involvement appears to be limited to directing one of the attorneys working at his law firm, Thomas Brett, to draft the stock purchase agreements. (Trustee's SOF ¶ 607; Pedersen's SOF ¶ 34.) Although the agreements called for Emerald to return the Statutory Investor's purchase price if the IGB did not approve the investor, Emerald immediately spent the funds it received from the sales of shares, using those funds to pay for the design and construction of the Casino. (Trustee's SOF ¶ 603; C. Defs.' SOF ¶¶ 259, 265.) Defendants maintain that this plan to spend the funds immediately was properly disclosed to the IGB on several occasions, including in the Statutory Investors' applications to the IGB; in letters from Emerald to the IGB in August and early September 1999; in the September 24, 1999 Renewal Application; and at meetings with the IGB between July and October 1999. (C. Defs.' SOF ¶¶ 266–68.) Although the Statutory Investors began submitting applications to the IGB in August and September 1999, the IGB never approved any of Statutory Investors. (C. Defs.' SOF ¶ 269.) There is evidence that the IGB never even began their investigations of the Statutory Investors. (C. Defs.' SOF ¶ 284.)

F.    The IGB doggedly investigates Emerald

After receiving the Renewal Application from Emerald on September 24, 1999, the IGB conducted an investigation of Emerald that continued for the next 16 or 17 months. (Trustee's SOF ¶ 139; C. Defs.' SOF ¶ 284.) The IGB's Administrator, Sergio Acosta, who began that position in July 1999, oversaw the investigation. (Trustee's SOF ¶ 140.) Prior to serving as the IGB Administrator, Acosta had been an Assistant United States Attorney in Chicago, working in the Organized Crime Division, from July 1990 to July 1999. (C. Defs.' SOF ¶ 217.) Acosta returned to the United States Attorney's Office in September 2001. (Bankr. Tr. 309:18–22.) In early 2000, the IGB underwent additional changes in leadership. Gregory Jones, also a former Assistant United States Attorney, became the IGB Chairman. (C. Defs.' SOF ¶ 448.) James Wagner, a 30-year veteran of the FBI, and former head of the FBI's Organized Crime Section in

Chicago, became the IGB's new Deputy Administrator of Investigations. (C. Defs.' SOF ¶ 450.) The new administration had serious concerns about Emerald's intention to relocate to Rosemont because of Acosta's belief that Rosemont officials had connections to organized crime. (C. Defs.' SOF ¶ 645–50.)

During its investigation, the IGB focused on the extent of the construction in Rosemont. On February 22, 2000, the IGB adopted a resolution requiring Emerald to submit to the IGB Administrator a memorandum explaining "a) the reasons the company has failed to comply with the requirements set forth under the Riverboat Gambling Act and Board Rules; and b) the reasons the company should not be required to immediately cease and desist construction in Rosemont." (PX858 at 755–56; C. Defs.' SOF ¶ 461.) On February 24, 2000 Emerald's Board unanimously decided to suspend construction activities in Rosemont until Emerald received IGB approval of its application for renewal and relocation. (C. Defs.' SOF ¶ 466.)

After an extensive investigation of Emerald, its directors, officers, and other key persons, on January 30, 2001, IGB voted (1) to deny Emerald's Renewal Application and (2) to revoke Emerald's license. (PX135 at 35–37; Trustee's SOF ¶ 141: C. Defs.' SOF ¶ 706.) On March 6, 2001, the IGB issued its formal notice of nonrenewal and filed a five-count Complaint for Disciplinary Action against Emerald to revoke Emerald's license. (PX151; Trustee's SOF ¶ 144; C. Defs. SOF ¶ 714.) Emerald answered the Disciplinary Complaint on March 26, 2001, denying any IGB rule violations. (PX41; Trustee's SOF ¶ 145; C. Defs.' SOF ¶ 715.) The administrative hearing on the Disciplinary Complaint began on May 29, 2002 (Trustee's SOF ¶ 148; C. Defs.' SOF ¶ 744), but was swiftly brought to a halt on June 13, 2002, when certain of Emerald's creditors filed an involuntary Chapter 7 bankruptcy proceeding. (Trustee's SOF ¶ 148; C. Defs.' SOF ¶ 802.)

Shortly after the bankruptcy proceedings began, on August 26, 2002, Emerald's Board voted to "terminate[]" several Defendants from their positions as officers and employees of

Emerald including Kevin Flynn, Kevin Larson, Walter Hanley, and Joe McQuaid.[6]  (PX1316 at 214.)   At that point, and for the bulk of the bankruptcy proceeding, John McMahon was Emerald's only employee and officer.[7]  (Trustee's SOF ¶ 3; *see also* PX1316 at 214 (McMahon is appointed as the registered agent.).)   Donald Flynn was elected Chairman of the Board.  (PX1316 at 214; Trustee's SOF ¶ 22.)   The decision to terminate Emerald's remaining officers and employees may have been a function of an attempted settlement agreement with the IGB.  (*See* PX1316 at 214) (Board vote to terminate officers occurred after discussion of Emerald's "obligations under the settlement agreement . . . to develop a plan for operations going forward.")

Both before and during the administrative hearings and bankruptcy proceeding, Emerald attempted to challenge the IGB's action in state court.[8]   On May 21, 2001 Emerald filed suit challenging the IGB's authority to deny its Renewal Application on the ground that Section 11.2 used mandatory language.  *See Emerald Casino, Inc. v. Ill. Gaming Bd.*, 346 Ill. App. 3d 18, 803 N.E.2d 914 (Ill. App. Ct. 1st Dist. 2003).   While the administrative hearings were paused and bankruptcy proceedings were pending, the Illinois Appellate Court ruled in favor of Emerald on that issue.   On December 30, 2003, the First District Appellate Court concluded that the word "shall" in Section 11.2 required the IGB to grant Emerald's Renewal and Relocation Application.  *Emerald Casino*, 346 Ill. App. 3d at 32, 803 N.E.2d 914, 926-28.   The Illinois Appellate Court held, however, that the IGB retained the authority and discretion to pursue revocation proceedings.  *Id.*   On May 25, 2005, after Emerald and the IGB failed to reach a settlement, the revocation proceedings resumed with the Honorable Abner Mikva serving as the Administrative

---

[6]         Though no longer an officer, Hanley continued to provide legal services to Emerald as its "Special Counsel."  (PX1316 at 233.)

[7]         McMahon eventually stepped down as an officer of Emerald on March 20, 2008.  (Trustee's SOF ¶ 38; C. Defs.' SOF ¶ 1.)

[8]         The Emerald casino license has been the subject of a number of legal proceedings.  An overview of the procedural history is set forth in Appendix A to this opinion.

Law Judge. (Trustee's SOF ¶ 149; C. Defs.' SOF ¶ 769.) On November 15, 2005, Judge Mikva issued his determination, recommending that the IGB revoke Emerald's license, based on his findings that Defendants had dissembled about plans to move to Rosemont; had improper connections to organized crime; had failed to disclose: (1) Kevin Flynn's role in managing Emerald, (2) various agreements to sell shares of stock, and (3) agreements with Rosemont and construction professionals; and finally, that the "operation of gaming by Emerald in Rosemont would greatly undermine 'public trust and confidence in that credibility and integrity of the gambling operations and of regulatory process' in Illinois." (PX1231 at 38–39; Trustee's SOF ¶ 150; C. Defs.' SOF ¶ 770.) On December 20, 2005, the IGB issued a final administrative order revoking the license, largely adopting Judge Mikva's findings. (Trustee's SOF ¶ 151; C. Defs.' SOF ¶ 770.)

G.     **The IGB revokes Emerald's license**

The IGB's Final Board Order listed five Counts against Emerald. (PX162 at 32-37.) The conduct that IGB took issue with falls generally into three categories: (1) Emerald's attempted relocation of the casino to Rosemont; (2) Emerald's failure to seek IGB approval or keep the IGB informed of key decisions; and (3) Emerald's failure to obtain pre-approval for transfers of Emerald shares.

- **Emerald's attempted relocation of the casino to Rosemont**

The IGB found that Emerald violated several IGB Rules in its efforts to relocate to Rosemont. Specifically: (a) Emerald failed to disclose agreements between Emerald and Rosemont, which were purportedly entered into prior to the passage of Section 11.2 (PX162 at 33); (b) Emerald failed to disclose construction agreements between Rosemont and Emerald entered into after the passage of Section 11.2 (*Id.*); (c) the terms of the final Lease and Development Agreement between Emerald and Rosemont violated IGB rules by allowing Rosemont to "waive" certain IGB requirements and by committing Emerald to fund a parking garage when it did not have sufficient financing (*Id.* at 34); and (d) Emerald allowed a

construction company with known ties to organized crime to work on the site and allowed individuals with associations to organized crime to purchase stock in Emerald. (*Id.* at 36.)

- **Emerald's failure to seek IGB approval or keep the IGB informed of key decisions**

The IGB concluded that Emerald failed to inform the IGB about Kevin Flynn's involvement in management prior to his appointment as CEO in 1999. (PX162 at 33, 36.) Emerald also failed to inform IGB of construction agreements or keep the IGB informed of the status of construction activities in Rosemont. (PX162 at 33, 36.)

- **Emerald's failure to obtain IGB pre-approval for transfers of shares of Emerald**

The IGB identified several transactions for which Emerald did not obtain IGB pre-approval, including transfers to Emerald insiders, to minority and female investors ("Statutory Investors"), and to outside non-statutory investors. (PX162 at 33–36.) The IGB also cited Emerald for unauthorized transfers of stock to public officials. (PX162 at 11) (identifying one shareholder as a relative of State Representative Ralph Caparelli and "two other public officials.") The other two public officials appear to be Susan Leonis, who was Vice Chairman of the Board of the Chicago Transit Authority (Trustee's SOF ¶¶ 645–46), and Robert Martwick who was the Norwood Park Township Democratic Committeeman and whose son, Robert Martwick, Jr. was the Trustee for the Village of Norridge. (Trustee's SOF ¶¶ 651–52.)

The IGB Final Board Order found that Emerald violated five IGB rules:

- **110 (a):** A holder of any license shall be subject to imposition of fines, suspension or revocation or restriction of such license, or other disciplinary action for any act or failure to act by himself or by his agents or employees that is injurious to the public health, safety, morals, good order and general welfare of the people of the State of Illinois, or that would discredit or tend to discredit the Illinois Gaming industry or the State of Illinois. Without limiting the foregoing, the following acts or omissions may be grounds for such discipline. . . .

    **(5)** Associating with, either socially or in business affairs, or employing persons of notorious or unsavory reputation or who have extensive police records, or who have failed to cooperate with any officially constituted investigatory or administrative body and would adversely affect public confidence and trust in Gaming.

24

- **140(a)** Board licensees and applicants for licenses issued by the Board shall have a continuing duty to disclose promptly any material changes in information provided to the Board. The duty to disclose changes in information shall continue throughout any period of licensure granted by the Board. Board licensees or applicants for licenses must maintain current release of information forms as originally submitted to the Board.

- **140(b):** In addition to and without limiting disclosure of changes of information required under subsection (a), licensees and applicants for licensure shall periodically disclose changes in or new agreements, whether oral or written, relating to:

    **(3)** Construction contracts. . . .

    **(7)** Agreements to sell, grant, gift pledge, hypothecate or otherwise transfer or share an ownership interest or interests in a holder of an Owner's License.

- **235(a):** An ownership interest in an entity with a finding of preliminary suitability or a holder of an Owner's license may only be transferred with leave of the Board. An ownership interest in a business entity, other than a publicly traded corporation, which has an interest in an entity with a finding of preliminary suitability or in a holder of an Owner's license, may only be transferred with leave of the Board.

But the IGB concluded that violation of any one of the rules would have been sufficient to support the revocation of the license. (PX162 at 32.)

### H.    Procedural History

Emerald returned to the Illinois courts, seeking judicial review of the IGB's Final Board Order in the Illinois Appellate Courts. (Trustee's SOF ¶ 152.) This time, Emerald's efforts were less successful. On May 30, 2007, the Illinois Appellate Court affirmed the IGB's Final Board Order, though it concluded that the findings relating to organized crime were "against the manifest weight of the evidence."[9] (*Emerald Casino, Inc. v. Ill. Gaming Bd.*, No. 4-06-0051, 105

---

[9]    The Illinois Appellate Court noted the IGB's concerns that Mayor Stephens and certain of his associates had "connections to organized crime," but concluded that Emerald's contacts did not violate IGB rules because there was no evidence that these individuals had "notorious or unsavory reputations or extensive police records." (PX1233 at 106-07.) The record before this court, as well, includes little evidence of any "organized crime" connections. An IGB preliminary report concerning the IGB's investigation of Emerald, from Acosta to the IGB, stated that IGB "[s]taff randomly inspected the [construction] site and observed construction process after the Renewal Application was submitted [in September 1999]. Random day and night surveillance activities included identifying contractors working and documenting their personal vehicle information. Subsequently, Secretary of State Vehicle

(continued . . . )

(Ill. App. Ct. 4th Dist. May 30, 2007), hereinafter "PX1233.") Emerald petitioned for leave to appeal, but on November 29, 2007, the Illinois Supreme Court refused to hear the case, making the revocation final. *Emerald Casino, Inc. v. Vill. of Rosemont*, 879 N.E.2d 930 (Table) (Ill. 2007).

The bankruptcy action commenced on June 13, 2002, when certain creditors filed an involuntary petition. (Involuntary Petition, *In re: Emerald Casino Inc., Debtor*, No. 02-22977 [1].) On September 10, 2002, the action was converted to a Chapter 11 proceeding. (Order Converting Chapter 7 to Chapter 11 and an Order for Relief Under Chapter 11, *In re: Emerald Casino Inc., Debtor*, No. 02-22977 [113].) Years later, on March 19, 2008, the bankruptcy action was converted back to a Chapter 7 (Order Converting Case Under Chapter 11 To Case Under Chapter 7, *In re: Emerald Casino Inc., Debtor*, No. 02-22977 [1985]), and the Trustee was appointed. (Letter of Appointment, *In re: Emerald Casino Inc., Debtor*, No. 02-22977 [1984].) Over several weeks in 2010, Judge Wedoff of the Bankruptcy Court heard evidence on the Trustee's claims against these Defendants, but never issued findings of fact or conclusions of law, and on January 31, 2012 this court withdrew the reference. *See In re Emerald Casino, Inc.*, 467 B.R. 128 (N.D. Ill. 2012). This court has now reviewed the record from the bankruptcy proceeding, and heard additional evidence as well.

## II.    A casino in Rosemont

The IGB found that Emerald violated IGB Rules 140(a), 140(b)(3), and 110(a) by

---

information queries were conducted through the Law Enforcement Agencies Data System (LEADS). This information was cross-referenced to the listing of subcontractors working on the casino and the parking garage that Emerald supplied. These individuals were cross-referenced to a Cook County Sheriff's Department intelligence list identifying known members of Chicago Area organized crime *and no matches were found.* Additionally, an Illinois Department of Revenue Tax Inquiry was conducted on each of the subcontractors. A list of the registered owners and officers of the companies were compiled from this inquiry. These individuals were cross-referenced to a Cook County Sheriff's Department intelligence list identifying known members of Chicago Area organized crime *and also no matches were found.*" (DX662 at 38–39) (emphasis added.)

withholding information about its efforts to relocate its license to Rosemont. First, the IGB found that Emerald began making efforts to relocate to Rosemont—including an agreement to split ownership interests in a Rosemont casino with the Mayor of Rosemont and two interested investors—before the legislation allowing relocation had passed. The IGB found the alleged pre-legislation agreement violated IGB rules because Emerald failed to disclose the agreement to the IGB. Second, the IGB further found that once the legislation passed, Emerald repeatedly failed to disclose its decision to move to Rosemont and failed to keep the IGB fully informed of (1) its agreements with the Village of Rosemont and (2) the status of construction on the new site. IGB Rules 140(a) and 140(b)(3) and (7) specifically require gaming licensees to disclose these agreements. Finally, the IGB found that the terms of one of the agreements Emerald executed with the Village of Rosemont violated IGB rules.

### A. Emerald lays the groundwork to move to Rosemont

The parties dispute when Emerald decided to relocate the casino to Rosemont and whether any of Defendants made an agreement with the Village of Rosemont to relocate. Defendants maintain that Emerald did not consider Rosemont a viable site until after the legislation passed. (C. Defs.' SOF ¶ 130.) The Trustee alleges, and the IGB concluded, that Emerald in fact made the decision to relocate to Rosemont long before the legislation passed and entered into a secret agreement with the Mayor of Rosemont and other interested investors. (Trustee's SOF ¶ 330.) The IGB inferred the existence of an agreement from several circumstances: (1) Kevin Flynn met in 1997 with Mayor Stephens (PX162 at 7-8); (2) Kevin Flynn and Joseph McQuaid met with representatives of the Davis Companies and Duchossois Industries and, according to the IGB, made deals to sell interests in Emerald (PX162 at 8-9); (3) Emerald, the Davis Companies, and Duchossois Industries engaged in joint lobbying efforts after December 1, 1998 (PX162 at 9); (4) the Davis Companies, Duchossois Industries, certain Defendants, and other Emerald contractors made contributions to Mayor Stephens' campaign fund in October 1999 (PX162 at 10); and (5) the fact that "[e]verybody else seemed to know,"

even before passage of the legislation, that Emerald's license was going to Rosemont. (PX162 at 9-10.) From this, the IGB concluded that Kevin Flynn, on behalf of Emerald, had entered into an agreement to relocate to Rosemont and to "divide the pie" without disclosing the agreement to the IGB, in violation of Rules 140(a) and 140(b)(7) which require disclosure and IGB approval of such agreements.

### 1. Kevin Flynn met with Mayor Donald Stephens in 1997

The Trustee alleges that efforts to relocate to Rosemont began in 1997. Sometime in 1997, Isaac Degen, a friend of Mayor Stephens and principal of Degen & Rosato Construction Company, and Victor Casini, an attorney at Flynn Enterprises, arranged a meeting between Mayor Stephens and Kevin Flynn. (Trustee's SOF ¶¶ 208, 210–11, 213–14; C. Defs.' SOF ¶ 614.) The parties dispute what was discussed at the meeting. While the Trustee asserts, and the IGB concluded, that Kevin Flynn and Mayor Stephens "discussed the possibility of moving the Emerald operation to Rosemont," (Trustee's SOF ¶ 208; *see* PX162 at 16), Defendants maintain that Kevin Flynn requested the meeting because he had heard Mayor Stephens was interested in lobbying for legislation that would allow Rosemont to open a new land-based casino (and not one requiring a waterway), and Kevin Flynn wanted an opportunity to manage a land-based Rosemont casino if Mayor Stephens was successful in that effort. (C. Defs.' SOF ¶ 614.)

Attorney Casini testified that the purpose of the 1997 meeting was to introduce Kevin Flynn to Mayor Stephens because "Kevin Flynn had just completed developing this world-class casino in Indiana" and "[i]t was common knowledge that the mayor of Rosemont was interested in a casino in Rosemont." (Bankr. Tr. 2088:1–8.) Casini denied that the meeting was intended to obtain Mayor Stephens' support for Emerald's relocation. (Bankr. Tr. 2088:9–16.) Isaac Degen, who also was present, testified that "the best [he] recall[s]," is that Kevin Flynn and Mayor Stephens discussed "maybe a license from Galena for a casino coming to—possibly one of the locations was the Village of Rosemont." (Bankr. Tr. 1874:25–1875:3.) Degen did not

recall hearing Kevin Flynn discuss the Blue Chip Casino. (*Id.* 1875:8–12.) Casini testified that he did not recall any specific statements concerning the Blue Chip or Emerald's possible relocation to Rosemont. (Bankr. Tr. 2073:19–2075:4.)

Both at trial and in earlier statements to the IGB, Kevin Flynn maintained that he and Mayor Stephens only discussed Blue Chip at the meeting, and not Emerald's possible relocation of the Silver Eagle operation to Rosemont. (PX1095 at 110 ("The whole notion of Rosemont was not anything that was considered as far as I know until the legislation [allowing relocation] passed."); PX1222 at 31–33 (IGB Disciplinary Proceeding); Bankr. Tr. 3307:12–3309:3; Tr. 2358:2–21.)

Citing an internal memorandum written by Stephen J. O'Neil, a Bell, Boyd & Lloyd attorney retained by Emerald for representation in the *Davis* litigation, described below, the Trustee asserts that Kevin Flynn's testimony, denying any discussion of relocating the Emerald license to Rosemont, is not credible. (Trustee's SOF ¶ 219) (citing PX651 (dated 11/22/99).) The memorandum purports to summarize a November 17, 1999 interview with Kevin Flynn and Joseph McQuaid, and tracks the history of Mayor Stephens' interest in a Rosemont casino. The parties dispute the accuracy of the memorandum. The Trustee observes that Defendants had "less…motive to lie" when talking to their own attorneys. (Trustee's SOF ¶ 255.) Defendants maintain that the memorandum is unreliable because the attorney was hearing the facts for the first time, from five individuals. (C. Defs.' SOF ¶ 529.) Furthermore, the memo was written five days after the meeting and according to the attorney who prepared the memo was "likely based on no notes or sketchy notes." (C. Defs.' SOF ¶ 529) (quoting Bankr. Tr. 1339:9–11.) The memo observes that: "Stephens was not, however, interested in having Davis obtain a gaming license. He was looking for a municipal license, not a relocation of the existing license." (PX651 at 1.) According to the memo, Stephens was looking for a new license so he could pick the management company himself. As the memo notes: "There was some discussion of a land-based casino but Stephens wanted a major, well-known management company. Stephens

wanted ownership of the license in accordance with the following priorities: 1) Rosemont ownership; 2) State ownership; 3) ownership by a Stephens-designated developer." (*Id.* at 2.) Kevin Flynn testified that Mayor Stephens was not interested in having "local" management, instead, Mayor Stephens told Kevin Flynn, "[t]he only thing that I need to determine is whether it's MGM or Mirage or Harrah's." (Tr. 2358:7–16.)

The IGB concluded that "Kevin Flynn lied" concerning the purpose of his meeting with Mayor Stephens. (PX162 at 16.) The version of events set forth in O'Neil's memorandum, however, is not inconsistent with Kevin Flynn's testimony that Mayor Stephens was only interested in a land-based casino (and thus, not interested in Emerald's license for a casino on a waterway), and that Kevin Flynn was seeking the opportunity to manage a land-based casino for Rosemont in the event that an amendment to the Riverboat Gambling Act allowed it.

The court concludes that the Trustee has failed to present sufficient evidence to conclude what exactly was discussed at the meeting in 1997. It appeared to be common knowledge that Mayor Stephens was interested in a land-based casino in Rosemont, and while Kevin Flynn admits that he attended the meeting and that he briefly discussed gaming with Mayor Stephens, he emphasizes that the meeting concerned Blue Chip, and not relocating Emerald's license. This account is consistent with the account in the O'Neil memorandum, in which Kevin Flynn reportedly told his attorneys at Bell, Boyd & Lloyd that Mayor Stephens was interested only in a land-based casino, and that this was discussed at the 1997 meeting. And, while Degen and Casini admit to arranging the meeting, Casini cannot recall what was discussed (Bankr. Tr. 2073:19–2075:4), and Degen (the only witness to testify that relocation was discussed) appears to be uncertain of the accuracy of his own testimony. (Bankr. Tr. 1874:25–1875:3.) There is insufficient evidence to conclude that Kevin Flynn was acting on behalf of Emerald at the 1997 meeting with Mayor Stephens or that he attempted to sell an interest in Emerald or make a deal to relocate to Rosemont.

## 2. The alleged agreement between Emerald, the Davis Companies, and Duchossois Industries

The IGB Final Board Order found that during Emerald's efforts to relocate, prior to the legislation passing, Emerald officials made oral agreements to sell ownership interests in a Rosemont casino to Mayor Stephens, and two companies (Davis Companies and Duchossois Industries) but failed to disclose the agreements to the IGB. (PX162 at 8-9, 17-19.)

The first meeting between any of the Defendants and the Davis Companies took place in 1997, when Kevin Flynn and Michael Colleran, the Chief Financial Officer for the Davis Companies, met at Presidential Towers in Chicago. (Trustee's SOF ¶ 249; C. Defs.' SOF ¶ 490.) There is conflicting testimony about what was said at the meeting and whether or not Kevin Flynn attempted to sell Emerald's license. (Trustee's SOF ¶¶ 253–55; C. Defs.' SOF ¶¶ 490–92.) But the IGB Final Board Order neither refers to this 1997 meeting nor relies on it in its revocation order, instead finding that the undisclosed agreement was reached in late 1998. (PX162 at 8.) The details of the Presidential Towers meeting are therefore not relevant to determine whether an agreement between Davis, Duchossois, and Emerald existed.

During the fall of 1998, there were several meetings between certain Defendants and representatives of the Davis Companies and Duchossois Industries. The parties present significantly different accounts of what happened at these various meetings. The dispute over these meetings has also been the subject of separate litigation between the Davis Companies and Emerald. *See Davis Companies, Inc. v. Emerald Casino, Inc.*, No. 99-c-6822, 2003 WL 22113414 (N.D. Ill. Sept. 11, 2003) (granting Defendants' motion for summary judgment on breach of contract and civil conspiracy claims and denying Defendants' motion with respect to fraudulent misrepresentation claim). The Trustee alleges that Kevin Flynn, acting on behalf of Emerald, entered into an agreement with the Davis Companies and Duchossois Industries to sell ownership interests to those companies. (Trustee's SOF ¶ 257.)

Precisely what Davis and Duchossois purportedly promised in return for the ownership

interests in Emerald is not clear. The Trustee seems to adopt the IGB's suggestion that Davis and Duchossois agreed to support Emerald's lobbying efforts to amend the Riverboat Gambling Act to allow relocation in exchange for an ownership interest in a relocated casino. (PX162 at 8; PX1231 at 7–8; Trustee's SOF ¶¶ 257–63.) Defendants' theory is that the ownership interests were instead part of Davis and Duchossois's proposal to "remedy [Emerald]'s licensure situation." (Tr. 559:5–6; C. Defs.' SOF ¶¶ 496–96.) Specifically, Defendants suggest, Michael Colleran, on behalf of Duchossois Industries, requested that Emerald give up its appeal of the IGB's revocation order and simply surrender the license, so that the license could be re-issued to Rosemont and the Davis Companies could manage the casino. (Tr. 653:5–16; C. Defs.' SOF ¶ 497.) In exchange for giving up the license, Emerald would receive a percentage ownership in the new casino. (Tr. 563:14–20; C. Defs.' SOF ¶ 497.) Kevin Flynn and Defendants ardently maintain that they did not agree to that proposal or reach any other agreement with Davis and Duchossois. (C. Defs.' SOF ¶¶ 506, 518–520.)

The parties do agree on a few basic facts. First, on October 28, 1998, Kevin Flynn, Donald Flynn, and Joseph McQuaid met with Richard Duchossois, the owner of Duchossois Industries and Arlington International Race Course. (Trustee's SOF ¶ 260; C. Defs.' SOF ¶ 133.) Also present at the meeting was David Filkin, the Executive Vice President and General Counsel at Arlington Park (Trustee's SOF ¶ 261; C. Defs.' SOF ¶ 133), and Scott Mordell, President of Arlington Park. (Trustee's SOF ¶ 262; C. Defs.' SOF ¶ 133.) At this meeting, the Emerald representatives expressed Emerald's desire to move its license to a more profitable market. (Trustee's SOF ¶ 267; C. Defs.' SOF ¶ 493.) Kevin Flynn expressed that Rosemont would be a great location for a casino, specifically referring to such a move as a "no-brainer." (Trustee's SOF ¶ 268; C. Defs.' SOF ¶ 493.) Defendants also sought to enlist Duchossois in their relocation lobbying efforts and discussed common legislative goals shared by the gaming and horse racing industries. (Trustee's SOF ¶ 267; C. Defs.' SOF ¶ 493.) After the October 28, 1998 meeting, McQuaid met with Duchossois lobbyist, Jim Fletcher, to discuss the specifics of

coordinating lobbying efforts.  (Trustee's SOF ¶ 272; C. Defs.' SOF ¶ 135.)

The parties also agree that on November 20, 1998, Michael Colleran and Richard Duchossois met to discuss Duchossois' potential involvement in a Rosemont casino and a "potential percentage interest."  (Trustee's SOF ¶ 274; C. Defs.' SOF ¶ 495.)  Furthermore, on November 24, 1998, McQuaid met with Davis lobbyist Gene Reineke and Michael Colleran at the Ritz Carlton Hotel.  (Bankr. Tr. 2250:21–2251:2; C. Defs.' SOF ¶ 496.)  Colleran testified that the meeting was at Mayor Stephen's suggestion.  (Bankr. Tr. 2251:5.)  At the meeting, Colleran presented a proposal to share ownership interests in a Rosemont casino between the Davis Companies, Rosemont, and "the Flynn family."  (Tr. 563:14–564:3; Trustee's SOF ¶ 275.)  Everyone agrees that the meeting did not go well.  (Trustee's SOF ¶ 276.  C. Defs.' SOF ¶ 498.)  Defendants explain that the meeting did not end amicably because Colleran proposed that Emerald surrender its license, so that the IGB could re-assign it to the Village of Rosemont.  (Tr. 562:25–564:7; C. Defs.' SOF ¶ 497.)  Colleran proposed that Rosemont would then enlist Davis to run the casino and "the Flynns" could have a 10% interest.  (Bankr. Tr. 3422:2–14; C. Defs.' SOF ¶ 497.)  McQuaid thought this proposal was "ludicrous" because the IGB "doesn't award a license to a municipality. The municipality doesn't pick the operator."  (Tr. 564:6–11.)  Furthermore, Emerald would be left with the $30 million in debt it had at that time and, without the license, would have no way to recover the lost amount.  (Tr. 564:12–16.)

The next day, November 25, 1998, McQuaid, Colleran, and Mayor Stephens met at a coffee shop in Rosemont.  (Trustee's SOF ¶¶ 277–278; C. Defs.' SOF ¶ 499–500.)  This is where the parties' accounts radically diverge.  Colleran testified that State Representative Ralph Capparelli, whose district included the Rosemont area, was also at the meeting for part of the time.  (Bankr. Tr. 2253:6–10, 2255:2–6.)  The Trustee asserts, based on Colleran's account, that Mayor Stephens successfully brokered a deal between McQuaid and Colleran regarding joint ownership of a Rosemont casino.  (Bankr. Tr. 2254:7–18; Trustee's SOF ¶ 280–81.)  As Colleran reported, he and McQuaid reached an agreement about specific percentage splits in

ownership. (Bankr. Tr. 2254:10–18.) Emerald and Davis would each receive a 37.5% interest, with 20% reserved for Duchossois, and 5% for local investors. (Bankr. Tr. 2254:14–15; Trustee's SOF ¶¶ 280–81.) Colleran believed that the Mayor would designate the local investors who would receive the 5%. (Bankr. Tr. 2255:10–12.) The IGB, on the other hand, in its Final Board Order, based on the recommendations of ALJ Mikva, concluded that the five percent interest was for the Mayor personally. (PX162 at 18.) The IGB interviewed Mayor Stephens in September 2000—as part of its extensive investigation of Emerald before it denied Emerald's Renewal Application. In that sworn interview, Stephens claimed the five percent for local investors "was for me." (PX162 at 18.)

Defendants, relying primarily on the accounts of McQuaid and Kevin Flynn, insist that no agreement was ever reached. McQuaid testified that, although he knew the Mayor and Emerald wanted different things, he met with Mayor Stephens on November 25, 1998 to ensure that Mayor Stephens would not block Emerald's efforts to seek legislation allowing relocation. (Tr. 567:19–568:22; C. Defs.' SOF ¶¶ 501–503.) According to McQuaid, Colleran repeated the proposal he had made the night before, but increased the percentage he offered to the Flynns slightly. (Tr. 573:8–16.) McQuaid testified that Colleran asked McQuaid to present the proposal to Donald Flynn (Tr. 573:17–21), and McQuaid admitted that he agreed to do so. (Tr. 574:1–2.) According to McQuaid, the discussion then shifted towards Emerald's legislative goals, and he and the Mayor quickly realized they had different goals. (Tr. 575:14–17.) The Mayor wanted a land-based casino, while Emerald was still focused on relocating the riverboat casino. (Tr. 576:4–10.) According to McQuaid, the meeting ended shortly thereafter. (Tr. 576:17–19.) McQuaid was satisfied that he had explained Emerald's position and had managed to ensure that Mayor Stephens would not block Emerald's lobbying efforts. (Tr. 577:1–10.)

The parties agree that McQuaid sent Colleran to speak with Kevin Flynn, but disagree about the reason. The Trustee alleges, citing Colleran's testimony, that McQuaid claimed Kevin Flynn was the only one with authority to enter into a joint ownership deal and McQuaid,

therefore, suggested that Colleran meet with Kevin Flynn. (Bankr. Tr. 2254:19–2255:1; Trustee's SOF ¶ 282.) Defendants maintain that McQuaid sent Colleran to Kevin Flynn because Donald Flynn was not interested in speaking to Colleran. (Tr. 580:5–15.) McQuaid apparently acted as the go-between for Colleran and Donald Flynn: First, McQuaid called Donald Flynn to report on his meeting with Mayor Stephens and convey Colleran's proposal about surrendering the license. (Tr. 577:11–578:15.) Donald Flynn was not interested. (Tr. 578:17–19.) When McQuaid called Colleran to let him know that Donald Flynn was not interested in a joint ownership deal, Colleran asked if he might discuss non-gaming interests with Donald Flynn. (Tr. 579:9–16.) McQuaid conveyed that request to Donald Flynn, but Donald Flynn suggested that Colleran speak with Kevin Flynn instead. (Tr. 580:5–15.)

Kevin Flynn and Colleran did meet privately on December 1, 1998. (Trustee's SOF ¶ 285; C. Defs.' SOF ¶ 504.) Based again on Colleran's account, the Trustee alleges that this is the meeting at which an agreement to sell ownership interests in Emerald was ultimately reached. (Trustee's SOF ¶ 285.) Colleran testified that he and Kevin Flynn discussed the same percentage split he had discussed with McQuaid: 37.5% each for Davis and the Flynns, 20% for Duchossois and 5% for local investors. (Bankr. Tr. 2258:2–5.) Colleran testified that he and Kevin Flynn ended the conversation agreeing, at Kevin Flynn's suggestion, to keep the deal confidential. (Bankr. Tr. 2258:8–13, 2259:7.)

Defendants deny that the agreement was reached. (C. Defs.' SOF ¶¶ 506, 518–520.) By Kevin Flynn's account, McQuaid had filled him in on Colleran's proposals before the December 1, 1998 meeting. (Bankr. Tr. 3295:12–13.) At that meeting, Kevin Flynn testified, Colleran did propose a deal in which Emerald would give up its license, the Village of Rosemont would acquire it, and then Davis would take a majority interest, and "the Flynns" would take a minority interest. (Tr. 2641:21–25.) Kevin Flynn admitted that Colleran also spoke about a different deal, one in which the Davis Companies and the Flynns would have equal shares and Duchossois would have a 20% share. (Tr. 2644:14–19.) Kevin Flynn recalled that Colleran

also discussed the tax structure of the proposed entity and stated that "the Flynns" could run the day-to-day operations. (Tr. 2646:1–8.) Kevin Flynn testified that he "stopped [Colleran] and said the casino in Rosemont is illegal," (*see* Bankr. Tr. 3298:19–20), presumably referencing the ban on gaming in Cook County. In response to Kevin Flynn's concerns, Colleran said he had already talked to Duchossois about getting a legislative change. (Bankr. Tr. 3298:21–25.) Specifically, Colleran asserted that Duchossois could get it "taken care of, and for that Davis was going to give Duchossois 20 percent of the casino and the Flynns and Marvin [Davis] would have the rest of it to share equally." (Bankr. Tr. 3298:21–25.) Kevin Flynn responded that he did not think Emerald would lose its license, but "if for some reason that did happen, that he [Colleran] should call us then." (Bankr. Tr. 3299:19–22.) But Kevin Flynn testified that he did not make any deal or agreement with Colleran. (Bankr. Tr. 3299:25.)

Immediately after his conversation with Colleran, Kevin Flynn ran into Richard Duchossois and David Filkin, Duchossois's lawyer, on Michigan Avenue. (Bankr. Tr. 916:1-4; Tr. 2646:9–13.) Kevin Flynn had arranged to meet with the two or them at a nearby restaurant, but was running late. (Bankr. Tr. 952:10–19; Tr. 2464:13–15.) When he saw them on the street, Duchossois and Filkin informed Kevin Flynn that they knew he had just met with Colleran and that they themselves planned to meet Colleran later that day. (Bankr. Tr. 954:3–10; Tr. 2647:9–15.) Kevin Flynn testified that there was no agreement made during this conversation, either. (Bankr. Tr. 3303:9–11; Tr. 2649:5-13.) Later that day, Duchossois, Filkin, and Colleran met at the Ritz Carlton without Kevin Flynn. (Trustee's SOF ¶ 289; C. Defs.' SOF ¶ 515.) In his notes from this meeting, Filkin stated that the three men discussed a proposal where Davis and the Flynns would each have a 37.5% interest, Duchossois would have a 20%, a 5% interest would be reserved for local investors. (PX55.)

After the meetings in 1998, some of the Defendants began joint lobbying efforts with Duchossois. The Trustee alleges, and the IGB agreed, that these efforts are evidence that a joint ownership agreement was reached in late 1998. (Trustee's SOF ¶ 294.) The court notes,

however, that Joseph McQuaid, who oversaw Emerald's lobbying activities, attended lobbyist meetings with other representatives from the horse racing and riverboat gambling industries, as well. (Trustee's SOF ¶ 296; C. Defs.' SOF ¶¶ 122, 520.) In March or April of 1999, Kevin Flynn, Richard Duchossois, and Jim Fletcher, one of Duchossois's lobbyists, flew in Duchossois's helicopter to Springfield, where Kevin Flynn and Duchossois met with representatives from the horseracing and gaming industries. (Tr. 2658:15–17, 2660:17–20; Trustee's SOF ¶ 299.) Thus, as Defendants assert, gaming and horseracing interests acted as political allies in a joint effort to get legislation passed. (C. Defs.' SOF ¶ 520.) And, although Duchossois and representatives from Emerald worked together on lobbying, it does not appear that the Davis Companies had a large role. The only evidence the Trustee presents on the Davis Companies' involvement is that Kevin Flynn met with Colleran on February 9, 1999 (Trustee's SOF ¶ 295), but there is no specific evidence of what was discussed at the meeting. (*see* Bankr. Tr. 965:18–966:3.)

Notably, the Davis Companies filed a breach of contract action to enforce the alleged deal on October 18, 1999. (Trustee's SOF ¶ 319; C. Defs.' SOF ¶¶ 321, 524.) Judge Ronald Guzman of this court ultimately granted summary judgment on the breach of contract claim in favor of Defendants in that case. *See Davis Corporation, Inc. v. Emerald Casino*, No. 99-c-6822, 2003 WL 2213414 (N.D. Ill. Sept. 11, 2003).[10]

This court concludes that there is insufficient evidence that an agreement between Davis, Duchossois, and Emerald was reached on December 1, 1998. Kevin Flynn, McQuaid, and Colleran all acknowledged that various joint ownership arrangements were proposed and discussed. Yet the only evidence that Kevin Flynn actually agreed to the deal is Colleran's

---

[10] Judge Guzman found in the *Davis* litigation that Kevin Flynn did not enter into an enforceable contract with Davis, but that there was sufficient evidence for a fraudulent misrepresentation claim against Kevin Flynn, Donald Flynn, and McQuaid to survive summary judgment. *Davis Companies, Inc. v. Emerald Casino, Inc.*, No. 99-c-6822, 2003 WL 22113414 (N.D. Ill. Sept. 11, 2003).

testimony to that effect. The agreement was never reduced to writing, which appears inconsistent with Defendants' past practice; on November 14, 1997, Emerald and Lake County had Riverboat entered into a written "agreement in principle," to make reasonable efforts to relocate Emerald's license to Lake County if an amendment allowing Emerald to relocate its license passed in the 1997 veto session. (Trustee's SOF ¶ 226; C. Defs.' SOF ¶ 625.) Because the legislation did not pass in 1997, that agreement never came to fruition. The Trustee emphasizes that Attorney Filkin prepared contemporaneous notes of the conversation between Duchossois and Colleran in the evening of 1998, and those notes corroborate the existence of the agreement—but they do not support the assertion that Kevin Flynn agreed to the terms. (PX55; Trustee's SOF ¶ 290.) The fact that the parties engaged in joint lobbying efforts does not by itself establish the existence of an agreement. The evidence is also consistent with Defendants' assertion that the horse racing and gaming industries were working together on mutually beneficial legislation.

The Trustee presents several other pieces of evidence to show that Emerald did enter into an agreement with Davis and Duchossois. First, the Trustee points with suspicion at contributions that Emerald, the Davis Companies, and the Duchossois Industries all made to Mayor Stephens' campaign fund in October 1999. (PX162 at 9–10; Trustee's SOF ¶ 352.) The IGB concluded that "it is reasonable to infer from these contributions, their timing and the lobbying efforts acknowledged by the parties involved, that there was an agreement in 1998–99 to get legislation passed to relocate the Emerald gaming operations to Rosemont and to divide the pie in some kind of secret agreement." (PX162 at 10.)

This court respectfully disagrees. The contributions were made in October 1999, well after the legislation passed on May 25, 1999, and after the Governor signed it into law on June 25, 1999. By October, Rosemont had already accepted Emerald's request to relocate to Rosemont under the terms of the legislation. (Trustee's SOF ¶ 132; C. Defs.' SOF ¶ 174.) Contributions made months after the legislation allowing relocation had passed do not readily

38

support the inference that there was a secret agreement to relocate and divide ownership of a casino in 1998, prior to the legislation's passage. Furthermore, as the Trustee herself points out, the Davis Companies filed suit in October 1999 arguing that the Flynns, McQuaid, and Emerald had repudiated the alleged agreement. It does not seem likely that Davis, Duchossois, and Emerald would all make contributions to Mayor Stephens' campaign as part of a secret agreement that Emerald and the Flynns had already repudiated. What is far more likely is that Defendants' contributions were made in order to encourage Mayor Stephens' cooperation going forward. The Davis Companies and Duchossois Industries may also have wanted to participate in a casino in Rosemont now that legislation allowed for it, or they may have sought to curry favor with Mayor Stephens for independent reasons. Either way, the court does not infer from these belated campaign contributions the existence of an agreement in 1998.

Next, the Trustee points to a November 22, 1999 internal memo prepared by Stephen O'Neil of Bell, Boyd & Lloyd. The memorandum purports to summarize a November 17, 1999 interview with Kevin Flynn and Joseph McQuaid, and tracks the history of Mayor Stephens' interest in a Rosemont casino. O'Neil wrote that "[f]rom about October of 1998, the focus had turned to Rosemont. [Emerald's] proposed legislation was never site-specific, but it was always understood from that time that Rosemont might be available." (PX651 at 4.) The memo notes that Emerald did pursue other locations, as well, including Gurnee. (*Id.* at 3.) This memo does establish that Defendants were interested in a Rosemont location; it does not establish that an agreement had been reached.

As the Trustee emphasizes, Rosemont representatives participated in the lobbying efforts to amend the Riverboat Gambling Act. (Trustee's SOF ¶ 347.) Yet there is reason to believe that Rosemont had its own interests in the legislation, independent of any relationship with Emerald. Casinos were prohibited in Cook County, where Rosemont is located, prior to the legislation. (*See* Trustee's SOF ¶ 259; C. Defs.' SOF ¶ 143.) The new law lifted that restriction. (Trustee's SOF ¶ 306; C. Defs.' SOF ¶ 143.) Defendants contend they were in fact opposed to

Stephens's lobbying efforts because those efforts were location-specific and Emerald "fear[ed] that they would lose support from legislators from other municipalities." (C. Defs.' SOF ¶¶ 132, 137.) The participation of Rosemont representatives in lobbying efforts is more likely evidence of the Village's own interest in lifting the Cook County restriction than it is of a secret deal between Davis, Duchossois, and Emerald.

Finally, the Trustee points to evidence that "*[e]verybody else* seemed to know," even before passage of the legislation, that Emerald's license was going to Rosemont. (Trustee's SOF ¶ 330) (quoting PX162 at 9.) The IGB Final Board Order noted that "[t]he legislative history of the debate during which Section 11.2 of the Act was approved was replete with references to Rosemont as the designated city for the relocation." (PX162 at 8.) Several legislators made public comments confirming that the license would be relocated to Rosemont even before the legislation passed. (Trustee's SOF ¶ 350) (citing four different senator's statements.) Victor Casini testified that "[i]t was common knowledge that the mayor of Rosemont was interested in a casino in Rosemont." (Bankr. Tr. 2088:1–8.) Again, however, these circumstances do not satisfy the court that Defendants had entered a secret agreement to sell ownership interests in a Rosemont casino.

The record reveals that Rosemont was a desirable location for the license, that the Mayor and Defendants were interested in establishing a casino there, and that Defendants discussed the possibility of relocating to Rosemont with Mayor Stephens, the Davis Companies, and Duchossois Industries. But the Trustee has not established by a preponderance of the evidence that there was an agreement to relocate a casino and "divide the pie." Because the court is unable to find that the agreement existed, the court is unable to conclude that the Defendants violated IGB rules by failing to notify the IGB of an agreement to sell ownership interests in Emerald.

### B. Emerald attempts to relocate to Rosemont

Once Emerald decided on Rosemont as a site, Emerald sought official approval from the

Village of Rosemont. Within one week after the legislation passed, McQuaid met with the Mayor of Rosemont, Mayor Donald Stephens, to discuss potential locations for the casino within the Village of Rosemont. (C. Defs.' SOF ¶ 173.) They ultimately settled on a site that Rosemont owned. (Trustee's SOF ¶ 362; C. Defs.' SOF ¶ 173–74.) On June 30, 1999, Joe McQuaid sent a letter to the Village of Rosemont, requesting approval to relocate Emerald. (Trustee's SOF ¶ 131; C. Defs.' SOF ¶ 174.) Mayor Stephens replied the same day stating that Rosemont would be pleased to welcome Emerald. (Trustee's SOF ¶ 132; C. Defs.' SOF ¶ 174.) On July 7, 1999, the Village of Rosemont officially approved the relocation of the casino. (Trustee's SOF ¶ 133; C. Defs.' SOF ¶ 174.)

On July 1, 1999, McQuaid and Walter Hanley met with IGB staff: then-Administrator Robert Casey, Chief Legal Counsel Mareile Cusack, and Deputy Administrator of Audit and Financial Analysis Al McDonald. (C. Defs.' SOF ¶ 192.) McQuaid and Hanley informed the IGB that Emerald had decided on Rosemont as a location and that they expected the Rosemont Village Board to act upon their pending request soon. (C. Defs.' SOF ¶ 192.) A July 1, 1999 letter from McQuaid to Administrator Casey, summarizing the July 1, 1999 meeting, confirms this account. (PX306 at 1.) McQuaid's letter stated that at the July 1, 1999 meeting, Emerald had submitted a "proposal to relocate to Rosemont" along with "copies of HP's correspondence with the Village of Rosemont and a preliminary site plan." (PX306 at 1.) The minutes from a July 20, 1999 IGB meeting also show that at that meeting Michael Ficaro, Emerald's outside counsel, gave formal public notice of Emerald's intention to relocate to Rosemont. (PX858 at 693–94.) The minutes reflect that Emerald provided the IGB with copies of the June 30, 1999 letters between McQuaid and Mayor Stephens, the official approval from the Village of Rosemont, and a diagram of the proposed casino. (PX858 at 693–94.) The court concludes that the IGB was on notice of Emerald's intentions to relocate to Rosemont no later than July, 1999.

The IGB Final Board Order found that Emerald violated IGB Rules 140(a), 140(b)(3),

and 110(a) by (1) failing to keep the IGB informed about the status of construction in Rosemont; (2) failing to disclose the existence of specific agreements between Emerald and the Village of Rosemont; and (3) including terms in the Lease and Development Agreement with Rosemont that violated IGB Rules. (PX162 at 32–36.)

### 1. Emerald's construction activities

The IGB concluded that Emerald had violated Rules 140(a), 140(b)(3) and 110(a) by failing to disclose or misrepresenting to the IGB the status of construction in Rosemont, including that Emerald began construction in the summer of 1999. (PX162 at 14, 31–35.) The Illinois Appellate Court affirmed, finding sufficient evidence that the IGB did not have "detailed knowledge of Emerald's construction activities," as the IGB requested construction plans on both September 17, 1999 and again on January 31, 2000. (PX1233 at 114.) The court interprets "status of construction" to mean whether Defendants disclosed to the IGB that construction activities were occurring, and not disclosures related to financing.

### a. Construction progress

Soon after the legislation allowing relocation passed the Illinois legislature, Emerald's Board of Directors met on June 23, 1999 and discussed relocation and construction plans. (PX18 at 6.) Emerald's target date for opening the casino was August 1, 2000. (C. Defs.' SOF ¶¶ 170, 350.) McMahon testified that in the summer of 1999, Emerald understood the steps[11] that had to be taken before the casino could open, and that, based on his (and other Emerald employees') experience constructing and opening Blue Chip Casino, Defendants believed that it would take "at least" eight or nine months to complete construction of Emerald—"we thought, by

---

[11] Before the casino opened, McMahon testified, Emerald needed to complete the following steps: receive acceptance from a host community; identify a site within the host community for the casino; hire architects and engineers, and brainstorm "what it is we had to build," specifically "a casino on a nonnavigable waterway that's going to be, in essence, a floating building;" create a budget; obtain financing (equity, subordinated debt, and senior debt) for construction and operations; and hire employees for operations. (Tr. 128:11–132:8.)

putting out that August number, that we had enough time to get it done in that window." (Tr. 139:23–140:1, 140:9–141:3, 141:11–15.)

In order to meet this deadline, Emerald used a "design-build" approach to construct the casino, which would allow it to begin construction before the casino's design was complete. (C. Defs.' SOF ¶ 179.)  Under this approach, the architect, Aria Architects, would design an "overall, conceptual schematic," and then "proceed to design specific components of the structure, so that construction could begin on those components, while design continued on other components of the structure."  (C. Defs.' SOF ¶ 179.)  At the June 23 meeting, the Board "authorized [Emerald's] officers . . . to prepare construction plans and budgets . . . ."  (PX18 at 6.)  John McMahon became Emerald's "point person" for design, construction, and financing of Emerald's proposed casino that same month.  (Trustee's SOF ¶ 457; C. Defs.' SOF ¶ 179.) Kevin Flynn "oversaw all of the activities of the company as CEO," but was not involved in Emerald's day-to-day operations related to construction.  (C. Defs.' SOF ¶ 395.)  McMahon began to meet with construction professionals as early as June 1999 (*see* PX218 at 2), and testified that he attended "status meetings" regarding "ongoing projects" at the construction site weekly.  (Tr. 202:9–203:6.)

At an Emerald Board meeting on August 12, 1999, McQuaid reported that Emerald had "engaged numerous professionals, including architects and engineers" for design and construction of the casino, and "described . . . the timetable for clearing the site, excavating the foundation and basin, ordering steel, and other key milestones."  (PX20 at 1.)  The Board of Directors specifically "discussed the risk[] of . . . expending . . . capital prior to obtaining all required approvals (including IGB approvals) . . . ."  (PX20 at 1.)  The Board nevertheless unanimously "authorized [Emerald's] officers to proceed with the Development (and expend resources) in accordance with the timetable reviewed by the [B]oard."  (PX20 at 1.)  Joseph McQuaid and Donald Flynn each testified that they believed that they were acting in Emerald's best interest in voting to proceed with construction.  (Bankr. Tr. 2258:6–18 (Donald Flynn); Tr.

756:8–14 (McQuaid).)  The Trustee notes that each of the Defendants attended this meeting. (Trustee's SOF ¶ 467; *see* PX20 at 1.)

As the Trustee sees things, Defendants sought to begin construction immediately, regardless of the necessary IGB approvals, in order to begin making money on the casino as soon as possible.  Some evidence supports this theory: For example, at his first meeting with Aria Architects, on June 7, 1999, Kevin Flynn "emphasized the importance for speed in this development, since every weeks [sic] delay is potentially missing over $2,000,000.00 dollars worth of revenues."  (Trustee's SOF ¶ 455) (quoting PX218 at 3.)  Terry Graber of Power Construction also testified that at a construction meeting during the summer of 1999, Kevin Flynn and McQuaid indicated that their "plan" for the casino was "to try and get it up and running as quickly as possible." (Bankr. Tr. 1098:1–20.)  And, in a proposal letter dated July 2, 1999 from the Joint Venture (Power Construction/ Degen & Rosato) formed to build the casino to McQuaid, Isaac Degen "propose[d] to perform all the pre-construction and construction services on a fast track basis . . . ." (PX238.)  Terry Graber and Isaac Degen both testified that "fast track basis" meant something similar to Emerald's "design-build" approach—proceeding with construction though designs for parts of the casino remained incomplete. (Bankr. Tr. 1099:5–1100:18, 1870:23–1871:6.)

Emerald had other reasons to set a short deadline for completing construction, however. As noted above, Defendants contend that they understood that under the Riverboat Gambling Act they had a finite time period to complete construction or risk losing their license.  (C. Defs.' SOF ¶ 168.)  Because Section 7(e) permits the IGB to revoke the license if a licensee "fails to begin conducting gambling within 15 months of receipt of the Board's approval,"  230 ILCS 10/7(e), and Section 11.2 directed that "the Board *shall* grant the application and approval upon receipt by the licensee of approval from the new municipality or county" 230 ILCS 10/11.2(a) (emphasis added), Defendants believed, upon the advice of their attorney Michael Ficaro, that the fifteen-month time limit would begin to run as soon as Emerald submitted its application to

the IGB for renewal and relocation. (C. Defs.' SOF ¶¶ 162–64; D. Flynn's SOF ¶¶ 88–89.) McMahon repeatedly referred to the fifteen-month provision when testifying about Emerald's construction timeline. (*See* Tr. 138:20–140:1.) Emerald hoped to have its application for renewal and relocation approved by September 1999. (C. Defs.' SOF ¶ 222; D. Flynn's SOF ¶ 91.) In at least one meeting with Hanley and McMahon on September 30, 1999, the IGB, too, appeared to encourage a swift construction timeline, asking whether Emerald could complete construction of the casino "sooner" than the anticipated August 1, 2000 deadline. (PX65 at 2.)

Beginning in July and August 1999, the Village of Rosemont began to clear the site on which the casino would be built. (C. Defs.' SOF ¶ 227.) In October 1999, Rosemont issued Emerald a building permit for construction of a basin foundation for the casino (PX256); the Trustee notes that Emerald failed to disclose this permit to the IGB. (Trustee's SOF ¶ 485.) Excavation of the basin that would hold the barge on which the casino would sit began in October 1999, and construction crews began to pour the concrete foundation for the basin the following month. (Trustee's SOF ¶ 477; C. Defs.' SOF ¶¶ 383, 385 (citing DX782–84, DX786, DX788–89, DX791, photographs taken of the construction site at this time).) In December 1999, the basin walls were built. (C. Defs.' SOF ¶ 386) (citing DX793, a photograph taken on December 2, 1999, which shows construction of concrete walls.) At an Emerald Board meeting on December 22, 1999, McQuaid reported on the status of construction, and noted that "[Emerald] has paid or incurred approximately $4 million and the general contractor has made commitments for an additional $26 million of Development costs." (PX25 at 1.) Again, the Board "discussed various aspects of the Development, including the risks of expending capital . . . prior to obtaining all required approvals (including IGB approvals)" but proceeded unanimously to "authorize [Emerald's] officers to proceed with the Development (and continue to expend resources) in accordance with the construction timetable previously reviewed by the board." (PX25 at 2.) Each of the Defendants attended this meeting, and no one at the meeting expressed concerns about continuing with construction. (PX25; C. Defs.' SOF ¶ 288; D. Flynn's

SOF ¶¶ 107, 111.)

The project proceeded in late December 1999 and early January 2000, when construction crews began to build a land-based structure beside the basin, and the barge structure (the casino itself) that would float in the basin. (C. Defs.' SOF ¶¶ 391–92) (citing DX795–96, photographs of construction taken on January 6, 2000.) Emerald received another building permit from Rosemont in January 2000 for "structural – bld shell" (PX419 at 17), which again, the Trustee notes, Emerald did not disclose to the IGB. (Trustee's SOF ¶ 485.) The design for the land-based structure included "IGB's on-site office, restaurants and other non-gaming facilities." (C. Defs.' SOF ¶ 391.) By early February, construction crews had completed laying the structural steel for the land-based structure. (C. Defs.' SOF ¶ 429.) Attorney Ficaro advised Emerald to stop construction after the February 22, 2000 IGB Meeting, where the IGB indicated that Emerald needed prior approval to begin construction, and the Emerald Board unanimously voted to stop construction on February 24, 2000. (Trustee's SOF ¶¶ 491, 494; C. Defs.' SOF ¶¶ 465–66.)

By the time Emerald stopped construction, in February 2000, the concrete foundations for the barge and land-based structure were complete, the barge and structural steel for the land-based structure were nearly complete, and construction crews were beginning to lay the structural steel for the casino facility on the barge. (Trustee's SOF ¶ 497; C. Defs.' SOF ¶ 469.) Aria's design work at the time was nearly complete as well, as the architect had completed drawings and specifications for the entire casino, but needed to perform "contract administration." (Trustee's SOF ¶ 498.) Between March and December 2000, Defendants note, "Emerald continued to prepare to open the casino," by completing the casino design[12] and

---

[12] McMahon testified that Emerald worked to complete casino design. (Tr. 250:19–251:2), but James Lencioni, president of Aria Group Architects, testified that as of February 2000, Aria had "fully complete[d] the drawings, the construction documents, for the interior as well as the exterior of the building," and needed only to perform "contract administration." (Bankr. Tr. 1079:15–1080:5.) It is not clear, then, what design work Emerald needed to
(continued . . .)

continuing financing negotiations with LaSalle Bank.  (C. Defs.' SOF ¶ 475.)

### b.     Financing construction

To finance construction, Emerald used the money that it had received from the female and minority investors who had contracted to purchase Emerald shares ("Statutory Investors"). The IGB noted this in its Final Board Order, observing that Emerald had spent the approximately $30 million it had received from Statutory Investors on construction "because it could not secure financing for construction," and that Emerald had failed to inform the Statutory Investors that it would use the funds they had provided before the investors were approved as shareholders by the IGB.  (PX162 at 13–14.)  The IGB did not, however, conclude that Emerald's use of the proposed shareholders' payments for construction violated an IGB Rule.[13]

After Section 11.2 passed, Emerald prepared a proposed budget for design and construction of the casino, estimating the cost for the casino's development at $135 million. Emerald also prepared a financing proposal under which Emerald would seek equity from current and proposed shareholders and would obtain senior secured bank financing, as well as subordinated debt.  (C. Defs.' SOF ¶ 176.)  John McMahon was responsible for obtaining subordinated and senior secured financing for Emerald.  (C. Defs.' SOF ¶ 178.)  At a December 22, 1999 Emerald Board Meeting, Joseph McQuaid reported that Emerald had sold 16.8 percent of stock for approximately $26.7 million, and that Emerald still needed to sell 3.16 percent of stock to minority shareholders in order to satisfy the female and minority shareholder requirement.  (Trustee's SOF ¶ 478.)  Emerald increased the price of stock to $2.5 million per

---

complete, though McMahon could have been referring to design of the barge (performed by naval architect DeJong & Lebet), or to the "contract administration" work with Aria.

[13]     Rather, the IGB found that Emerald violated Rules 140(a), 140(b)(3), and 110(a) for failing to disclose and/or misrepresenting the status of construction in Rosemont, Rules 140(a) and 140(b)(5) for failing to disclose and/or misrepresenting to IGB that it had transferred shares to the Statutory Investors, and Rule 235(a) for transferring shares to the Statutory Investors without IGB approval.  (PX162 at 31–35.)

one percent interest for the remaining 3.16 percent, and the Board unanimously authorized McQuaid to sell the shares for the maximum price possible. (PX25 at 1.) At the same meeting, the Board also considered and unanimously authorized the Company's officers to execute a proposal for financing $82 million from LaSalle Bank. (PX25 at 2–3.)

Emerald's Board unanimously approved the sale of shares to Statutory Investors on August 12, 1999, after discussing Emerald's "immediate need for equity investments to finance the [Rosemont] Development and facilitate a debt financing." (PX1316 at 149.) In a letter dated October 20, 1999, McMahon wrote to Terry Graber of the Joint Venture (Power Construction/ Degen & Rosato), and copied Harris Bank, to inform the Joint Venture that "[Emerald] currently has over $25 million of equity capital in the bank, and [Emerald] is currently in negotiations with potential lenders to obtain debt financing, subject to the approval of the [IGB]." (PX254.) The Trustee notes that the "$25 million of equity capital" was a reference to the funds Emerald had obtained for the sale of shares to the Statutory Investors. (Trustee's SOF ¶ 464.) In the end, Emerald received approximately $30 million from the sale of shares to the Statutory Investors, never obtained additional financing from other sources, and used the funds it received from the Statutory Investors for design and construction of the casino. (Trustee's SOF ¶¶ 459, 465, 466; C. Defs.' SOF ¶¶ 224, 257, 259, 365.)

At the same time that Emerald was using the Statutory Investors' contributions for construction, the Trustee notes, Emerald informed the Statutory Investors[14] and the IGB[15] that it intended to return money received from any Statutory Investors who were not approved by the

---

[14]    Emerald's Subscription Agreement, executed by the Statutory Investors, states, "In the event that the [IGB] determines that the undersigned is not an acceptable owner of the Issuer . . . the Issuer shall return the Purchase Price without interest to the undersigned within ninety days after such determination by the IGB." (PX1318 at 4.)

[15]    In his letter to IGB Administrator Casey dated July 1, 1999, McQuaid wrote that "If any Form One applicant is not approved by the [IGB], [Emerald] would immediately return the purchase price to such individual." (PX306 at 2.) McMahon made similar representations to the IGB. (*See* PX65 (9/30/99 IGB Meeting).)

IGB. (Trustee's SOF ¶ 459.) Though it appears that Emerald did not have a plan or the funds to refund the payments that it received from the Statutory Investors (*see, e.g.* Bankr. Tr. 1336:21–1338:6), if the IGB did not approve them as shareholders, the IGB made no specific finding that this alone violated any IGB Rule.

### c. Communication with the IGB

### i. The pre-approval construction requirement

Defendants maintain that IGB rules did not require that Emerald obtain IGB approval before beginning construction. (C. Defs.' SOF ¶ 375; D. Flynn's SOF ¶ 92; Pedersen's SOF ¶ 103.) At least some history supports that understanding: William Kunkle, the IGB's first chairman, testified that between 1990 and 1999, the IGB did not require a casino licensee to obtain IGB pre-approval for construction. (Tr. 2511:13–24, 2527:16–19.) He further testified:

> I can't think of a single owner that didn't do some kind of, whether it was actually physical construction or whether it was contracting for construction, contracting for the building of a riverboat, the remodeling of a riverboat, the leasing of a riverboat, the same for the dock, the shore facilities, the security systems . . . . They needed to make a decision, a business decision . . . . knowing that if the board didn't like it, when the time came for a ruling on preliminary suitability, they might have to change it. But they could take that risk. And the board did not require advance notice about what they were doing.

(Tr. 2527:21–2528:20.) Joseph McQuaid, himself a former IGB staffer, said much the same thing. He testified that "[p]reapproval or approval in general [of construction] for the riverboats was not necessary" (Tr. 622:1–15), and that none of the original ten licensees had received pre-approval from the IGB before beginning construction. (Bankr. Tr. 3379:12–16.) McQuaid testified that this was his understanding of the IGB's position in June 1999. (Tr. 622:16–22.) Though the Defendants did not believe that pre-approval was required, they did understand that the IGB would inspect the casino facilities, and possibly require changes, before Emerald Casino could open. (C. Defs.' SOF ¶¶ 375–76; D. Flynn's SOF ¶ 93.)

The IGB gave mixed signals about the pre-approval requirement. The minutes of an IGB meeting on September 7, 1999 state:

> Chairman Vickrey stated that several licensees have requested *initial consideration for proposed barge construction*. The Chairman informed all licensees that *prior to approving* any such projects, the Board would like each owner licensee to submit expert reports attesting to the soundness of the engineering structure and electrical workings; and the environmental air quality of the facility as well as other matters relating to public health and safety. He stated that the reports must be submitted to staff *prior to the Board's final approval* of any project.

(PX858 at 700) (emphasis added.) Chairman Vickrey and Mareile Cusack, Chief Legal Counsel to the IGB, disagreed publicly, in a January 2000 *Chicago Sun-Times* article, about the pre-approval requirement. (DX276.) The article quoted Cusack as stating that Rule 230 requires any "prior board approval" for any "capacity or design change," including barge construction, while Chairman Vickrey stated, "I don't see it as a violation. What [Emerald is] doing is obviously trying to ready the casino so they can open at the earliest possible date to start generating patrons and revenue streams as soon as possible. I can understand that, from a business point of view." (DX276 at 2.)

The language of Rule 230 is open to some interpretation. Rule 230(d) provides that an "owner licensee must immediately inform the Board and . . . obtain prior formal Board approval thereof whenever a change is proposed in the following areas: . . . G) Riverboat cruising schedules or routes, capacity or design change." 86 ILL. ADMIN. CODE § 3000.230(d)(1)(G). The Rule does not specifically mention construction of a new facility, and Defendants maintain that they did not believe that this rule applied to such construction. (C. Defs.' SOF ¶ 380–81.) The IGB itself did not find that Emerald violated Rule 230(d), but it did conclude that because Emerald's Lease and Development Agreement with Rosemont contained a term that allowed Rosemont to "waive" the pre-approval requirement (discussed below), Emerald violated Rule 110(a), which in broad terms prohibits any activity the IGB determines is a detriment to the gaming industry, the State of Illinois, or the public generally. (PX162 at 14, 34–35; *see infra* Background II.B.3.) Furthermore, the Illinois Appellate Court expressly rejected Defendants' argument, reasoning "[c]ommon sense would suggest that if Emerald could not change the

design of its riverboat without prior formal Board approval, Emerald could not build an altogether new boat and associated structures without prior formal Board approval."[16]  (PX1233 at 113.)

Defendants did not obtain pre-approval for construction.  Defendants did, however, inform the IGB that they planned to begin construction as early as August 10, 1999, and updated the IGB on September 30, 1999. (*See infra* Background II.B.1.c.)  And while the IGB never gave express approval for beginning construction, the court concludes that it tacitly approved the construction when it failed to object as Defendants updated them about the status of construction.

### ii.     The IGB was aware of construction

The parties dispute what knowledge the IGB had about the ongoing construction in Rosemont.  Defendants insist that they discussed the status of construction several times with IGB staff and were never directed to stop construction or warned that they were in violation of IGB rules.  (C. Defs.' SOF ¶ 396.)  As discussed *supra*, John McMahon began to meet with construction professionals as early as June 1999 (PX218 at 2), and Emerald's Board approved a construction timetable on August 12, 1999.  (PX20 at 1.)  Rosemont began "preliminary site-clearing activities" in July and August 1999 (C. Defs.' SOF ¶ 227), and excavation of the basin began in October 1999.   (Trustee's SOF ¶ 477; C. Defs.' SOF ¶¶ 383, 385.)   As described below, the record reveals that the IGB was aware that Emerald began construction of the casino as early as October 1999, and it was public knowledge at least as early as November 4, 1999.

Defendants assert that the IGB was on notice even earlier.  They maintain that on July 1, 1999, McQuaid and Hanley informed the IGB that construction would begin immediately. (C. Defs.' SOF ¶¶ 192–93) (citing DX602.)  The record contains little evidence to support this.

---

[16]      But the Illinois Appellate Court did note that "[f]rom our reading of its conclusions of law, we understand the Board to be more concerned with Emerald's failure to disclose agreements and plans relating to construction.   Of course, prompt disclosures of these agreements and plans theoretically would have prevented unapproved construction, so one violation probably amounts to another." (PX1233 at 112.)

Hanley's handwritten notes, allegedly taken at the meeting, state "when does construction begin? ASAP w/r/t demolition, Phase 1, engineering studies, etc." (DX602 at 2.) Throughout the IGB's investigation, and continuing into this litigation, Defendants maintain that they consistently referred to the July 1, 1999 meeting as the basis on which Emerald began accepting funds from Statutory Investors and using those funds for construction, (C. Defs.' SOF ¶¶ 189, 197), but they identify no compelling evidence in the record to support this claim.[17] While it is possible that construction was mentioned at the meeting, other evidence in the record demonstrates that the IGB neither approved the start of construction at that time nor was so much as put on notice that Emerald planned to begin construction.[18] Significantly, the letter from McQuaid to the IGB

---

[17]    Defendants cite PX383, and PX1091 at 31–32. PX383 is a letter dated September 29, 2000 from McQuaid to Administrator Acosta responding to several questions. The letter claims that "Emerald promptly informed the Board of its intentions to relocate to Rosemont" at the July 1, 1999 meeting, but does not mention that Emerald also informed the IGB at the July 1, 1999 meeting that it planned to begin construction. (PX383 at 5.) The exhibits to PX383 include letters between McQuaid and Mayor Stephens dated June 30, 1999, McQuaid's letter to Casey summarizing the July 1 meeting, and another follow up letter, as well as a letter from Casey to McQuaid dated July 23, 1999 in response. These letters refer to Emerald's receipt of initial approval from Rosemont to relocate there, but do not mention construction. (PX383 at 7–8, 12, 18–21.) PX1091 is a transcript of an IGB interview with Joseph McQuaid. Pages 31-32 include a discussion of the process for submitting applications for Statutory Investors, but do not confirm approval of construction.

[18]    The evidence is abundant. Acosta testified that after he became IGB Administrator, neither Casey (who remained an IGB employee), nor Emerald asserted that Casey had approved construction. (Bankr. Tr. 3680:5–3682:23.) McDonald, another IGB employee, similarly testified that during the IGB's investigation of Emerald, neither Casey nor anyone at Emerald told him that on July 1, 1999, Casey had authorized Emerald to sell shares to the Statutory Investors and spend the money on construction. (Bankr. Tr. 3352:14–3353:25.) The minutes of Emerald's own August 12, 1999 Board Meeting state that "[t]he directors discussed the risks of (a) expending risk capital prior to obtaining all required approvals (including IGB approvals)." (PX20 at 1.) The minutes make no mention of any approval McQuaid had purportedly received from Casey at the July 1 meeting to begin construction. The minutes of Emerald's December 22, 1999 Board meeting contain similar language. (PX25 at 1–2.) Additionally, in a letter dated March 15, 2000 from Emerald's counsel Michael Ficaro to Acosta in response to the IGB's demand for information, Ficaro maintains that Emerald was not required to obtain prior approval for construction, and does not mention the July 1 meeting. (PX769.) Finally, McQuaid testified in a deposition for the *Davis* litigation that he thought that he and Hanley informed the IGB at the July 1 meeting that Emerald would "initiate construction at our risk," but acknowledged that Emerald did not receive approval to do so. (PX1074 at 10 (81–82).)

summarizing the meeting does not mention starting construction. (PX306.) Moreover, Defendants themselves point out that Emerald's Board did not approve construction activities or expending funds on construction until the Board meeting on August 12, 1999. (C. Defs.' SOF ¶ 378.) Nor is there any mention of approval for Emerald's construction in the minutes from the July 20, 1999 IGB Board meeting. (PX858 at 693–694.) Those minutes state instead that Emerald was still seeking Board approval for the facility. Specifically, Emerald "would be presenting its plan at future Board meeting for its new facility and financing structure for Board consideration and appropriate Board action." (PX858 at 693.)

Defendants McQuaid and Hanley did inform the IGB as early as August 10, 1999 that site-clearing activities were underway. McQuaid understood site-clearing to constitute construction activities—or at least, that advising the IGB of site-clearing constituted notice that Emerald was engaging in preliminary construction activities. McQuaid and Hanley met with Acosta and Casey on August 10, 1999. (C. Defs.' SOF ¶ 225.) McQuaid testified that he told Acosta at that time that "construction had begun at our site," noting that "I didn't differentiate between demolition, utilities being removed and additional utilities bringing in, land clearing. I categorized all that as construction." (Tr. 655:9–656:17.) Hanley's testimony corroborates this; he testified that McQuaid "explained the current status of the development project in Rosemont," specifically "the clearing of the land to prepare for the construction." (Tr. 1240:18–1241:3.) Acosta admitted that he did not direct Defendants to put a halt to the site-clearing activities. (Bankr. Tr. 3635:7–22.) Acosta wrote McQuaid a letter dated the following day "to confirm the substance of our conversation yesterday," in which Acosta stated:

> [D]uring our conversation you mentioned some of the steps and expenditures [Emerald] has incurred in conjunction with the development of the Rosemont project. As you acknowledged, these efforts and expenditures are being incurred at the company's own risk. The Gaming Board has in no way encouraged and is not responsible for any of the costs or risks the company and its principals have chosen to incur at this point.

(PX310 at 2.) Acosta testified that he understood "steps and expenditures" to mean

"preliminary site clearing activities that were taking place at the site in Rosemont," and "were preliminary to the start of construction." (Bankr. Tr. 3634:8–25.) Defendants interpret this letter as evidence that the IGB was aware that Emerald had begun started construction efforts, and that the "risk" Acosta referred to was the risk that the IGB would make changes to the final construction design before granting approval. (C. Defs.' SOF ¶¶ 229–30; D. Flynn's SOF ¶ 97.) McQuaid also wrote a "follow-up" letter after the August 10 meeting, telling Acosta, "I want to keep the Board fully informed of our progress. I am concerned that [Emerald] may be portrayed in an undesirable perspective if media attention is directed toward construction in Rosemont." (PX311.) McQuaid's testimony reflects that he and Acosta defined "construction" differently: while McQuaid believed that construction began with site-clearing activities, which he disclosed to the IGB, Acosta did not understand these activities to constitute construction. At a minimum, however, Defendants did put the IGB on notice at the August 10, 1999 meeting that Emerald was preparing to begin construction.

A few weeks later, at another meeting on September 30, 1999, Defendants Hanley and McMahon informed the IGB that site-clearing activities had begun. Minutes from that IGB meeting show that, in response to Cusack and McDonald's question whether construction had started, McMahon stated that Rosemont had begun preliminary site-clearing activities, but that these activities have not been "part of [Emerald's] costs at this point."[19] (PX65 at 3.) Acosta

---

[19]   The parties disagree about the accuracy of this statement, but only insofar as who was responsible for the costs. That dispute is irrelevant to whether the IGB knew construction had started. The Trustee complains that McMahon failed to inform the IGB that under the Site Access Agreement, which Emerald had executed with Rosemont on August 2, 1999, Emerald had agreed to pay the costs related to site-clearing. (Trustee's SOF ¶ 482) (citing PX366.) In fact, Emerald had not so agreed, Defendants urge; the Lease and Development Agreement with Rosemont (executed on February 10, 2000) provided that "the removal of all improvements and grading" of the casino site was Rosemont's responsibility. (C. Defs.' SOF ¶ 357) (citing PX188 at 29.) It is not clear from the Lease and Development Agreement that "the removal of all improvements and grading" obligated Rosemont to pay for the site-clearing activities that had already occurred. The IGB made no specific finding about McMahon's statement in its Final Board Order.

also asked Defendants Hanley and McMahon when the casino would be completed, and after Hanley answered that "they were still hopeful for an August 1, 2000 completion date," "[Acosta] asked if a possibility existed that the completion would occur sooner than August 1." (PX65 at 2.)   The Trustee notes that McMahon and Hanley failed to disclose to the IGB at the September 30, 1999 meeting that they planned to begin construction in mid-October 1999. (Trustee's SOF ¶ 482.)   Emerald in fact began excavation in October 1999, but as McQuaid disclosed to Acosta on August 10, 1999, and as McMahon again disclosed at the September 30, 1999 IGB Meeting, site-clearing activities for the proposed casino had begun months earlier. Thus, at the September 30, 1999 meeting, as at the August 10, 1999 meeting, the IGB was put on notice that Emerald was moving forward with steps toward building the casino.   Furthermore, Acosta's question to Emerald about whether the casino could be completed sooner supports the conclusion that the IGB knew Emerald was proceeding with construction on a tight timeline.

Emerald began excavation of the basin in October 1999—the first construction activity that occurred after site-clearing. (Trustee's SOF ¶ 477; C. Defs.' SOF ¶¶ 383, 385.)   Walter Hanley provided Deputy Administrator McDonald a copy of Emerald's "unaudited financial statements through September 30, 1999" in a letter dated October 29, 1999. (PX319 at 1, 4–7.) The financial statements showed that Emerald had assets identified as "[c]onstruction-in-progress" worth $281,921. (PX319 at 5.)   In addition, the financial records revealed that while Emerald had, as of September 30, 1999, $40,465,924 of "paid-in-capital," it had just $26,256,016 in cash and cash equivalents. (PX319 at 5.)   Nicholas Wilke, a financial and auditing consultant for the IGB, reviewed these financial statements for the IGB in the fall of 1999. (C. Defs.' SOF ¶ 366; see Tr. 1613:3–24.)   Wilke testified that after reviewing the financial statement and speaking with Hanley, he concluded that the "construction in progress" figure showed that the casino was being constructed; that the "paid-in-capital" figure demonstrated that there had been an "influx of capital from minority investors"; and finally, that because "[t]he financial statement shows $26 million in cash" and "at that time, there was about $30 million

collected from minority investors," then "some of those funds had to have been used" by Emerald. (Tr. 1615:7–1619:6.)

The IGB knew that construction had started as early as October 1999—IGB investigators visited the construction site, and Acosta communicated with Joseph McQuaid about Emerald's construction activities during this time. Based on the IGB's physical presence at the site, and its communications with McQuaid, Defendants McMahon and McQuaid believed that Emerald's earlier statements had effectively communicated to the IGB that construction had begun. McMahon testified that sometime between October 1, 1999 and early January 2000, he learned from the project manager that IGB investigators had visited the site and had taken photographs. (Tr. 224:18–229:2; *see also* Tr. 693:2–16.) In addition, McQuaid testified that Acosta called him in October 1999 and asked McQuaid to schedule a tour of the construction site for Chairman Vickrey. (Tr. 693:17–694:5; *see also* PX1094 at 247–48 (293–94).) McQuaid agreed, and offered to meet with Vickrey at the site, but the IGB called McQuaid back later that day to say that McQuaid did not need to accompany Vickrey to the site. (Tr. 694:6–12.)

For his part, Acosta testified that he learned about Emerald's construction activity in "approximately December of 1999 . . . either through media accounts or a statement made to me by IGB staff." (Bankr. Tr. 374:2–8.) But, in an IGB interview of McQuaid that he conducted on September 26, 2000, Acosta admitted to calling McQuaid about Vickrey's plan to visit the construction site. When McQuaid testified that he received that call in October or November 1999, Acosta stated, "[y]es, I do recall there was a conversation." (PX1094 at 247–48 (293–94).) And in a preliminary report to the IGB concerning Emerald's Renewal Application, Acosta noted that IGB agents frequently visited the construction site after Emerald submitted its Renewal Application on September 24, 1999. (DX662 at 38.) Acosta's testimony that he was unaware of construction activities in the fall of 1999 is not convincing—it demonstrates

significant failures of communication within the IGB itself,[20] or a simple memory lapse.

The Trustee argues that Defendants both failed to disclose the status of construction at Rosemont, and affirmatively attempted to keep it "discreet." (Trustee's SOF ¶ 451) (quoting Emerald Meeting Minutes of 8/6/99, PX218 at 48.)  She notes that Emerald never placed a sign at the construction site identifying it as the future site of Emerald Casino.  (Trustee's SOF ¶ 454.)  Defendants explain that the decision not to place a sign on the site was an effort to avoid negative media attention and to be "deferential" to the IGB.  (C. Defs.' SOF ¶ 397.) Thus, at a meeting on August 6, 1999, various construction professionals and McMahon discussed a plan to place a sign "contain[ing] the names of all of the parties involved and a rendering" at the site, but McMahon cautioned that Emerald should "hold before placing the sign on the site until the [IGB] comes back with their approval of the documents" and "any construction on the site needs to be kept discreet as we prepare the site in anticipation of [IGB] approval."  (PX218 at 48.)  Terry Graber, who attended this meeting and others like it on behalf of Power Construction, understood "discreet" to mean that McMahon wanted "to keep everything a low profile."  (Bankr. Tr. at 1110:12–1111:1.)  McMahon and McQuaid represented Emerald at another meeting with construction professionals on September 24, 1999.  Minutes from this meeting, similarly, state that "Emerald Casino noted that signage should not be placed on the site when the excavation starts."  (PX218 at 102, 107.)  Notably, however, on January 20, 2000, McQuaid contacted Joe Haughey, the IGB Deputy Administrator and Director for Enforcement, to ask for the IGB's input on the appropriate location for the IGB regulator's offices at the proposed casino. (Trustee's SOF ¶ 486; C. Defs.' SOF ¶ 409.)  McQuaid's contact with

---

[20]     At a February 22, 2000 IGB meeting IGB Member Jones asked Ficaro, "What construction has Emerald undertaken or authorized in Rosemont[?]." (*See, e.g.* PX858 at 753.) The question is at least puzzling, in light of substantial evidence that IGB agents had visited the site as early as October 1999, and that Chairman Vickrey even sought to visit the site that fall. (PX1094 at 247–48 (293–94); DX662 at 38; Bankr. Tr. 1087:5–17, 3324:10–20; Tr. 693:17–694:5, 1620:8–1621:11.)

Haughey on this question is inconsistent with any concerted attempt to conceal the status of construction from the IGB.

Whatever Defendants did or did not say, there is substantial evidence that the IGB had knowledge of the construction activities from other sources as early as October 1999. IGB agents visited the site periodically, and reported on the status of construction to the IGB. A preliminary report from Acosta to the IGB concerning the IGB's investigation of Emerald, dated September 5, 2000, confirms that "after the renewal application was submitted" (on September 24, 1999), "[IGB] Staff randomly inspected the site and observed the construction process. . . . " (DX662 at 38.) IGB Agent John Gnutek testified that he visited the site in October 1999 and "saw site clearing," which "to me was what I believed to be construction at the time." (Bankr. Tr. 3324:10–20.) He also testified that other IGB agents had visited the site, though he could not recall the precise dates. (Bankr. Tr. 3324:16–20.) Jim Lencioni, of Aria Architects, testified that he recalled a group from the IGB visiting the construction site, but could not recall when. (Bankr. Tr. 1087:5–17.) IGB financial consultant Nicholas Wilke testified that he learned that construction had begun after IGB Agents Gnutek and Pannier, who had visited the site, reported back to the IGB. (Tr. 1620:8–1621:11.)

Indeed, the construction of the casino was public knowledge. The construction site was visible from Interstate 294. (C. Defs.' SOF ¶ 390; *see* Tr. 208:8–209:2; Bankr. Tr. 1154:2–22.) Wilke testified that he could see work being performed when he drove past the construction site. (Tr. 1620:8–23.) And, a *Chicago Tribune* article published on November 4, 1999 discussed the status of construction at the site, reporting that "Emerald Casino is already working on the Rosemont site between Bryn Mawr and Balmoral Avenues, east of the Tri-State Tollway. The company has excavated the pond that will hold the boat and is set to start pouring the concrete bottom by early next week." (DX249.) Finally, during public comments at a December 16, 1999 IGB Meeting, a citizen noted "that construction is still going on in Rosemont at the proposed casino site" and asked the IGB whether that violated IGB rules. (PX858 at 735.) No member of

the IGB commented in response. (*Id.*)

The Trustee maintains that McQuaid's phone call to Haughey on January 20, 2000[21] "was the first time that the IGB was notified by Emerald that construction was underway at the Project." (Trustee's SOF ¶ 486) (citing PX69, Letter from Acosta to Hanley of 1/25/00, stating "it was somewhat surprising to me to learn that construction of your proposed facility had gotten to the point where office space was being allocated.") IGB Deputy Administrator McDonald then requested "additional information as it relates to the construction project" on January 31, 2000. (PX72.) Hanley responded to Acosta's letter, specifically asserting that IGB personnel knew about the status of construction prior to January 2000:

> At several meetings with you or your staff, Emerald has described the nature and status of its construction in Rosemont. You and your staff have consistently advised Emerald that all construction is at Emerald's risk. Agents of the Illinois Gaming Board have visited the construction site on multiple occasions and have interviewed construction personnel at the site. We would welcome the opportunity to advise the Board publicly of the status of Emerald's development.

(DX279 at 1; *see also* DX300 at 1–2 (March 15, 2000 Letter from Ficaro to Acosta stating "Emerald . . . has had numerous contacts with the Board's staff regarding the subject of construction work in Rosemont. These contacts go back to prior to our meeting on August 10, 1999, and have occurred as recently as our meeting on March 9, 2000").) As Hanley's letter reflects, the Trustee's argument that the IGB only learned of construction in January 2000 is belied by the facts that Defendants (McQuaid, Hanley, McMahon) repeatedly informed the IGB in August and September 1999 that the site was being cleared for construction; that Hanley

---

[21] Defendants also provide additional evidence of communications with the IGB concerning construction activities between January and March 2000. (PX763 (draft construction financing agreement); PX1062 (building, site and construction plans); PX405 (list of vendor payments, list of agreements, checking account balances); PX858 at 753–54 (2/22/00 IGB Board Meeting).) While this evidence shows that Emerald attempted to keep the IGB informed about its continuing construction activities, the timing of the disclosures, several months after construction began, and after Acosta's January 25, 2000 letter to Hanley expressing surprise about the construction progress, make them less relevant for the purposes of showing that Defendants informed the IGB about the status of construction from its inception.

disclosed construction expenditures to the IGB in October 1999; that IGB personnel visited the construction site on several occasions in the fall of 1999.[22]   The IGB concluded in its Final Board Order that Emerald failed to disclose "the status of construction in Rosemont" (PX162 at 32), but the Trustee has provided insufficient evidence to demonstrate that any of the Defendants here individually concealed or otherwise failed to disclose the progress of construction.

### 2. Emerald failed to disclose preliminary agreements between Emerald and Rosemont to the IGB

In addition to the concern about IGB knowledge of construction, the IGB's Final Board Order revoking the license separately relied on Emerald's failure to disclose specific agreements between Emerald and the Village of Rosemont.  (PX162 at 32; *see also* PX1233 at 112 (stating that the Board appeared more concerned about Emerald's failure to disclose agreements and plans relating to construction than concerned about commencing construction without approval or notice).)  The IGB identified a total of five documents that Emerald failed to disclose related to the agreement between Emerald and the Village of Rosemont to relocate the casino in Rosemont.

- First, on July 21, 1999 (C. Defs.' SOF ¶ 208), Joe McQuaid and Mayor Stephens executed a Letter of Intent to "memorialize key terms that have been agreed to" of the arrangement for Emerald to use the Rosemont site.  (PX192 at 1.)  Hanley and McQuaid worked with the Village of Rosemont's lawyer Peter Rosenthal on several drafts of the agreement.  (*See* PX192 at 7) (Hanley cc'ed on Letter of Intent).)  The Letter outlined key provisions such as rent and term of the lease and payment obligations for various construction costs.  (PX192 at 1-5.)  The Letter contemplated that the parties would execute a final Lease and Development Agreement.  (PX192 at 1; Trustee's SOF ¶ 365; C. Defs.' SOF ¶ 208.)

- On August 2, 1999, Defendant McQuaid, on behalf of Emerald, and with the authorization of the Emerald Board, executed a second agreement with Rosemont—

---

[22]    Defendants also assert that they disclosed Emerald's intent to begin construction and/or the status of construction when they submitted a draft of their Debt Offering Circular to the IGB on August 27, 1999. (C. Defs.' SOF ¶ 413) (citing PX315 at 8–9.)  The pages cited explain the construction process, and that it will take "approximately nine months" to complete, but do not indicate that construction has commenced. (PX315 at 9.)

the Rosemont Site Access Agreement. (PX365 at 2; Trustee's SOF ¶ 368.) The main purpose of this agreement was to allow Emerald to begin work on the site prior to approval of a final Lease and Development Agreement. (PX365 at 1.)

- Between August 26, 1999 and December 1, 1999 Emerald and Rosemont also entered three Extension Agreements to maintain the terms of the Letter and the Site Agreement until they signed a final Lease and Development Agreement. (PX367; PX377; PX380; Trustee's SOF ¶¶ 378–379; C. Defs.' SOF ¶ 209.) McQuaid signed these documents on behalf of Emerald (PX367 at 3; PX377 at 2; PX380 at 2), and Hanley received a copy of each of them. (PX401 at ¶ 729 (August. 26, 1999 agreement), ¶ 737 (September 28, 1999 agreement), ¶ 744 (December 1, 1999 agreement).) Emerald and Rosemont executed the final Lease and Development Agreement on February 10, 2000 and sent a copy of the executed agreement to the IGB. (Trustee's SOF ¶ 394; C. Defs.' SOF ¶ 422.)

Emerald did not provide copies of the Letter of Intent, the Site Access Agreement, or the Extension Agreements to the IGB until December 5, 2000. (PX41 at 26; Trustee's SOF ¶ 403. *See also* PX1106 at 2.) The parties dispute the reason for Emerald's failure to disclose these documents earlier. The Trustee maintains that Emerald was purposefully withholding information despite the IGB's consistent requests that Emerald submit documents and be "over-inclusive" in their submissions. (Trustee's SOF ¶¶ 388–90; ¶¶ 395–96.) Defendants contend that McDonald told them that IGB lacked the staffing capacity to review draft agreements and asked Emerald not to send drafts. (C. Defs.' SOF ¶¶ 348-49.) Emerald, therefore, waited until it executed final agreements to submit documents. (C. Defs.' SOF ¶ 212–13.) The IGB concluded in its Final Board Order that Emerald was under an obligation to disclose the earlier agreements and that Emerald did not make the required disclosures. (PX162 at 13, 36–37.) The Illinois Appellate Court affirmed this finding. (PX1233 at 114–18.)

The evidence shows that at various times between August 1999 to December 5, 2000, Defendants McQuaid, McMahon, and Hanley had knowledge of the agreements and opportunities to disclose the agreements to the IGB. On August 10, 1999, soon after the Letter of Intent and Site Access Agreement were executed, Hanley and McQuaid met with then newly-appointed IGB Administrator Acosta for the first time. (Trustee's SOF ¶¶ 371–72; C. Defs.' SOF ¶ 225.) McQuaid and Hanley attempted to submit a copy of the old Renewal Application to

61

Acosta, but he informed them that the IGB was developing a new version of the application form, in light of Section 11.2. (C. Defs.' SOF ¶ 226.) Defendants maintain that McQuaid disclosed in that meeting that the Village of Rosemont had begun site-clearing activities. Acosta later admitted that he knew about the preliminary site clearing. (Bankr. Tr. 3634:16–35:6; C. Defs.' SOF ¶ 227.) It is undisputed, however, that Hanley and McQuaid did not provide copies of the Site Access Agreement or the Letter of Intent at this meeting. (*See* PX41 at 26 (Emerald's Verified Answer admitting that the documents were not disclosed until December 2000.))

Two days later, on August 12, 1999, McQuaid sent Administrator Acosta a follow-up letter regarding the August 10 meeting. (Trustee's SOF ¶ 373; C. Defs.' SOF ¶ 232.) McQuaid's letter noted Emerald's concern about "media attention directed toward the construction in Rosemont" (PX311 at 1; C. Defs.' SOF ¶ 232), but the letter again did not include information about or copies of the Letter of Intent or the Site Access Agreement. (Trustee's SOF ¶ 373.) On September 7, 1999, Michael Ficaro represented Emerald at an IGB Board meeting to request consideration of Emerald's renewal and relocation proposal. (PX858 at 705.) Again, however, Ficaro did not provide the IGB Board with the Letter of Intent, the Site Access Agreement or the existing Extension Agreements. (Trustee's SOF ¶ 374.) McQuaid and Hanley met one more time with Administrator Acosta on September 17, 2000. (Trustee's SOF ¶ 375; C. Defs.' SOF ¶ 270.) Again, the documents were not disclosed. (*See* PX384) (November 27, 2000 letter from McQuaid to Acosta explaining the failure to provide the Letter of Intent to the IGB.)

On September 24, 1999, McQuaid submitted Emerald's Renewal Application, using the new form the IGB had developed. (PX418.) McQuaid prepared this second Renewal Application, with the assistance of Hanley, Larson, and McMahon. (C. Defs.' SOF ¶ 287; *see infra* Background III.A.) Question 47 of the renewal application form asked Emerald to "Submit any agreements between LICENSEE and municipality(ies) not elsewhere disclosed in this

application, and any other agreements between the municipality(ies) regarding funds, revenues or other benefits to be derived from this license." (DX213 at 10) (capitalization in original.) Emerald's Renewal Application disclosed that "[p]reliminary discussions have been held with representatives of the Village of Rosemont. These discussions are continuing and will eventually result in a development agreement, but to date no formal agreement has been executed." (C. Defs.' SOF ¶¶ 315–16.) Emerald's Application also disclosed that it intended to enter into a development agreement with the Village of Rosemont, but did not submit any of the preliminary letters or agreements with the Renewal Application. (PX418 at 94.) Emerald did identify and submit two agreements with Rosemont: (1) a resolution by the Board of Trustees of the Village of Rosemont approving Emerald's request to relocate the license to Rosemont, and (2) a tax-revenue sharing agreement with Rosemont to share the revenue from the casino with dozens of other Cook County communities. (PX418 at 94.) The application did not include the Letter of Intent, the Site Access Agreement, or the existing Extension Agreements. (PX418.)

On September 30, 1999, Hanley and McMahon met with Administrator Acosta and several other IGB staff. (Trustee's SOF ¶ 380; C. Defs.' SOF ¶ 341.) According to Defendants, the primary purpose of the meeting was to discuss debt financing. (C. Defs.' SOF ¶ 341.) The parties also discussed the progress of construction, however. McMahon was aware that site clearing activities were happening at the site pursuant to the Letter of Intent and Site Access Agreement. As he testified at trial, as of late July and early August of 1999, the Village of Rosemont was "clearing those structures, making the site ready for us as part of our lease agreement with them." (Tr. 159:22–160:1, 160:21–161:15.) At the September 30, 1999 meeting, McMahon stated that the Village of Rosemont was conducing site-clearing activities and that Rosemont was incurring the costs. (C. Defs.' SOF ¶ 346.) McMahon also stated that there was "no lease agreement" yet, but that the parking garage was being negotiated. (C. Defs.' SOF ¶ 346; PX65 at 3.) McMahon and Hanley did not disclose the existence of or provide copies of the Letter of Intent, the Site Access Agreement, or the Extension Agreements.

Defendants admit that Administrator Acosta and the IGB staff requested that Emerald submit copies of contracts to the IGB. (Trustee's SOF ¶ 383; C. Defs.' SOF ¶ 348.) Defendants nevertheless assert that the IGB provided mixed signals at this meeting: Administrator Acosta asked for Defendants to be "over-inclusive" with the documents they sent. (C. Defs.' SOF ¶ 348; Trustee's SOF ¶ 383.) But, according to Hanley and McMahon, Deputy Administrator McDonald suggested that it was only necessary to submit executed contracts and not drafts. (Tr. 197:14–23, 1252:9–53:10; C. Defs.' SOF ¶ 348–49.) McDonald's testimony confirmed that Acosta had asked Defendants to be "overinclusive, that they should just give us more documents than– we'll tell them when to stop." (Bankr. Tr. 3347:17–22.) McDonald did not specifically recall telling Defendants that the IGB was not interested in receiving drafts or preliminary agreements (Bankr. Tr. 3347:24–3348:6), but he acknowledged it was "not the practice . . . for [the IGB] to request . . . [d]ocuments that were preliminary to a final agreement" from a licensee. (Bankr. Tr. 3350:4–11.)

On October 19, 1999, McDonald wrote to Hanley, requesting copies of "agreements reached with governmental entities," (PX318 at 2; Trustee's SOF ¶ 385), and "all significant contracts or agreements you may have executed since your last submission." (PX318 at 2; C. Defs.' SOF ¶ 362.) Emphasizing the use of the word "executed," Defendants urge that they interpreted this request to mean final agreements (C. Defs.' SOF ¶ 52); but the IGB Final Board Order concludes that the IGB had a broader scope in mind. Furthermore, although labeled a "Letter of Intent," the document signed by Emerald and the Village of Rosemont on July 21, 1999 was a contract that bound the Village of Rosemont and Emerald. In fact, the Letter stated that it was intended to "memorialize key terms that have been agreed to." (PX192 at 1.) The Illinois Appellate Court found that the Letter of Intent, the Site Access Agreement, and three Extension Agreements were contracts. (PX1233 at 104.) Even accepting Defendants' contention that the IGB wanted only final, not draft agreements, the Letter of Intent, Site Access Agreements and Extension Agreements fell into the category of "executed agreements."

Hanley responded to the letter on October 29, 1999. (Trustee's SOF ¶ 386; C. Defs.' SOF ¶ 364.) Hanley included financial statements and information, but again did not include the relevant Rosemont agreements. (PX319.) On January 25, 2000, Administrator Acosta wrote to Hanley again, warning that the IGB had not yet received any contracts from Emerald. (Trustee's SOF ¶ 388.) Hanley responded the next day, but still did not include the Letter of Intent, Site Access Agreement, or Extension Agreements, presumably on the understanding that these did not constitute executed contracts.

Then on January 31, 2000, McDonald wrote to Hanley, again requesting the submission of documents, but this time using much broader language; McDonald specifically asked for "letters of intent" and other non-final agreements entered into since July 1, 1999. (Trustee's SOF ¶ 391; C. Defs.' SOF ¶ 419.) On February 10, 2000, Emerald executed the final Lease and Development Agreement with the Village of Rosemont. (C. Defs.' SOF ¶ 422.) Four days later, on February 14, 2000, Hanley responded to McDonald's letter with a list of written agreements and not-fully-executed Agreements. (Trustee's SOF ¶ 395.) But that list did not include the Letter of Intent, the Site Access Agreement, or the three Extension Agreements. (Trustee's SOF ¶ 296; C. Defs.' SOF ¶ 430.) Defendants assert that Hanley believed there was no need to submit the Letter of Intent and other preliminary agreements, because Emerald had by this time submitted the February 10, 2000 Lease and Development Agreement, which was the final agreement and superseded the earlier versions. (C. Defs.' SOF ¶ 430.) The Trustee alleges that it was Kevin Flynn who supervised drafting the February 14, 2000 letter. (Trustee's SOF ¶ 397.) In his testimony, Kevin Flynn equivocates about whether he was directly involved in collecting the documents or merely provided general oversight. (Bankr. Tr. 990:17–93:19.) Without more, the court in unable to conclude that Kevin Flynn withheld documents from the IGB.

Whatever mixed signals or misunderstandings there may have been about whether Emerald was required to submit the documents, the IGB Final Board Order concluded that

Emerald was required to send the Letter of Intent, the Site Access Agreement, and the Extension Agreements. (PX162 at 13.) The evidence largely supports the conclusion that Emerald did not in fact submit those materials to the IGB until December 5, 2000. Only McQuaid's testimony suggests that the documents were submitted by Emerald to the IGB at an earlier date. (*See* C. Defs.' SOF ¶ 216.) Before the Bankruptcy Court, McQuaid testified that he submitted the documents to then-Administrator Casey at a meeting in early August 1999. (Bankr. Tr. 3401:7–19, 3436:8–16.) McQuaid admitted that he was unable to find any record of the transmittal, however (Bankr. Tr. 3403:6–9, 3451:22–3452:9), and that the documents were not submitted to the IGB on any other occasion. (*See* Tr. 990:19–22.)[23]

Other contemporaneous evidence supports the conclusion that the documents were not submitted in response to IGB's requests for contracts before December 5, 2000. On November 27, 2000, McQuaid wrote to Acosta, explaining that the Letter of Intent had not been submitted because he did not believe it was a final executed contract. (PX384 at 1.) In a letter dated December 5, 2000, Hanley apologized to the IGB for not providing the documents earlier and attached copies of the relevant documents with this letter, evidently for the first time. (PX1106 at 2; Trustee's SOF ¶ 403.) Finally, in its Answer to the IGB's Disciplinary Complaint for revocation of the license, Emerald asserts that the letters were not submitted because Emerald did not believe they were required to submit them. (PX41 at 26.) McQuaid's testimony that he submitted the documents to then-Administrator Casey is not credible in light of the weight of this contemporaneous evidence.

In short, although the parties dispute the reasons that Emerald failed to disclose the

---

[23] "Q. All through the months of October, November, and December of 1999, these agreements or letters -- let's call them letters -- signed by the Village and Emerald were never submitted to the IGB, correct?

A. I have in the past given testimony that I thought I gave a copy of the letter of intent to Mr. Casey on one occasion. Other than that, sir, they were not submitted with our renewal application." (Tr. 990.)

documents, they do not seriously dispute that Emerald did fail to disclose the documents until December 5, 2000. This failure to disclose violated IGB Rules 140(a) and 140(b)(3). (PX162 at 32–33.) The evidence reveals that Defendants McQuaid, Hanley, and McMahon were responsible for this failure to disclose.

### 3. The IGB found that the final Lease and Development Agreement between Emerald and Rosemont violated IGB rules

The IGB also found that the final Lease and Development Agreement, which was submitted to the IGB on the day it was executed, contained multiple provisions that violated the IGB's rules. (PX162 at 14–15, 34–35.) First, the IGB found that the Agreement "allowed the Village of Rosemont to waive the requirement that Emerald obtain necessary regulatory approval from the IGB prior to commencing construction of the casino." (*Id.* at 14.) Second, the Agreement also "committed Emerald to fund the construction of a parking garage even though Emerald did not have sufficient financing dedicated to do so." (*Id.* at 14–15.) Third, according to the IGB, the Agreement "failed to provide Emerald the ability to exercise appropriate control or supervision over the management of the contractor or sub-contractors for the casino and parking garage construction project." (*Id.* at 15.) The last finding related to the fact that D & P Construction Company, an organization "controlled by Peter and John DiFronzo," worked on the construction site. (*Id.*) According to an FBI memo that the IGB had access to, but which was not produced here, John DiFronzo had been identified "as a known member of the Chicago Outfit" and "Peter DiFronzo was considered to be a member of the Chicago Outfit." (PX162 at 16.) The Illinois Appellate Court, however, found that the IGB's findings related to organized crime "against the manifest weight of the evidence" and overturned these findings. (PX1233 at 105.) Therefore, only the first two provisions of the Lease and Development Agreement are at issue here.

The Lease and Development Agreement authorized Emerald to commence construction "subject to [Emerald's] performance to the satisfaction of, or waiver by, the Village prior to or on

the Construction Commencement Date of every covenant required to be performed by [Emerald] prior thereto including the following conditions precedent." (PX188 at 45, Art. 8.) Among the "conditions precedent" the Village was authorized to waive were "Required Construction Approvals" (PX188 at 46, § 8.4), including specifically "the approval of the Gaming Board of the relocation of the home dock for Developer's Owner's License to the Village." (PX188 at 26, § 1.50.)

The Defendants do not dispute the inclusion of these terms, but do dispute the overall meaning of the contract. Citing Article 7, Defendants maintain that the entire agreement was contingent on IGB approval. (C. Defs.' SOF ¶ 445.) Specifically, they point out that the Agreement provides "[t]he obligation of the Developer to proceed with the development of the Casino site . . . shall be subject to fulfillment to the satisfaction of, or waiver by, [Emerald . . . of the following conditions precedent," including that Emerald "shall have obtained all Required Construction Approvals." (PX188 at 42.) But this term, cited as evidence that the Agreement was contingent on IGB approval, itself includes the "waiver" language that the IGB took issue with. The only difference between this provision and the provision the IGB took issue with is that Emerald, rather than Rosemont, is the party authorized to waive the condition. The IGB interpreted the contract as providing the Village of Rosemont with the authority to "waive" the requirement for IGB approval before construction could begin. (PX162 at 15.) This court notes that a contractual provision could not give the Village power to "waive" a state regulatory requirement; as the Appellate Court noted in another context, "[w]aiving the Board's approval would put the contracts in violation of Rule 235(a) and illegal contracts are void." (PX1233 at 122.) In any event, the Illinois Appellate Court did not overturn the IGB's finding concerning this provision.

The parties also dispute now whether the IGB even had a rule requiring licensees to obtain approval prior to commencing construction. The Trustee alleges that Emerald was required to obtain prior approval for construction activities and failed to do so in violation for

Rule 230(d).  (Trustee's SOF ¶ 448.)  Defendants note that Rule 230(d) only requires IGB prior approval "whenever a change is proposed" in the design of a casino.  86 ILL. ADMIN. CODE § 3000.230(d).   The Illinois Appellate Court rejected this interpretation of Rule 230(d): "Common sense would suggest that if Emerald could not change the design of its riverboat without prior formal Board approval, Emerald could not build an altogether new boat and associated structures without prior formal Board approval."  (PX1233 at 113–14.)  However the language of Rule 230(d) is interpreted, Defendant contend, it was not the normal practice of the IGB to require advance approval for casino construction.  (C. Defs.' SOF ¶ 372.)  To the contrary, all the original licensees commenced physical construction or contracted for construction without obtaining IGB approval.  (C. Defs.' SOF ¶ 375.)  The IGB itself gave mixed signals about whether prior approval was necessary, Defendants observe, and Chief Legal Counsel Cusack and Board Chair Vickery themselves publicly disagreed about whether there was such a requirement.  (C. Defs.' SOF ¶¶ 403–06.)  Though the pre-approval requirement may have been poorly, if ever, communicated to Defendants, the IGB ultimately decided that prior approval for construction was necessary, and the Illinois Appellate Court agreed.  (PX1233 at 113.)

The IGB found, further, that the inclusion of the "waiver" term in the Rosemont agreement, a term that purportedly contemplated a violation of Rule 230(d), violated Rule 110(a).  (PX162 at 35.)  Emerald itself admitted, in its Verified Answer to the Disciplinary Complaint for revocation of the license, that the Lease and Development Agreement "among other things, allows the Village of Rosemont to waive the requirement that Emerald first obtain the necessary regulatory approval from the Board prior to commencing construction of the casino."  (PX41 at 28.)  A contract term could not, of course, authorize the Village of Rosemont to "waive" a state regulatory requirement; as the court understands this contract language, it meant that Rosemont was willing to permit progress on construction of the casino before the IGB itself had approved it.  Although Defendants may have genuinely believed that the contract

69

nevertheless remained contingent on IGB approval (C. Defs.' SOF ¶ 445), the IGB disagreed and cited that provision as a basis for its revocation order.

The second term in the Lease and Development Agreement that the IGB took issue with was the term outlining the financing to build a parking garage. The IGB found that the Lease and Development Agreement "obligated Emerald to fund the construction of a parking garage even though [it] did not have sufficient financing to do so." (PX162 at 36.) Defendants assert that Emerald's obligation to build the Parking Garage was subject to a condition precedent that Emerald first obtain financing. (C. Defs.' SOF ¶ 446.) The Trustee argues there was no condition. Article 12.1 of the contract simply required Emerald, "at its cost and expense, [to] design the Parking Facility Addition." (Trustee's SOF ¶ 411) (quoting PX188 at 57, § 12.1.) As this court reads that language, it imposed a requirement that Emerald design the facility—not construct it. Moreover, the Lease and Development Agreement also contains a specific section entitled "Conditions Precedent to the obligation of the Developer" (PX188 at 42, Art. 7), including, specifically, the condition that Emerald "shall have obtained construction financing commitments from financial institutions . . . for construction and completion of the Casino, the Parking Facility Addition and the Common Areas." (PX188 at 43, § 7.2.) Although Article 7 permitted Emerald to "waive" the conditions precedent (*see* PX188 at 42), the agreement certainly did not *obligate* Emerald to fund the parking garage without financing. Thus, although the IGB may have had separate concerns about the specific financing Emerald did ultimately obtain for the parking facility (*see, e.g.* PX162 at 14), the Trustee has not established that the Lease and Development Agreement included a term that "obligated Emerald to fund the construction of a parking garage even though [it] did not have sufficient financing to do so." (PX162 at 36.)

The Trustee has established that the Lease and Development Agreement included one term that the IGB determined violated its rules—the term permitting Rosemont to "waive" the requirement of IGB approval. For purposes of this case, in which the Trustee seeks to impose

liability on the individual Defendants, the inclusion of an unlawful term in the final Lease and Development Agreement is insufficient. The Trustee must also establish which individual Defendant was responsible for the term. As Defendants note, the Lease and Development Agreement was the product of negotiation between Emerald, Emerald's outside counsel, the Village of Rosemont, and Rosemont's attorneys. Several drafts were exchanged and various individuals added and subtracted terms. (C. Defs.' SOF ¶¶ 433–38, 444.) The Trustee does not specify which terms she believes Defendants were responsible for including (or subtracting).

The Trustee has presented evidence that Walter Hanley was the point person on behalf of Emerald for drafting the Lease and Development Agreement. Defendants admit that Hanley communicated with Rosemont's attorney and reviewed and edited the various drafts of the Agreement. (C. Defs.' SOF. ¶¶ 432–40.) Hanley also routinely consulted with outside counsel regarding the drafts. (C. Defs.' SOF ¶¶ 433, 435–36, 438.) McQuaid, too, was involved in some of the meetings with outside counsel regarding the drafts of the Lease and Development Agreement. (C. Defs.' SOF ¶ 436.) At an Emerald Board meeting on December 22, 1999, Hanley reviewed the draft of the Lease and Development Agreement and discussed its key elements. (C. Defs.' SOF ¶ 439.) The Emerald Board, including at that time, Eugene Heytow, Defendants Donald Flynn, Peer Pedersen, Kevin Larson, and Joseph McQuaid, unanimously approved the Agreement. (PX25 at 2; Trustee's SOF ¶ 412; C. Defs.' SOF ¶ 439.) Heytow was not personally present at the meeting but was represented by his attorney Richard Levy. (C. Defs.' SOF ¶ 439.) Finally, Hanley and McQuaid signed the Lease and Development Agreement on behalf of Emerald. (PX188 at 117.)

The court's review of the draft Lease and Development Agreement shows that the waiver term that the IGB took issue with was in the initial draft that Rosemont's lawyer, Peter Rosenthal, sent to Hanley. (*See* PX472 at 41) ("The right of the Developer to commence construction of the Casino and to take other affirmative actions under this Lease in connection with the development of the Casino Site, including the right to possession of the Casino Site,

shall be subject to the Developer's performance to the satisfaction of, or waiver by, the Village prior to or on the Construction Commencement Date or every covenant required to be performed by Developer prior thereto.")

Because the term remained in the final Lease and Development Agreement, it is clear Defendants did not remove it. Yet Defendants' failure to remove the term appears to be based on their understanding that the IGB had already tacitly approved the start of construction. As discussed above, on August 10, 1999, McQuaid and Hanley met with Acosta and Casey. (C. Defs.' SOF ¶ 225.) McQuaid testified that he told Acosta that "construction had begun at our site." (Tr. 655:9–656:17.) Acosta admitted that he did not tell Defendants not to proceed with the site-clearing activities. (Bankr. Tr. 3635:7–22.) Hanley's August 18, 1999 handwritten comments on the draft Lease and Development Agreement appear to take this into account; he wrote: "Do we need a waiver to commence construction prior to all these things? (e.g., Gaming Board approved Common Areas, etc.?)" (PX472 at 41; C. Defs.' SOF ¶ 432–433 (stating that Hanley received the first draft of the LDA, reviewed it and made comments throughout).) Hanley otherwise did include language recognizing the need for IGB approvals. In the section defining "Required Approvals," Hanley added terms requiring that Gaming Board approval. (*See* PX472 at 24, § 1.45.) The Trustee, therefore, has not established that any individual Defendant was responsible for the inclusion of the improper "waiver" term.

## III. Defendants' disclosures to the IGB

### A. Emerald's September 24, 1999 Renewal Application

Emerald submitted a revised[24] Renewal Application to the IGB on September 24, 1999,

---

[24] Emerald originally submitted a Renewal Application to the IGB on August 10, 1999, but at that time, Acosta informed McQuaid and Hanley that Emerald had received an outdated renewal application form by mistake and that the IGB would send Emerald a revised renewal application form. (C. Defs.' SOF ¶¶ 225–26.) The revised form, which was delivered to Emerald on September 22, 1999, contained additional questions. (C. Defs.' SOF ¶ 286.) Ficaro was of the view that the IGB did not have the authority to change the renewal application form (continued . . . )

using a form it had received from the IGB only two days earlier.  (C. Defs.' SOF ¶¶ 285, 287; D. Flynn's SOF ¶¶ 183–84.)  McQuaid prepared the Renewal Application, with the assistance of McMahon, Larson, and Hanley.[25]  (Trustee's SOF ¶¶ 633–35; C. Defs.' SOF ¶ 287; D. Flynn's SOF ¶ 184.)  And, though neither Donald Flynn nor Peer Pedersen participated in preparing or submitting the Renewal Application (D. Flynn's SOF ¶ 185; Pedersen's SOF ¶ 67), the Trustee asserts that as "Key Persons" they were responsible for ensuring that its contents did not violate the IGB Rules.  (Trustee's SOF ¶ 637.)  The IGB Final Board Order concluded that Emerald's Renewal Application was incomplete and inaccurate in response to questions concerning the identity of shareholders (Question 16), agreements Emerald had entered into (Question 21), threatened and pending litigation (Question 31), and Rosemont as the casino's chosen location (Questions 46 and 47) in violation of Rules 140(a), 140(b)(3), and 110(a). (PX162 at 10–12; Trustee's SOF ¶ 638.)  The Trustee has proven by a preponderance of the evidence that Defendants McQuaid and Hanley[26] provided incomplete or inaccurate answers in response to

without approval from the Joint Commission on Administrative Rules, but he advised Emerald to complete the revised application.  (*Id.*)

[25]     The Trustee claims that Kevin Flynn also assisted McQuaid (Trustee's SOF ¶ 633) (citing PX401; PX1090; PX1251), but Defendants, including Kevin Flynn, deny that he participated in preparing the Renewal Application.  (C. Defs.' SOF ¶ 287; D. Flynn's SOF ¶ 184.)  Defendants (all but Pedersen) admitted that "other Defendants" assisted McQuaid in preparing the Renewal Application, without identifying those other Defendants.  (PX401 ¶ 871.)  Hanley testified in an IGB interview on September 12, 2000 that "[a]ll the executive officers were involved in preparing the application."  (PX1090 at 53; *see also* PX1251 at 57–58 (when deposed, Hanley testified that "other officers participated" in preparing the Renewal Application).)  At trial, McQuaid stated that only Hanley, McMahon and Larson assisted with the Renewal Application.  (Tr. 687:19–688:2.)  Kevin Flynn testified about completion of the Renewal Application in general terms—referring to "Emerald" and "we" (as Emerald), but was not asked whether he specifically worked on the Renewal Application and did not identify any question on which he assisted McQuaid. (Bankr. Tr. 713:3–714:16.)  In addition, before this court, Kevin Flynn testified that he "imagin[ed]" that he reviewed the Renewal Application, that he "d[idn't] specifically remember," and when pressed, that he "at least reviewed parts of it" and "[p]erhaps all of it." (Tr. 2729:10–17.)  This testimony is insufficient to establish that Kevin Flynn himself prepared answers that the IGB found to be incomplete and inaccurate.

[26]     Though the record indicates that McMahon and Larson also helped McQuaid draft answers to the Renewal Application, the Trustee has failed to identify for the court the

(continued . . . )

Questions 21, 31, 46 and 47 of the Renewal Application in violation of IGB Rules 140(a), 140(b)(3), and 110(a), but there is insufficient evidence to conclude that McQuaid's answer to Question 16 was incomplete or inaccurate.

### 1.    Question 16: public officials

In its Final Board Order, the IGB concluded that in response to Question 16 of the Renewal Application, Emerald failed to identify three prospective shareholders who either were themselves public officials or were or relatives of public officials.  (PX162 at 11.)  The Illinois Appellate Court affirmed, reasoning that the IGB could reasonably find that Emerald's answer to Question 16 was false in violation of IGB Rules 110(a)(2) and 110(a)(5) for "failing to comply" or "failing to cooperate" with the IGB.  (PX1233 at 126–27.)  Question 16 asked:

> Has LICENSEE identified any PUBLIC OFFICIALS or officers or employees of any unit of government, or RELATIVES of said PUBLIC OFFICIALS, officers or employees, who, directly or INDIRECTLY own any financial INTEREST in, have any beneficial interest in, are the creditors of or hold any DEBT INSTRUMENT issued by, or hold or have any interest in any contractual employment or service relationship with LICENSEE?

(PX418 at 4.)  The IGB's Personal Disclosure Form 1[27] ("PDF 1") defined "public official" as "[a]n Individual who is elected to office pursuant to Illinois statute, or who is appointed to an

---

specific sections that these Defendants prepared.  Without evidence that they assisted McQuaid in drafting Questions 21, 31, 46 and 47, the court does not find them responsible for the incomplete and inaccurate answers to these questions.

[27]    Rule 235(a)(1) provides: "An individual or entity filing an application for transfer of any ownership interest in an entity with a finding of preliminary suitability or in a holder of an Owner's license, must complete a . . . Personal Disclosure Form 1, and any other information specifically requested by the Board. The information will form the basis of Board investigation to determine suitability of the person or entity seeking transfer." 86 ILL. ADMIN. CODE § 3000.235(a)(1).  Rule 225(a) further requires every "Key Person" to complete a PDF 1. 86 ILL. ADMIN. CODE § 3000.225(a).  The rules define a "Key Person" as "[a] person identified by the Board under [Rule 222] as subject to regulatory approval as a Person able to control, or exercise significant influence over, the management, assets, or operating policies of an owner or suppliers license." 86 ILL. ADMIN. CODE § 3000.100.  The PDF 1 requires individuals to provide information including a recent photograph, birth certificate, fingerprints, legal name, address, phone number, driver's license information, and information concerning the applicant's marital status, his or her spouse, parents, children, and extended family, educational history, (continued . . . )

office which is established under and the qualifications and duties of which are prescribed by Illinois statute to discharge a public duty for the state or any of its political subdivisions." (PX194 at 10.) Question 16a then asked Emerald to "[d]escribe in detail what steps [it] has taken to verify the accuracy" of its answer to Question 16. (PX418 at 4.) The instructions accompanying Question 16 state that Emerald is "required to identify" public officials or relatives of public officials. (PX544 at 5.) Emerald responded "no" to Question 16, and explained in Exhibit 16a-1 that, though it provided each of its proposed shareholders with PDF 1s, "[Emerald] does not review the PDF 1 or update materials of its shareholders," and therefore, "[a]ll disclosures made in this application are subject to any matters disclosed on any PDF 1 or update materials submitted to the Illinois Gaming Board by any shareholder of [Emerald]." (PX418 at 4, 52.) Thus, Defendants acknowledge that, as the IGB noted in its Final Board Order, no one at Emerald examined prospective shareholders' PDF 1s. (PX162 at 11; C. Defs.' SOF ¶ 293.)

In fact, two prospective shareholders were public officials and one was a relative of a public official—Susan Leonis was Vice Chairman of the Board of the Chicago Transit Authority, Robert Martwick was Democratic Committeeman for Norwood Park Township, and John Sisto was nephew of Illinois State Representative Ralph Capparelli. (Trustee's SOF ¶¶ 646, 651, 654; C. Defs.' SOF ¶¶ 296–99.) Susan Leonis, who agreed to purchase stock from Donald Flynn on September 10, 1999, was Vice Chairman of the Board of the Chicago Transit Authority ("CTA") as of September 24, 1999. (Trustee's SOF ¶¶ 645–46; *see* C. Defs.' SOF ¶ 299.) As an appointed official to the CTA Board, Leonis was a "public official" under the IGB's definition. (*See* 70 ILCS §§ 3605/19, 3605/20.) The Trustee contends McQuaid knew about Leonis' position on the CTA Board, but the evidence is equivocal: Leonis testified that she told McQuaid in a September 1999 telephone conversation that she was a CTA Board member, and asked

---

judicial or non-judicial investigations of the applicant, disciplinary proceedings, arrests or convictions, and similar information about family members. (PX194.)

McQuaid whether she could nevertheless invest in Emerald. According to Leonis, McQuaid responded that she was free to do so despite her status as an appointed official. (Trustee's SOF ¶ 647) (citing Bankr. Tr. 2388:19–2390:6.) In an affidavit submitted to the IGB in September 2006, Leonis stated that no one advised her that as a CTA Board member she was barred from investing in Emerald (C. Defs.' SOF ¶¶ 300–01) (citing Bankr. Tr. 2406:12– 2407:3.) McQuaid testified that he did not recall any conversation with Leonis about her position as a CTA Board member (C. Defs.' SOF ¶ 299) (citing Bankr. Tr. 2375:3–2376:19.) Leonis did not disclose her position on the CTA Board in her PDF 1. (PX1036 at 3.) The court finds that there is insufficient evidence to conclude that McQuaid was aware that Leonis was a public official at the time of the Renewal Application. McQuaid may have known (or perhaps should have known) that Leonis was a public official, but it is equally likely, given his denial of the conversation, that he was unaware of her position with the CTA.

Robert Martwick, another individual who agreed to purchase stock from Donald Flynn on September 17, 1999, has been the Norwood Park Township Democratic Committeeman since 1969. (Trustee's SOF ¶¶ 651–52.) Though Defendants dispute that he was a "public official," under Illinois law, a party committeeman is an elected position. *See* 10 ILCS 5/2A-1.2(b)(2); (C. Defs.' SOF ¶ 297.) In addition, Defendants admit that Martwick's son, Robert Martwick, Jr., for purposes of Illinois law, is Trustee for the Village of Norridge—a public official. (Trustee's SOF ¶ 653; C. Defs.' SOF ¶ 296.) Martwick disclosed his son's employment with the Village of Norridge in his PDF 1, which he submitted to the IGB, but did not disclose his position as Democratic Committeeman. (C. Defs.' SOF ¶¶ 295–96; *see* PX195 at 32, 72.) John Sisto, who agreed to purchase stock from Donald Flynn on September 2, 1999, was the nephew of Illinois State Representative Ralph Capparelli, who had lobbied with McQuaid for the legislation that allowed Emerald to relocate. (Trustee's SOF ¶¶ 654–55.) Sisto disclosed his relationship with Capparelli in his PDF 1, which he submitted to the IGB in September 1999. (C. Defs.' SOF ¶ 298; *see* PX194.)

The Trustee urges that Emerald's response to Question 16a of the Renewal Application was "inadequate" because the instructions clearly stated that it was Emerald's burden to prove that it qualified for renewal of its license. (Trustee's SOF ¶ 659) (quoting PX544 at 3.) Defendants, on the other hand, maintain that because prospective shareholders submitted their PDF 1s directly to the IGB, Emerald and its officers were unaware of their status as, or relationship to, public officials when they completed the Renewal Application, and Emerald qualified its response by stating that "[a]ll disclosures made in this application are subject to any matters disclosed on any PDF 1." (Trustee's SOF ¶ 644; C. Defs.' SOF ¶¶ 292, 294.) This understanding, Defendants assert, is consistent with their past experience with the IGB; in the past, proposed investors would submit their PDF 1s directly to IGB (and not to Emerald), and the IGB would be responsible for investigating these individuals.[28] (C. Defs.' SOF ¶ 273.)

The Trustee has not admitted that this was the IGB's past practice, and the court recognizes that the IGB was free to change its practice. The court nevertheless concludes that the Trustee has not shown by a preponderance of the evidence that Defendants' response to Question 16a failed to comply or cooperate with an IGB order under Rule 110(a). There is no IGB rule that required Emerald to review the PDF 1s of proposed shareholders or otherwise screen them. *See* 86 ILL. ADMIN. CODE §§ 3000.240(b), 3000.235(a)(1). Additionally, not only was Emerald's answer to Question 16a of the Renewal Application expressly contingent on disclosures made by individual proposed shareholders in their PDF 1s, but Emerald had repeatedly informed the IGB that the proposed shareholders were sending their PDF 1s directly to the IGB without any prior review by Emerald. (PX306 at 2; PX369 at 1; PX376 at 1; PX544 at

---

[28] Ficaro testified that he did not advise Emerald to conduct its own investigation of prospective investors because it was not required under the Riverboat Gambling Act (the "only" investigation requirement was of "suppliers.") Rather, he believed it was the IGB's responsibility to investigate prospective investors, and that the $50,000 application fee was intended to cover some of the expenses the IGB incurred in its investigation. (C. Defs.' SOF ¶ 273) (citing Tr. 1836:9–1837:14.)

2.)  And Emerald's Renewal Application explicitly disclosed that Emerald had not reviewed those forms.

## 2.    Question 21: agreements

The IGB also found that Emerald's response to Question 21, disclosing certain agreements into which it had entered, was incomplete and inaccurate, in violation of Rules 140(a) and 140(b)(3).  (PX162 at 11–12, 31–32.)  Question 21 instructed Emerald to  "Provide all . . . instruments, agreements or contracts which have been initiated or changed since your last renewal" including "contracts, leasing or rental agreements, or other agreements relating to GAMING," and "all agreements, arrangements and commitments related to proposed gaming facility and related projects."  Emerald submitted the following five agreements:

- (a) license agreement for certain technology for use in electronic gaming devices;
- (b) agreement with Mackie Consultants, Inc. regarding engineering services;
- (c) agreement with Jefferies & Company, Inc. regarding financing;
- (d) agreement with Anthony Leone regarding lobbying services;
- (e) agreement regarding sale of real estate in Jo Daviess County, Illinois."

(PX418 at 54.)  In addition, Emerald disclosed that it had "engaged numerous professionals and consultants . . . to work on its casino development," identifying those individuals and companies, but noting that it "has not executed any agreements except for those [five] described above."[29] (PX418 at 54.)  The Trustee asserts that Emerald omitted the following agreements that it had entered into as of September 24, 1999:

- Lake County Riverboat Agreement (November 12, 1997) (*see* PX424);
- Davis-Duchossois Agreement (December 1, 1998);

---

[29]      Emerald identified the following professionals and consultants in Exhibit 21-1 to its Renewal Application: "Aria Group Architects, Michael Toensmeyer (structural engineer), Power Construction/Degan [sic] & Rosato (construction management), Kenig, Lidgren, O'Hara, Aboona, Inc. (traffic engineer), DeJong & Lebet (naval architect), James McHugh Construction, Anthony Rossi (architect), Testing Service Corporation (soil borings), Honkamp, Krueger & Co. (CPA's), Hopkins & Sutter (attorneys), Bell, Boyd & Lloyd (attorneys) and Arthur Andersen (tax)."  (PX418 at 54.)

78

- Aria Proposal (June 10, 1999) (*see* PX222);
- Joint Venture (Power Construction/Degen & Rosato) Proposal Letter (July 2, 1999);
- Letter of Intent with Rosemont (July 21, 1999) (*see* PX192);
- Rosemont Site Access Agreement (August 2, 1999) (*see* PX366); and
- Rosemont Extension Agreement (August 26, 1999) (*see* PX367.)

(Trustee's SOF ¶¶ 664–65.)  The IGB Final Board Order identified, as agreements that Emerald failed to disclose only the Letters of Intent with Rosemont and the December 1997 Davis-Duchossois Agreement.  (PX162 at 12.)

The court finds, first, that McQuaid's[30] response to Question 21 was not incomplete or inadequate for failing to disclose the Lake County Riverboat Agreement, the Davis-Duchossois Agreement, or the Joint Venture Proposal Letter. By its terms, the Lake County Riverboat Agreement would "expire and be of no further force and effect on the last day of the fall 1997 VETO session, unless prior to that date the first condition set forth in Section 2 is met," which conditioned the agreement on an amendment to the Illinois Riverboat Gambling Act "to permit a site relocation with respect to the use of HP's Gaming License at another site."  (PX424 at 1–2.) The Riverboat Gambling Act was eventually amended to satisfy this condition, but because this did not occur before the end of the fall 1997 legislative session, the agreement expired.  The IGB did not cite Emerald for failing to disclose this agreement, nor, does it appear to be relevant to Question 21 of the Renewal Application, which appears to request identification of current, and not past or void, agreements into which Emerald has entered.  Furthermore, Defendants deny that there was any agreement between Emerald and Davis-Duchossois on December 1, 1998, and as discussed *supra,* the court agrees. (*See supra* Background II.A.2; C. Defs.' SOF

---

[30]  Hanley testified about Emerald's response to Question 21, but did not testify that he knew about Emerald's construction agreements or that he helped prepare this answer. (Tr. 1248:9–20.) Hanley did participate in negotiating the Lease and Development Agreement with Rosemont, however, preceded by the three Rosemont agreements not disclosed in response to Question 21.  (Tr. 1247:12–1248:8.)  Therefore, the court finds sufficient evidence to conclude that Hanley assisted McQuaid in preparing an answer to Question 21 at least with respect to the Rosemont agreements.

¶ 506.) And, similar to the Lake County Riverboat Agreement, the court finds that the Joint Venture Proposal Letter was not a binding agreement, but instead, was merely a proposal to serve as Emerald's general contractor for the project, which Emerald was free to reject. (*See infra* Background III.B.4.a.)

There were other agreements that McQuaid failed to disclose however: the Aria Proposal as well as agreements with DeJong & Lebet and Michael Toensmeyer. And McQuaid and Hanley failed to disclose Emerald's agreements with Rosemont. Defendants admit that they did not submit the Letter of Intent with Rosemont, the Rosemont Site Access Agreement, or the Rosemont Extension Agreement. (PX401 at ¶ 908; C. Defs.' SOF ¶ 206.) Defendants explain this failure by emphasizing that in Question 21, the IGB requested only final agreements, and did not seek "preliminary, non-binding documents" from Emerald until January 31, 2000. (C. Defs.' SOF ¶ 305.)

Defendants' characterization of the Rosemont agreements is disingenuous; each of these agreements entered into by Emerald with Rosemont was a binding agreement. The Letter of Intent (and the subsequent extension agreement) agreed on key terms of an anticipated Lease and Development Agreement, and the Site Access Agreement granted Emerald permission to begin construction before the Lease and Development Agreement was executed, but required Emerald to bear the costs. (*See infra* Background II.B.2.) Moreover, IGB Rule 140(b)(3) clearly specifies that Emerald was required to disclose "oral or written" agreements "relating to . . . construction contracts." 86 ILL. ADMIN. CODE § 3000.140(b)(3). McQuaid's disclosure that Emerald had "engaged" Aria, Michael Toensmeyer, and DeJong & Lebet was insufficient (*see* PX418 at 54), as, by September 24, 1999, Emerald had entered into a Letter of Intent with Aria, and had incurred expenses for work performed by Aria, DeJong & Lebet, and Michael Toensmeyer—evidence that Emerald had entered into agreements with each of these vendors. (*See infra* Background III.B.4.a.)

### 3. Question 31: threatened litigation

In addition, the IGB found, Emerald failed to disclose the threatened *Davis* litigation, and therefore, provided incomplete and inaccurate information in response to Question 31. (PX162 at 12.) Question 31 asks: "Has LICENSEE or any of its Affiliates, during the past three years been a party to any legal action, including pending or threatened litigation or administrative action not elsewhere disclosed in this APPLICATION?" (PX418 at 6.) McQuaid and Hanley[31] identified two legal actions in response—a shareholder's action for a lien on real estate in Jo Daviess County, and the administrative action before the IGB concerning Emerald's 1997 license Renewal Application. (*Id.* at 82.) The Trustee asserts, and the IGB concluded in its Final Board Order, that Emerald also should have disclosed that the Davis Companies had threatened to sue Emerald to enforce the alleged December 1998 agreement. (PX162 at 12, 35 ("the Davis Companies had already planned a complaint and notified Emerald of the fact"); Trustee's SOF ¶¶ 668–69; *see also* C. Defs.' SOF ¶ 308.) The Illinois Appellate Court affirmed that determination, rejecting Emerald's explanation that it was not obligated to disclose the threatened action because it "reasonably believed" that the Davis Companies would not file litigation, and concluding that Emerald provided an incomplete answer to Question 31 in violation of IGB Rule 110(a)(2). (PX1233 at 129–30.)

Before this court, the parties dispute whether the Davis Companies had, in fact, threatened Emerald with litigation before Emerald submitted the Renewal Application. (Trustee's SOF ¶¶ 669–70; C. Defs.' SOF ¶ 308.) In a letter dated August 18, 1999, Wayne Whalen of Skadden, Arps, Slate, Meagher & Flom, counsel for the Davis Companies, wrote to Michael Ficaro, Emerald's attorney, explaining that his firm represented the Davis Companies

---

[31] Hanley testified that he was "involved with [Emerald's] defense of the *Davis* litigation," and answered questions about Question 31. (Tr. 1516:14–19, 1521:8–25.) The court presumes that, as general counsel, Hanley assisted McQuaid in answering Question 31, and therefore, also is responsible for its contents.

"in connection with the Agreement reached among Mike Colleran and Kevin Flynn and others . . . for the operation, development and financing of a Casino Riverboat and Entertainment Complex in Rosemont, Illinois and a sharing of appropriately $30 Million dollars of investment and expenses previously incurred by the parties." (PX339 at 1.) The agreement, Whalen continued, "requires . . . [the Davis Companies'] prior approval for material business decisions." (*Id.*) Whalen concludes the letter by requesting a meeting with Ficaro, and stating that "[u]nless we hear from you, we will need to present the Agreement as an interested party to the Gaming Board at its September meeting to avoid any misunderstanding which requires we act this week." (*Id.*) Whalen called Ficaro and left a voicemail on August 20, 1999 to inform Ficaro that the Davis Companies "filed with the Gaming Board an expression of interest," and to reiterate that the Davis Companies would like to meet with Emerald regarding the Agreement. (PX341 at 2.) He also stated that "[McQuaid] apparently was concerned that a lawsuit might be filed before any such meeting occurred" but emphasized "that at least as to us that will not happen." (*Id.*)

Then, in a letter dated August 23, 1999, Whalen again wrote Ficaro requesting a meeting between the Davis Companies and Emerald "to sit down and discuss the open issues." (PX342.) On August 25, 1999, Whalen left another voicemail for Ficaro, stating, "I understand that the way has been cleared for at least you and me and possibly for the principals to sit down and have a conversation about the status of things," and asking Ficaro to return his call to set up the meeting. (PX343 at 2.) The following day, Mark Filip, another Skadden attorney, wrote to Ficaro to inform him that the Davis Companies would "answer the Gaming Board's request for further information concerning the agreement among [Emerald], the Davis Companies and others relating to the Casino Riverboat and Entertainment Complex in Rosemont," unless Ficaro contacted Filip or Whalen before the start of business the next day, August 27, 1999. (PX344.)

Emerald responded to the Davis Companies' efforts, through counsel, to set up a meeting to discuss the alleged Agreement. In a letter dated August 27, 1999, Ficaro informed

Whalen that Emerald had "notified the Gaming Board that [the Davis Companies'] claims are spurious and without legal basis." (PX345.) Ficaro concluded: "Emerald Casino, Inc. will take all necessary action to protect its existing riverboat license. The company will also seek legal redress for all damages caused by any interference with the rights or interests of the company and/or its shareholders." (*Id.*) In other words, Emerald itself threatened legal action on August 27, 1999. Hopkins & Sutter's billing records during this time period refer to the Davis Companies' communications both as "N. Bluhm and M. Davis Threats" and as the "Marvin Davis issue" or the "Whalen, Blum issue." (PX340 at 6–7.)

On September 20, 1999, Kevin Flynn at last spoke to Marvin Davis by telephone. During their conversation, Davis reiterated that the Davis Companies and Emerald had an agreement, and asked Kevin Flynn to meet with him to discuss it. (Trustee's SOF ¶¶ 675–76; C. Defs.' SOF ¶ 313.) When Kevin Flynn responded that there was no agreement, Defendants claim, "Davis became agitated, threatened other action, and hung up." (Trustee's SOF ¶ 675; C. Defs.' SOF ¶ 313, quoting PX1065 at 7).) Hanley testified that he was in Kevin Flynn's office when Kevin Flynn spoke with Davis on the telephone, and that though he "did not hear anything that Mr. Davis said during that call," he spoke with Kevin Flynn after the call, and understood that "there was a disagreement" between Davis and Kevin Flynn. (Tr. 1517:20–1518:22.) Hanley testified that he understood the "other action" threatened by Davis as a plan to "take the complaint to the Illinois Gaming Board—or not the complaint, the allegations of a deal" at a public meeting. (Tr. 1522:14–1523:6.)

Though the Davis dispute was not disclosed in Emerald's Renewal Application, the IGB appeared to be aware both that the Davis Companies claimed that it had entered into an agreement with Emerald to obtain an interest in the casino, and that Emerald denied the existence of such an agreement. Both Ficaro and Hanley testified that Ficaro notified the IGB

sometime before August 27, 1999 of the Davis Companies' claims.[32] (Tr. 1528:20–22, 1585:13–22, 1821:2–4, 1822:7–11.) And, Acosta wrote a memorandum on August 30, 1999 to Cusack, with the subject line "Davis Industries/Emerald Casino Issue," informing her that Whalen had left him a voicemail message on August 27, 1999 in which Whalen stated that the Davis Companies had an investment and management interest in Emerald arising from "an agreement with 'the Flynn family'." (PX177.) Acosta also wrote that he spoke with Filip, who asked that the matter of the Davis Companies' interest be placed on the September 7, 1999 IGB Board meeting agenda, and Acosta directed Filip to meet with the IGB staff before raising the issue at an IGB Board meeting. (*Id.*) This memorandum makes no reference to threatened litigation against Emerald arising from the Davis Companies' claims. (*Id.*)

Emerald and the Davis Companies obviously disagreed about the existence of any agreement giving the Davis Companies an interest in Emerald, but Defendants maintain that the Davis Companies never threatened litigation in their August and September 1999 communications with Emerald. (C. Defs.' SOF ¶ 308 (8/18/99 letter); ¶ 309 (8/20/99 voicemail); ¶ 309 (8/23/99 letter); ¶ 310 (8/26/99 letter).) Rather, the "M. Davis threats" referred to in Hopkins & Sutter's billing records, Defendants assert, were "Davis's threat to inform the Gaming Board of the alleged agreement." (C. Defs.' SOF ¶ 310.) There is no evidence that Whalen, on behalf of the Davis Companies, ever did disclose the existence of the alleged Davis agreement at a public IGB meeting.

This court concludes that the communications between the Davis Companies and Emerald in August and September 1999 escalated to such a point, that, as of September 24,

---

[32] Neither Hanley nor Ficaro state how Ficaro communicated this information to the IGB, and only Hanley specified a date (August 1999). (*See* Tr. 1528:20–22, 1585:13–22, 1821:2–4, 1822:7–11.) Ficaro's time records show that on August 26, 1999 he had a five-and-a-half hour "telephone conference" with Acosta, but when asked whether he notified Acosta of Davis' claims during this call, Ficaro testified that he had "no independent recollection if that was part of the conversation." (Tr. 1821:16–1822:6.)

1999, when Defendants submitted the Renewal Application, McQuaid and Hanley knew or reasonably should have suspected that the claims could form the basis for a suit against Emerald, a suit that the Davis Companies were prepared to file. The Davis Companies had forcefully asserted a claim of ownership in Emerald's most valuable asset, its license, and after Emerald rebuffed its requests for a meeting, Whalen threatened to publicly disclose such claims to the IGB. Emerald itself had made clear that it was prepared to take legal action to defend its interest in Emerald's license (and against allegedly false ownership claims in it). The next logical step, after Emerald denied any agreement with the Davis Companies, was for the Davis Companies to file suit, which it did on October 18, 1999, less than a month after Marvin Davis's conversation with Kevin Flynn. (Trustee's SOF ¶ 319; C. Defs.' SOF ¶¶ 321, 524.) The Trustee has presented sufficient evidence that McQuaid and Hanley failed to disclose the Davis claims even though they knew about the claims, and that such claims could lead to litigation.

Defendants argue that McQuaid and Hanley did not disclose the Davis claims because they were not credible, and that the IGB already knew about them. (C. Defs.' SOF ¶¶ 311, 314.) Neither of these arguments moves the court. Both ignore the language of Question 31, which asked whether Emerald was party to threatened litigation. (PX418 at 6.) The question swept broadly, and by asking Emerald for all threatened litigation in the past three years unless "elsewhere disclosed in this application," the IGB certainly contemplated disclosure of such claims, whether or not Defendants found them credible or believed they had somehow otherwise been disclosed to the IGB.

### 4. Questions 46 & 47: agreements with municipalities

The IGB Final Board Order also found that Emerald's responses to Questions 46 and 47 were incomplete and inaccurate in violation of Rules 140(a), 140(b)(3), and 110(a). (PX162 at 12, 31–32, 34–35.) Question 46 asked Emerald to "Describe LICENSEE's negotiations and dealings with any and all communities in which LICENSEE has initiated steps to locate its GAMING OPERATION." (PX418 at 7.) In addition, Question 47 required Emerald to "Submit

any agreements between LICENSEE and municipality(ies) not elsewhere disclosed in this application, and any other agreements between the municipality(ies) regarding funds, revenues or other benefits to be derived from this license." (*Id.*)  McQuaid and Hanley[33] responded that Emerald "has not initiated any steps to relocate with any community other than Rosemont, Illinois."[34] (*Id.* at 93.)  The Renewal Application also disclosed that "[p]reliminary discussions have been held with representatives of the Village of Rosemont.  These discussions are continuing and will eventually result in a development agreement, but to date no formal agreement has been executed." (*Id.*)  Emerald identified and submitted two agreements with Rosemont: (1) the approval by the Village of Rosemont to relocate the Emerald's license to Rosemont, and (2) a tax-revenue sharing agreement with Rosemont to share the revenue with seventy Cook County communities.  (*Id.* at 94.)  Emerald also disclosed that it "intends to enter into a development agreement with the Village of Rosemont," but did not submit any agreements to that effect.  (*Id.*)

The parties disagree about whether Emerald's response to these questions was completely forthcoming.  The Trustee argues that Emerald should have disclosed that it had negotiated and entered into a Letter of Intent, Site Access Agreement, and Extension Agreement with Rosemont, and should have submitted those agreements with its Renewal Application.  (Trustee's SOF ¶ 679) (citing PX192 (July 21, 1999 Letter of Intent); PX366 (August 2, 1999 Site Access Agreement); PX367 (August 26, 1999 Extension).)  Defendants contend that Emerald did sufficiently disclose that it had identified Rosemont as the community

---

[33]    Hanley testified that he was involved in negotiating Emerald's Lease and Development Agreement with Rosemont.  He also testified about Emerald's answers to Questions 46 and 47 of the Renewal Application.  (Tr. 1247:12–1248:8.)  The court presumes that Hanley assisted McQuaid in answering Questions 46 and 47 about Emerald's negotiations and agreements with its host community.

[34]    McQuaid and Hanley did admit that Emerald agents "spoke with or met with representatives of a number of communities but [asserted that] there were never any negotiations or steps taken to relocate" before Section 11.2 was passed.  (PX418 at 93.)

to which it intended to relocate, that it was in negotiations with Rosemont concerning the relocation and development of the casino, and that those negotiations would ultimately be memorialized in a development agreement. (C. Defs.' SOF ¶¶ 315–16) (quoting PX418 at 93–94.) Again, however, like their answer to Question 21, in which McQuaid and Hanley failed to disclose construction agreements and these same agreements with Rosemont, McQuaid and Hanley's response to Questions 46 and 47 was incomplete in violation of Rules 140(a), 140(b)(3), and 110(a). (*See also supra* Background II.B.2.)

## B. Construction Agreements

The IGB found that Emerald violated Rules 140(a) and 140(b)(3) by failing to disclose or "providing false, misleading or incomplete information" to the IGB regarding Emerald's agreements with "construction professionals, contractors, subcontractors and vendors." (PX162 at 31–33.) The Illinois Appellate Court agreed. (PX1233 at 104–05.) As explained below, this court, too, finds that McQuaid and Hanley failed to disclose various construction agreements to the IGB.

### 1. Aria Architects

In June 1999, before Section 11.2 became law, Defendants Kevin Flynn, John McMahon, and Kevin Larson met with Aria Group Architects, Inc. to discuss Emerald's retaining Aria to serve as design architects for the casino. (Trustee's SOF ¶¶ 421–22; *see also* PX218 at 2; Bankr. Tr. 1020:15–1021:4.) Between June 7 and 10, 1999, Jim Lencioni of Aria attended three design meetings with Kevin Flynn, John McMahon, and Kevin Larson (each of whom attended at least one of the meetings), concerning design of the "Rosemont Casino." (PX218 at 2, 6, 9; Trustee's SOF ¶¶ 421–22.) Lencioni sent McMahon a letter dated June 10, 1999 that contained terms of a preliminary contract,[35] stating that Aria would continue its "preliminary

---

[35] This initial agreement, though clearly on behalf of Emerald in anticipation of building a casino in Rosemont, does not explicitly identify Emerald as the contracting party.
(continued . . .)

studies" for the casino project at specified hourly rates. (PX222 at 1.)  In the letter, Lencioni wrote that "[o]nce the scope of the project is better defined we will provide you with an A.I.A. owner/architect agreement for architecture and interior design services for the project." (*Id.* at 1.)  Though the letter thus anticipated a more formal agreement at a later date, it also provided that the terms Lencioni set forth in the letter "will be deemed accepted, whether or not the proposal is executed and returned, in the event we receive verbal instructions to proceed." (*Id.* at 3.)  Jim Lencioni testified that Aria did receive verbal instructions from Emerald[36] to continue its design work (Bankr. Tr. 1048:10–14), and McMahon authorized payment to Aria for work performed as early as June 1999. (Bankr. Tr. 1276:21–1278:20; *see* PX223.)  Emerald paid Aria $1,588,867 for design work performed between June 1999 and March 2000.  (PX224; Trustee's SOF ¶ 425.)

### 2.  Degen & Rosato Construction Company/ Power Construction LLC, Joint Venture ("Joint Venture")

Soon after the legislation passed, Kevin Flynn and Joseph McQuaid also met with Isaac Degen and Ray Rosato (owners of Degen & Rosato Construction Company) and Terry Graber and Tom Settles (representatives from Power Construction, LLC) to discuss hiring the joint venture of Degen & Rosato/ Power Construction as Emerald's general contractor. (Trustee's SOF ¶ 427.)  The Joint Venture issued its proposal to act as general contractor for construction of the casino in a letter dated July 2, 1999, addressed to McQuaid, which stated that the Joint Venture would "perform all the pre-construction and construction services on a fast track basis for a fee equal to five percent (5%) of the total construction cost." (PX238.)  Similar to Aria's letter, the Joint Venture's letter to McQuaid stated that it expected to execute a final contract

---

Instead, the letter defines "client" as "Kevin Flynn, John McMahon" and is addressed to McMahon at Blue Chip. (PX222 at 1, 2.)

[36]    Jim Lencioni does not specify who at Emerald gave Aria instructions to continue work, and as noted *supra*, note 35, Emerald was not a named party to the initial agreement with Aria.

with Emerald in the future, and that "[w]e anticipate the contract form to be consistent with AIA document 'Cost of the Work plus a fee' modified to our mutual satisfaction considering the particulars of this project and to reflect the extent of our services and obligations." (*Id.*) The letter also identified certain additional costs that would not be part of the "fee." (*Id.*) Later, in October 1999, McMahon, on behalf of Emerald, executed a Letter of Intent dated October 4, 1999 to enter into a final contract with the Joint Venture. (PX252.) The October 4 Letter of Intent, again, anticipated execution of a final contract, providing that "[a] formal contract will be submitted by [the Joint Venture] within two weeks based upon the AIA A111 and A201 Agreement, which is the Cost of the Work Plus a Fee contract" and the parties "agree[d] to negotiate diligently and in good faith to complete the Agreement" within thirty days. (PX252 at 1.) As general contractor, between October 1999 and January 2000, the Joint Venture, with McMahon's approval, hired various subcontractors, including[37] Plote Excavating on October 8, 1999 (for excavation services), Zalk Joseph Fabricators on October 22, 1999 (for structural steel erection work on a barge), Standard-Hayes Boiler and Tank on October 27, 1999 (for erection of the barge), and Gurtz Electric Company on January 17, 2000 (for electrical services). (PX407 (Plote); PX248 (Zalk Joseph); PX409 (Standard-Hayes); PX408 (Gurtz); *see* PX401 ¶¶ 648, 650; Bankr. Tr. 1309:9–1314:12.) McMahon testified that he "[did not] think that [Emerald] notified [the IGB] of those subcontractor agreements." (Bankr. Tr. 1314:13–1315:6.)

---

[37] The record contains evidence of at least nine other subcontractors hired by the Joint Venture who performed or agreed to perform work on the project, as well: Arrow Concrete (cleaned basin-barge area); Precast Concrete Specialties (loaded, transported, and unloaded concrete panels); Wilkin Spray Insulation Company; G & L Associates, Inc. (stored and delivered composite and foam metal panel material); LaForce Hardware; Illinois Contract Glazing (delivered curtainwall material); Barry Thomas Plumbing (manufactured house pumps); Superior Mechanical Systems (revised architectural and mechanical drawings); and FE Moran. (PX274.)

### 3. Other agreements

In addition, Emerald hired and paid the following professionals for services performed on the casino project:

- DeJong & Lebet (naval architects) (PX245 at 3 (invoice dated 9/21/99); Bankr. Tr. 1315:11–1318:19);

- Michael Toensmeyer (structural engineer) (PX402 (invoice dated 9/24/99); Bankr. Tr. 1318:21–1320:2);

- Christopher Burke Engineering (Trustee's SOF ¶ 440) (citing PX399 at 60 (first payment issued 12/3/99));

- James McHugh Construction Company (Trustee's SOF ¶ 440) (citing PX399 at 70 (first payment issued 10/27/99));

- Mackie Consultants, Inc. (Trustee's SOF ¶ 440) (citing PX399 at 73 (first payment issued 9/27/99));

- McGuire Engineers (Trustee's SOF ¶ 440) (citing PX399 at 73 (first payment issued 10/15/99).)

### 4. Communication with the IGB

In addition to agreements with Rosemont (*see supra* Background II.B.2), the IGB found that Emerald failed to disclose various construction agreements, but it only specifically identified the October 4 Letter of Intent with the Joint Venture. (PX162 at 14, 31–32.) Defendants maintain that Rule 140(b)(3), which required Emerald to disclose "changes in or new agreements, whether oral or written, relating to: . . . [c]onstruction contracts," applied only to final, executed agreements and not to draft agreements. (C. Defs.' SOF ¶¶ 305, 347–48.) Under the "design-build" approach to construction, which "allow[ed] a project to proceed in advance of finalizing and executing a contract," Defendants note, "a guaranteed maximum price contract can only be issued after all costs had been determined, based upon the final plans and specification." (C. Defs.' SOF ¶ 428.) As a result, Defendants maintain, they never executed final agreements with many of these construction professionals. But the record clearly shows that Emerald entered into some sort of agreement with these construction professionals, who performed services for Emerald, in exchange for payment or an agreement to pay from Emerald. McQuaid and Hanley, in their communications with the IGB, failed to disclose

construction agreements with Aria, DeJong & Lebet, Michael Toensmeyer, the Joint Venture, McGuire Engineers, James McHugh Construction Company, and Christopher Burke Engineering Company, as well as subcontractors Plote Excavating, Zalk Joseph Fabricators, Standard-Hayes Boiler & Tank, and Gurtz Electric.

### a. September 24, 1999 Renewal Application

In their revised Renewal Application, submitted on September 24, 1999, Emerald (McQuaid)[38] submitted five agreements: "license agreement for certain technology in electronic gaming devices;" an agreement with Mackie Consultants, Inc. for engineering services; an agreement with Jeffries & Company, Inc. "regarding financing;" an agreement with Anthony Leone for lobbying services; and a sales agreement for the sale of Emerald's real estate in Jo Daviess County, Illinois. (PX418 at 54.)  In addition, it identified the following individuals and companies that it had engaged on the casino project, but represented that it "has not executed any agreements except for" the five disclosed: Aria Group Architects; Michael Toensmeyer; the Joint Venture; Kenig, Lindgren, O'Hara, Aboona, Inc.; DeJong & Lebet; James McHugh Construction; Anthony Rossi; Testing Service Corporation; Honkamp, Krueger & Co.; Hopkins & Sutter; Bell, Boyd & Lloyd; and Arthur Andersen. (*Id.*)  As of the date of the Renewal Application, however, Emerald had entered into a Letter of Intent with Aria, and had incurred at least $68,360.31 in charges for Aria's design work. (PX222 at 3; PX224 at 1.)  Additionally, DeJong & Lebet and Michael R. Toensmeyer had already performed services for Emerald, and Emerald owed these contractors $62,365.84 and $1154.98, respectively. (PX245 at 3; PX402.)

---

[38]     McMahon, Larson, and Hanley "assist[ed]" McQuaid in preparing the Renewal Application (PX401 ¶ 871), but there is no evidence in the record to show what parts of the Renewal Application these Defendants helped to draft. (*See, e.g.* PX1251 at 57–58 (216:6–24) (Hanley testified at his deposition that he participated in preparing "[p]ortions" of the Renewal Application); Bankr. Tr. 2765:10–20 (Hanley testified at trial that "[d]ifferent officers prepared different portions" of the Renewal Application).)  Without such evidence, it appears that McQuaid alone, who was primarily responsible for the Renewal Application and signed it (attesting to the truth of its contents) on behalf of Emerald, is accountable for the representations made within it. (PX418 at 2; *see supra* Background III.A.)

McQuaid did not disclose these agreements in the Renewal Application.[39]  Though McQuaid

had disclosed that Emerald had "engaged" Aria, DeJong & Lebet, Michael Toensmeyer, Joint

Venture, and James McHugh Construction in the Renewal Application, the IGB found that this

was insufficient, because Emerald had failed to submit the agreements themselves. (PX162 at

31–32; PX418 at 54.)

**b.      September 30, 1999 meeting with the IGB**

IGB Rule 140(b)(3) requires licensees to submit "changes in or new agreements"

concerning "[c]onstruction contracts," but does not define "agreements."  86 ILL. ADMIN. CODE

§ 3000.140(b)(3).  At the September 30, 1999 meeting with the IGB, however, Administrator

Acosta made clear that Defendants should be "over-inclusive" in submitting agreements to the

IGB.  (PX65 at 3.)  On September 30, 1999, McMahon and Hanley met with the IGB.  (PX65.)

As reflected in the minutes of that meeting, McMahon responded to Acosta's question about the

anticipated completion date for the casino, explaining that Emerald was "working with the

general contractor and [was] in the process of negotiating a contract with Power Construction

from Schaumburg."  (*Id.* at 2.)  Hanley stated that Emerald was "working with a 'long list of

professionals' and will submit contracts to the Board when executed." (*Id.* at 2–3.)  In addition,

"[Allan] McDonald [IGB Deputy Administrator of Audit and Financial Analysis] explained the

need for any contracts or agreements executed by Emerald to be sent to him." (*Id.* at 3.)  As

Defendants contend, McDonald and Acosta were inconsistent in communicating their desire for

all contracts, including drafts, or just for executed agreements.  McDonald admitted at the

bankruptcy trial that it was not the IGB's practice to request preliminary agreements from

---

[39]      The Trustee also argues that Defendants failed to submit the July 2, 1999
proposal letter from the Joint Venture in the Renewal Application. (Trustee's SOF ¶ 444.)  That
proposal letter does not appear to be an agreement, however. (*See* PX238.)  Unlike the June
10, 1999 Letter with Aria, which served as a working contract between Aria and Emerald during
the design process (and which Emerald accepted by giving Aria verbal instructions to proceed),
the July 2, 1999 proposal from the Joint Venture is exactly that—a mere proposal from the Joint
Venture to serve as Emerald's general contractor, which Emerald was free to reject. (*Id.*)

Emerald or other licensees. (Bankr. Tr. 3350:4–11.)  And, when deposed in May 2010, McDonald testified that "[the IGB] didn't have the staff resources to even review those kind of things, because, as you know, these things change back and forth depending on who's negotiating." (Bankr. Tr. 3350:22–3351:7.)

The minutes of the meeting do not distinguish between preliminary and final contracts, however.  Rather, they state that

> A discussion ensued about the many contracts that will be executed, and an attempt was made by Deputy McDonald, and Mr. Wilke to determine what contracts should be submitted . . . . Administrator Acosta explained to the Emerald representatives that they should be over-inclusive and that the IGB will communicate to Emerald what we need and don't need as we move forward.

(PX65 at 3.)  Acosta denied that either he or any other IGB representative told Defendants McMahon and Hanley to submit only final, executed contracts, and instead, when McMahon expressed concern that the IGB staff would be overrun with submissions, testified that "my response was to be over-inclusive, give us everything they got. If there were contracts or agreements we do not believe we needed, we would let them know please don't continue to send us this type of agreement." (Bankr. Tr. 367:20–368:25.)  Even McDonald, who admitted at trial that this was not consistent with the IGB's past practice, stated that at the September 30, 1999 meeting "Mr. Acosta made that very clear about the—being over-inclusive regarding the documents. I certainly was not in a position to counter him." (*See also* Bankr. Tr. 1893:21–1894:20.)

### c.      Communications with the IGB after September 30, 1999

In a letter dated October 19, 1999, McDonald requested from Hanley "[s]ignificant contracts or agreements you may have executed since your last submission." (PX318 at 2.) Hanley responded in a letter dated October 29, 1999, stating only that "governmental agreements and significant contracts will be provided when available." (PX319 at 1.)  Hanley understood "significant contracts" to mean "one that I would submit to the Board of Directors for their consideration, review and approval before the company would enter into such an

agreement." (Bankr. Tr. 2896:14–24.)  McDonald's letter did not define "significant contracts" (*see* PX318), but in light of the exchange with Acosta of the IGB on September 30, 1999 (*see* PX65 at 3), the court concludes the following construction agreements should have been, but were not disclosed:

- October 4, 1999 Letter of Intent with the Joint Venture (PX252);
- October 8, 1999 subcontractor agreement with Plote Excavating (PX407);
- October 22, 1999 subcontractor agreement with Zalk Joseph Fabricators (PX248); and
- October 27, 1999 subcontractor agreement with Standard-Hayes Boiler & Tank (PX409).

Additionally, Hanley failed to disclose that Emerald had engaged and paid the following professionals for services related to the casino's construction.

- Payment to McGuire Engineers on October 15, 1999 for $15,471.25 (PX399 at 73); and
- Payment to James McHugh Construction Company on October 27, 1999 for $19,375.17. (PX399 at 70.)

In addition, like McQuaid, Hanley failed to disclose agreements with Aria (PX222 at 3), DeJong & Lebet (PX245 at 3), and Michael Toensmeyer for construction services.  (PX402.)

 Acosta wrote Hanley on January 25, 2000, expressing surprise at the progress of construction, and summarizing the conversation that he and McDonald had had with McMahon and Hanley about submission of contracts to the IGB on September 30, 1999.  (PX69 at 1.) Acosta wrote, "[i]t is my understanding that since the time of that meeting, we have not received *any* contracts from Emerald." He demanded that Emerald produce "copies of all construction contracts pertaining to your proposed facility."  (PX69 at 2) (emphasis in original.)  Acosta's letter included language that, Defendants contend, communicated that they were required to submit (and the IGB wanted) only copies of final, executed contracts and not draft agreements: Acosta wrote, "If I am mistaken in my belief that such contracts have already *been entered into*, please advise me accordingly.  If, on the other hand, *such contracts have been executed* and copies have not been timely provided to the IGB, please provide all such contracts immediately."  (PX69 at 2) (emphasis added.)  Even if Acosta's arguably ambiguous language is

interpreted as Defendants suggest, however, the court notes that the agreements they failed to disclose were, in fact, actual agreements—to exchange construction services for payment—regardless of the labels Defendants attached to them. Defendants also took the position that these agreements were not final, because they were subject to change; but Rule 140(b)(3) required disclosure of agreements, even if they were subject to change.

Hanley responded to Acosta's January 25, 2000 letter the following day, disclosing that Emerald had "executed a letter of intent with [the Joint Venture] and two change orders with [DeJong & Lebet], but Emerald has not yet executed construction contracts with either of those firms. Drafts of those and all other construction contracts are either being negotiated or will not be executed until Emerald obtains financing." (DX279 at 1.) Hanley's letter contained the same list of "professionals and consultants" "engaged" by Emerald as set forth in the September 24, 1999 Renewal Application, but failed to disclose that Emerald had entered into subcontractor agreements with Gurtz Electric (PX408), Plote Excavating (PX407), Zalk Joseph Fabricators (PX248), Standard-Hayes Boiler & Tank (PX409), and had incurred, as of January 26, 2000, expenses for services provided by Michael Toensmeyer ($173,012.49), McGuire Engineers ($188,826.40), James McHugh Construction Company ($35,335.66), and Christopher Burke Engineering ($155,793.92). (PX399 at 60, 70, 73, 74.)

McDonald followed up on January 31, 2000 with a request that Emerald furnish "additional information as it relates to the construction project," including "[a] listing of all written and/or oral contracts, arrangements, work orders, change orders, engagements, hires, commissions of work, requests for performance, exchanges of mutual promises, letters of intent, etc. entered into since July 1, 1999 by Emerald Casino, Inc. If an executed copy has not been negotiated, please submit the most recent draft. If the terms, conditions and/or basis of compensation has not been reduced to writing, please submit a summary of the nature of the business transaction or relationship." (PX72 at 1.) Hanley, with the assistance of McQuaid, responded in a letter dated February 14, 2000, with an enclosure listing "completed written

agreements," "agreements not yet fully executed," and "other agreements." (PX405 at 10–11; C. Defs.' SOF ¶ 423.) This time, Hanley and McQuaid submitted a contract with James McHugh Construction Company; a draft contract with Aria; a draft contract with Christopher Burke Engineering; the October 4 Letter of Intent as well as a draft contract and change proposals, with the Joint Venture; a draft contract and change orders with DeJong and Lebet; and a draft contract with Michael R. Toensmeyer. (PX405 at 10.) In addition, Hanley and McQuaid disclosed that McGuire Engineers is a subcontractor of Aria, but that "Emerald does not intend to enter into a contract with . . . McGuire." (*Id.* at 11.)

Hanley and McQuaid still failed to disclose, however, Emerald's relationships with the following subcontractors: Plote Excavating, Zalk Joseph Fabricators, and Standard-Hayes Boiler & Tank. (*Id.* at 10–11.) Emerald took the position, at an IGB meeting on February 22, 2000, that "Emerald does not enter into any agreements with subcontractors," and Hanley observed that "he does not know who the subcontractors are." (PX858 at 754–55.) Emerald's procedure with the Joint Venture for hiring subcontractors, however, required McMahon, on behalf of Emerald, to provide signature approval of the Joint Venture's subcontractor recommendation. (*See, e.g.* PX407.) Whether or not this signature approval requirement was an agreement between Emerald and the subcontractor, the IGB found that Emerald had violated Rules 140(a) and 140(b)(3) by failing to disclose "agreements between Emerald and . . . subcontractors." (PX162 at 31–32.) And, regardless, in addition to failing to disclose their agreements with contractors, both McQuaid and Hanley failed to disclose agreements between Emerald and construction professionals other than subcontractors.

### C. Kevin Flynn

#### 1. Pre-June 23, 1999 involvement in Emerald

The IGB concluded in its Final Board Order that Emerald violated Rules 140(a) and 110(a) by "failing to disclose and actively misleading the IGB as to Kevin Flynn's involvement in the operation and management of Emerald." (PX162 at 15–20, 31–32, 34–35.) The IGB also

noted that Kevin Flynn "did not tell the truth to the IGB" about his involvement in Emerald before June 1999. (PX162 at 18.) Though Emerald maintained before the IGB (and the Defendants assert in this litigation) that Kevin Flynn did not become involved in Emerald matters until he became Emerald's CEO on June 23, 1999, the IGB found that Kevin Flynn represented Emerald in various meetings with outside gaming interests, some of which culminated in agreements, and attended a majority of Emerald's Board meetings, before June 1999. (PX162 at 16–18.) As additional evidence of Kevin Flynn's involvement in Emerald before 1999, the Trustee cites Kevin Flynn's interactions with gaming interests lobbying for new legislation in Springfield and Kevin Flynn's participation in the management and decision-making at Emerald before June 1999. (Trustee's SOF ¶¶ 184, 201, 329.)

In response, Defendants maintain that between 1996 and 1999, Kevin Flynn's primary responsibility was as CEO of Blue Chip, and to the extent that he was "involved" in Emerald matters, it was solely as the president of Flynn Enterprises, where Kevin Flynn "attended to the day-to-day issues relating to Donald Flynn's investments," and acted as a liaison for his father on behalf of Donald Flynn's investments, including Emerald. (C. Defs.' SOF ¶¶ 77, 79, 82, 117; D. Flynn's SOF ¶ 202.) Defendants explain, further, that because there was at least some overlap between Blue Chip and Emerald—they shared an office space and at times held board meetings on the same days—Kevin Flynn was present for communications concerning Emerald and some Emerald board meetings. (C. Defs.' SOF ¶ 85.) Finally, though Kevin Flynn admitted that he was interested in Emerald's activities preceding June 1999 as a proposed shareholder, Defendants insist that the Emerald Board never gave Kevin Flynn the authority to act on behalf of Emerald before June 23, 1999. (PX1222 at 47; C. Defs.' SOF ¶ 570; D. Flynn's SOF ¶ 201.)

Defendants Kevin Flynn, Joseph McQuaid, Kevin Larson and Donald Flynn made similar representations to the IGB. In two interviews with the IGB on June 29 and September 27, 2000, Kevin Flynn denied becoming involved in Emerald prior to June 1999. (*See* PX433 at 2; PX1095 at 8-9.) Joseph McQuaid and Kevin Larson similarly told the IGB that Kevin Flynn had

97

no official role with Emerald before June 1999. (PX1094 at 57–58, 237–38 (McQuaid); PX803 at 1 (Larson).)

An IGB report summarizing an IGB interview with Kevin Larson on September 28, 2000, reveals that IGB Agent Kevin Pannier asked Larson "to explain Kevin Flynn's role in HP Inc.," and Larson responded that "Kevin had no role in HP Inc." (PX803 at 1.) Defendants argue that Pannier's question and Larson's response fail to specify a time frame or to define the term "role." (C. Defs.' SOF ¶ 583.) The report itself distinguishes between "HP Inc." and "Emerald," however. (PX803.) "HP Inc." became "Emerald" at Emerald's June 23, 1999 Board Meeting, and therefore, in referring to "HP Inc.," it was clear that Pannier and Larson were discussing Emerald's management before June 1999. (PX1316 at 127.) Additionally, while Pannier did not define the term "role," Larson's flat denial unfortunately erred on the side of under-inclusiveness, where the IGB, and its rules, emphasized full disclosure.

The court acknowledges that this appears to be the only statement that Larson made about Kevin Flynn's involvement in Emerald before June 1999. But this single statement was an important one, as it misled the IGB. To carry out its responsibility to ensure the integrity of gaming in Illinois, the IGB needs to know precisely who has control over gaming licenses and operations. Kevin Larson, who was president of Emerald between 1996 and 1999, was in the best position to know about Kevin Flynn's involvement in Emerald's management. Despite Larson's own title as president, there is evidence that Larson reported to Kevin Flynn and allowed him to act on behalf of Emerald during this time. For example, Kevin Larson addressed a note to Kevin Flynn on November 11, 1996 concerning "Silver Eagle: Avg Daily Payroll Expenses" for September 1995 and September 1996, and wrote to Kevin Flynn "A quick and dirty to give you a feel for how we've cut things back in Galena." (PX422.) It was Kevin Flynn who negotiated a financing deal in July 1996 between Emerald and Bank of America, which Larson ultimately signed. (PX425; *see infra* Background III.C.1.c.) Larson admitted that he did not negotiate the deal, and testified that, in fact, he did not know who did negotiate its terms.

(Bankr. Tr. 1594:2–1595:15.)  That testimony is curious at best.  It makes no sense that Larson would sign a contract as the president of Emerald without knowing who had negotiated its terms.  It is not even clear how Larson knew that a contact existed unless he communicated with the person who had negotiated it.  Larson admitted that he communicated with Kevin Flynn about Emerald matters during this time, but maintained that he did so only so that Kevin Flynn could update Emerald directors Donald Flynn, Peer Pedersen, and Gene Heytow because "[Larson] didn't have very frequent interaction with [them]."  (Tr. 2105:4–13.)  The notion that Emerald's president did not communicate with its directors is curious, as well, but even assuming that Kevin Flynn only acted as a proxy for Donald Flynn or the other Emerald directors, Larson's unequivocal statement that Kevin Flynn had "no role" with Emerald before June 1999 was inaccurate.  Larson was president of Emerald and knew of Kevin Flynn's role. His blanket denial is a violation of IGB rules.

Donald Flynn likewise testified before the IGB on October 10, 2000 that "Kevin Flynn really had no role with [Emerald]" before June 1999, and asserted that Kevin Flynn had not represented Donald Flynn's interest in Emerald in any "significant transactions" during this time. (PX1097 at 11, 13.)   Donald Flynn's statement was important to the IGB.  In addition to Kevin Flynn's own statements, Donald Flynn was the only Defendant whose testimony the IGB specifically referenced in its Final Board Order to support the conclusion that "the record is replete with clear and convincing evidence" that Emerald dissembled about Kevin Flynn's role. (PX162 at 19.)

Walter Hanley told the IGB that Kevin Flynn did not have an official role with Emerald before June 1999, explaining that "[Kevin Flynn] was an employee.  He wasn't an officer." (PX1093 at 47.)   Hanley disclosed that Kevin Flynn attended "some of [Emerald's] Board of Directors meetings," but that he was "not aware" whether Kevin Flynn was otherwise involved in Emerald matters before June 1999.  (PX1093 at 7, 47.)  Pedersen, too, testified on October 31, 2000, that he did not know what Kevin Flynn's role at Emerald was during this time, and

recanted an earlier statement to the IGB that Kevin Flynn was active in Emerald's lobbying efforts, testifying instead that he "overstated" Kevin Flynn's role "because it was Joe McQuaid who was involved in that." (PX1100 at 19–21.) The Trustee admits that McMahon made no individual statements to the IGB concerning Kevin Flynn's pre-June 1999 involvement in Emerald, but asserts that McMahon is also liable for these misrepresentations. The Trustee notes that McMahon helped to prepare Emerald's Answer to the IGB's Disciplinary Complaint, submitted on March 26, 2001, denying Kevin Flynn's involvement. Further, McMahon was Emerald's only officer during the IGB Disciplinary Proceedings, in which Emerald denied that Kevin Flynn was involved in Emerald before June 1999. (Trustee's SOF ¶ 183.)

The Trustee has presented evidence to prove by a preponderance that Defendants Kevin Flynn, Donald Flynn, McQuaid, and Larson each dissembled about Kevin Flynn's involvement in Emerald before June 23, 1999 in violation of IGB Rules 140(a) and 110(a). The evidence is not sufficient, however, to make such a finding against Hanley, McMahon or Pedersen. Hanley disclosed to the IGB that Kevin Flynn attended Emerald Board meetings before June 1999, but stated that he was otherwise unaware of Kevin Flynn's involvement with Emerald during this time. (PX1093 at 7, 47.) The record contains no evidence that Hanley's statement was false or that he was concealing Kevin Flynn's role. The only statement made by McMahon about Kevin Flynn's role that the Trustee identifies was made in Emerald's March 2001 Verified Answer to the Disciplinary Complaint. (Trustee's SOF ¶ 183.) The IGB's decision to revoke the license on January 30, 2001 could not have been based on McMahon's statements made in March 2001 in response to the revocation decision. Indeed, the Final Board Order does not rely on evidence of Emerald's behavior that occurred after January 30, 2001. (*See* PX162.) Finally, the evidence about the truthfulness of Pedersen's representations to the IGB is equivocal. Pedersen told the IGB in October 2000 that he had no understanding of Kevin Flynn's involvement in Emerald before June 1999, and when confronted with a prior statement that Kevin Flynn was actively involved in Emerald's lobbying efforts, Pedersen

explained that he may have "overstated" Kevin Flynn's role in Emerald's lobbying efforts. (PX1100 at 19–21.) The IGB made no findings with respect to Kevin Flynn's participation in Emerald *lobbying* efforts, however, instead finding that Emerald had violated IGB rules by failing to disclose Kevin Flynn's active management and decision-making roles with Emerald. (*See* PX162 at 15–20.) Pedersen made no statements to the IGB denying Kevin Flynn's involvement in Emerald's management, and his statements about Kevin Flynn's lobbying efforts do not satisfy the court that he concealed or otherwise failed to disclose Kevin Flynn's involvement. In addition, there is some evidence that Pedersen's prior statement to the IGB, that Kevin Flynn was actively involved in lobbying efforts, plans for a barge, and a hotel at Rosemont, confused Kevin Flynn's work with Blue Chip with his work with Emerald. (PX96 at 2, 3; PX1100 at 19–21; Bankr. Tr. 1088:1–9 (Lencioni testifying that there was no hotel designed at Rosemont, but that there was one at Blue Chip).) Pedersen also invested in Blue Chip. (PX96 at 2.) Kevin Flynn, McQuaid, Larson, and Donald Flynn are liable for this violation; McMahon, Hanley, and Pedersen are not.

### a. Pre-1999 meetings & agreements with third parties

**I**n its Final Board Order, the IGB found that Kevin Flynn in fact did represent Emerald in several meetings and agreements with other individuals and companies with an interest in gaming before June 1999. (PX162 at 16–18.) The Trustee notes that because of the breach of contract action filed by the Davis Companies on October 18, 1999 against Kevin Flynn, Joseph McQuaid, Donald Flynn, and Emerald, "Kevin Flynn had an incentive to minimize his involvement with Emerald with respect to his meeting with the Davis Companies and/or the Duchossois Group" (Trustee's SOF ¶ 319), and more broadly, his authority to act on behalf of Emerald before June 1999.

### i. Lake County Riverboat

In November 1997, Glenn Seidenfeld, Jr., president and CEO of Lake County Riverboat L.P., contacted Joseph McQuaid about a possible joint venture between Lake County Riverboat

and Emerald, and the two companies entered into a non-disclosure agreement on November 6, 1997 to facilitate negotiations. (Trustee's SOF ¶¶ 221, 223; C. Defs.' SOF ¶¶ 622–23.) Emerald and Lake County Riverboat then entered into an "agreement in principle" on November 14, 1997, to make reasonable efforts to relocate Emerald's license to Lake County if an amendment allowing Emerald to relocate its license passed in the 1997 veto session. (Trustee's SOF ¶ 226; C. Defs.' SOF ¶ 625.) McQuaid executed that agreement on behalf of Emerald. (Trustee's SOF ¶ 231 n.10; C. Defs.' SOF ¶ 624.)

The Trustee asserts, and the IGB concluded, that Kevin Flynn "negotiated on behalf of Emerald." (PX162 at 16; Trustee's SOF ¶¶ 224–25.) Defendants admit that Kevin Flynn was aware of Emerald's negotiations with Lake County Riverboat[40], but claim that, as Joseph McQuaid testified, it was McQuaid, not Kevin Flynn, who represented Emerald in these negotiations. (Bankr. Tr. 1044:5–7, 1045:10–13; C. Defs.' SOF ¶¶ 622–23.) Seidenfeld recalled that he "mainly" worked with Kevin Flynn on the joint venture negotiations, and that when he initially contacted McQuaid concerning the joint venture opportunity, McQuaid responded that he would meet with Seidenfeld together with Kevin Flynn. (Bankr. Tr. 1823:22–1824:12.) Seidenfeld testified that he had "[m]any" follow-up conversations with Emerald after this initial interaction in which Kevin Flynn primarily represented Emerald (Bankr. Tr. 1824:25–1825:14); that he sent a "300-page business plan" for Lake County Riverboat to Emerald and followed up with Kevin Flynn (Bankr. Tr. 1827:7–21); and that he negotiated the equity provision of the

---

[40]      Kevin Flynn testified that he became "aware" of the agreement between Emerald and Lake County Riverboat "about the time that it was executed" after overhearing conversations between Hanley and Seidenfeld in Emerald/Blue Chip's shared office. (Bankr. Tr. 893:3–14.) He claimed he did not participate in the negotiations with Seidenfeld on behalf of Emerald. (Bankr. Tr. 906:6–20.) When asked what might have motivated Seidenfeld to testify otherwise, Kevin Flynn speculated that Seidenfeld may have acted out of "spite"; Seidenfeld had worked to develop a casino in Lake County, and failed to do so, while Emerald successfully obtained legislation allowing it to relocate its license. (Bankr. Tr. 911:1–23; 913:2–10.)

agreement with Kevin Flynn.[41]  (Bankr. Tr. 1832:1–1836:5.)   Between November 10 and November 21, 1997, Seidenfeld called Kevin Flynn and left him three phone messages, including one "[r]e: information he sent."  (PX956 at 14, 25, 43.)  This court concludes, contrary to Kevin Flynn and Joseph McQuaid's testimony, that Kevin Flynn acted on behalf of Emerald in negotiations with Seidenfeld concerning a joint venture with Lake County Riverboat.

The IGB concluded that no one at Emerald disclosed Emerald's negotiations or agreements with Lake County Riverboat (or Kevin Flynn's involvement) to the IGB, and "Kevin Flynn did not tell the truth about his involvement with Lake County Riverboat L.P."  to the IGB, in violation of Rules 140(a) and 110(a).  (PX162 at 16; 31–32; 34–35.)  Like his testimony at trial, Kevin Flynn consistently represented before the IGB that he did not represent Emerald in its negotiations with Lake County Riverboat.  (PX436 at 2 (10/30/00 Interview); PX353 at 4 (Letter from Kevin Flynn to Acosta of 11/27/00); PX1222 at 64–65 (7/20/05 IGB Disciplinary Hearing).)  McQuaid also told the IGB in an interview that he did not know whether Kevin Flynn was aware of the Lake County Riverboat agreement, and answered at the IGB Disciplinary Proceedings that "to his knowledge" Kevin Flynn was not involved in negotiations.  (PX1102 at 2–3 (11/15/00 Interview); PX1224 at 16 (7/25/05 IGB Disciplinary Hearing).)  No other Defendants appeared to have made any statements to the IGB concerning Kevin Flynn's involvement in the Lake County Riverboat negotiations and agreement.

---

[41]     On cross-examination, Seidenfeld was questioned about the accuracy of his testimony that he negotiated with Kevin Flynn.  At an earlier deposition Seidenfeld had testified that he did not recall meeting with anyone from Emerald between November 6 and November 12, 1997.  (Bankr. Tr. 1844:18–1847:3.)  Additionally, though the agreement containing the equity provision is dated November 14, 1997, Seidenfeld had previously testified, in the proceeding before ALJ Mikva, that he did not speak with Kevin Flynn during the first half of November 1997.  (Bankr. Tr. 1848:1–1849:21.)  Seidenfeld responded by asserting that the date on the agreement must be incorrect, and maintaining that he negotiated the equity provision with Kevin Flynn because "[Kevin Flynn] would never let Joe McQuaid decide something like that."  (*Id.* 1851:18–1853:2.)  The court acknowledges the inconsistencies in Seidenfeld's testimony, but nevertheless credits his account that Kevin Flynn was involved in the negotiations with Lake County Riverboat on behalf of Emerald.

### ii.     Meeting with Mayor Stephens

As described in detail earlier, in 1997, Isaac Degen, a friend of Mayor Stephens and principal of Degen & Rosato Construction Company, and Victor Casini, an attorney at Flynn Enterprises, arranged a meeting between Mayor Stephens and Kevin Flynn. (Trustee's SOF ¶¶ 208, 210–11, 213–14; C. Defs.' SOF ¶ 614.) There was a discussion of establishing a land-based casino in Rosemont, but the details of that discussion are disputed. Kevin Flynn asserted, both at trial and in prior statements to the IGB, that he and Mayor Stephens only discussed Blue Chip at the meeting, and not Emerald's possible relocation to Rosemont. The IGB concluded that "Kevin Flynn lied" concerning the purpose of his meeting (PX162 at 16), but, for the reasons explained earlier, the court concludes that the Trustee has failed to present sufficient evidence to definitively conclude what exactly was discussed at the meeting. The court therefore concludes, as well, that the evidence is insufficient to establish that Kevin Flynn was acting on behalf of Emerald at the 1997 meeting with Mayor Stephens.

### iii.     Davis and Duchossois meetings and alleged agreement

The IGB found that Kevin Flynn actively participated in negotiations, which culminated in the Davis Agreement on behalf of Emerald. The court agrees that the evidence demonstrates that Kevin Flynn acted on behalf of Emerald at the December 1, 1998 meeting.

On October 28, 1998, Kevin Flynn, Donald Flynn, and Joseph McQuaid met with Duchossois Industries representatives Richard Duchossois, Scott Mordell, and David Filkin at Flynn Enterprises' offices. (Trustee's SOF ¶ 265; C. Defs.' SOF ¶ 133.) At the meeting, the parties discussed collaborative lobbying efforts for legislative amendments favorable to their respective gaming interests. (Trustee's SOF ¶¶ 266–67; C. Defs.' SOF ¶ 134.) Filkin testified that at this meeting Kevin Flynn spoke the most for the Flynn family, though he was "not sure what his [Kevin's] role at the meeting was." (Bankr. Tr. 1466:12–1468:12.) The IGB credited Filkin's testimony, rejecting Kevin Flynn's assertion that he "had no role" at the meeting.

(PX162 at 16–17.)  In his communications with the IGB, Kevin Flynn admitted that he attended and spoke at the October 1998 meeting, but emphasized that he "had no role as it related to [Emerald] at the meeting."  (PX1095 at 66) (9/27/00 Interview.)  Instead, Kevin Flynn asserted in a later representation to the IGB, Donald Flynn had invited him to attend, and that "[a]ny misunderstanding as to my role at the meeting may be because others were not focusing on the fact that I was CEO of Blue Chip at the time."  (*See* PX353 at 4) (Letter from Kevin Flynn to Acosta of 11/27/00.)

The IGB concluded that these meetings ended with an agreement entered into by Kevin Flynn on behalf of Emerald with the Davis Companies and Duchossois Industries.  (PX162 at 17.)  Defendants deny that Emerald (through Kevin Flynn or otherwise) entered into any agreement on December 1, 1998, (C. Defs.' SOF ¶ 518), and the court agrees there is insufficient evidence to find an agreement was reached.  (*See supra* Background II.A.2.)  It is undisputed, however, that Kevin Flynn met with Colleran, the Davis Companies' Chief Financial Officer, in the late afternoon on December 1, 1998, and that Emerald's license was discussed at the meeting.  (C. Defs.' SOF ¶ 504.)  Kevin Flynn testified that he thought the purpose of the meeting was to discuss other non-gaming business opportunities with Colleran, but that at the meeting, Colleran mentioned Emerald's license, proposing that the Flynn family enter into a deal with Davis and Duchossois to use Emerald's license for a casino in Rosemont.  (Bankr. Tr. 3295:15–25, 3296:24–3299:2.)  In addition, he testified that he told Colleran: "I didn't think [Emerald] was going to lose its license, and if for some reason [Emerald] did lose *our* license, that [Colleran] should call *us* then."  (Bankr. Tr. 3299:17–22) (emphasis added.)  The terms of the alleged deal refer only to the "Flynn family" and not to Emerald itself, but Kevin Flynn testified that "I don't know whether [Colleran] meant [Emerald] in that particular transaction or whether it was the Flynn family."  (Tr. 2641:7–2642:4.)

After his meeting with Colleran, Kevin Flynn also met with Filkin and Duchossois.  (Trustee's SOF ¶ 286; C. Defs.' SOF ¶ 509.)  Kevin Flynn testified that he spoke with Filkin and

Duchossois about Colleran's offer, and again stated that he did not think Emerald would lose its license. (Bankr. Tr. 3302:21–3303:8.) He also denied entering into any agreement with Filkin and Duchossois during this meeting. (Bankr. Tr. 3303:9–11.) Filkin testified that Kevin Flynn told him and Duchossois that "the deal was the same," which Filkin understood, from "prior discussions" meant "[t]hat the Flynn family would own 37 and a half percent of [Emerald], that the Davis Companies would own 37 and a half percent, that the Duchossoises [sic] would have the opportunity to purchase 20 percent, and that there would be some residual for some local investors." (Bankr. Tr. 1480:1–1481:7) After meeting with Colleran and Duchossois, Filkin testified that he called Kevin Flynn to confirm the deal. (Bankr. Tr. 1482:20–1484:17.)

Whether Kevin Flynn met with Colleran, Filkin and Duchossois on December 1, 1998 on behalf of himself, the Flynn family, or Emerald, is not entirely clear. What is clear, however, is that Kevin Flynn thought at the time that he had some authority[42] to speak for Emerald, if to do nothing else than to deny the deal and to inform Colleran that they would remain in touch pending the outcome of Emerald's appeal of the denial of its 1997 Renewal Application. So too did the other individuals—Colleran, Filkin and Duchossois—appear to understand that Kevin Flynn had authority to represent Emerald and its license at this meeting. This evidence satisfies the court that Kevin Flynn was involved with Emerald at the December 1, 1998 meeting. The court notes, too, that though Kevin Flynn maintained generally that he had no role with Emerald before June 1999, in speaking to the IGB about the December 1, 1998 meeting he never denied his ability to act on behalf of Emerald. (*See* PX353 at 1–2 (denying reaching an agreement on

---

[42]        In the litigation that followed this alleged agreement, *The Davis Companies Inc. v. Emerald Casino, Inc.*, Judge Guzman of this court concluded that under Illinois law though the terms of the December 1, 1998 agreement were "sufficiently definite to be enforced," Kevin Flynn did not have the apparent authority to act on behalf of Donald Flynn individually, and therefore the agreement was void. No. 99-cv-6822, 2003 WL 22113414 at *2 (N.D. Ill. Sept. 11, 2003). Judge Guzman's holding is not inconsistent with the IGB's conclusion that Kevin Flynn purported to enter into an agreement with the Davis Companies on December 1, 1998 on behalf of Emerald.

December 1, 1999); PX1095 at 42–57, 67–74 (testifying that he was "irritated" by the fact that Colleran wanted to discuss Emerald's license "[b]ecause [Colleran] had conveyed so clearly that [the meeting] was not going to be about those matters," but that he "didn't have any particular reaction" to Colleran's discussion of Emerald; that he responded to Colleran's proposal by stating "I didn't think that [Emerald] had any interest in surrendering its license," but that if Emerald would lose its license, Colleran should call McQuaid).)

### iv. Meeting with Gary Armentrout

As one final example of Kevin Flynn's involvement in Emerald before June 1999, the Trustee identifies an alleged meeting between Kevin Flynn and Gary Armentrout, Senior Vice President of Business Development and Governmental Relations for Harvey's Casino Resorts. (Trustee's SOF ¶ 236.) The IGB did not discuss this meeting in its Final Board Order.

At trial, Armentrout testified that in June 1997, he met with Kevin Flynn to discuss opportunities for Harvey's to enter into a joint venture with or to invest in Emerald. (Bankr. Tr. 2208:12–2209:9.) At the time, Armentrout was responsible for finding new gaming opportunities for Harvey's. (Trustee's SOF ¶ 237; C. Defs.' SOF ¶ 631.) Armentrout testified that he had spoken with Kevin Flynn prior to this meeting (Bankr. Tr. 2209:10–2211:19), and Kevin Flynn's phone records indicate that he received at least one message from Armentrout and another from Emerald's lobbyist Tim Hennessey concerning a possible meeting with Armentrout. (PX560 at 13.) According to Armentrout, in June 1997, Kevin Flynn picked him up from the airport in Chicago, and drove him to Blue Chip Casino. (Bankr. Tr. 2208:16–24.) Kevin Flynn testified that he did "not specifically" remember meeting with Armentrout in June 1997. (Bankr. Tr. 3316:15–21.)

In a letter dated June 5, 1997, Armentrout wrote to Kevin Flynn: "I appreciated the opportunity to finally meet with you to discuss the status of your riverboat casino gaming license in East Dubuque (Galena)." (PX561 at 1.) Throughout the letter, Armentrout directs statements concerning Emerald and Emerald's license at Kevin Flynn—"[y]ou have a casino license that will

107

expire in July;" "The Illinois Legislature adjourned Saturday night without passing a gaming bill that would give you a legislative solution;" "With your license expiring in July it appears that you only have three options"—language demonstrating that Armentrout understood Kevin Flynn to represent Emerald. (PX561 at 1–2.) The letter concludes by outlining a potential agreement with Harveys. (*Id.* at 2–3.) The letter was addressed to Kevin Flynn at Blue Chip Casino, with a copy to Hennessey, Emerald's lobbyist. (*Id.* at 1, 3.) Kevin Flynn testified that he did not remember receiving this letter. (Bankr. Tr. 881:3–5.) Armentrout testified that he spoke with Kevin Flynn about a possible joint venture on the phone after this meeting (Bankr. Tr. 2216:17–23), and Kevin Flynn's phone records show that Gary Armentrout called him at least three times after this meeting. (PX560 at 25, 34, 38.) On cross-examination, Armentrout admitted that he did not have any specific recollection of statements made by Kevin Flynn during the June 1997 meeting or in subsequent conversations, and that his testimony about the content of the meeting was based primarily on the June 5, 1997 letter. (Bankr. Tr. 2220:3–2221:18.) Ultimately, the parties did not reach an agreement. (Trustee's SOF ¶ 247; C. Defs.' SOF ¶ 635.)

There is sufficient evidence to conclude that Kevin Flynn, acting on behalf of Emerald, met with Armentrout in June 1997, contrary to Kevin Flynn's insistence that he had no role in Emerald before June 1999.

### b. Lobbying

The Trustee asserts that Kevin Flynn was "actively involved" in lobbying for a legislative amendment to allow Emerald to relocate its license. (Trustee's SOF ¶ 201.) The IGB made no specific findings with respect to Kevin Flynn's involvement in these lobbying efforts, instead referring to the lobbying activities only in support of its finding that Emerald failed to disclose or misrepresented its plan to move the casino to Rosemont, and Kevin Flynn's involvement in Emerald's agreement with the Davis Companies and Duchossois Industries. (*See* PX162 at 6–10, 17.)

Defendants maintain that Joseph McQuaid, not Kevin Flynn, was responsible for Emerald's lobbying efforts, and McQuaid reported to Kevin Larson about his progress. (C. Defs.' SOF ¶¶ 122–24, 611.) Kevin Flynn remained informed about Emerald's lobbying efforts, Defendants assert, solely on behalf of Donald Flynn, who funded the lobbying efforts and wanted information on how the money had been spent after each legislative session to determine whether to continue funding it. (C. Defs.' SOF ¶¶ 120–21, 124, 610, 612.) Additionally, Kevin Flynn testified at trial that he interacted with Emerald's lobbyists Hennessey and Leone, and engaged in some lobbying efforts on behalf of Flynn Enterprises. Neither McQuaid nor Kevin Flynn was convincing on this issue.[43] (Bankr. Tr. 853:19–854:13.)

The Trustee presented evidence that in 1997 Kevin Flynn received at least two memorandums from Emerald's lobbyists Tony Leone and Tim Hennessey concerning Emerald's lobbying efforts. (PX587; PX588; Trustee's SOF ¶ 203.) In addition, Kevin Flynn admitted to meeting with Hennessey and Leone "at times," and engaging in other lobbying efforts for an amendment that would allow Emerald to relocate its license. (Bankr. Tr. 854:5–13.) Around March 25, 1997, Leone and Hennessey sent Kevin Flynn and Joseph McQuaid a "Confidential Memorandum" titled "Progress & Strategy for the Remainder of 1997 Session," which discussed

---

[43] McQuaid testified at trial that before May 25, 1999, when the legislation passed, "Kevin Flynn was the conduit to Don Flynn," and that therefore, McQuaid "would tell Kevin Flynn exactly where we were legislatively, exactly what the prognosis was legislatively." (Tr. 1128:23–1129:2; 1130:24–1133:7.) At his July 23, 2010 deposition, however, McQuaid testified that he did not recall giving information to Kevin Flynn to pass along to Donald Flynn. (PX1254 at 116.) Defendants quibble that the question that McQuaid responded to did not specify a time frame, but in fact, the preceding question specifies "the year 1999" (which includes the five months before the legislation was passed) and the question itself asks McQuaid whether he "*ever* gave information to Kevin Flynn" to pass along to his father. (*See* PX1254 at 116) (emphasis added.) McQuaid's trial testimony also conflicts with his prior statements to the IGB in that he did not recall speaking with Kevin Flynn about the legislation at all. (*See* PX1091 at 19.) Kevin Flynn, for his part, testified that he was unaware of anyone at Flynn Enterprises involved in lobbying efforts in April 1997, but then testified that he "may have" been involved in lobbying efforts on behalf of Flynn Enterprises at other times, and that he did not "specifically recall" whether he was involved. (Bankr. Tr. 853:8–22.) Kevin Flynn finally admitted both that he did recall being involved, but said he did not recall at what time, and also stated that Flynn Enterprises had no interest in Emerald. (Bankr. Tr. 853:23–854:4; 854:14–16.)

Emerald's strategy for seeking an amendment to allow relocation of its license. (Trustee's SOF ¶ 203; *see* PX587 at 2–4.) The memorandum is addressed to Kevin Flynn as president of "Flynn Enterprises Blue Chip Casino" and McQuaid is copied as "Vice President of Development" (presumably of Emerald). (PX587 at 2.) It identifies Danville, Illinois as a possible site for Emerald's relocation, and outlines a plan of action "[i]f you agree with us and want to embrace this strategy," specifically: "Kevin should meet with the Mayor and Lou Mervis and solidify a local agreement which includes a distribution of future receipts to Jo Daviess County." (PX587 at 1, 3.) At trial, Kevin Flynn admitted to travelling to Danville in order to lobby for legislation that would allow Emerald to relocate its license. (Bankr. Tr. 854:5–9.) He nevertheless testified in a deposition for the *Davis* litigation that he did not know why Leone and Hennessey sent him another memorandum the following month. (PX588; Bankr. Tr. 857:7–858:14.)

In addition to his trip to Danville, the record shows that Kevin Flynn also traveled to Springfield on at least two occasions, and admitted to doing so when questioned by the IGB. (PX1095 at 20–22, 79–80; C. Defs.' SOF ¶ 612.) In April or May of 1999, Kevin Flynn traveled to Springfield with David Filkin, Richard Duchossois, and Duchossois's lobbyist Jim Fletcher, and Defendants have admitted that the "[d]uring the trip the parties discussed pending legislation." (PX1065 at 13; Trustee's SOF ¶¶ 299–300; C. Defs.' SOF ¶ 612.) In Springfield, Kevin Flynn, Duchossois, and Leone, but not McQuaid, attended a meeting concerning the legislation. (Trustee's SOF ¶ 300; C. Defs.' SOF ¶ 612; *see also* Tr. 2660:11–16, 21–22.) Kevin Flynn and Leone went out to lunch after the meeting and continued to discuss the legislation. (Tr. 2660:23–2661:1.) Kevin Flynn told Sergio Acosta at an interview on September 27, 2000 that he attended the meeting to witness Emerald's lobbying efforts on behalf of his father and as a "pending applicant" in Emerald, but that he "didn't really have a capacity" or role at the meeting. (PX1095 at 87:3–88:6.) Again, on May 25, 1999, the day that

the legislation was passed, Kevin Flynn traveled to Springfield with Hanley and McQuaid. (Trustee's SOF ¶ 303; C. Defs.' SOF ¶ 612.)

Finally, David Filkin and Richard Levy testified that they spoke with Kevin Flynn multiple times before the legislation was passed in May 1999 about Emerald's lobbying efforts for legislation that would allow it to relocate its license. (Bankr. Tr. 1488:5–1494:15 (Filkin); Bankr. Tr. 2015:1–2016:18 (Levy).) And Kevin Flynn admitted that he met with Colleran in February 1999. (Bankr. Tr. 965:24–966:3.)

The court concludes that Kevin Flynn did participate in lobbying efforts, and likely did so on behalf of Emerald—though he testified that he did so on behalf of Flynn Enterprises and/or Donald Flynn, he admitted that Flynn Enterprises had no interest in Emerald. Nor did Blue Chip, where Kevin Flynn was CEO, have an interest in Emerald's license. Yet Kevin Flynn appeared to interact with other individuals such as David Filkin, Duchossois, and Levy, on behalf of Emerald itself. The court agrees with the Trustee that Kevin Flynn's lobbying activities support the finding that he was involved with Emerald before June 1999. Additionally, the record contains evidence that Kevin Flynn[44], Joseph McQuaid[45], and Peer Pedersen[46]

---

[44] When interviewed by the IGB on September 27, 2000, in response to Acosta's question "did you have any discussions, participate in any meetings, anything of that nature during that period of time?" Kevin Flynn maintained that he "didn't have any direct involvement" in lobbying or offer his input. (PX1095 at 11–12.) Yet he admitted at trial to travelling to Danville, Illinois, a location identified as a possible site for relocation by Emerald's lobbyists, to lobby for relocation. (Bankr. Tr. 854:5–9.)

[45] In a September 12, 2000 interview with the IGB, McQuaid testified, "I never remember speaking to Kevin Flynn about the legislation" for relocation of Emerald's license. (PX1091 at 19.) Again, in another IGB interview on September 26, 2000, McQuaid answered that "to [his] knowledge" Kevin Flynn did not participate in lobbying efforts for relocating Emerald's license or barge planning before June 1999. (PX1094 at 239.)

[46] Pedersen gave conflicting testimony to the IGB concerning Kevin Flynn's involvement in Emerald's lobbying activities. First, in an internal investigative report drafted by IGB Special Agent Kevin Pannier summarizing Pedersen's June 12, 2000 interview with the IGB, Pannier quotes Pedersen as stating, when asked about Kevin Flynn's role with Emerald, that "he understood Kevin Flynn to be the acting agent in his father's (Donald Flynn) absence," and that "Kevin was very active in seeking the relocation of the license" and had "worked on the
(continued . . . )

represented to the IGB that Kevin Flynn did not lobby on behalf of Emerald; but the IGB did not rely on Kevin Flynn's participation in Emerald's lobbying efforts in determining that Emerald's officers failed to disclose and misrepresented to the IGB Kevin Flynn's involvement in Emerald before June 1999.

### c.    Emerald's management & Board meetings

In 1996, Donald Flynn attained control of Emerald through the purchase of shares. Thereafter, the Trustee maintains, though Kevin Larson held the title of President of Emerald, Kevin Flynn was the "*de facto* CEO of Emerald."  (Trustee's SOF ¶¶ 184, 329; C. Defs.' SOF ¶¶ 596, 598.)   The IGB Final Board Order did not make such a finding, but did note Kevin Flynn's attendance at Emerald Board of Directors meetings (and the testimonies of Kevin and Donald Flynn concerning his attendance) as additional evidence of Emerald's failure to disclose and/or misrepresent Kevin Flynn's involvement in Emerald before June 1999.  (PX162 at 18.)

Between January 1997 and April 1999, Kevin Flynn attended four of six total Emerald Board of Directors meetings—on April 29, 1997, June 19, 1997, June 30, 1997 and April 28, 1999.  (PX1316 at 89–92, 98; Trustee's SOF ¶ 322; C. Defs.' SOF ¶ 602.)  Each of the meetings that Kevin Flynn attended, Defendants explain, were held at Blue Chip's office (shared with

---

lobbying efforts, plans for the barge, and a possible hotel at the Rosemont site."  (PX96 at 3.)  In a follow-up memorandum to the IGB dated June 21, 2000, Pedersen changed his statement, now asserting that "Kevin Flynn was not involved in the lobbying efforts nor relocation of [Emerald's] license and was never involved in a hotel at the Rosemont site since no hotel was ever planned.  Kevin was elected as Chairman and CEO of Emerald in June of 1999 and was actively involved in all Emerald matters (including plans for the barge)."  (PX208.)  Pedersen (and the other Defendants) note that Pannier's question did not specify a time frame.  Furthermore, Pedersen argues, he may have confused Emerald and Blue Chip as there was a plan to build a hotel in Michigan City, Indiana for Blue Chip but not one for Emerald.  (C. Defs.' SOF ¶ 586; Pedersen's SOF ¶ 12.)  IGB Agent Gnutek testified at trial that he was "skeptical" of Pedersen's supplemental response, but that skepticism arose only after he was interviewed by Trustee's counsel in preparation for trial; in an earlier deposition, he acknowledged that the IGB accepted Pedersen's response as "credible."  (Bankr. Tr. 521:3–523:15.)  Pedersen gave a similar statement to the IGB in an interview in October 2000, and when asked about his June 2000 statement regarding Kevin Flynn, Pedersen answered that he "overstated" Kevin Flynn's involvement.  (PX1100 at 20–21.)

Emerald) or telephonically.  (C. Defs.' SOF ¶ 604.)  Of the two meetings that Kevin Flynn did not attend, one was held telephonically (January 31, 1997), and another was at the office of the law firm of Pedersen & Houpt (October 15, 1997).  (PX1316 at 88, 94; C. Defs.' SOF ¶ 604.)

Kevin Flynn told the IGB that he attended Emerald Board meetings because they coincided with Blue Chip Board meetings, and later, that he was interested as a proposed shareholder.  In a report prepared by IGB Agent Kevin Pannier summarizing his interview with Kevin Flynn on June 29, 2000,[47] Pannier wrote that Kevin Flynn admitted that he attended some of Emerald's Board meetings during this time, but explained that he did so because they either preceded or followed Blue Chip Board meetings, which Kevin Flynn attended as Blue Chip's Chairman.  (PX433 at 2.)  Kevin Flynn reportedly told Pannier that he participated in the Emerald Board meetings held telephonically because of "general curiosity."  (*Id.*)  Again on September 27, 2000, Kevin Flynn told Acosta that he attended Emerald Board meetings that took place before or after Blue Chip meetings.  (PX1095 at 11–12.)  At the IGB Disciplinary Hearing, on July 20, 2005, Kevin Flynn again explained that he attended Emerald Board meetings because he was "curious" and "wanted to understand what was happening with that company" as a proposed shareholder.  (PX1222 at 47.)

Donald Flynn and McQuaid provided a similar explanation to the IGB for Kevin Flynn's presence at Emerald Board meetings.  On October 10, 2000, Donald Flynn stated that Emerald and Blue Chip's Board of Directors "for the most part met at the same time because it was an overlap of directors, and Kevin sat in on most of the meetings as a result of that."  (PX1097 at 29.)  McQuaid, similarly, stated in a September 26, 2000 interview with the IGB, that Kevin Flynn did not represent Donald Flynn at these meetings, and attended Emerald Board meetings because they took place either before or after Blue Chip Board meetings.  (PX1094 at 237–38.)

---

[47]     Defendants challenge Pannier's motivations for creating this report, but the court notes that Pannier's account appears consistent with the testimony Kevin Flynn gave at a subsequent IGB hearing.

In fact, however, only one of the meetings that Kevin Flynn attended prior to June 23, 1999, the April 28, 1999 meeting, coincided with Blue Chip's Board of Directors' Meetings. (Trustee's SOF ¶ 322.) Half of the Emerald Board meetings Kevin Flynn attended during this time took place telephonically. (PX1316 at 89–92, 98.) Defendants argue that when Kevin Flynn, Donald Flynn, and Joseph McQuaid were asked about Kevin Flynn's presence at Emerald Board meetings, the question did not specify a time frame, implying that these Defendants may have overstated the number of times Emerald and Blue Chip Board meetings overlapped. (C. Defs.' SOF ¶¶ 601, 605–06.) But, even assuming that there was more overlap of meetings, Defendants still fail to explain why, other than because Kevin Flynn was "curious," he attended a majority of Emerald's Board meetings before he became CEO and Chairman of Emerald on June 23, 1999.

As noted, Kevin Flynn repeatedly told the IGB that he did not have any management role with Emerald until June 1999. (PX353 at 3 (Letter from Kevin Flynn to Acosta of 11/27/00); PX1222 at 25–27 (7/20/05 IGB Disciplinary Hearing).) As additional evidence that these statements were false, the Trustee asserts that Kevin Flynn assisted in the selection of new management for Emerald, met with the IGB, participated in preparing Emerald's 1996 Renewal Application, and sought financing for Emerald's operations. (Trustee's SOF ¶¶ 184, 188–89.)

After Donald Flynn took control of Emerald in 1996, Flynn Enterprises employees replaced Aerie Management Company staff as managers of Emerald, and Donald Flynn delegated Emerald's day-to-day operations to Kevin Flynn,[48] Hanley, Larson and McQuaid.

---

[48] Later in his testimony at trial, Donald Flynn revised his testimony, stating that "The question you asked me before relative to management, my son never managed HP of Illinois in the '90s." (Bankr. Tr. 2506:24–2507:1.) Donald Flynn explained that he "get[s] confused between HP because there was an HP of Illinois and an HP of Indiana." (Id. 2506:4–5.) "HP of Illinois" is a reference to Emerald, however, because by this time, "HP of Indiana" had been re-named "Blue Chip Casino." (Id. 2506:11–15.) In his August 9, 2010 deposition, Donald Flynn testified that between 1997 and 2002 "I had delegated the day-to-day operations of [Emerald] to Kevin [Flynn], Walter [Hanley], Kevin Larson and Joe McQuaid." (PX1257 at 31–32.)

(Bankr. Tr. 2488:6–25, 2491:19–2492:8.)  Though his investment in Emerald was in his own name, Donald Flynn testified that he intended it to be a family investment, and therefore to include Kevin Flynn. (Bankr. Tr. 2487:1–12; 2493:12–17.)  The Trustee asserts that during this time, Emerald's management reported to Kevin Flynn, while Defendants maintain that Kevin Larson reported to Kevin Flynn only as CEO of Blue Chip, and not in any capacity with respect to Emerald.  (Trustee's SOF ¶ 197; C. Defs.' SOF ¶ 599.)  Larson admitted that he provided "information about significant items" concerning the Silver Eagle and Emerald's operations to Kevin Flynn to "cover[] [his] tracks" because he "didn't have very frequent interaction with [Board of Directors members] Don Flynn, Peer Pedersen, or Gene Heytow."  (Tr. 2105:4–13.) "[T]o the extent that Don [Flynn] called Kevin [Flynn] and asked him if he knew what was going on in East Dubuque," Larson testified, "I thought it would be in my best interest for Kevin [Flynn] to have information about significant items."  (*Id.*)

Providing Kevin Flynn with information to convey to his father may have been in Kevin Larson's best interest, but contemporaneously-drafted documents provide evidence of Kevin Flynn's own management role in Emerald before 1999.[49]  In a letter to Peer Pedersen dated April 28, 1996, Joseph Duellman, then-Vice President of Emerald and President of Aerie, wrote "unfortunately, after spending a considerable time with Kevin Flynn, it is apparent that he intends to be the executive that runs the new company and that any role that I play is redundant to his role and will soon become unwanted."  (Trustee's SOF ¶ 184) (quoting PX539 at 2.)  In a letter dated June 26, 1996 Kevin Flynn himself updates Pedersen about Emerald's license Renewal Application, stating "[w]e are preparing" that application and financial situation, noting

---

[49]    The Trustee contends there may be additional documents created between 1997 and 2003 that demonstrate communications between Defendants concerning Emerald, but they are no longer available because Defendant McMahon gave away three Emerald computers during the Chapter 11 bankruptcy proceeding without the court's permission and did not preserve the data on those computers.  (Trustee's SOF ¶ 197 n.9.)  In any event, the evidence presented here satisfies the court that Kevin Flynn was, in fact, involved in Emerald before June 1999 and made untrue statements about this to the IGB.

that he has "scheduled a meeting with John Companelle [sic] for Monday, July 9 and expect to get things moving there," and that "[Emerald] is currently out of money." (PX865 at 1.) Kevin Larson addressed a note to Kevin Flynn on November 11, 1996 concerning "Silver Eagle: Avg Daily Payroll Expenses" for September 1995 and September 1996, and wrote to Kevin Flynn "A quick and dirty to give you a feel for how we've cut things back in Galena." (PX422.) Larson denied that he reported to Kevin Flynn before June 1999. Before the Bankruptcy Court and this court, he testified that he was merely "sharing this information with [Kevin Flynn]" (Bankr. Tr. 1609:11–1610:20), so that Kevin Flynn would know the status of Emerald's finances if Donald Flynn asked him about it. (Tr. 2106:10–21.) On June 27, 1997, however, the day that Emerald was notified that the IGB denied its Renewal Application, Larson left Kevin Flynn a phone message concerning a call from then-IGB Administrator Michael Belletire and assured Kevin Flynn he would call back after speaking with Belletire. (PX940 at 13; Trustee's SOF ¶ 197.) Larson left Kevin Flynn another message on July 16, 1997 concerning the "Silver Eagle." (PX940 at 41.)

Additionally, Richard Levy, who participated in Emerald's management on behalf of Board member Eugene Heytow, testified that he worked "almost exclusively with Kevin Flynn" on Emerald management issues between June 1996 and May 1999, and that he was "told by Kevin [presumably Kevin Flynn] and others that I should deal with Kevin [Flynn], he was running the company, and so I did." (Bankr. Tr. 1996:1–1997:2.) During this time, Levy testified, he spoke with Kevin Flynn about Emerald's financial situation; Levy recalled that Kevin Flynn asked him whether Heytow would loan or invest additional money in Emerald, and told Levy, regarding a loan that Emerald was seeking from Bank of America, that he [Flynn] "hoped he could get this loan done for [Emerald]." (Bankr. Tr. 1999:8–2001:13.) Kevin Flynn denied telling Levy that Levy should contact him regarding Emerald matters because he was "running the company" and knows of no one else at Emerald who told Levy that. (Bankr. Tr. 3290:13–18.) Defendants note that, too, that Kevin Flynn had informed Levy that he was not an officer or director in a

letter dated April 27, 1999, implying that Levy knew that Kevin Flynn had no authority for Emerald.  (PX15; C. Defs.' SOF ¶ 637.)

Yet other activities are consistent with Levy's apparent understanding that Kevin Flynn was involved in managing Emerald.  In November 1996, Kevin Flynn and Donald Flynn met with IGB Administrator Michael Belletire regarding Emerald matters, including an employee stock award plan.  (Trustee's SOF ¶ 196; C. Defs.' SOF ¶ 83; *see also* PX114 at 13–17; Bankr. Tr. 834:18–835:2.)  Donald Flynn explained to the IGB that Kevin Flynn accompanied him to the IGB meeting because he was interested in gaming, was a proposed shareholder in Emerald, and acted as a "liaison" to Donald Flynn regarding Emerald matters.  (PX1097 at 22–23.)  Kevin Larson, Emerald's president, did not attend the meeting.  (Trustee's SOF ¶ 196; *see also* PX114 at 13.)  And, as indicated above, Kevin Flynn wrote to Pedersen on June 26, 1996 stating "[w]e are preparing [Emerald's] license renewal materials."  (PX865 at 1.)

In addition, Kevin Flynn negotiated loan financing with Bank of America on behalf of Emerald.  When Donald Flynn increased his control in Emerald in 1996 pursuant to a Stock Purchase Agreement, he committed to making "reasonable best efforts to cause Bank of America to release Eugene Heytow and Peer Pedersen . . . from their personal guarantees to the extent of [Donald Flynn's] guaranty."  (C. Defs.' SOF ¶ 590) (quoting PX899 at 20–21.)  To that end, Donald Flynn agreed to guarantee forty percent of the nearly $20 million Bank of America loan.  (C. Defs.' SOF ¶ 590.)  Defendants assert that Donald Flynn, Heytow, and Pedersen sought to restructure Emerald's line of credit with Bank of America in July 1996, but neither the testimony nor the exhibit cited support Defendants' implication that Donald Flynn, Heytow, and Pedersen were the individuals acting on behalf of Emerald with respect to this transaction.  (C. Defs.' SOF ¶ 590) (citing PX284 at 2; Bankr. Tr. 1677, 3283.)

Instead, the evidence is that Kevin Flynn participated in Emerald's negotiations with Bank of America to restructure the line of credit.  (Trustee's SOF ¶ 189.)  In July 1996, Kevin Flynn met with John Compernolle from Bank of America regarding restructuring Emerald's line

of credit. (Trustee's SOF ¶ 189; *see* PX284; PX865 at 1 (June 26, 1996 letter from Kevin Flynn to Pedersen, stating "I have scheduled a meeting with John Companelle [sic] for Monday, July 9 and expect to get things moving there.").) After the meeting, Compernolle wrote Kevin Flynn a letter on July 12, 1996, enclosing "[Bank of America's] term sheet for the proposed restructuring of the [Emerald] credit facility." (PX284.) The letter was addressed to Emerald in care of Kevin Flynn at Flynn Enterprises, Inc., and both Heytow and Pedersen were sent copies. (*Id.*) Kevin Flynn admitted receiving the letter. (Trustee's SOF ¶ 190.) Defendants assert that "there was no 'negotiation' of the guaranty," which resulted in the line of credit restructuring, because the "restructuring" only referred to the change in guarantors. (C. Defs.' SOF ¶ 591.) Kevin Flynn participated in the transaction, Defendants maintain, "on behalf of the Flynn family" and "as President of Flynn Enterprises" representing Donald Flynn's investment in Emerald. (C. Defs.' SOF ¶¶ 592, 594.) Kevin Flynn testified that he did not know who negotiated the terms of the restructuring, and denied doing it himself. (Bankr. Tr. 831:1–19.) His testimony is not credible; the court finds that Kevin Flynn was actively involved in negotiating the terms of the loan. Regardless of the details, both parties agree that the restructuring was for a line of credit from Bank of America to Emerald, and resulted in an Amended and Restated Term Loan Agreement between Emerald and Bank of America, ultimately executed by Kevin Larson. (PX425; Trustee's SOF ¶¶ 189–92; C. Defs.' SOF ¶¶ 590, 595.) As describe earlier, Larson testified that he did not negotiate the restructuring, and in fact, that he "[did not] know who negotiated it." (Bankr. Tr. 1594:2–1595:15.)

Given the porous connections between Flynn Enterprises, Donald Flynn individually, and Emerald, it is not surprising that different individuals such as Richard Levy and David Filkin, and even Defendants themselves, would have varying understandings of the capacity in which Kevin Flynn was working on Emerald matters during this time. Donald Flynn admitted that, though his ownership interest in Emerald was held by himself individually, he did not treat his investments through Flynn Enterprises any differently than those he held individually. (C. Defs.' SOF ¶¶ 80,

84; D. Flynn's SOF 198.)  Between 1996 and June 1999, Kevin Larson was president of both Blue Chip and Emerald, as well as COO of Blue Chip, and Kevin Flynn was CEO and Chairman of Blue Chip.  (Trustee's SOF ¶¶ 43–44; C. Defs.' SOF ¶¶ 21, 29.)  In June 1999, Larson and Kevin Flynn adopted the same positions in both corporations—Larson remained president of Blue Chip and Emerald, as well as COO of Blue Chip, and became COO of Emerald, and Kevin Flynn remained Blue Chip's CEO and Chairman and officially assumed the role of CEO and Chairman of Emerald.  (PX1316 at 126; Trustee's SOF ¶ 44; C. Defs.' SOF ¶¶ 21, 29, 151.) There was no CEO of Emerald before Kevin Flynn was appointed to that position by Emerald's Board in June 1999, and in light of the evidence discussed above of Kevin Flynn's involvement in Emerald before 1999, it is possible that Kevin Flynn was, as the Trustee asserts, Emerald's "*de facto* CEO" during this time.  In any event, as the IGB found, it is clear from the record here that Kevin Flynn did actively participate in matters on behalf of Emerald during this time period—regardless of whether his conduct was also on behalf of Flynn Enterprises, or Donald Flynn, in addition to Emerald itself.

### 2. Field Street Agreement

The IGB Final Board Order concluded that Kevin Flynn, a Key Person[50] and Proposed Emerald Shareholder, had failed to disclose the existence of a consulting and lobbying agreement between himself and Boyd Gaming in violation of IGB Rule 110(a).  (PX162 at 19–20, 34–35.) The Illinois Appellate Court affirmed, rejecting Emerald's argument that it was not responsible for Kevin Flynn's individual misconduct, and instead reasoning that because Kevin Flynn was CEO of Emerald, his misconduct could be attributed to Emerald.  (PX1233 at 132–33.)

---

[50]     IGB rules define a "Key Person" as "[a] person identified by the Board under [Rule 222] as subject to regulatory approval as a Person able to control, or exercise significant influence over, the management, assets, or operating policies of an owner or suppliers license." 86 ILL. ADMIN. CODE § 3000.100.  Rule 225(a) further requires every "Key Person" to complete a PDF 1. 86 ILL. ADMIN. CODE § 3000.225(a).

Between 1996 and 1999, several of Emerald's principals also were principals for Blue Chip Casino. (Trustee's SOF ¶¶ 43–44, 55, 57, 102; C. Defs.' SOF ¶¶ 6, 9, 16, 21.) In June 1999, Boyd Gaming,[51] a Nevada corporation, purchased Blue Chip for $273.6 million. (Trustee's SOF ¶ 683; see PX429 at 1.) Field Street, Inc. was incorporated on June 18, 1999, by Victor Casini, Vice President and General Counsel of Flynn Enterprises. (Trustee's SOF ¶ 685.) On June 27, 1999, Field Street and Boyd Gaming entered into a consulting and lobbying agreement (the "Field Street Agreement") under which Boyd Gaming engaged Kevin Flynn to manage lobbying efforts to block the establishment of a casino in southwest Michigan. (Trustee's SOF ¶¶ 686–87; C. Defs.' SOF ¶ 639.) Field Street itself was a "shell corporation," of which Kevin Flynn was the "sole owner, director and the president." (Trustee's SOF ¶ 685; C. Defs.' SOF ¶¶ 639, 642.) Victor Casini assisted Kevin Flynn with Field Street activities. (Trustee's SOF ¶¶ 685, 689.) Flynn Enterprises paid Casini for all of the work that he performed in relation to Field Street, and Kevin Flynn gave Casini an additional $500,000 bonus after receiving a $5 million bonus under the terms of the Field Street Agreement. (Id. ¶¶ 689, 697.)

Under those terms, Boyd Gaming agreed to pay Kevin Flynn an annual salary of $500,000 plus expenses for the term of five years, with the potential for a $5 million bonus if no Native American casinos were established in southwest Michigan during the time he was employed. (PX429 at 2–4; Trustee's SOF ¶ 688.) As part of its endeavor to prevent a competitor-casino in southwest Michigan, Field Street hired a lobbying firm and Guy Chipparoni of the public relations firm Kemper Lesik, who provided opposition articles to local newspapers, and also financed a lawsuit brought on behalf of grassroots organizations against state legislation allowing gaming activities in southwest Michigan. (Trustee's SOF ¶¶ 694–95.) Boyd

---

[51]     Boyd Gaming, according to its website, "is one of the largest and most successful casino entertainment companies in the United States. [It] currently own[s] and operate[s] 22 gaming properties in eight states – Nevada, New Jersey, Illinois, Indiana, Iowa, Kansas, Louisiana and Mississippi." *About Boyd Gaming*, BOYDGAMING, http://www.boydgaming.com/about-boyd-gaming (last visited September 30, 2014).

Gaming provided Field Street with additional funds for each of these efforts.  (*Id.*)  And they were successful:  Kevin Flynn did receive the $5 million bonus.[52]  (Trustee's SOF ¶ 696.)

Kevin Flynn submitted two filings to the IGB in which he failed to disclose the existence of the Field Street Agreement.  In June or July 1999,[53] Kevin Flynn submitted his Annual Key Person and Level 1 Occupational Licensee Disclosure Affidavit ("Form 1"), without any mention of his ownership interest in Field Street or the Field Street Agreement.  (Trustee's SOF ¶ 690.) But because the Form 1 "did not include a schedule of investments,"[54] Kevin Flynn claims, he was unaware that he was required to disclose the Field Street Agreement.  (C. Defs.' SOF ¶ 641) (citing DX145.)

Around the same time, in late July or early August 1999[55], Kevin Flynn submitted an update to his PDF 1, which asked him to "[i]dentify any business, including if applicable, the state of incorporation or registration, in which you or your spouse or children has an equity

---

[52]     Neither party provided evidence of the date on which Kevin Flynn received the $5 million bonus payment.  Kevin Flynn and Boyd Gaming updated the Field Street Agreement on January 10, 2000, which superseded the original agreement.  (PX1054.)  In the updated Field Street Agreement, Boyd Gaming agreed to pay Kevin Flynn $5 million "within five (5) business days from the Expiration Date," which was November 30, 2004.  (*See* PX1054 at 1, 4.)

[53]     Kevin Flynn testified that he submitted the Form 1 on June 30, 1999 (Bankr. Tr. 1194:3–9), but the Form 1 is dated July 29, 1999.  (DX145 at 2.)  Regardless, both dates are after Kevin Flynn and Boyd Gaming entered into the Field Street Agreement.

[54]     Form 1 did not in fact require disclosure of investments.  (DX145.)  It did ask, however, in Question 6, "Have you been appointed to or resigned from any corporate officer or director's position of any gaming-related entity," and in Question 15, "Are you aware of any circumstances involving financial matters or the potential for a conflict of interest that might affect your status with the Illinois Gaming Board or any other gaming jurisdiction?" (*Id.* at 1–2.) But the IGB did not specifically conclude that Kevin Flynn should have disclosed the Field Street Agreement or his interest in Field Street in response to either question. (*See* PX162 at 19–20.)

[55]     Kevin Flynn's signature on the PDF 1 is dated July 29, 1999 (PX391 at 3), but the Trustee asserts (and Defendants admitted) that the PDF 1 was submitted to the IGB on or around August 4, 1999.  (PX401 ¶ 995; Trustee's SOF ¶ 691.)  In fact, these two submissions— the Form 1 and the PDF 1—may have been filed with the IGB together.  The Form 1 has an IGB stamp on it that states that it was "received" by the IGB on August 4, 1999, the same date on which the parties agree the PDF 1 was submitted. (*See* PX401 ¶ 995; DX145 at 1; Trustee's SOF ¶ 691.)

interest of more than 5%."  (PX391 at 1.)   Kevin Flynn responded "See Schedule D," but Schedule D does not identify Kevin Flynn's ownership interest in Field Street.  (*Id.* at 1, 38–39.) Kevin Flynn did not disclose his interest in Field Street or the Field Street Agreement anywhere in the PDF 1 update.  (PX391; Trustee's SOF ¶ 692.)   Defendants do not dispute that Kevin Flynn failed to disclose Field Street or the Field Street Agreement, but instead state that he "did not intentionally withhold the [agreement]," because at the time "Field Street was a shell corporation with no assets, liabilities, activities, or business affairs," and "Kevin Flynn did not believe that the Field Street Agreement was required to be included in his Disclosure Affidavit, as the Disclosure Affidavit did not include a schedule of investments." (C. Defs.' SOF ¶¶ 641–42) (citing DX145, a "Disclosure Affidavit," which appears to have been submitted with Kevin Flynn's updated PDF 1 on August 4, 1999, and PX353 at 4–5, a letter from Kevin Flynn to Acosta of 11/27/00, in which Kevin Flynn also notes that the Indiana Gaming Commission did not approve the Field Street Agreement until May 12, 2000.)   Defendants' argument is unpersuasive both because as discussed *supra*, Question 15 of the Form 1 clearly asks Kevin Flynn to disclose "financial matters" or other "conflict[s] of interest" (*see supra* note 54), and because Question 2 of the PDF 1, submitted at or around the same time as the Form 1, did explicitly require Kevin Flynn to disclose investments in businesses exceeding five percent. (PX391 at 1.)

Kevin Flynn was not yet a party to the Amended Shareholders' Agreement, which he executed on August 6, 1999 (PX1008 at 36; *see infra* Background IV.B.3), at the time that he submitted his Form 1 and PDF 1, but IGB Rule 140(a)[56] imposes a continuing duty to disclose

---

[56]      The IGB found that Kevin Flynn failed to disclose the Field Street Agreement to the IGB, and reasoned that the Field Street Agreement "could affect the gaming industry and the reputation of persons in the gaming industry in Illinois."  (PX162 at 19–20.)  IGB Rule 110(a) provides the IGB with the authority to take disciplinary action "for any act or failure to act by [the holder of any license] or by [the license holder's] agents or employees that . . . would discredit or tend to discredit the Illinois Gaming industry or the State of Illinois." 86 ILL. ADMIN. CODE § 3000.110(a).   The IGB concluded that Emerald "through its officers, employees,
(continued . . .)

updated information to the IGB. Here, neither the IGB nor the Indiana Gaming Commission were promptly notified of the Field Street Agreement. (Trustee's SOF ¶¶ 698–99.) When the Indiana Gaming Commission discovered the existence of the agreement, it concluded that Boyd Gaming had a responsibility to disclose the agreement and failed to, and as a result, fined Boyd Gaming $1 million. (*Id.* at ¶ 698.) The Indiana Gaming Commission eventually approved the updated Field Street Agreement on May 12, 2000. (PX509 at 9; C. Defs.' SOF ¶ 643.)

The IGB did not become aware of the Field Street Agreement until June 29, 2000, when Kevin Flynn disclosed its existence in an interview with IGB Agent Kevin Pannier. (Trustee's SOF ¶ 701.) In response to Pannier's question regarding updates to Kevin Flynn's Form 1 since it was submitted in July 1999, Kevin Flynn disclosed that he had an interest in Field Street, Inc., which had entered into the Field Street Agreement.[57] (C. Defs.' SOF ¶ 640.) Kevin Flynn subsequently sent a letter to Pannier on July 8, 2000 with an updated Form 1 (dated July 7, 2000), in which Kevin Flynn disclosed that "[s]ince June 21, 1999 I have been the sole owner, director and president of Field Street, Inc. (a consultant of Boyd Gaming Corporation since May 2000 and the trustee of the Blue Chip Casino, Inc. Shareholders' Liquidating Trust)." (PX434 at

---

representatives, shareholders, Key Persons, and others, repeatedly engaged in" this type of activity, including "failing to fully, truthfully, timely and accurately disclose information to the IGB, as required by the Act and Rules, and as specifically requested by the IGB." (PX162 at 35.) There is sufficient evidence from which to conclude that Kevin Flynn's failure to disclose the existence of the Field Street Agreement until a full year after it became effective (and only upon the IGB's specific request) violated Rule 140(a), which imposes a continuing duty to disclose, and in turn, Rule 110(a).

[57] According to the memorandum prepared by Agent Pannier on July 6, 2000 summarizing the interview, when asked whether anything had changed since completing his Form 1, Kevin Flynn disclosed that "he had opened a business called Field Street Inc. in May of 2000." (PX433 at 1.) Defendants do not appear to dispute that Kevin Flynn provided the May 2000 date as the date in which Field Street was incorporated, despite the fact that Field Street had in fact been in existence and entered into an agreement with Boyd Gaming on June 27, 1999, *before* Kevin Flynn submitted either his Form 1 or PDF 1 to the IGB. (C. Defs.' SOF ¶ 639; *see also* PX678 at 2; Bankr. Tr. 1181:21–1183:18.) His statement to the IGB on June 29, 2000, then, that Field Street was not opened until May 2000 (after these forms were submitted) is not credible.

1, 4.) The letter also stated that it included "documents [Kevin Pannier] requested today regarding Field Street, Inc." (*Id.* at 1.) Boyd Gaming, in October 2000, also sent the IGB a copy of the Field Street Agreement. (*Id.* ¶¶ 700, 702.) On the updated Form 1, Kevin Flynn responded "No" to Question 15, which asked him to disclose "circumstances involving financial matters or the potential for a conflict of interest that might affect your status with the Illinois Gaming Board or any other gaming jurisdiction," despite the fact that both the original and updated Field Street Agreements provided that "[i]t is the intention of the parties to this Agreement that the services hereunder be rendered in the Great Lakes region of the United States, *primarily in Indiana and Illinois.*" (PX434 at 3; *see* PX390 at 4; PX1054 at 3.)

In addition to Kevin Flynn, only Kevin Larson appears to have been aware of the Field Street Agreement. (Trustee's SOF ¶ 704.) Kevin Larson testified that he learned about the Field Street Agreement when reviewing a draft of sales documents related to the sale of Blue Chip to Boyd Gaming in April or May 1999. (PX1228 at 11–12; Bankr. Tr. 1616:4–19.) But, Kevin Larson testified that he thought that it was Kevin Flynn's responsibility to disclose the agreement. (Bankr. Tr. 1616:20–1618:2.) There is no evidence that Kevin Larson communicated this belief to Kevin Flynn, but this court agrees that it was Kevin Flynn's responsibility, and finds that only Kevin Flynn failed to disclose the Field Street Agreement. The court notes, as well, that the irony (if not hypocrisy) of his anti-gambling lobbying activities appeared to be lost on Kevin Flynn.

## IV. Transfer of Emerald shares

### A. Amendment to Emerald's Shareholders' Agreement

Emerald's original Shareholders' Agreement, dated December 31, 1991 and executed by the eighteen original shareholders (PX1008 at 122–38; C. Defs.' SOF ¶ 239; D. Flynn's SOF ¶ 127), required that shareholders seeking to sell their shares give Emerald and existing shareholders 90 days' notice and the first option to purchase before shares were made available to outsiders. (PX1008 at 116–17; Trustee's SOF ¶ 512.) In August 1999, however,

Emerald amended its Shareholders' Agreement, including the provisions governing the transfer of shares. (PX1008 at 4, 5.) The Amended Shareholders' Agreement required only that shareholders intending to sell shares provide Emerald with 10 days' notice of the sale, eliminating altogether the notice requirements to existing shareholders and the first option provision. (PX1008 at 5; Trustee's SOF ¶ 515.)

Emerald's General Counsel, Walter Hanley, consulted outside counsel from two law firms for legal advice on making amendments to the original Shareholders' Agreement. He did so, Defendants assert, in order to ensure compliance with Section 11.2. On June 28, 1999, Hanley contacted outside counsel Michael Ficaro for advice, providing him with a copy of the original Shareholders' Agreement, and some earlier correspondence between Emerald and Administrator Michael Belletire of the IGB. (C. Defs.' SOF ¶ 240; D. Flynn's SOF ¶ 128; *see* PX896.) Attorney Will McMaster, Ficaro's partner at Hopkins & Sutter, recommended amendments to the Shareholders' Agreement, including the addition of a mechanism for adding new shareholders to Emerald. (C. Defs.' SOF ¶ 241; D. Flynn's SOF ¶ 130.) Hanley also discussed amendments with Tom Brett, an attorney at Pederson & Houpt[58], the firm that had drafted the original Shareholders' Agreement. (C. Defs.' SOF ¶ 242; D. Flynn's SOF ¶ 131; Pedersen's SOF ¶ 22.) Hanley provided both McMaster and Brett with a copy of an April 25, 1996 letter from Belletire, directing Emerald to include in its bylaws requirements for disclosure to the IGB of ownership interests. (C. Defs.' SOF ¶ 242; D. Flynn's SOF ¶ 131.) In late July 1999, Hanley incorporated both McMaster's and Brett's recommendations into a draft Amended Shareholders' Agreement (PX1316 at 148; C. Defs.' SOF ¶¶ 241–42; D. Flynn's SOF ¶¶ 130–31), and the draft agreement, as well as a draft letter for existing shareholders explaining the

---

[58] The parties dispute whether it was Peer Pedersen or Walter Hanley who contacted Brett to make the amendments (*compare* Trustee's SOF ¶¶ 513–14, *with* Pedersen's SOF ¶ 22), but both sides agree that both Pedersen and Hanley appeared to have at least a hand in drafting the Amended Shareholders' Agreement.

amendments was sent to all of Emerald's directors for comment.  (Trustee's SOF ¶ 517; C. Defs.' SOF ¶ 243; D. Flynn's SOF ¶ 132.)

On July 29, 1999, McQuaid sent existing Emerald shareholders a letter explaining the amendments to the Shareholders' Agreement along with a copy of the Amended Shareholders' Agreement, and a marked-up version of the Shareholders' Agreement identifying the proposed changes.  (Trustee's SOF ¶ 517; C. Defs.' SOF ¶ 243; D. Flynn's SOF ¶ 132.)  The letter explained that one reason for the amendments was because "[t]he IGB has requested that all licensees address certain regulatory issues in a shareholders' agreement, and ours needs to be modified to address these regulatory concerns."  (PX359 at 2.)  Hanley testified that the "regulatory concerns" cited by McQuaid in the July 29, 1999 Letter were based on Will McMaster's advice that Emerald's Shareholders' Agreement needed to include several new provisions, such as a mechanism to add new shareholders, and a provision making them subject to the Shareholders' Agreement.  (Tr. 1222:21–1223:16.)

The Trustee notes, however, that the amendments to the Shareholders' Agreement removed provisions that Emerald had previously added at the IGB's request. (Trustee's SOF ¶ 517.)  In a letter to Joseph Duellman of Aerie Management (then Emerald's operations management firm) dated April 25, 1996, IGB Administrator Belletire explained that "[a] recent occurrence involving the transfer of an ownership interest in an owner licensee without prior Board approval has caused the Board concern," and therefore, in order to ensure that transfers comply with IGB rules, the IGB required owner licensees to add provisions in their "by-laws, shareholders' agreements or other agreements," specifying the following:

> (1) all owners must be disclosed to and all ownership interests must be approved by the Illinois Gaming Board; (2) owner licensees are to be immediately notified of any plan or intent to sell . . . or otherwise transfer an ownership interest in an owner licensee; (3) no acquisition, disposition, transfer . . . may occur without prior Board approval; (4) any attempted acquisition of ownership or ownership transfer without prior Board approval is void; and, (5) any individual approved by the Board for ownership interest who is subsequently determined to be held by the Board as an unacceptable owner shall be required to divest all ownership interest on terms acceptable to the Board.

(PX896 at 1.)  The letter identifies other provisions to ensure that these requirements are met, such as: "a mechanism by which [owner licensees], or their existing ownership interest holders, may immediately purchase or redeem the stock of an interest holder in the event the interest holder fails to meet [IGB requirements];" and "provisions which give the company, and/or existing interest holders, the right to purchase a shareholder's interest in the event of death, bankruptcy, insolvency or other involuntary transfer, subject to the Board's approval." (PX896 at 2.)  Kevin Larson had responded to Belletire's letter on November 11, 1996, and identified the mechanisms created by Emerald in its original Shareholders' Agreement to address the IGB's transfer concerns, which included the ninety-day notice requirement, and the right of first option available for existing shareholders.  (PX915 at 1.)

Though the parties do not dispute the substance of the 1999 changes, they disagree about their purpose and effect, including whether the Amended Shareholders' Agreement did satisfactorily ensure compliance with IGB rules.  According to the Trustee, Donald Flynn and some of the other Defendants sought to amend the Shareholders' Agreement in order to make it easier for existing shareholder Donald Flynn to transfer shares to "local investors," specifically affiliates of Mayor Donald Stephens of Rosemont, in exchange for his support of legislation that allowed Emerald to move its license.  (Trustee's SOF ¶¶ 522–23, 536.)  Defendants do not deny that the amendments they proposed in 1999 made it easier for existing shareholders to transfer their shares, but instead assert that these amendments were necessary to comply with another legal requirement: Section 11.2's requirement that twenty-percent of Emerald shares be held by female and minority investors.  (C. Defs.' SOF ¶¶ 240, 244; D. Flynn's SOF ¶¶ 128, 133.)  The Amended Shareholders' Agreement did contain several of the provisions addressed by Belletire; paragraph 4.03 requires a shareholder intending to transfer his shares to give Emerald 10 days' written notice; paragraph 4.07 makes all transfers to outsiders subject to IGB approval; paragraph 2 states that "any transfer of Shares made in conflict with or in derogation of any

such terms, provisions or conditions of this Agreement shall be of no legal force and effect and have no validity;" and paragraph 5.01 required a shareholder to "promptly sell his Shares to the Corporation or another Shareholder thereof" if the IGB does not approve that shareholder. (PX1008 at 4, 5, 6.)

The Amended Shareholders' Agreement became effective upon execution by all original shareholders. (Trustee's SOF ¶ 521.) Emerald provided the IGB with a copy of the Amended Shareholders' Agreement in their Renewal Applications submitted on August 10 and September 24, 1999. (C. Defs.' SOF ¶ 246.)

**B.      Transfer of shares to Kevin Flynn, Joseph McQuaid, John McMahon, Kevin Larson, and Walter Hanley, the "Officer Defendants"**

Defendants Kevin Flynn, McQuaid, McMahon, Larson, and Hanley argue that they are not shareholders (or otherwise parties to the Amended Shareholders' Agreement) because the IGB did not approve them as shareholders. (Trustee's SOF ¶ 70; C. Defs.' SOF ¶¶ 157, 249–50, 253.) This argument, too, is factually complicated.

**1.      Emerald's Restricted Stock Award Plan**

On June 23, 1999, Emerald's Board of Directors approved a Restricted Stock Award Plan ("1999 Restricted Stock Plan"), under which "key officers and employees" would receive shares of Emerald stock. (PX521at 2; Trustee's SOF ¶ 74; C. Defs.' SOF ¶ 153.) Under the 1999 Restricted Stock Plan, the Officer Defendants could not sell stock before certain dates, and were subject to forfeiture requirements in the event that they were no longer employees of Emerald. (PX521 at 4.) "Except for such restrictions," the 1999 Restricted Stock Plan provided that "the Participant, as owner of such shares, shall have all the rights of a shareholder of the Corporation, including (but not limited to) the right to receive all dividends paid on such shares . . . and the right to vote such shares." (PX521 at 4.)

Kevin Flynn, Joseph McQuaid, John McMahon, Kevin Larson, and Walter Hanley each executed Restricted Stock Agreements on June 23, 1999. (PX521 at 18, 22, 26, 30, 44.) Each

agreement recited the following: "Company hereby grants to Key Employee and Key Employee hereby accepts from Company [number of shares] shares of common stock of [Emerald] ('Shares')." (PX521 at 11, 19, 23, 27, 31.) Though the Restricted Stock Agreements do not explicitly state that the transfer of shares under the agreement is subject to IGB approval, they do state that "the terms of the [1999 Restricted Stock Plan] are incorporated herein by reference and Key Employee's rights hereunder are subject to such terms to the extent they are inconsistent with or in addition to the terms set forth herein and Company and Key Employee hereby agree to comply with requirements of the Plan." (PX521 at 9.) The 1999 Restricted Stock Plan refers to the requirement of IGB approval, stating that the Plan would "become effective on June 23, 1999 (subject to approval, to the extent required, by the Illinois Gaming Board or its Administrator) . . . ." (PX521 at 2.) Defendants Kevin Flynn, McQuaid, McMahon, Larson, and Hanley all executed stock certificates the same day. (Trustee's SOF ¶ 77; C. Defs.' SOF ¶ 158.) Each stock certificate stated, "This certifies that [name] is the owner of [number of shares] full paid and non-assessable shares of the capital stock of [Emerald] . . . ." (PX1282 at 81–95.)

Defendants now contend that they never actually received the stock certificates because their stock certificates were "held in escrow in Hanley's office." (C. Defs.' SOF ¶ 251.) Notably, Hanley was one of the "key employees" to whom Emerald had issued stock under the 1999 Restricted Stock Plan, and as a result, his own stock certificate was "escrow[ed]" in his office. Hanley testified that in his view escrow did not necessarily mean that these items were required to be held by a "neutral third party," and acknowledged that the stock certificates were "held by [Emerald]." (Bankr. Tr. 2745:5–21.)

### 2.    Amended and Restated Purchase Agreement

In addition to the 1999 Restricted Stock Plan, Defendants Kevin Flynn, McMahon, Hanley, and McQuaid purchased Emerald shares from Donald Flynn on November 15, 1999 pursuant to an Amended and Restated Purchase Agreement. (PX413; Trustee's SOF ¶ 80; C. Defs.' SOF ¶ 325.) In the agreement, Donald Flynn agreed to "sell, transfer, assign and

129

deliver" and Defendants agreed to "purchase from [Donald Flynn]" shares of Emerald "effective as soon as practicable after the date (a) the IGB has approved the Purchaser to the extent required by Illinois law . . . ." (PX413 at 1.) Kevin Flynn, McMahon, Hanley, and McQuaid acknowledged that "no transfer of the Shares shall occur unless and until (i) the IGB approves the Purchaser to the extent required by Illinois law and (ii) the Seller fulfills all of his obligations under the Shareholders' Agreement." (*Id.*) The Amended Shareholders' Agreement, to which Donald Flynn was a party, similarly provided that transfers were contingent on IGB approval. (PX1008 at 4, 6; C. Defs.' SOF ¶ 326.) In addition, the agreement stated, "THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONDITIONED UPON AND SUBJECT TO ANY REQUIRED APPROVAL OF THE ILLINOIS GAMING BOARD." (PX413 at 1) (emphasis in original.)

### 3. The Officer Defendants executed the Amended Shareholders' Agreement and were issued Emerald shares

Significantly, each of the Officer Defendants executed, as "shareholder[s]," and as such are parties to, the Amended Shareholders' Agreement on August 6, 1999.[59] (PX1008 at 36

---

[59] The Amended Shareholders' Agreement, dated August 6, 1999 provides that it is between Emerald and "those parties set forth on Exhibit A attached hereto while such party holds Shares . . . and any party who hereafter acquires Shares." (PX1008 at 4.) Exhibit A contains a list of the eighteen original Emerald shareholders, and states that it "excludes shares relating to [Emerald's] 1999 Restricted Stock Award Plan." (PX1008 at 10.) Strictly construed, together, these terms suggest that the Amended Shareholders' Agreement would not apply to the Officer Defendants, who executed Stock Purchase Agreements to acquire Emerald shares on June 23, 1999 pursuant to the 1999 Restricted Stock Plan. The court need not address that possibility further, however, as each of the Officer Defendant executed an Amended Shareholders' Agreement on August 6, 1999. (PX1008 at 36, 39–41, 43.) In addition, each of the stock certificates issued to Defendants Kevin Flynn, McQuaid, McMahon, Larson, and Hanley, stated that "By accepting the shares of the stock evidenced by this certificate, the holder agrees to execute and be bound by the Shareholders' Agreement" dated August 6, 1999. (PX1282 at 81–95.) The Officer Defendants maintain that they never "accept[ed]" the stock certificates because they were not approved by the IGB. (C. Defs.' SOF ¶ 251.) They point out, as additional evidence that they never accepted the stock certificates, the fact that the Officer Defendants never executed the page in the stock register, attached to their certificates, confirming receipt of the certificate. (C. Defs.' SOF ¶ 251) (citing PX1282 at 81–95.) But the Officer Defendants accepted Emerald shares when they executed the Restricted Stock Agreements on June 23, 1999. The stock certificates themselves acknowledge that they are

(continued . . . )

(Kevin Flynn), 39–41 (McQuaid, McMahon, Hanley), 43 (Larson).)  Defendants do not dispute this fact, but instead emphasize that the IGB never approved the transfer of stock under the Restricted Stock Agreements, or the Amended and Restated Purchase Agreement, and therefore, they argue, the Officer Defendants are not shareholders. (C. Defs.' SOF ¶¶ 157, 327.) McMahon testified that he understood that under the 1999 Restricted Stock Plan he had been "awarded some shares in the company subject to Gaming Board approval." (Tr. 153:7–24.) Larson testified similarly. (Tr. 2941:6–2942:5.)  But the Amended Shareholders' Agreement itself does not state that one cannot be a party to the agreement without IGB approval.  Rather, it provides that the transfer of shares to outsiders ("a person other than a Shareholder"), is contingent on IGB approval, and that "[i]f the IGB determines for any reason that . . . any Shareholder is not an acceptable owner of the Corporation, the Shareholder shall promptly sell his Shares . . . ." (PX1008 at 6.)  Larson testified that when he signed the Amended Shareholders' Agreement, he understood that he was bound by Paragraph Ten of the agreement to comply with the Riverboat Gambling Act and IGB Rules.  (Bankr. Tr. 1661:4–11.)

In addition, the Officer Defendants acted as if they were shareholders, and adhered to the terms of the Amended Shareholders' Agreement.  Emerald's bylaws provided that only shareholders of record were entitled vote at shareholders' meetings. (PX1317 at 5, 22.)  All of the Officer Defendants attended Emerald shareholder meetings, and voted their shares according to the terms of the Amended Shareholders' Agreement. (PX23 (8/12/99 Shareholders' Meeting); PX29 (2/25/00 Shareholders' Meeting); PX40 (3/6/01 Shareholders' Meeting); PX1008 at 7, ¶ 9.)

---

only "evidence[]" of the shares, and as such, are symbolic representations of the transfer that occurred through the Restricted Stock Agreements.  Finally, each of the Officer Defendants except for Larson, acquired additional shares from Donald Flynn in November 1999, after the Amended Shareholders' Agreement became effective.  (PX413.)

Emerald treated all of its proposed shareholders (those awaiting IGB approval) as bound by the Amended Shareholders' Agreement. Prior to the 2001 Shareholders' Meeting, Hanley mailed a letter to twelve of the proposed shareholders (the "Twelve Outsiders") and the statutory investors informing them of their voting rights and obligations under the Amended Shareholders' Agreement. (PX1124; Bankr. Tr. 2755:8–22.) At trial, Hanley explained that he sent this letter because "[u]nder [Emerald's] bylaws the definition of shareholder is a holder of record of units of proprietary interest in [Emerald]. These individuals had proprietary interest in [Emerald]. . . . The Gaming Board allowed individuals to act in the capacity after they had Personal Disclosure Form 1 applications submitted to the Gaming Board. All of these individuals had done that." (Bankr. Tr. 2758:6–2759:4.) Hanley's testimony reflects the understanding that individuals could be shareholders of Emerald (with all the attendant rights and responsibilities) before receiving IGB approval. The Officer Defendants, like the Statutory Investors and Twelve Outsiders, were treated as shareholders by Emerald though they were never approved by the IGB as such. (C. Defs.' SOF ¶¶ 269, 338.)

Emerald also referred to its issuance of stock to the Officer Defendants in 1999 as income to those individuals for tax purposes. (*See* PX18 at 8) (Emerald's Board authorized Emerald's officers to value the restricted stock issued under the 1999 Restricted Stock Plan at $100,000 "for tax purposes.") Emerald identified the Officer Defendants as shareholders on its own Subchapter S federal tax returns in 1999 and 2000. (PX404 at 67–81, 236 (1999 Tax Return); PX1128 at 60–74, 217–18 (2000 Tax Return); C. Defs.' SOF ¶ 480.)[60] Likewise, between 2000 and 2006 or 2007, McMahon sent the Officer Defendants, including himself, K-1

---

[60] Emerald also reported that Defendants were shareholders for tax years 2002 (PX886 at 12–13, 19–23, 34–35), 2003 (PX887 at 49–52, 66–70, 81–84, 106–13), 2004 (PX888 at 7, 10–12, 22–25.), 2005 (PX1297 at 5–8, 17- 20), 2006 (PX1298 at 3–8, 11–15), and 2007 (PX1299 at 3–4 (Kevin Flynn and John McMahon only)). The relevant timeframe for determining whether Defendants were shareholders is when Defendants engaged in the conduct that violated IGB rules (i.e. prior to 2001).

tax forms for reporting Emerald's income and losses on their personal income tax returns according to the shares that they each held. (C. Defs.' SOF ¶ 480.)

Finally, the Officer Defendants represented themselves as shareholders to the Bankruptcy Court. In Emerald's Statement of Financial Affairs, filed on September 26, 2002, Emerald identified Kevin Flynn, Larson, McQuaid and McMahon each as "stockholder[s] who directly or indirectly own[], control[], or hold[] 5 percent or more of the voting or equity securities of the corporation." (PX1185 at 15–16.) The Trustee notes that Hanley was not listed because he did not own more than five percent of Emerald's shares in Emerald. (Trustee's SOF ¶ 84.) Similarly, the List of Equity Security Holders, filed in the Bankruptcy Court by Emerald on November 18, 2002, identifies each of the Officer Defendants as a "[h]older of [s]ecurity" "as reflected on [Emerald's] books and records" as of June 13, 2002. (PX1189 at 1, 2–4.) Finally, each of the Officer Defendants filed a proof of interest with the Bankruptcy Court. (PX395 (McMahon); PX518 (Larson); PX1192 (Hanley); PX1194 (McQuaid); PX1196 (Kevin Flynn); *see also* Claims Register in *In Re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill.)) Defendants note that the proofs of interest forms filed by the Officer Defendants "do not state that they own shares, are shareholders or have been approved to be shareholders by the IGB," and that each of the proofs of interest state that they are held "in book form" by Emerald. (C. Defs.' SOF ¶¶ 784–86.) These circumstances do not change the analysis. That the shares were held "in book form" merely denotes the way in which the shares were recorded, and is irrelevant to determining whether the Officer Defendants actually own shares. In filing proofs of interest, the Officer Defendants have effectively claimed an interest in Emerald's estate. Emerald treated the Officer Defendants as shareholders and the Officer Defendants each asserted a valuable claim against Emerald's estate. The court concludes that each has executed, and is a party to, the Amended Shareholders' Agreement.

## C. Transfers of shares to and from Donald Flynn

Between June and November 1999, existing shareholder Donald Flynn both acquired and sold shares of Emerald stock. In June 1999, Donald Flynn significantly increased his interest in Emerald by exercising two options which he had received in exchange for a 1996 loan to Emerald, and by converting to equity some debt that Emerald owed him under a 1997 Credit Agreement. (Trustee's SOF ¶ 506; D. Flynn's SOF ¶ 124.) On July 14, 1999, Emerald issued Donald Flynn 2,633 shares of Emerald common stock, and as a result, as of July 15, 1999, Donald Flynn owned 3,600 shares of Emerald stock, a seventy-four percent ownership interest. (Trustee's SOF ¶¶ 509, 511; D. Flynn's SOF ¶ 124.) In a letter to IGB Deputy Administrator McDonald dated July 15, 1999, McQuaid provided the IGB with a list of Emerald shareholders and the total number of shares and corresponding percentage ownership interest held by each shareholder. (Trustee's SOF ¶ 510.)

Just a few weeks later, between September 1 and September 17, 1999, Donald Flynn sold 294 shares of Emerald stock to twelve outsiders ("Twelve Outsiders")[61] as well as a large amount of stock to eleven other individuals, subject to IGB approval. (PX324 at 2–3; PX416; Trustee's SOF ¶ 524; D. Flynn's SOF ¶ 146.) Pursuant to the Amended Shareholders' Agreement (though not apparently consistent with its ten-day notice provision), Donald Flynn notified Emerald on September 13, 1999 that he intended to sell a total of 2,804.9513 shares to twenty-three individuals and trusts. (PX324; Trustee's SOF ¶ 525; C. Defs.' SOF ¶ 324; D. Flynn's SOF ¶¶ 143, 149.) The Twelve Outsiders were chosen from a list kept by McQuaid of non-minority individuals who had expressed interest, either to the IGB or to Emerald, in investing in Emerald after Section 11.2 passed. (C. Defs.' SOF ¶¶ 323–24; D. Flynn's SOF

---

[61] The Twelve Outsiders who purchased stock from Donald Flynn were: Michael Blumenthal, Wayne Douglas, Susan Leonis, Barbara Levy, Robert Martwick, Michael Parillo, Joseph Salamone, Joseph Scarpelli, John Sisto, Mark Triffler, George Voutiritsas, and Edwin Zeman. (Trustee's SOF ¶ 536.)

¶ 143.) The other eleven proposed shareholders included Hanley, McMahon, McQuaid, and a trust for Kevin Flynn. (C. Defs.' SOF ¶ 324; D. Flynn's SOF ¶ 143.)

Shortly thereafter, Donald Flynn agreed to purchase all of the shares owned by five existing shareholders in the Pedersen group ("Five Insiders")[62] and some of Defendant Pedersen's shares. Thomas Brett, the attorney with Pedersen & Houpt, facilitated the transfer of shares from shareholders in the Pedersen group to Donald Flynn. Between July or September 1999[63] and October 1999, under Pedersen's direction, Brett worked on the sale of shares from the Pedersen group to Donald Flynn. (Trustee's SOF ¶¶ 588–89; C. Defs.' SOF ¶ 333.; D. Flynn's SOF ¶ 165.) Brett drafted the stock purchase agreements[64] for these sales. (Trustee's SOF ¶¶ 592–93; D. Flynn's SOF ¶ 166; *see also* Pedersen's SOF ¶ 37.) Pedersen maintains that he agreed to sell Donald Flynn 31.44286 shares in November 1999 in order to

---

[62] The Five Insiders were Russell Steger, Howard Warren, Richard Forsythe, Anne O'Laughlin Scott and Barton Love. (Trustee's SOF ¶ 547.)

[63] There appears to be some disagreement between the parties about when Brett began work on facilitating the sale of shares from certain Pedersen group shareholders to Donald Flynn. While the Trustee asserts that Brett began work in July 1999 (Trustee's SOF ¶¶ 588–89), Donald Flynn claims that Brett did not inform Emerald of certain Pedersen group shareholders' desire to sell their shares until at earliest September 7, 1999, after the IGB concluded that the ALJ's recommendation to not renew Emerald's 1997 license application was moot. (D. Flynn's SOF ¶ 165; *see also* Pedersen's SOF ¶ 20 n.3.) In a parallel dispute, the parties also disagree on when Brett drafted a memorandum concerning the sale. The Trustee claims that the billing records and document itself show it was drafted on July 21, 1999 (Trustee's SOF ¶ 590 n.13), while Defendants claim that the date is a mistake and that billing records show that it was drafted on September 8 and finalized on September 21, 1999. (D. Flynn's SOF ¶ 179; Pedersen's SOF ¶ 20.) Under either version, however, Pedersen was aware of the sale of shares to Donald Flynn before they occurred in late 1999. (Trustee's SOF ¶ 590 n.13.)

[64] The Trustee notes the draft stock purchase agreement between Donald Flynn and the Five Insiders contained a non-disclosure provision which stated "Neither the Seller nor the Purchaser shall disclose to anyone the existence of or any terms of this Agreement, unless required by law," without further explanation of its significance. (Trustee's SOF ¶ 593.) As Pedersen observes, the "required by law" clause likely provided an exception for reporting to the IGB, simply because, as the Trustee acknowledges, IGB approval was required in order to become a shareholder of Emerald. (Pedersen's SOF ¶ 34.) Regardless, the IGB did not cite this agreement in its Final Board Order revoking Emerald's license. (*See* PX162.)

maintain exactly a two-percent ownership interest in Emerald. (Pedersen's SOF ¶ 29.) Though he encouraged shareholders in the Pedersen group to sell all of their shares because, at the time, Emerald did not look like a good investment, Pedersen chose to retain a small ownership interest in Emerald.[65] (Trustee's SOF ¶¶ 552–53; Pedersen's SOF ¶ 30 n.7.)

On September 28, 1999, Donald Flynn agreed to purchase all of the shares owned by four Pedersen group shareholders (Richard Forsythe, Howard Warren, Anne O'Laughlin Scott, Russell Steger), and in November 1999, Donald Flynn agreed to purchase all of the shares held by another Pedersen group shareholder (Barton Love), as well as 31.44286 shares from Pedersen himself. (Trustee's SOF ¶ 548; D. Flynn's SOF ¶ 165.) Each of the agreements for sale of these shares was subject to IGB approval. (PX485; PX325 at 21.) In total, between September and November 1999, Donald Flynn purchased 325.44286 shares of Emerald stock; 294 shares from the Five Insiders, and 31.44286 shares from Pedersen. (Trustee's SOF ¶ 547; D. Flynn's SOF ¶ 171.)

The Trustee contends the transfers had two purposes: first, Donald Flynn's sale to the Twelve Outsiders satisfied Emerald's obligation under the alleged Davis agreement to sell five percent of its shares to "local" investors, specifically those affiliated with Rosemont and Mayor Stephens, (Trustee's SOF ¶¶ 583–84), and second, Donald Flynn's subsequent purchase of the same number of shares ensured that he retained majority control of Emerald. (Trustee's SOF ¶¶ 537, 584–85.) With respect to the first of these purposes, the Trustee refers, again, to the deal allegedly entered into on December 1, 1998, in which Emerald allegedly agreed to provide

---

[65] Again, the Trustee makes much of the fact that Pedersen encouraged shareholders in the Pedersen group to sell all of their shares because Emerald did not appear to be a good investment, but also retained an interest in Emerald for himself, and, told Acosta that he did so because Emerald did appear to be a good investment. (*See* Trustee's SOF ¶¶ 552–53.) The Trustee identifies these statements as contradictory, suggesting, the court presumes, that Pedersen had another motive for encouraging the sale of shares to Donald Flynn, but the Trustee fails to explain why this is relevant. Pedersen plausibly reconciles these two statements, explaining that he was more cautious with others' investments than his own. (Pedersen's SOF ¶ 30 n.7.)

five percent of its shares to local investors in exchange for the support of the Davis Companies and Duchossois Industries in seeking legislation that would allow Emerald to move its license. (Trustee's SOF ¶ 583.)  Consistent with the terms of that alleged agreement, the local investors were, as the IGB Final Board Order recognized, closely associated with Mayor Stephens. (PX162 at 25.)[66]  In addition to Mayor Stephens' own statements to the IGB, the Trustee cites, as evidence of this deal, a statement made by Kevin Flynn in November 1999 to attorneys representing Emerald in the lawsuit litigation filed by the Davis Companies.  Specifically, Kevin Flynn reportedly told counsel that in September 1999, Donald Flynn decided to sell 4.23 percent of shares to "local owners."  (Trustee's SOF ¶ 584.)  The Trustee believes that these "local owners" were the Twelve Outsiders.  (*Id.*)  The IGB, in its Final Board Order, found that Donald Flynn's sale of 294 shares to the Twelve Outsiders was about 4.23 percent of his ownership interest.  (PX162 at 22.)

Defendants deny that these transfers were part of any deal.  (C. Defs.' SOF ¶¶ 322, 340; D. Flynn's SOF ¶¶ 151, 154, 176.)  Contrary to the Trustee's assertion that at least some of the Twelve Outsiders were chosen because of their affiliation with Rosemont, Defendants maintain that these investors were in fact selected from a list kept by McQuaid of approximately twenty individuals who had expressed interest, either to Emerald or the IGB, in investing in Emerald after Section 11.2 became law, and who did not qualify as minority or female investors.[67]

---

[66]    The IGB Final Board Order found that the agreement, in fact, occurred.  (PX162 at 7.)  According to the IGB, in December 1998, Kevin Flynn, on behalf of Emerald, and the Davis Companies and the Duchossois Industries agreed to split the ownership interest in Emerald (37.5 percent for Flynns, 37.5 percent for Davis Companies, 20 percent option for Duchossois), and provide five percent to "local investors."  (*Id.*)  Mayor Stephens, in a statement to the IGB, indicated that the five percent interest for local investors "was for me."  (*Id.*)  The court concludes there is insufficient evidence to find that the agreement was reached.  (*See supra* Background II.A.2.)

[67]    Richard Levy testified that Heytow would have purchased shares from Donald Flynn had he been given the opportunity.  (Trustee's SOF ¶ 527.)  But, Defendants Donald Flynn and Pedersen disagree, and Pedersen asserts that there is no contemporaneous evidence that Heytow was interested in purchasing additional shares in the fall 1999.

(continued . . . )

(Trustee's SOF ¶ 537; C. Defs.' SOF ¶¶ 323, 328; D. Flynn's SOF ¶¶ 139–40.)  It appears to this court that the parties' positions, at least on this score, are not inconsistent.  At least six of the Twelve Outsiders do appear to have a connection to Rosemont: Susan Leonis was a consultant in Rosemont who knew both Mayor Stephens and Rosemont's state district Representative Ralph Capparelli; Robert Martwick was president of Tempo International, a company that held an exclusive license for music presentations at Rosemont Horizon, and also knew Stephens and contributed to Capparelli's campaign; John Sisto was Capparelli's nephew; Joseph Scarpelli, Edward Zeman, and the brother of Joseph Salamone,[68] Vito Salamone, had made campaign contributions to Capparelli.  (Trustee's SOF ¶¶ 538–41.)  The IGB Final Board Order also noted that at least one of these six individuals, Vito Salamone, "was identified by the FBI as being close with members and associates of organized crime."  (PX162 at 23–24.)  But there are no allegations that the other six outsiders, or the remaining eleven other proposed shareholders, had any connection with Rosemont.  Donald Flynn asserts that he neither knew nor chose the Twelve Outsiders as proposed shareholders, and sold his shares to them because McQuaid told him the outsiders had expressed interest in investing.  (D. Flynn's SOF ¶ 152.)  Donald Flynn testified before the IGB that so long as the proposed investors "were willing to come up with the money, I didn't really care."  (PX162 at 22.)  The IGB concluded in its Final Board Order that "Donald Flynn . . . either intentionally kept himself ignorant of the identities and backgrounds of the Twelve Outsiders or he knew their identities and backgrounds

---

Defendants also note an interest that might influence Levy's testimony; he is a partner at Jenner & Block, the firm representing the Trustee.  (D. Flynn's SOF ¶ 182; Pedersen's SOF ¶ 26.)

[68]    The IGB Final Board Order found that there was a "secret memorandum of agreement" not disclosed to the IGB, in which Joseph and Vito Salamone agreed to share their Emerald shares with officers of the Parkway Bank and Trust Company, which Mayor Stephens used for some transactions.  (PX162 at 23.)  The Trustee has presented no evidence of this secret agreement, and the Illinois Appellate Court agreed that "the agreement was just as much a secret to Emerald as it was to the Board." (PX1233 at 126.)

and wanted to be able to deny knowledge of such if necessary." (PX162 at 22.) The IGB did not identify evidence in support of its finding concerning Donald Flynn's motivation.

The Trustee argues that in addition to complying with the term of Emerald's alleged "deal," Donald Flynn's sales reflect his effort to maintain control of Emerald. Thus, the Trustee notes, Donald Flynn purchased the 294 shares from the Five Insiders at a loss.[69] He sold 294 shares to the Twelve Outsiders for $1.5 million per one-percent interest, in total, $6,345,000, but agreed to purchase the same number of shares from the Five Insiders for $2.5 million per one-percent interest, in total, paying $10,571,193.82 for the same number of shares he had sold just a few weeks earlier. (Trustee's SOF ¶¶ 522, 556, 582.) Emerald's Board of Directors set the price at $1.5 million per one-percent interest on August 12, 1999, and this was the price at which female and minority investors were permitted to purchase shares in Emerald. (Trustee's SOF ¶ 522.) Between August 12, 1999 and September 28, 1999, when Donald Flynn agreed to pay $1 million more per one-percent interest, however, Emerald did not perform any new valuation. (Trustee's SOF ¶ 556.) Donald Flynn testified that he did not know how the new price was calculated, and Thomas Brett, the Pedersen and Houpt attorney who documented the transactions, testified only that Peer Pedersen or Walter Hanley informed him of the price. (Trustee's SOF ¶ 556.)

According to Donald Flynn, it was no more than "some kind of strange coincidence" that his sale to the Twelve Outsiders amounted to the same number of shares he subsequently purchased from the Five Insiders. (Trustee's SOF ¶ 557; *see also* D. Flynn's SOF ¶ 176.) And, in fact, the overall deals did not involve identical numbers of shares; Donald Flynn agreed to sell

---

[69]    Donald Flynn denies losing money as a result of the sale and subsequent purchase of Emerald stock, arguing that the price of shares that he sought to sell exceeded the cost basis of those shares. (D. Flynn's SOF ¶ 177.) Regardless of the financial gain Donald Flynn realized in agreeing to *sell* 294 shares to the Twelve Outsiders and 2,510.9513 shares to eleven other individuals and trusts, he still subsequently agreed to *purchase* 294 shares for a substantially higher price than the price at which he had agreed to sell shares several weeks earlier.

2,804.9513 shares to twenty-three individuals and trusts, including 294 shares to the Twelve Outsiders, and then later agreed to purchase 325.44286 shares from Pedersen and the Five Insiders. (D. Flynn's SOF ¶¶ 149, 176.) Donald Flynn testified that he chose to sell because he wanted to lower his financial exposure to Emerald, which contained certain risks as an investment, including the possibility that Emerald's license would not be renewed, and possible "political backlash" from the choice of Rosemont as a site. (Bankr. Tr. 2608:1–2611:5.) He later chose to purchase shares from the Five Insiders who were "unhappy" with their investment in Emerald. [70]

On August 10, 1999, Acosta informed Emerald that the IGB had not yet determined how Section 11.2 affected the ALJ's recommendation to deny Emerald's 1997 application for renewal of its license. (D. Flynn's SOF ¶ 141.) On September 7, 1999, IGB approved a motion finding the ALJ's recommendation moot in light of new legislation. (D. Flynn's SOF ¶ 164.) Though Donald Flynn apparently began to sell shares to the twenty-three proposed shareholders, including the Twelve Outsiders on September 1, 1999 (PX416), he did not notify Emerald of his intent to sell shares until September 13, 1999, after the risk of non-renewal of Emerald's 1997 application had passed. (PX324.) Further casting what she deems a cloud of suspicion over the Donald Flynn transactions, the Trustee notes that Donald Flynn turned down at least two potential offers to sell shares in July 1999. He declined to sell shares to at least one friend interested in investing and, like the other existing shareholders, Donald Flynn did not sell any of his own shares to Emerald in July 1999 for resale to prospective female and minority

---

[70] Donald Flynn denies that his agreement to sell over 2,800 shares, including 294 shares to the Twelve Outsiders, deprived him or the Flynn family of a majority interest in Emerald, because "the total ownership by the Flynn family and the key Emerald employees (McMahon, Hanley, McQuaid, etc.) still exceeded 50% of Emerald's shares if the proposed sales were consummated." (D. Flynn's SOF ¶ 178.) Yet McMahon, Hanley and McQuaid never were approved by the IGB as Emerald shareholders (C. Defs.' SOF ¶¶ 251, 253), and it is not clear how, even if approved, their interest could ensure that Donald Flynn and his family maintained a majority ownership interest in Emerald.

shareholders. (Trustee's SOF ¶ 534) (citing PX1306 at 1; Bankr. Tr. 2611:23–2612:15; D. Flynn's SOF ¶ 182.) Donald Flynn asserts that at the time Emerald offered to purchase shares for resale, it did not have any cash to make the purchase. (D. Flynn's SOF ¶ 126.)

The Trustee asserts that McQuaid and Donald Flynn's testimony concerning these transfers is contradictory, and therefore, not credible. (Trustee's SOF ¶ 528.) For example, while McQuaid testified that Donald Flynn approached McQuaid about possibly selling approximately $5 or $6 million in shares, Donald Flynn testified that it was McQuaid who asked him if he would be interested in selling shares. (Trustee's SOF ¶¶ 529, 531.) And, while McQuaid testified that he gave Donald Flynn a list of interested, non-minority investors, Donald Flynn denied speaking with McQuaid about prospective shareholders or receiving such a list. (Trustee's SOF ¶¶ 530–31.) The Trustee notes, further, that Peer Pedersen told the IGB in June 2000[71] that in 1999, Kevin Flynn was interested in purchasing all of the Pedersen shareholders' interest in Emerald; but in October 2000, Pedersen told the IGB that only Donald Flynn had ever expressed interest in purchasing shares from the Pedersen group shareholders. (Trustee's SOF ¶¶ 550–51.) The Trustee appears to imply that these sales were orchestrated to satisfy Donald Flynn's and/or Emerald's obligation to sell shares to local (Rosemont) investors under the Davis agreement. Donald Flynn presented confusing, but plausible explanations for the transactions. On this record, the court is unable to make a finding concerning Donald Flynn's actual motivations for the sales, nor that those sales reflected nefarious intentions. Notably, the IGB Final Board Order cited the sales of shares themselves as rule violations and did not explicitly rely on any improper motivation. (PX162 at 32–34.) That IGB finding is on solid ground; although the parties dispute the motivations for the sales, the record clearly establishes that the transactions occurred.

---

[71] Pedersen's June 2000 statement was summarized in a post-interview memorandum prepared by IGB Agent Gnutek. (Pedersen's SOF ¶ 30.)

### D. Emerald sells shares to the Statutory Investors

The amendment to Section 11.2 of the Riverboat Gambling Act, enacted in June 1999, mandated that twenty percent of Emerald's shareholders be female or minority investors (the "Statutory Investors"), specifically, at least sixteen percent minority and four percent female investors. 230 ILCS 10/11.2(b).

McQuaid[72] began efforts to satisfy this provision immediately after Section 11.2 became law. Between June and August 1999, McQuaid interviewed the prospective female and minority shareholders. (Trustee's SOF ¶ 609.) McQuaid identified the prospective Statutory Investors through phone calls from interested investors, law firms, accounting firms, and referrals of IGB staff members. (C. Defs.' SOF ¶ 260.) Emerald also hired Paul Donnelly from Emerald Ventures, Inc. ("EVI") in July 1999 to perform a valuation of Emerald, which then was used to set the price at which the Statutory Investors could purchase Emerald stock. (Trustee's SOF ¶ 606.) McMahon provided Donnelly with background materials for the valuation. (*Id.*) Around this time, on July 15, 1999, Pedersen & Houpt attorney Tom Brett, under Pedersen's direction, began to prepare the documents that Emerald would use to sell stock, including subscription agreements and questionnaires. (Trustee's SOF ¶ 607; C. Defs.' SOF ¶ 177; Pedersen's SOF ¶ 50.) In August 1999, McQuaid sent the interested Statutory Investors an application packet, which included a blank subscription agreement, Emerald's Amended Shareholders' Agreement, a questionnaire, and a PDF 1. (Trustee's SOF ¶ 608.) In this packet, McQuaid instructed the prospective Statutory Investors to return copies of their completed applications to McQuaid

---

[72] Kevin Flynn and John McMahon deny responsibility for Emerald selling shares to the Statutory Investors. (C. Defs.' SOF ¶ 271.) Defendants admit that McMahon was responsible for Emerald's debt financing, and assisted Paul Donnelly in performing a valuation to establish a price at which to sell stock to the Statutory Investors, and that Kevin Flynn spoke with proposed investors in the summer of 1999. (*See* PX401 ¶ 1020; Bankr. Tr. 1327:11–1328:25; C. Defs.' SOF ¶ 276.) The court finds that these admissions alone are insufficient evidence from which to conclude that either Kevin Flynn or McMahon were responsible for selling shares to the Statutory Investors.

along "with a check for the Purchase Price . . . made payable to 'Emerald Casino, Inc.'" (PX1004 at 1; PX1005 at 1.)  He instructed them to send their PDF 1s directly to the IGB. (PX1004 at 1; PX1005 at 1; Trustee's SOF ¶ 608; C. Defs.' SOF ¶ 255.)  McQuaid explained that "[c]ompleting and timely returning the enclosed materials with a check does not guarantee that [Emerald] will accept your Subscription Agreement."  (PX1004 at 1; PX1005 at 1.)  Instead, "[i]f [Emerald] elects to accept your Subscription Agreement, [Emerald] will cash your check and send you a fully executed copy of the Subscription Agreement." (PX1004 at 1; PX1005 at 1.) McQuaid explained, further, that "[a] fully executed copy of the Shareholders' Agreement and shares of [Emerald's] common stock will not be issued to you unless and until you are approved as a shareholder by the [IGB]."  (C. Defs.' SOF ¶ 261; *see* PX1004; PX1005.)

At Emerald's Board Meeting on August 12, 1999, the Board unanimously approved EVI's stock valuation, which concluded that the fair market value for twenty percent of Emerald stock as of July 31, 1999 was $30,750,000, or $1,537,500 per one-percent interest.  (PX20 at 2–3; PX317 at 2–3.)  Emerald's Board then unanimously approved Emerald's sale of twenty percent of the common stock to the Statutory Investors, based on EVI's valuation, effective immediately. (PX20 at 2–3; Trustee's SOF ¶ 610; C. Defs.' SOF ¶ 257; D. Flynn's SOF ¶ 76.)  Before the meeting, Walter Hanley had provided Emerald's directors with copies of the application packet given to the Statutory Investors, including the notice that any sale of stock would be subject to IGB approval.  (C. Defs.' SOF ¶ 256; D. Flynn's SOF ¶ 72.)  At the meeting, Hanley presented information about issuance of stock, and Joseph McQuaid informed the Board that Emerald would try to satisfy the statutory requirement of twenty-percent female and minority investors by August 31, 1999.  (Trustee's SOF ¶ 610; C. Defs.' SOF ¶ 256; D. Flynn's SOF ¶ 74.)  The Board consented unanimously to Emerald's sale of stock to the Statutory Investors, authorizing Emerald to offer to sell to, and accept documents and payment from, interested investors.  The Board also determined that funds paid by the Statutory Investors (approximately $30 million for twenty-percent of Emerald's common stock) would be placed in Emerald's "paid-in capital

account." (PX522; Trustee's SOF ¶ 611.) The Board directed, as well, that Emerald "issue such shares and . . . execute and . . . deliver to the respective minority persons and females stock certificates . . . representing such shares" only "upon receipt of any necessary approvals of such minority persons and females by the Illinois Gaming Board." (PX1316 at 151.) Though the Trustee contends that the Board effectively authorized Emerald to sell shares to the Statutory Investors without IGB approval (Trustee's SOF ¶ 610), the Defendants maintain that they consented to the issuance of shares to the Statutory Investors only upon receipt of that approval. (C. Defs.' SOF ¶ 257; D. Flynn's SOF ¶¶ 76–77.) No one at the August 12, 1999 Board meeting, including outside counsel Thomas Brett or Michael Ficaro, expressed concern that Emerald was potentially acting in violation of IGB Rules. (C. Defs.' SOF ¶ 256; D. Flynn's SOF ¶ 75.)

Defendants assert that the vote to authorize the immediate sale of shares to the Statutory Investors was in Emerald's best interest. (C. Defs.' SOF ¶ 258; D. Flynn's SOF ¶ 79.) Defendants acknowledge that Emerald needed capital from those investors to proceed with construction and development of the casino (*id.*), and McQuaid also was concerned that the price of shares would rise and become cost-prohibitive. (C. Defs.' SOF ¶¶ 188, 254.) Peer Pedersen asserts that Joseph McQuaid and Walter Hanley informed the Board that using the funds received for sale of shares to the Statutory Investors was either approved by IGB and/or permitted under IGB rules. (Pedersen's SOF ¶ 45; *see also* D. Flynn's SOF ¶ 78 (referring to the July 1, 1999 meeting with Casey).) All of the Directors voted to approve the sale of shares to the Statutory Investors subject to IGB approval, and the Trustee has sued them all, except for Eugene Heytow. (D. Flynn's SOF ¶ 80; Pedersen's SOF ¶ 44.)

In exchange for agreeing to sell stock to approximately twenty-three prospective Statutory Investors,[73] Emerald received around $30 million, which it used for expenses related to design and construction of the casino.  (Trustee's SOF ¶¶ 612–13, 628; C. Defs.' SOF ¶ 260.) In addition to paying Emerald, these prospective investors also completed subscription agreements, executed Amended Shareholders' Agreements, and submitted PDF 1s to the IGB, which the IGB received in August and September 1999.  (Trustee's SOF ¶ 612; C. Defs.' SOF ¶¶ 265–66.)  The subscription agreements provided that "The Issuer may use the proceeds from this Subscription Agreement for its unrestricted use and general corporate purposes immediately upon acceptance of this subscription."  (*See, e.g.*, PX543 at 171, 176).  By requiring prospective investors to submit PDF 1s and copies of their subscription agreements directly to the IGB, Defendants contend, Emerald assured that the IGB was timely notified that Emerald was receiving funds from the Statutory Investors and that their subscription

---

[73]      The following Statutory Investors completed subscription agreements, executed Amended Shareholders' Agreements, and paid Emerald for its stock: Myoung Hwa Bae; Ronald Blackstone; Andrew Jin-Chan Cherng; Jacoby Dee Dickens, Jr.; Chaz Ebert; Shaun L.  Gayle; Walter E. Grady; Albert Johnson; Althea Knowles; Lester H.  McKeever, Jr.; Ernest J. Ojeda; Walter J. Payton; Rudolph Rodriguez; Arthur J. Smith Sr.; Ida Hansen; Sandra A. Degnan; Maureen S. Flaherty; Elizabeth Lucas; Joan Morrissey; Maureen M. Obermeier; Susan A. Peloza; Kathryn V. Shannon; and Timothy J. Rand.  (Trustee's SOF ¶ 612.)  If the Illinois General Assembly's goal was to involve overlooked or disadvantaged groups in the state's economic development, this court is not sure that goal was achieved.  The price tag for Emerald's shares would rule out all but the most fortunate.  Many, if not all, of the minority and female investors are persons of significant prominence and apparent personal wealth, apart from any gaming interests: Chaz Ebert is the widow of noted movie critic Roger Ebert.  Two former Chicago Bears players also invested: Walter Payton, a runningback for thirteen seasons, and member of the Pro Football Hall of Fame, and Shaun Gayle, the Bears' eleven-season cornerback.  Jacoby Dickens was Chair, and Walter Grady, president and CEO, of Chicago's Seaway Bank and Trust.  Lester McKeever was a member of the board of the Federal Reserve Bank of Chicago, and its former chairman.  Ernest Ojeda is owner of several McDonald's franchises in Chicago, and was Chairman of the Pan American Bank.  Several of the Statutory Investors were notable business owners and entrepreneurs, as well.  *See generally* Douglas Holt, *Illinois Pulls License Held By Rosemont Casino Group*, CHI. TRIBUNE, Mar. 7, 2001, http://articles.chicagotribune.com/2001-03-07/news/0103070243_1_illinois-gaming-board-silver-eagle-casino-license; Rick Pearson & Ray Long, *Who's Who Betting on Rosemont*, CHI. TRIBUNE, Sept. 23, 1999, http://articles.chicagotribune.com/1999-09-23/news/9909230265_1_riverboat-new-investors-mayor-richard-daley.

agreements allowed Emerald to use those funds for any purpose.  (C. Defs.' SOF ¶¶ 267–68.)

The IGB was in fact aware that Emerald had sold approximately $30 million in shares to the

Statutory Investors by at least September 1999.  (C. Defs.' SOF ¶ 345; Pedersen's SOF ¶ 41.)

The IGB never approved the prospective Statutory Investors as shareholders, nor, Defendants

note, did the IGB even  begin investigations on these proposed investors.  (C. Defs.' SOF

¶¶ 269, 284.)  By the end of 1999, Emerald had agreed to sell four percent of its shares to

women, but was still working to complete sale of sixteen percent to minorities.  (C. Defs.' SOF

¶ 260.)

### E.      Defendants' communication with the IGB about the transfers of shares

The parties dispute only the significance of the transfers to and from Donald Flynn and

from Emerald to the Statutory Investors.   In its Final Board Order, the IGB concluded

(1) Emerald violated Rules 140(a), 140(b)(5), and 110(a) by "failing to disclose" and/or

"providing false, misleading or incomplete information to the IGB" concerning the transfer of

Emerald shares (PX162 at 33, 34–35), and (2) Emerald violated Rule 235(a) in "fail[ing] to apply

for or obtain pre-approval to transfer ownership" for transfers related to the Statutory Investors.

(*Id.* at 33–34.)   The Appellate Court concluded that the IGB's findings "were not against the

manifest weight of the evidence."  (PX1233 at 123–25.)

### 1.      Defendants failed to obtain IGB pre-approval for the transfers of shares

The parties do not dispute that these transactions occurred; they only disputed the

relative significance of these transactions.  The parties disagree about whether Emerald was

required to seek pre-approval from the IGB for agreeing to sell shares to the Statutory Investors.

In its Final Board Order, the IGB concluded that Emerald had "failed to apply for or obtain *pre-*

*approval* to transfer ownership," which included the Donald Flynn transfers.  (PX162 at 33–34)

(emphasis added.)  The Trustee claims that none of these transfers of shares—neither Donald

Flynn's transfers of Emerald stock (both his sales and purchases) nor Emerald's sale of shares

to the Statutory Investors—comply with IGB rules. (Trustee's SOF ¶¶ 501–04, 602–03.) Defendants maintain that because the IGB never approved any of the prospective shareholders, Emerald never actually transferred any shares in violation of any IGB rules.[74] (C. Defs.' SOF ¶ 269.) The court finds that McQuaid and Donald Flynn failed to obtain pre-approval from the IGB before transferring Emerald shares.

Both the IGB in its Final Board Order, and the Trustee in this litigation, cite IGB Rule 235 for the requirement that Emerald seek pre-approval of these transactions. The rule itself is less than explicit about such a requirement:

> An ownership interest in an entity with a finding of preliminary suitability or a holder of an Owner's license *may only be transferred with leave of the Board*. An ownership interest in a business entity, other than a publicly traded corporation, which has an interest in an entity with a finding of preliminary suitability or in a holder of an Owner's license, *may only be transferred with leave of the Board*.

86 ILL. ADMIN. CODE § 3000.235(a) (emphasis added). Regardless of any lack of clarity in the rule, the Trustee asserts that Defendants understood they were required to obtain pre-approval for all transfers of shares and intentionally ignored that requirement. The Trustee points out that McQuaid acknowledged the pre-approval requirement at an August 12, 1999 Emerald Board of Directors' meeting, noting that the offering "would not occur unless and until . . . the IGB approves the sale of equity" and that "the IGB probably would require two public meetings to approve the equity offering." (Trustee's SOF ¶ 626) (quoting PX18 at 6.) Defendants were directly aware of the pre-approval requirement, the Trustee continues, because of two IGB Disciplinary Complaints, one in 1994 and another in 1996, for which Emerald was fined for failure to receive pre-approval for equity changes. (Trustee's SOF ¶¶ 562, 627, citing PX286 at 2, ¶ 12 (July 23, 1996 Disciplinary Compl.); PX332 at 2, ¶ 13 (Dec. 1, 1994 Disciplinary

---

[74] In the *Payton* litigation, described *infra*, the Trustee admitted that the Statutory Investors were not shareholders because their ownership interest remained subject to IGB approval. (DX555 at 29–30, 31 (arguing that "[t]he Statutory Investors were not shareholders of Emerald stock" because there was no "sale" of Emerald stock, as the IGB never approved the Statutory Investors as shareholders); D. Flynn's SOF ¶ 87; Pedersen's SOF ¶ 46.)

Compl.).)  Donald Flynn, Kevin Flynn, Kevin Larson, Joseph McQuaid and Peer Pedersen were all aware of this history.  (PX401 ¶¶ 178–82; Trustee's SOF ¶ 627.)  Defendant Peer Pedersen observes, however, that these previous Disciplinary Complaints related to IGB Rule 230(d),[75] a rule not cited by the IGB in its Final Board Order, and are therefore irrelevant.  (PX286 at 2; PX332 at 2–3; *see* Pedersen's SOF ¶¶ 49, 49 n.13.)

Defendants deny that the IGB Rules required it to seek pre-approval for agreeing to sell Emerald shares, so long as the sales agreements were, by their terms, subject to IGB approval. Each of the subscription agreements completed by the Statutory Investors met that test, Defendants assert, as those agreements provide: "Upon payment by the undersigned of the Purchase Price and written approval of the undersigned by the IGB, the Shares shall be issued to the undersigned and shall consist of fully paid, non-assessable, no par value common stock of the Issuer."  (*See, e.g.*, PX543 at 2.)  The subscription agreements also contemplated the possibility that the IGB might not approve the prospective shareholder:

> In the event that the IGB determines that the undersigned is not an acceptable owner of the Issuer, (a) this Agreement shall immediately terminate without any further action required for the parties, (b) the Issuer shall not issue the Shares, and (c) the Issuer shall have no liability or obligations to the undersigned, except the Issuer shall return the Purchase Price without interest to the undersigned within ninety days after such determination by the IGB.

(*See, e.g.*, PX543 at 1.)

This language, Defendants contend, demonstrates that the transfers of shares to the Twelve Outsiders were always subject to IGB approval.[76]  (C. Defs.' SOF ¶ 324; D. Flynn's SOF

---

[75]     Rule 230(d) requires licensees to "immediately inform" and "obtain prior formal Board approval" for proposed changes to "[e]quity and debt capitalization of entity" and "[i]nvestors and/or debt holders."  86 ILL. ADMIN. CODE § 3000.230(d)(1)(C)–(D).

[76]     For example, Donald Flynn's September 13, 1999 notice to Emerald of his intent to sell shares stated that any transfer of shares was contingent on IGB approval.  (D. Flynn's SOF ¶ 144.)  In addition, the purchase agreements executed by the Twelve Outsiders (and eleven others) barred "transfer" of shares without IGB approval. (*Id.* ¶ 146) (citing PX413 at 1; PX416 at 1.)

¶¶ 144, 147, 167, 169.)  Thus, because the IGB never approved the transfers,[77] Defendants assert, the twenty-three proposed shareholders, including the Twelve Outsiders, and Kevin Flynn, Walter Hanley, John McMahon, and Joseph McQuaid never became shareholders.  (C. Defs.' SOF ¶¶ 327, 338; D. Flynn's SOF ¶¶ 150.)  With respect to the twenty-three proposed shareholders to whom Donald Flynn agreed to sell shares, Emerald never issued them stock certificates, Donald Flynn's stock certificates associated with these sales were never cancelled, and Emerald's Stock Ledger identified each of the twenty-three proposed shareholders as "Pending Illinois Gaming Board Approval."  (C. Defs.' SOF ¶ 338; D. Flynn's SOF ¶ 150.)  The IGB itself entered into a settlement agreement with Donald Flynn, Kevin Flynn, and other identified Emerald shareholders in August 2002.  The language of that agreement distinguished between "original shareholders" and "proposed shareholders," including the Twelve Outsiders, and, recognizing that the applications of these proposed shareholders "are pending before the Gaming Board," identified them as "General Applicants."  (DX417 at 1, 32.)  Likewise, though Emerald issued Donald Flynn stock certificates for the shares he purchased from the Five Insiders and Pedersen, these stock certificates were held in escrow[78] pending IGB approval, and the stock certificates issued to the Five Insiders and Pedersen were cancelled only after the IGB approved the sale on August 8, 2002.  (D. Flynn's SOF ¶¶ 171–72, 174.)

Defendants urge that their interpretation of the IGB rules is consistent with Emerald's past experience with the IGB.  In the past, Defendants insist, the IGB had never previously required prior approval of transfers, so long as the sale of shares was subject to IGB approval.  (D. Flynn's SOF ¶¶ 148, 173; *see also* Trustee's SOF ¶¶ 597–98; C. Defs.' SOF ¶¶ 50, 52.)  According to Michael Ficaro and Joseph McQuaid, all of the original applicants for the ten

---

[77]     The IGB did approve Donald Flynn's purchase of Emerald stock from the Five Insiders and Pedersen on August 8, 2002.  (C. Defs.' SOF ¶¶ 335, 339; D. Flynn's SOF ¶ 174.)

[78]     The stock certificates were held in Hanley's office at Emerald.  (*See supra* Background I.D; *infra* Background IV.B.1.)

licenses received and used money from proposed shareholders before those shareholders were approved by the IGB. (C. Defs.' SOF ¶ 259; D. Flynn's SOF ¶ 82.) These funds were used for leasing or purchasing the vessel or property, for purchasing gaming equipment, for conducting environmental studies, and for paying accountants and legal fees. (*Id.*) McQuaid testified that the Jo Daviess Riverboat Corporation itself purchased its riverboat using proposed investors' funds before the IGB approved them as shareholders. (Tr. 496:6–497:4; *see also* Tr. 608:11– 611:1.) And, if the IGB did not approve the proposed shareholder, McQuaid testified, then the licensee would return the investment money. (Tr. 611:2–12.)

McQuaid provided other illustrations as well. After the IGB did not approve two prospective investors in the Alton Riverboat Casino who had already contributed money, McQuaid testified, the casino, which had used the money for "general use," returned it to the prospective investors. (Bankr. Tr. 3383:20–3386:23.) Similarly, after the IGB objected to a prospective shareholder of Empress Casino, who had already contributed money that Empress had used, Empress returned the investment to that shareholder. (Bankr. Tr. 3386:24–3387:11.) Neither Alton Riverboat Casino nor Empress Casino faced discipline from the IGB for their use of prospective shareholders' money. (Bankr. Tr. 3389:2–16.)

The Trustee claims that regardless of how Rule 235(a) is interpreted, Emerald violated it by treating the proposed shareholders as shareholders before receiving IGB approval. (Trustee's SOF ¶ 542.) None of the consideration exchanged between Donald Flynn and the Twelve Outsiders and between Donald Flynn and the Five Insiders was escrowed, and Emerald instead began spending the Statutory Investors' money immediately. (*Id.* ¶¶ 459, 465–66, 599.) With respect to the Twelve Outsiders who agreed to purchase shares from Donald Flynn, the Trustee observes that each of them received a letter from Joseph McQuaid and Walter Hanley addressed to "Shareholder of Emerald Casino, Inc.," which provided relevant information for shareholders and invited them to attend shareholders' meetings. (*Id.* ¶ 543.) Though Emerald's bylaws only permitted shareholders to vote, these proposed shareholders were permitted to

vote at shareholders' meetings, and at least some of the Twelve Outsiders did vote either in person or by proxy at the February 25, 2000 and March 6, 2001 shareholders' meetings. (*Id.* ¶ 544.) Additionally, the proposed shareholders were treated by Emerald as shareholders for tax purposes; McMahon sent the Twelve Outsiders K-1 tax forms between 1999 and 2007 to claim their shares of Emerald losses on their tax returns, and Emerald reported the Twelve Outsiders as shareholders on its own tax returns. (*Id.* ¶ 545.) During bankruptcy proceedings, on November 18, 2002, Emerald listed the Twelve Outsiders as holders of common shares on the "List of Equity Security Holders." (*Id.* ¶ 546.) Similarly, the Trustee claims, Donald Flynn became a shareholder of additional shares held by the Five Insiders and Pedersen because Donald Flynn was issued stock certificates for these shares, and the stock certificates for the Five Insiders were cancelled on Emerald's Stock Ledger. (Trustee's SOF ¶ 600; D. Flynn's SOF ¶¶ 171–72.)

In the Trustee's view, the Statutory Investors were also treated as shareholders "in all important respects"—the Statutory Investors voted at shareholders' meetings on February 25, 2000 and March 6, 2001; Emerald reported the Statutory Investors as shareholders on its tax returns, and sent them K-1 forms; McQuaid and Hanley addressed the Statutory Investors in letters as "shareholder"; and in its "List of Equity Security Holders" filed with the Bankruptcy Court on November 18, 2002, Emerald identified the Statutory Investors as holders of common shares. (Trustee's SOF ¶¶ 617, 620, 622–24.) Emerald, itself, appeared to acknowledge that the Statutory Investors held the status of shareholders. In a letter dated April 13, 2000 to shareholders, including the Statutory Investors, McQuaid wrote that the number of "shareholders" had increased from eighteen (original investors) to sixty, a number which included sales to the Statutory Investors. (*Id.* ¶ 621.) Additionally, McQuaid testified that the IRS, the Illinois Department of Revenue, and "business law" all recognized the Statutory Investors as shareholders, and Emerald's accountant, Arthur Andersen, had advised Emerald

that the Statutory Investors were shareholders because they had given consideration for their shares, which Emerald had then used. (*Id.* ¶¶ 617, 619.)

Defendants assert that the Statutory Investors did not become shareholders because the IGB never approved them. (C. Defs.' SOF ¶ 269; Pedersen's SOF ¶ 46.) They contend Emerald actually distinguished between existing shareholders, and those shareholders, including the Statutory Investors, who were awaiting IGB approval: Emerald's Stock Ledger did not list the Statutory Investors as shareholders, but instead indicated that their shares were "TO BE ISSUED" and the Statutory Investors were identified in Emerald shareholder records as "Pending Illinois Gaming Board Approval;" minutes from Emerald's shareholders' meetings in 2000 and 2001 indicated that the Statutory Investors were "subject to the approval of the Illinois Gaming Board;" and the Statutory Investors never received stock certificates for their shares. (C. Defs.' SOF ¶¶ 269–70; D. Flynn's SOF ¶ 85.) The IGB itself also identified the Statutory Investors as "proposed" or "contingent" shareholders. (C. Defs.' SOF ¶ 274) (citing IGB financial consultant Nicholas Wilke's testimony, Tr. 1605:10–22.)

The parties agree, and the IGB Final Board Order concluded, that Donald Flynn did not seek pre-approval from the IGB for these transfers. (PX162 at 22; PX401 ¶¶ 450–53; Trustee's SOF ¶¶ 559, 563, 595.) But, assuming that pre-approval was required for the Statutory Investor-transactions, Defendants assert that Emerald received it.[79] After Section 11.2 was

---

[79] The parties disagree about when Emerald first made this claim. The Trustee contends Defendants raised the issue only "in this case." (Trustee's SOF ¶ 629.) Defendants insist they made the argument during the IGB's investigation in 2000 and 2001, providing the IGB at that time with a copy of McQuaid's July 1, 1999 letter to Robert Casey. (C. Defs.' SOF ¶¶ 197–200) (citing PX383; DX367; DX368.) Defendants' communications with the IGB during 2000 and 2001 indicate that they understood IGB Administrator Casey to have approved the procedure for selling shares to the Statutory Investors (i.e., sending PDF 1s directly to the IGB) on July 1, 1999, but Defendants never explicitly stated that they had received pre-approval for the transfer of shares to each individual Statutory Investors. (*See* PX383 at 1, Letter from McQuaid to Acosta of 9/29/00 (stating, "I met with Administrator Robert Casey, Chief Legal Counsel Mareile Cusack and Deputy Administrator Allan McDonald on July 1, 1999 to discuss the proposed procedures that Emerald would utilize for those sales. These procedures included execution of stock purchase agreements subject to Illinois Gaming Board approval, payment of (continued . . . )

152

passed, Joseph McQuaid arranged a meeting of himself, Walter Hanley, IGB Administrator Robert Casey, IGB Chief Legal Counsel Mareile Cusack, and Deputy Administrator of Audit Allan McDonald. (C. Defs.' SOF ¶ 186.) At this July 1, 1999 meeting, the participants discussed what type of application Emerald should file with the IGB (new or renewal), how Emerald would satisfy the female and minority shareholder requirement, and the manner of implementation for the Restricted Stock Award Plan that Emerald intended to provide shares to its officers and directors. (*Id.* ¶¶ 187–189, 191.) McQuaid and Hanley explained Emerald's proposed procedure for selling shares to the Statutory Investors: Emerald would provide them with a subscription agreement, a shareholders' agreement, and a PDF 1, and the prospective Statutory Investors would be required to return a completed PDF 1 and a copy of the subscription agreement to the IGB, as well as a copy of the subscription agreement and full payment for the shares to Emerald. (*Id.* ¶ 189.) McQuaid also expressed his concern that a delay in selling the shares would render them cost-prohibitive. (*Id.* ¶¶ 188, 254.) According to Defendants, "Casey advised that [Emerald] could sell shares to the proposed female and minority investors and use their money as soon as possible. However, if the IGB found any proposed shareholder to be unsuitable, [Emerald] would be required to return the shareholder's money." (*Id.* ¶ 189) (citations omitted.) Both Hanley's handwritten notes[80] and McQuaid's letter

---

the purchase price, and submission of Personal Disclosure Form One ownership applications to proposed purchasers," and referring Acosta to his July 1, 1999 Letter to Casey); DX367, Letter from Ficaro to Ryder & Acosta of January 22, 2001 (referring IGB member Mac Ryder & IGB Administrator Acosta to the enclosed copy of McQuaid's July 1, 1999 Letter to Casey); DX368, Mem. from Acosta to IGB dated January 23, 2001 regarding the IGB's meeting with Emerald (noting that Ficaro had stated that McQuaid had met with Casey and Cusack regarding the process of selling shares to the Statutory Investors).)

[80]     Hanley's notes state: Emerald "can sell to minority/women & use their money ASAP, subject to obligation to return $ if not approved," and "Rule 235 → transfer of ownership → can transfer shares, submit Form Ones, sell shares if not approved." (DX602 at 1, 3.)

to Casey summarizing their July 1, 1999 meeting,[81] Defendants argue, reflect this understanding that Emerald could begin to sell shares to the Statutory Investors immediately, and use the money, subject to IGB approval.  (*See id.* ¶¶ 187, 190, 194.)

The Trustee denies that Emerald received any such approval at this meeting, and notes that McQuaid and Hanley only asserted that Casey approved such a sale "in this case." (Trustee's SOF ¶ 629.)  Cusack testified that neither she nor Casey approved Emerald's immediate sale of shares to the Statutory Investors, and, the Trustee, observes, McQuaid's July 1 letter to Casey does not confirm that the Casey approved his proposal. (*Id.*)  Acosta testified that he was never informed of the alleged approval.  (*Id.*)  Nor, the Trustee asserts, do Emerald's subsequent communications with the IGB demonstrate that Casey approved the sale to the Statutory Investors on July 1, 1999.  (*Id.*)  In a letter to McQuaid summarizing McQuaid's meeting with the IGB on August 10, 1999, Acosta wrote that McQuaid had asked for "advice regarding whether [Emerald] should make a presentation to the [Illinois Gaming] Board at the September 7, 1999 Board meeting to request 'initial consideration'[82] for . . . an equity financing to be provided by minority investors . . . ."  (PX0310 at 1.)  Acosta declined to entertain such a presentation, observing that before addressing the issues raised by McQuaid, including equity financing, the IGB must first determine the effect of the ALJ's 1997 decision to deny renewal of Emerald's license.  (*Id.*)  Finally, the Trustee emphasizes, Casey's alleged approval is

---

[81]     McQuaid's July 1, 1999 letter states: "Minority and women ownership: [Emerald] will negotiate with minorities and women regarding the sale of equity interests in [Emerald] as required by statute.  As we discussed, any women or minority investors would be required to simultaneously (a) execute a stock purchase agreement and shareholders' agreement with [Emerald]; (b) pay [Emerald] the purchase price for the equity interests; and (c) submit a Form One ownership application to the Illinois Gaming Board.  If any Form One applicant is not approved by the Illinois Gaming Board, [Emerald] would immediately return the purchase price to such individual."  (PX0306 at 2.)

[82]     "Initial consideration," according to Defendants, refers to the IGB's consideration of the PDF 1s, which the proposed Statutory Investors had submitted to the IGB directly, and not to consideration of equity financing from these proposed shareholders.  (C. Defs.' SOF ¶ 228.)

inconsistent with IGB Rule 235(a), which requires "leave of the Board" to transfer shares. (Trustee's SOF ¶ 629); *see* 86 ILL. ADMIN. CODE § 3000.235(a).

Defendants may have reasonably believed that the IGB's behavior constituted pre-approval of the process for transferring shares to the Statutory Investors. The IGB's Final Board Order, however, assumed that Defendants were required to obtain IGB approval of each individual shareholder before transferring the shares or allowing a shareholder to vote. Defendants clearly did not obtain prior approval to sell shares to the individual Statutory Investors. McQuaid recruited those investors, sent them the applications, and received the applications and their checks for the purchase price. The parties agree that Emerald immediately began spending the money from the Statutory Investors. Neither party has directed the court to any evidence in the record that specifies who actually cashed the checks, and thereby accepted the Statutory Investors' subscription agreements to purchase stock. But the court infers that McQuaid, who sent and received the applications, interviewed the investors, and reported on the sale of stocks to the Emerald Board was responsible for completing the transfers of shares. (*See* PX25 at 1) (McQuaid "stated that the Company has sold 16.84% of its common stock . . . He said he had planned to sell all 20% . . . but certain potential investors unexpectedly withdrew their subscriptions at the last minute.")

The court finds that both Donald Flynn and McQuaid failed to obtain IGB pre-approval before transferring Emerald shares.

## 2. Defendants disclosed the transfers of shares after the transfers were completed

Defendants did regularly communicate with the IGB regarding these transfers. Before any transfers were made, Defendants met with IGB staff to discuss the procedure for transferring shares to the Statutory Investors.

- **July 1, 1999**: McQuaid met with IGB Administrator Robert Casey to discuss Emerald's proposed process for submitting statutory investors' applications and summarized the meeting in a letter, written the same day, to Casey. (*See* PX306 at 2.) McQuaid's letter explained that proposed statutory investors would submit their PDF 1s directly to the

Illinois Gaming Board and "[i]f any Form One applicant is not approved by the Illinois Gaming Board, [Emerald] would immediately return the purchase price to such individual. As we discussed, to obtain debt financing timely, [Emerald] may raise equity from the existing shareholders in the near future." (*Id.*at 2.)

- **August 10, 1999**: Emerald submitted a Renewal Application.[83] (PX541.) Exhibit 38-1 of the application explained that Emerald anticipated approximately $30 million in proceeds from the sale of shares to statutory investors and that "[u]nder the . . . Restricted Stock Award Plan, the Company holds certain shares of common stock in escrow for certain key employees, subject to the approval of the Illinois Gaming Board." The application goes on to list the ownership percentages for Joseph McQuaid, Kevin Larson, Walter Hanley, John McMahon, and Kevin Flynn. (PX542 at 169.)

- **August 23, 1999**: McQuaid wrote to IGB Administrator Acosta to inform him that "[m]any people have expressed an interest in becoming a shareholder of Emerald. . . " and that the IGB should expect to receive application materials from prospective shareholders. (PX379 at 1.) McQuaid provided a list of individuals to whom Emerald had already sent application materials. (PX369 at 2.)

- **August 27, 1999**: Hanley forwarded a copy of Emerald's debt financing proposal, which included selling new shares to raise cash. The proposal explained that "[a]s of June 30, 1999, after giving effect to the notes, our total indebtedness and 1999 new shareholders' cash equity investments would have been approximately $130 million and $31 million, respectively." (PX315 at 17.) The proposal also listed $31 million in equity contributions as a source of revenue to use towards expenses related to opening the casino, including construction costs. (*Id.* at 21.)

Between September 1, 1999 and September 17, 1999, Donald Flynn agreed to sell shares to twenty-three individuals, including the Twelve Outsiders, Walter Hanley, Joseph McQuaid, and John McMahon. (PX324 at 2–3.) Defendants informed the IGB of these transfers soon after and continued to communicate about the Statutory Investors.

- **September 17, 1999**: Hanley and McQuaid met with Acosta and Cusack. (Tr. 1257:13–14.) Acosta asked Hanley and McQuaid to identify the proposed shareholders from whom the IGB should expect to receive PDF 1s. (Tr. 1257:14–20.)

- **September 21, 1999**: McQuaid wrote to IGB Administrator Acosta to inform him, as he had earlier, that "[m]any people have expressed an interest in becoming a shareholder of Emerald . . . " and that the IGB should expect to receive application materials from

---

[83] McQuaid and Hanley hand-delivered the application to Casey and Acosta at the IGB office. When they arrived, Acosta informed them that Emerald had received the wrong renewal application form by mistake and should expect to receive a new one. (C. Defs.' SOF ¶¶ 225–26.) The IGB did, however, accept the Renewal Application Emerald submitted, subject to the IGB's right to seek additional information from Emerald. (*Id.* ¶ 225.) Though not Emerald's final submission, the August 10 document is relevant to the issue of whether Emerald was forthcoming about its progress with the Statutory Investors.

prospective shareholders. (PX376 at 1.) McQuaid enclosed a list of Emerald shareholders, including the proposed shareholders to date (i.e. all of the Statutory Investors except for Ida Hansen (later disclosed), all of the Twelve Outsiders except for Joseph Salamone and Michael Parillo (later disclosed) and the Officer Defendants), without distinguishing between current and proposed shareholders. (*Id.* at 2.)

- **September 22, 1999**: Acosta wrote to McQuaid, acknowledging receipt of the September 21, 1999 letter and the enclosed list of shareholders. Acosta verified that he had "reconciled the list of shareholders that [McQuaid] provided yesterday to the list of persons who have thus far filed PDF 1s," but asked that Emerald ensure that future prospective shareholders submit a cover letter (from Emerald) with their applications identifying them as prospective Emerald shareholders. (PX544 at 2.)

- **September 24, 1999**: Emerald filed its Renewal Application, which identified shareholders in response to questions 8(e) and 14. (PX418 at 4, 29–30.) The list included all of the proposed shareholders to date (i.e. all of the Statutory Investors except for Ida Hansen (later disclosed), all of the Twelve Outsiders except for Michael Parillo (later disclosed), and the Officer Defendants), distinguishing the Statutory Investors from the other shareholders. (*Id.* at 30.)

On September 28, 1999, Donald Flynn agreed to purchase shares from four Pedersen group shareholders. (PX75; Bankr. Tr. 2597:2–10.) Defendants continued communicating, albeit imperfectly, with the IGB about the transfers of shares.

- **September 30, 1999**:
    - Hanley and McMahon met with IGB Staff: Sergio Acosta, Mareile Cusack, Robert Casey, Allan McDonald, Nicholas Wilke, Janis Kielbasa. As Kielbasa's notes show, Hanley informed McDonald that "Mr. Flynn would not transfer any shares until minority shareholders were approved by the IGB." (PX65 at 4.) Hanley also stated that "Mr. Flynn's shares will decrease and he will give some to his children and nephews." (*Id.* at 4.) Kielbasa's notes state that Cusack inquired about what "due diligence was conducted for the selection of minority investors" and Hanley replied that Emerald "met with each minority investor, gave them the Form 1 and asked pertinent background questions." (*Id.* at 2.) Hanley also disclosed that Emerald had $30 million in equity capital available. (*Id.*) "McMahon confirmed that these funds were technically in the form of a loan that would be repaid if an investor was not approved." (*Id.*) Kielbasa's summary of the meeting does not reveal any discussion of the September 28, 1999 agreement to transfer shares from Pedersen group shareholders to Donald Flynn. (*Id.* at 4.) But Defendants assert that this summary does not capture everything that was stated at the meeting. (C. Defs.' SOF ¶ 341.)
    - Hanley wrote to Acosta and asked the IGB to delete four existing shareholders (four of the Five Insiders from the Pedersen group) from Emerald's shareholder list, but did not provide any details about the September 28 sale. (PX326.)
    - Hanley wrote a second letter to Acosta, asking the IGB to add Shaun Gayle to its list of proposed shareholders. Hanley wrote "Mr. Gayle will submit a Personal Disclosure Form 1 directly to the Illinois Gaming Board." (DX642.) Hanley testified that he sent the IGB "at least 10 similar letters." (Tr. 1258:20–25.)

- **October 4, 1999**: McQuaid wrote to Acosta enclosing "a list of Emerald Casino's shareholders and applicant shareholders who are 'minority persons' or females" and stating the "total shares outstanding."  The list identified all of the Statutory Investors to date.  (PX378.)

- **October 11, 1999**: Hanley wrote to McDonald and included "a current list of [Emerald's] shareholders and their ownership percentages."  The list does not distinguish between current shareholders and those awaiting IGB approval, nor does it call attention to the September 28, 1999 sale.  (PX1035 at 1, 3.) The list identified all of the Statutory Investors[84] and the Twelve Outsiders to date, as well as the Officer Defendants to date.  (*Id.* at 3.)

- **October 19, 1999**: McDonald wrote to Hanley requesting a statement of Emerald's capitalization changes and "all other changes in shareholdings showing shares issued, amounts paid and ending balances by shares and percentage of total shares outstanding."  (PX318 at 1.)

- **October 29, 1999**: Hanley wrote to McDonald, furnishing a list of Emerald shareholders organized to display recent changes in ownership, including newly acquired shares and the amount paid.  (PX319 at 2–3.)

On November 3, 1999 Donald Flynn agreed to purchase stock from another Pedersen group shareholder and from Pedersen.  (D. Flynn's SOF ¶ 169.)  Defendants continued to respond to the IGB's requests for more information.

- **November 17, 1999**: In response to Hanley's October 29, 1999 letter, McDonald wrote to Hanley to request more detailed information regarding Donald Flynn's stock sales to outsiders and his purchases from the Pedersen group. (PX379.)  McDonald specifically requested copies of the sales agreements, and asked whether Donald Flynn had received consideration.  (PX379; Trustee's SOF ¶ 578; C. Defs.' SOF ¶ 336; D. Flynn's SOF ¶ 160; Pedersen's SOF ¶ 35.)

- **December 2, 1999**: Hanley wrote to McDonald, responding that twenty-three proposed shareholders had paid consideration to Donald Flynn and that Donald Flynn had paid Pedersen and the Five Insiders, subject to IGB approval.  Hanley's letter enclosed copies of Purchase Agreements between Donald Flynn and twenty-three proposed shareholders, Purchase Agreements between Donald Flynn and the Five Insiders and Pedersen, and an updated shareholder list as of November 30, 1999. (PX325; Trustee's SOF ¶¶ 579–80; C. Defs.' SOF ¶ 336; D. Flynn's SOF ¶¶ 161, 170; Pedersen's SOF ¶ 36.) Acosta and McDonald both reviewed this letter, and did not inform Emerald that it

---

[84]     The court notes that as of October 11, 1999, Defendants disclosed all of the proposed shareholders to the IGB except for proposed Statutory Investor Timothy Rand, who did not execute a subscription agreement with Emerald until August 18, 2000. (PX543 at 7.) The parties have not pointed the court to any evidence regarding Defendants' disclosures about Rand as a shareholder.  Because Trustee bears the burden of proof (and given Defendants' history of disclosing proposed shareholders), Trustee has not shown that Defendants failed to disclose Rand as a proposed Statutory Investor.

was in violation of IGB Rule 235 or any other rules. (C. Defs.' SOF ¶ 337; D. Flynn's SOF ¶ 162.)

- **December 21, 1999**: Hanley wrote to Acosta, asking the IGB to add a prospective shareholder to its list of proposed shareholders, and noting that the shareholder would file the PDF 1 directly with the IGB. (DX642.)

The Trustee makes much of the fact that when Defendants provided the IGB with its updated lists of proposed shareholders in the September 21, 1999 letter and Renewal Application, it failed to distinguish between existing and proposed shareholders. (Trustee's SOF ¶¶ 564–65 (citing the 9/21/99 letter); *id.* ¶¶ 566–71, 630–31 (9/24/99 Renewal Application); *id.* ¶¶ 573–74 (10/4/99 letter); *id.* ¶ 574 (10/11/99 letter); *id.* ¶ 577 (10/29/99 letter).) The Trustee observes, specifically, that among the proposed shareholders on these lists, Defendants did not distinguish between the Statutory Investors who purchased from Emerald and the Twelve Outsiders who purchased from Donald Flynn. (Trustee's SOF ¶¶ 564–65 (9/21/99 letter); *id.* ¶¶ 573–74 (10/4/99 letter); *id.* ¶ 577 (10/29/99 letter).) While the Trustee points to the structure of these lists as evidence of Emerald's attempt to conceal these transfers from the IGB, Defendants maintain that because the IGB had its own lists of existing shareholders that it had approved, and because the proposed shareholders submitted PDF 1s directly to the IGB (PX376 at 1; C. Defs.' SOF ¶ 330; D. Flynn's SOF ¶ 156), the IGB could, on its own, reconcile the lists of approved and pending shareholders.[85]

The court sides with Defendants on this dispute. Though the IGB took issue with the way the Defendants communicated the transfer of shares to the Statutory Investors (*see* PX162 at 36 (citing the shareholders' lists as a "shell game" that "provided little or no explanation")),

---

[85]    Defendants identify several actions taken by the IGB as evidence that the IGB was indeed capable of distinguishing between existing and proposed shareholders. For example, in October 1999, the IGB staff released a list of twenty-three proposed shareholders to whom Donald Flynn intended to sell shares. (PX756 at 6–7; C. Defs.' SOF ¶ 332; D. Flynn's SOF ¶ 159.) Additionally, on at least one occasion, the IGB contacted a proposed shareholder to whom Donald Flynn had agreed to sell shares, concerning the investigation that the IGB would conduct prior to approving the individual as a shareholder. (C. Defs.' SOF ¶ 332; D. Flynn's SOF ¶ 159.)

Defendants did in fact disclose the transfers in letters and in meetings with the IGB. Administrator Acosta himself acknowledged receipt of the September 21, 1999 letter and verified that he had reconciled the list of proposed statutory shareholders with the PDF-1s he had received as of that date. (PX544 at 2.) The IGB made requests for increasingly detailed information (*see* PX318; PX379), but Defendants responded each time with the requested information. (*See* PX319; PX325.) The court concludes that the Trustee has failed to establish that Defendants withheld or failed to disclose the transfers of shares.

## V.    Procedural History

### A.    IGB revocation proceedings

The IGB voted to deny Emerald's Renewal Application and to revoke Emerald's license on January 30, 2001. (PX135 at 37:16–19; Trustee's SOF ¶ 141; C. Defs.' SOF ¶ 706.) The public record of the meeting shows that Acosta presented the IGB staff's recommendation, based on its investigation of Emerald, not to renew Emerald's license. (PX135 at 32:23–33:1.) Acosta cited evidence that "the licensee and certain of its key persons have provided false and misleading information to the Board, and they have failed to establish a record of regulatory compliance required under the Board's rules," specifically naming Kevin Flynn and Donald Flynn. (*Id.* at 33:2–7, 33:12–34:3.) In addition, Acosta noted that there was evidence of "the insidious presence of organized crime elements associated with this proposed project." (*Id.* at 33:9-11.) Four of the five Board members voted to deny Emerald's Renewal Application, and to revoke Emerald's license. (*Id.* at 37:16–19.) Emerald's attorney, Michael Ficaro, reported on the IGB's vote the following day at Emerald's Board meeting. (PX35 at 1.)

The IGB issued a formal Notice of Denial of Emerald's Renewal Application, and a Disciplinary Complaint seeking to revoke Emerald's license on March 6, 2001. (PX151; PX161.) The Notice of Denial explained that "[t]he Board based its January 30, 2001 determination on three initial findings: (1) Emerald's continued failure to meet all of the requirements of the Act and the Rules; (2) Mr. Donald F. Flynn's unsuitability as a Key Person of Emerald; and (3) Mr.

Kevin Flynn's unsuitability as a Key Person of Emerald." (PX161 at 4.) The Disciplinary Complaint alleged that "Emerald, by and through certain of its shareholders, directors, representatives and other Key Persons" violated IGB Rules 140(a) (Count I), 140(b)(3) (Count II), 140(b)(5) (Count III), 235(a)(1) (Count IV), and 110(a) (Count V), rendering Emerald "subject to revocation of its license." (PX151 ¶¶ 47–72.) The only Defendants identified by name for making false or misleading representations to the IGB were Donald and Kevin Flynn. (*Id.* ¶¶ 15, 17–25.) The Notice of Denial and the Disciplinary Complaint detailed similar factual allegations regarding Emerald's (and Donald and Kevin Flynn's) noncompliance with IGB rules. (*See id.* ¶¶ 14–46; PX161 at 4–7.)

Emerald answered the Disciplinary Complaint on March 26, 2001, largely denying any rule violations and challenging the IGB's interpretations of several of its rules. (PX41.) The hearing on the IGB's Disciplinary Complaint began on May 29, 2002 before Administrative Law Judge Herbert Holzman. (PX162 at 4; Trustee's SOF ¶ 148; C. Defs.' SOF ¶ 744.) On June 13, 2002, some of Emerald's creditors forced Emerald into involuntary Chapter 7 bankruptcy, and the disciplinary proceedings were suspended that same day. (PX162 at 4; Trustee's SOF ¶ 148.) The proceedings resumed on May 25, 2005 before Administrative Law Judge Abner Mikva.[86] (PX162 at 4; Trustee's SOF ¶ 149.) On September 27, 2005, the disciplinary

---

[86] The procedural history section of the IGB's Final Board Order explains that ALJ Holzman recused himself from the disciplinary proceedings on August 4, 2004. (PX162 at 4; *see also* PX1231 at 2.) Emerald's counsel did not generate warm feelings for his client at that proceeding. As ALJ Mikva observed,

> throughout the proceedings, attorneys for Emerald insisted that staff and members of the IGB were biased against Emerald. These bias challenges raised questions about everyone from former Governor James Edgar to Chairman Aaron Jaffe to the staff of the U.S. Attorney's office, to the various ALJ's that were involved in this proceeding and to numerous members of the IGB staff. No evidence was presented to back up the charges . . . It is always unfortunate when lawyers decide to challenge the tribunal or the process rather than present their case. In this instance, Mr. Ficaro, then attorney for Emerald, delivered his opening statement in this proceeding by turning his back to the presiding officer, ALJ Holzman, and announcing to the assemblage of reporters and others who

(continued . . . )

proceedings concluded, and ALJ Mikva recommended that the IGB revoke Emerald's license on November 15, 2005. (PX1231 at 39; Trustee's SOF ¶¶ 149–50.) On December 20, 2005, the IGB adopted ALJ Mikva's recommendation, issuing a Final Board Order revoking Emerald's license. (PX162 at 1, 37.) Emerald appealed, and the Illinois Appellate Court affirmed[87] revocation on May 30, 2007. (PX1233 at 107.) The Illinois Supreme Court declined to hear Emerald's appeal on November 29, 2007. *Emerald Casino, Inc. v. Vill. of Rosemont*, 226 Ill. 2d 582, 879 N.E.2d 930 (tbl.) (2007).

### B.    Bankruptcy proceeding

As noted *supra*, Emerald's creditors filed an involuntary bankruptcy petition on June 13, 2002. (Involuntary Pet., *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2002) [1].) The Bankruptcy Court granted Emerald's motion to convert the case to a Chapter 11 proceeding on September 10, 2002. (Order, Sept. 10, 2002, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill.) [113].)

---

were present in the room 'I would like to welcome everybody to Kangaroo Court. This proceeding is a sham.' At the same time, various computers were displayed to the audience showing kangaroos jumping on the screen. Four separate motions to disqualify previous ALJ Holzman were made; he granted the fourth one.

(PX1231 at 32–33.) ALJ Mikva also noted that he "denied three separate motions to disqualify" himself and that "two were taken to the Gaming Board for review," but were denied. (*Id.* at 33.)

[87]    The Illinois Appellate Court did, however, find one of the IGB"s conclusions against the manifest weight of the evidence:  the IGB had concluded that Emerald violated Rule 110(a)(5) because "Emerald or its agents or employees associated with persons of notorious or unsavory reputation or with persons who had extensive police records." (PX1233 at 105.) The Appellate Court reasoned that the language of Rule 110(a)(5) did not prohibit Emerald from "associating with members or associates of organized crime," (a status which might well not be a matter of public knowledge), but instead prohibits only associating with people whose reputation, or publicly-understood character, was unsavory. (*Id.* at 106.) Because the persons identified by the IGB as "associated with organized crime" did not have such a reputation (or extensive police record), the Appellate Court found insufficient evidence to conclude that Emerald violated Rule 110(a)(5). (*Id.*)

Emerald, as debtor-in-possession, filed an application for leave to retain Kirkland & Ellis LLP ("K&E") as its counsel on September 27, 2002. The court approved that application on October 10, 2002. (Order, Oct. 10, 2002, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill.) [156]; Appl. Pursuant to Fed. R. Bankr. P. 2014(a), *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2002) [144], hereinafter "Debtor's Counsel Appl.".) K&E, as Emerald's counsel, acknowledged that it was obligated to "[t]ake all necessary action to protect and preserve the Debtor's estate, including the prosecution of all actions on the Debtor's behalf" and "[a]dvise the Debtor regarding the maximization of value of the estate for its creditors and interest holders[.]" (Aff. in Supp. of Debtor's Counsel Appl., *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2002) [144], ¶¶ 12(c), (i).) On November 1, 2002, the United States Trustee appointed creditors[88] to serve on the Committee of Unsecured Creditors ("Creditors' Committee"), and a few days later, on November 7, 2002, the Bankruptcy Court approved the Creditors' Committee retention of Gardner Carton & Douglas (now part of Drinker Biddle Reath LLP) as its counsel. (Order, Nov. 7, 2002, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill.) [197]; Notice of Appointment of Comm. of Unsecured Creditors, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2002) [184], hereinafter "App't Creditors' Comm."; C. Defs.' SOF ¶ 804.) Emerald filed a reorganization plan on April 9, 2004, approved by the Bankruptcy Court on May 19, 2004, in which Emerald intended to sell its gaming license (with IGB approval). (C. Defs.' SOF ¶¶ 813–15.) Emerald was unable, in the end, to complete a sale of its license. (*Id.* ¶ 818.) During this time, Defendants note, "[n]either the Creditors [sic]

---

[88] The United States Trustee appointed the following representatives to the Creditors' Committee: Christopher Burke (Christopher B. Burke Engineering, Inc.), Martin Burke (Mackie Consultants, LLC), Connie Payton (Estate of Walter Payton), and Albert W. Johnson (Albert W. Johnson). (App't Creditors' Comm.) Both Connie Payton and Albert Johnson also were plaintiffs in subsequently filed lawsuits brought by a group of the Statutory Investors against all of the Defendants except for Pedersen. (*See infra* Facts V.C.)

Committee nor the Debtor's counsel asserted or took any steps to preserve Emerald's potential claims against any of the Defendants." (C. Defs.' SOF ¶ 812.)

Time records submitted by Gardner Carton & Douglas for work performed on behalf of the Creditors' Committee show that the Creditors' Committee counsel was researching possible derivative claims against Emerald officers and directors as early as August 2003. For example, a time record for "J. Schwartz" notes, on August 4, 2003, a "[d]iscussion with H. Kaplan regarding strategy relating to IGB and Debtors [sic] insiders"; on August 11, 2003, a "[d]iscussion with R. Whitacre regarding potential derivative causes of action"; and on August 12, 2003, "[f]urther analysis derivative causes of action (.3) and discussion with P. Coffey and R. Whitacre regarding same and issues related to intervention (.5)." (Gardner Carton & Douglas LLP Invoice, Ex. A to Third Interim Appl. of Gardner Carton & Douglas LLP for Allowance of Compensation & Reimbursement, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2003) [750], hereinafter "Gardner Invoice 1," at 22; Gardner Carton & Douglas LLP Invoice, Ex. G to Third Interim Appl. of Gardner Carton & Douglas LLP for Allowance of Compensation & Reimbursement, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2003) [750], hereinafter "Gardner Invoice 2," at 14.) Similarly, the time record of "R. Whitacre" on August 11, 2003 notes Whitacre's "[r]esearch and review case law regarding cause of action against Flynns." Whitacre's August 15, 2003 entry includes a reference to his "[d]raft memo analyzing cause of action against Flynns." (Gardner Carton & Douglas LLP Invoice, Ex. E to Third Interim Appl. of Gardner Carton & Douglas LLP for Allowance of Compensation & Reimbursement, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2003) [750], at 29; Gardner Invoice 2 at 14.) Then, in a letter dated April 30, 2004, Jeffrey M. Schwartz, an attorney with Gardner Carton & Douglas representing the Creditors' Committee, wrote Joseph Schorer, an attorney with K&E representing Emerald, requesting "information from the Debtor regarding what steps the Debtor intends to take in investigating and preserving potential causes of action for the

Debtor's estate including but not limited to any actions against insiders (including the Flynns) . . . ." (Letter from Schwartz to Schorer of 4/30/04, Ex. O to Defs.' 56.1 [97].)

The Creditors' Committee did, eventually, take initial steps to pursuing a derivative cause of action against Emerald's officers and directors. On January 14, 2008, Creditors' Committee counsel at Drinker Biddle sent a memorandum to K&E discussing possible claims against Emerald's officers and directors such as "claims for breach of fiduciary duty, negligence, tortuous [sic] conduct and interference." (Mem. from Andrew Weissman on Regulatory Takings and Breach of Duty Claims Available to Emerald's Bankr. Estate (Jan. 14, 2008), Ex. Q to Defs.' 56.1 [97]; C. Defs.' SOF ¶ 811.) The Creditors' Committee informed the Bankruptcy Court on February 13, 2008 that it intended to seek permission to bring a derivative action against Emerald's directors and officers. (Bankr. Tr., Feb. 13, 2008, 4:2–5:3.) On March 19, 2008, the Creditors' Committee proposed that Foley & Lardner serve as counsel for the Creditors' Committee in that litigation under a contingency agreement, if the Debtor's counsel decided not to pursue the action after receiving a formal demand letter. (Bankr. Tr., Mar. 19, 2008, 5:14–7:1.) Instead, however, the Bankruptcy Court decided to convert the case back to a Chapter 7 proceeding, and to appoint a trustee who could choose to pursue a derivative action. (Bankr. Tr., Mar. 19, 2008, 7:23–9:11, 12:7–31:1; *see* Order, Mar. 19, 2008, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill.) [1985].) The Trustee, Frances Gecker, was appointed on March 21, 2008. (Letter of Appointment from Neary to Gecker of 3/21/08, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2008) [1984].)

The Trustee filed this adversary proceeding on December 19, 2008, adding to her derivative claims on behalf of the estate, claims from a removed state court action, *Payton v. Flynn*, including claims for breach of contract and breach of fiduciary duty. (Pl.'s First Am. Compl. in *Gecker v. Flynn*, No. 08-ap-00972 [14], hereinafter "First Am. Compl.") Ms. Gecker retained Jenner & Block LLP and Hughes, Socol, Piers, Resnick & Dym Ltd. to pursue the derivative claims on a contingent fee basis. (Trustee's Mot. to Employ Hughes, Socol, Piers,

Resnick & Dym Ltd. and Jenner & Block LLP as Special Counsel, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2008) [2018].)  The Bankruptcy Court approved the Trustee's application to retain these firms on November 12, 2008. (Order, Nov. 12, 2008, *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill.) [2022].)  Richard Levy, Eugene Heytow's attorney, who often served as proxy for Heytow at Emerald Board meetings, is a partner at Jenner & Block. (C. Defs.' SOF ¶¶ 794–96.)  Defendants note that "Heytow was the only Emerald Director the Trustee failed to sue." (*Id.* ¶ 827.)  The adversary proceedings proceeded to a bench trial before Judge Wedoff, which began on November 1, 2010 and concluded on December 14, 2010.  As noted earlier, this court heard additional testimony over several days in 2012 and 2013.

### C.  *Payton* Plaintiffs' litigation

Defendants argue that another action, filed in state court by certain Statutory Investors, bars the Trustee from bringing a breach of contract claim here.  A majority of the Statutory Investors sued all of the present Defendants (with other named defendants) in a federal action on January 25, 2006, alleging RICO violations, and state law claims for fraud, breach of fiduciary duty, estoppel, and conspiracy arising from similar facts as those alleged here. (Compl. in *Payton v. Flynn*, No. 06-cv-0465 (N.D. Ill. 2006) [1], hereinafter "*Payton* Fed. Compl;" *see* Trustee's SOF ¶ 612.)  Reasoning that the RICO claims would be actionable as securities fraud, Judge Grady of this court dismissed the RICO claims as barred under 18 U.S.C. § 1964(c), and declined to exercise supplemental jurisdiction over the remaining state law claims. *Payton v. Flynn*, No. 06-cv-0465, 2006 WL 3087075 at *9 (N.D. Ill. Oct. 26, 2006).

One year later, in October 2007, most of the 06-cv-0465[89] from the federal suit ("*Payton* Plaintiffs") filed a similar suit in the Circuit Court of Cook County.  In this state action, the

---

[89]  The following four statutory investor-plaintiffs in the federal *Payton* action were not plaintiffs in the state action: Chaz Ebert, Shaun I. Gayle, Jacoby Lee Dickens, Jr., and Susan Peloza. (*See Payton*, No. 06-cv-0465, 2006 WL 3087075 at *1 n.1; *Payton* Compl. at 1.)

plaintiffs named all of the present Defendants, excluding Pedersen,[90] alleging claims for breach

of the Amended Shareholders' Agreement and breach of fiduciary duties as well as claims for

fraud, conspiracy, and estoppel. (Compl. in *Payton v. Flynn*, No. 07-L-11989 (Ill. Cir. Ct. Cook

Cnty. 2007), Ex. C to Defs.' 56.1 [107], hereinafter "*Payton* Compl.," ¶¶ 1, 6, 21.) Like the

breach of contract claim before this court, Count I of the *Payton* Complaint alleged that

Defendants were either "party to, or subject to" Emerald's Amended Shareholders' Agreement,

and that they had violated Paragraph Ten of the Amended Shareholders' Agreement, causing

injury. (*Payton* Compl. ¶¶ 39–43.) The *Payton* defendants subsequently moved to dismiss. (C.

Defs.' SOF ¶ 833.) In November 2008, however, before the Circuit Court had ruled on that

motion, the *Payton* Plaintiffs sought a continuance, noting that they had assigned their claims to

the Trustee, appointed by the Bankruptcy Court in March 2008. (Mot. to Continue Hr'g of Defs.'

Mot. to Dismiss in *Payton v. Flynn*, No. 07-L-11989 (Ill. Cir. Ct. Cook Cnty. 2007), Ex. D to Defs.'

56.1 [107], hereinafter "*Payton* Pls.' Mot. to Continue;" Trustee's SOF ¶ 4.) In their motion, the

*Payton* Plaintiffs explained that the Trustee "has decided to pursue claims against the

defendants in this case and others *arising out of the same conduct that is at issue in this case*,"

and that the Trustee intended to remove the *Payton* lawsuit to the Bankruptcy Court once that

court approved the assignment. (*Payton* Pls.' Mot. to Continue ¶¶ 1, 3–4.) The Circuit Court

granted the motion (C. Defs.' SOF ¶ 833), and on December 1, 2008, the Trustee[91] removed the

---

[90]     Pedersen was added as a defendant in the Trustee's First Amended Complaint. (First Am. Compl. at 1.)

[91]     The *Payton* Plaintiffs assigned all of their claims to the Trustee, but the Trustee was not substituted as a party in the *Payton* action until March 5, 2009. (*See* Mot. to Substitute Pl. in *Payton v. Flynn*, No. 07-L-11989 (Cir. Ct. Cook Cnty. 2009), Ex. Q to Defs.' 56.1 [107]; Order, Mar. 5, 2009, *Payton v. Flynn*, No. 07-L-11989 (Cir. Ct. Cook Cnty.), Ex. DD to Defs.' 56.1 [107].) The Trustee's First Amended Complaint, filed in the bankruptcy proceedings, identifies the Trustee on behalf of Emerald's estate as Plaintiff, again names Donald Flynn, Kevin Flynn, McMahon, McQuaid, Larson, and Hanley as Defendants and adds, as an additional Defendant, Peer Pedersen. (First Am. Compl. at 1.)

*Payton* action to the Bankruptcy Court. (Trustee's Post-Trial Reply Br. [255], hereinafter "Trustee's Post-Trial Br.," at 412; C. Defs.' SOF ¶ 838.)

On December 19, 2008, the Trustee filed her First Amended Complaint[92] in the Bankruptcy Court. (First Am. Compl.) She alleged two separate counts for breach of fiduciary duty—Count I alleged that Defendants breached their fiduciary duties to Emerald, while Count II alleged that Defendants breached fiduciary duties owed to the *Payton* Plaintiffs. (First Am. Compl. ¶¶ 122–31.) The First Amended Complaint also included a breach of contract claim, Count III, which alleged that "*[t]he Estate*, the *Payton* Plaintiffs, and each of the Defendants was party to, or subject to, the Shareholder Agreement," and that while the *Payton* Plaintiffs performed their contractual obligations, Defendants violated Paragraph Ten of the Shareholder Agreement causing "the loss of Emerald's Owner's License and the loss of the entirety of the funds the *Payton* Plaintiffs entrusted to Emerald and damages incidental thereto."[93] (First Am. Compl. ¶¶ 133–36) (emphasis added.)

Defendants moved for remand, arguing that because she was not a party to the *Payton* claims, the Trustee could not remove the action, and that she had attempted to do so in order to create federal jurisdiction in violation of 28 U.S.C. § 1359. (Defs.' Revised Mot. to Remand or, in the Alt., for Abstention in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2009) [22], hereinafter "Defs.' Remand Mot.," at 6–10.) Defendants also insisted that the *Payton* claims did not satisfy the "related to" jurisdictional requirement under 28 U.S.C. § 1334(b). (*Id.* at 10–12.)

---

[92] Though identified as an amended complaint, this appears to be the first complaint that the Trustee filed in the adversary proceeding. The "original" complaint, then, the court presumes was the *Payton* Complaint filed in October 2007 in Circuit Court. Additionally, while the Trustee's Notice of Removal sought to remove the entire *Payton* action, the First Amended Complaint excluded Count VII of the *Payton* Complaint for conspiracy. (*Compare* First Am. Compl., *with Payton* Compl. ¶¶ 59–66.)

[93] *Compare with Payton* Compl. ¶¶ 39–43, which does not mention Emerald as it is neither a plaintiff nor defendant in that litigation. ("Each of the plaintiffs and each of the defendants was party to, or subject to, a common shareholder agreement . . . , which imposes obligations between and among them.")

In the alternative, Defendants asked the court to abstain from asserting jurisdiction over the *Payton* claims. (*Id.* at 12–18.) Defendants reiterated in their reply that "The Trustee's Claims Are Not The Same Or Even Similar To The Payton Claims," emphasizing that "the removed claims at issue are non-derivative state law causes of action that *Emerald could never have asserted.*" (Defs.' Reply in Supp. of Defs.' Remand Mot. in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2009) [31], hereinafter "Defs.' Remand Reply," at 4, 14) (emphasis added.)

The Trustee opposed Defendants' motion, and as in her Notice of Removal, maintained that the *Payton* claims were core proceedings or at least "related to" the bankruptcy proceedings. (Trustee's Mem. in Opp. to Defs.' Remand Mot. in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2009) [28], hereinafter "Pl.'s Opp. to Remand," at 2.) Because the Defendants filed proofs of claim against Emerald in the bankruptcy proceedings, the Trustee asserted, the estate's claims against Defendants were core proceedings as "counterclaims by the estate against persons filing claims against the estate." (*Id.* at 2) (quoting 28 U.S.C. § 157(b)(2)(C).) Alternatively, such claims (both the estate's and the *Payton* claims) were "related to" the core proceedings because the claims had been assigned to the Trustee, and recovery would affect Emerald's estate or the allocation of its assets. (Pl.'s Opp. to Remand at 3; *see also* Notice of Removal of Civil Action in *Gecker v Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2008) [3], ¶ 10 (quoting *Baxter Healthcare Corp. v. Hemex Liquidation Trust*, 132 B.R. 863, 866 (N.D. Ill. 1991) ("the outcome of [the *Payton* action] 'could conceivably have any effect on the estate being administered in bankruptcy' or 'could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.").)

On January 27, 2009, Judge Eugene Wedoff orally ruled that the Bankruptcy Court would, in its discretion, abstain from adjudicating Counts II through VII of the First Amended Complaint, which included the *Payton* Plaintiffs' breach of fiduciary duty claim (Count II) and the breach of contract claim (Count III). (Bankr. Tr., Jan. 27, 2009, Ex. O to Defs.' 56.1 [107],

hereinafter "1/27/09 Bankr. Tr.," 6:12–17, 14:3–7.) Judge Wedoff identified several reasons for exercising discretionary abstention, including that the *Payton* action "exclusively involved nondebtors suing other nondebtors" (*id.* 11:16–12:3), and that severance of the *Payton* claims from the Emerald estate's new claims was "feasible." (*Id.* 13:20–14:2.) The abstention order did not, however, address Emerald's own breach of fiduciary duty claim (Count I).

Before rendering his oral ruling, Judge Wedoff observed that "Counts II through VII of the amended complaint repeat Counts I through VI of the state court complaint," including Count III, the breach of contract claim. (1/27/09 Bankr. Tr. 5:5–10.) Yet, as noted above, Count I of the *Payton* Complaint and Count III of the First Amended Complaint, each alleging breach of contract, are worded slightly differently—only the breach of contract claim in the Trustee's First Amended Complaint mentions the Emerald estate. (*See Payton* Compl. ¶¶ 39–43; First Am. Compl. ¶¶ 132–36.) Recognizing this discrepancy, the Trustee moved to amend her complaint on February 2, 2009 (Mot. for Leave to Am. Compl. in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2009) [40], hereinafter "Pl.'s Mot. Am. Compl.," ¶ 6), explaining that in the First Amended Complaint she "added to [the *Payton* breach of contract claim] the estate's *separate* claims [sic] for breach of the Shareholder Agreement"—a response to the argument made by Defendants in the state court proceedings that the breach of contract claim could only be brought by the Trustee. (*Id.* ¶ 6) (emphasis added.) The result is that the Second Amended Complaint included the estate's claim for breach of contract (Count II) and remanded the *Payton* Plaintiffs' claim for breach of contract (Count III) in order "[t]o accurately reflect what the Court did in its abstention order." (*Id.*) Defendants did not object[94] to the amendment, nor cite any potential *res judicata* or collateral estoppel concerns (Bankr. Tr., Feb. 4, 2009, hereinafter

---

[94] Defendants' attorney, representing all Defendants except for Pedersen, did state on the record that Defendants "[didn't] agree with some of the characterizations," but did not explain further. (2/4/09 Bankr. Tr. 2:9–12.) Pedersen's attorney was not present at the hearing. (*Id.* 1.)

"2/4/09 Bankr. Tr.," 2:9–12), and the court granted Plaintiff's motion on February 4, 2009. (Order, Feb. 4, 2009, in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill.) [47].) Count II of the Second Amended Complaint alleges that Defendants breached Paragraph Ten of the Amended Shareholders' Agreement with Emerald, and is substantially similar to the current breach of contract claim pending before this court. (Second Am. Compl. in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2009) [48], ¶¶ 120–23; Third Am. Compl. in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2009) [60], ¶¶ 120–25.)

Back in Circuit Court, on February 20, 2009, the Trustee filed an amended complaint, which included a breach of fiduciary duty claim (Count I) and a breach of contract claim (Count II), each on behalf of the *Payton* Plaintiffs. (Am. Compl. in *Gecker v. Flynn*, No. 07-L-11989 (Ill. Cir. Ct. Cook Cnty. 2009), Ex. B to Defs.' 56.1 [107], hereinafter "*Payton* Am. Compl.") Count II alleged that "[t]he Defendants and Emerald tendered the Shareholder Agreement to the Statutory Investors, who each executed it and returned it to the Defendants and Emerald. The Defendants also each executed the Shareholder Agreement," and that the Defendants breached Paragraph Ten of the Shareholders' Agreement causing Emerald to lose its gaming license and thus injure the *Payton* Plaintiffs. (*Id.* ¶¶ 57–61.)

Defendants again moved to dismiss the state court action in April 2009. All of the Trustee's claims, including Count II for breach of contract, Defendants now argued, seek relief for "losses suffered by Emerald and, only derivatively, by its shareholders and investors. *They are not losses that can be asserted by any individuals in their own right.*" (Defs.' Mem. in Supp. of their Mot. to Dismiss Pl.'s Am. Compl. in *Gecker v. Flynn*, No. 07-L-11989 (Ill. Cir. Ct. Cook Cnty. 2009), Ex. R to Defs.' 56.1 [107], hereinafter "Defs.' Mot. to Dismiss *Payton*," at 13) (emphasis added.) Because "the Statutory Investors do not even claim to be shareholders"[95] or

---

[95] Defendants noted of the Statutory Investors: "Indeed, they all claim they are 'creditors' and <u>not</u> equity holders." (Defs.' Mot. to Dismiss *Payton* at 24) (emphasis in original.)

any "other 'status' that would allow them to bring *a cause of action on the corporation's behalf*," Defendants continued, the Trustee, on behalf of the *Payton* Plaintiffs, lacked standing to assert a claim for breach of contract (or any other claims alleged). (*Id.* at 12–13) (emphasis added.) Defendants also noted (taking an apparently contradictory position than that presented to Judge Wedoff): "to the extent the present action seeks damages for the loss of the license and lost future profits, it *duplicates the bankruptcy action and should be dismissed*[96] not only for lack of standing, but also pursuant to section 2-619(a)(3) of the Code of Civil Procedure, which requires dismissal of an action when there is another action pending between the same parties for the same cause." (*Id.* at 13) (emphasis added.) Defendants also challenged the sufficiency of the complaint. (*Id.* at 16–27.) In response, the Trustee maintained that the complaint stated an individual claim for breach of contract—each of the Statutory Investors and Defendants executed the Amended Shareholders' Agreement, which "created obligations on the part of each signer that run to all the others (as well as to the corporation)," acknowledging that though the Statutory Investors were never approved by the IGB, they were parties to the Amended Shareholders' Agreement (which identified them as "shareholders"), which gave them each individually enforceable rights to sue. (DX555 at 19–23, 31–32.)

---

[96]    Defendants argued in their motion to remand that "the causes of action in the State Court Action have no impact on Emerald's bankruptcy estate, and the proofs relative to establishing liability to the estate and the proofs necessary to establishing liability to the Payton Plaintiffs on their individual claims *are different and would not overlap.*" (Defs.' Remand Mot. at 16) (emphasis added.) This apparent contradiction may be reconciled by Defendants' argument that the *Payton* claims, including breach of contract, allege an injury only to the corporation, and therefore, may only be brought derivatively or by the corporation itself. (Defs.' Mot. to Dismiss *Payton* at 12–13.) In moving to remand the *Payton* action, Defendants did not concede that the *Payton* action stated a claim for breach of contract with respect to the individual *Payton* Plaintiffs, but instead, assumed that if the *Payton* Plaintiffs stated a claim for breach of contract it would be different from a breach of contract claim brought by the Trustee on behalf of the Emerald estate in Bankruptcy Court. (*See* Defs.' Remand Mot. at 16–17) ("The causes of action of the Payton Plaintiffs in the State Court Action are not related to any claims made in the bankruptcy court. *Those plaintiffs only have standing to assert individual claims against the Defendants. Any individual claims that they may have would not implicate or affect the estate's corporate claims, if any.*") (emphasis added.)

Later in 2009, however, the Trustee evidently lost enthusiasm for litigating in more than one forum. In August, she moved to stay the state court proceedings until the bankruptcy proceedings were resolved, recognizing that a win in the Bankruptcy Court would moot the state court action, because the bankruptcy award would constitute "a full recovery on behalf of the Debtor and all its creditors, including the Statutory Investors." (Mot. to Stay Proceedings in *Gecker v. Flynn*, No. 07-L-11989 (Ill. Cir. Ct. Cook Cnty. 2009), Ex. T to Defs.' 56.1 [107], hereinafter "Pl.'s Mot. to Stay 1," at 3–4.) The Trustee noted further that "a significant risk of conflicting judgments exists in the simultaneous litigation of this action and the Bankruptcy proceeding." (*Id.* at 4.) The Trustee renewed her motion in November 2009, pending the outcome of the Bankruptcy Court's summary judgment ruling then scheduled for December 16, 2009, and alternatively, moved for voluntary dismissal of the state court litigation. (Renewed Mot. to Stay Proceedings or, Alt., for Voluntary Dismissal in *Gecker v. Flynn*, No. 07-L-11989 (Ill. Cir. Ct. Cook Cnty. 2009), Ex. U to Defs.' 56.1 [107], hereinafter "Pl.'s Mot. to Stay 2.")

In an oral ruling on November 12, 2009[97] Judge Ronald Bartkowicz of the Cook County Circuit Court denied the Trustee's motion to stay or for voluntary dismissal. (Cir. Ct. Tr., Nov. 12, 2009, in *Gecker v. Flynn*, No. 07-L-1189 (Ill. Cir. Ct. Cook Cnty.), Ex. W to Defs.' 56.1 [107], hereinafter 11/12/09 State Tr., 10:12–17.) Instead, the Circuit Court dismissed the breach of contract claim with prejudice because of the statute of limitations contained in "the securities act."[98] The Circuit Court also dismissed Count V with prejudice, and all of the other claims

---

[97] The order dismissing the breach of contract claim with prejudice explains that it was dismissed "for the reasons stated by the court on Sept. 2, 2009 and [November 12, 2009]." (Order, Nov. 12, 2009, in *Gecker v. Flynn*, No. 07-L-11989 (Ill. Cir. Ct. Cook Cnty.), Ex. V to Defs.' 56.1 [107], hereinafter "11/12/09 Order.") Neither party provided the court with a copy of the September 2, 2009 transcript.

[98] It appears Judge Bartkowicz was referring to the Illinois Securities Law of 1953, 815 ILCS 5/1. Relying largely on Judge Grady's analysis of the *Payton* Plaintiffs' RICO claims (filed in federal court before the state court case), Defendants had argued that all of the claims in the state court action involved a "security" under both federal and state law, and were therefore barred by the Illinois Securities Law's timeliness provisions. (Defs.' Mot. to Dismiss (continued . . . )

without prejudice for insufficient pleading. (11/12/09 Order.) Yet in announcing his ruling, Judge Bartkowicz expressed some concern about the possible *res judicata* effects that a Bankruptcy Court summary judgment ruling (scheduled for December 16, 2009) could have on the Circuit Court case. (11/12/09 State Tr. 5:11–7:1.) If Judge Wedoff found that the issues before him were "core" proceedings, and if he ruled in Defendants favor, then, Judge Bartkowicz reasoned, "this case" (the Circuit Court action) "is gone." (*Id.* 6:11–18, 7:24–8:11.) Defendants' attorney opposed any stay to the Circuit Court proceedings, and maintained during the hearing that the Circuit Court action was a "different case" because "[t]here are very different arguments against a different party in that court than there are here." (*Id.* 7:15–18, 9:1–3.) The Trustee took the opposite stance, and without identifying the specific issues, argued that "both as a legal and a practical standpoint, the ruling that we will receive on [December 16] will have a profound impact on this case." (*Id.* 28:24–29:3.) Defendants noted that the Trustee failed to specify "what issue [Judge Wedoff is] going to decide that is going to control [Judge Bartkowicz's] decision in this case," and maintained that "[t]here's nothing in the bankruptcy court that's going to control the decision in this case." (*Id.* 31:4–13; *see also id.* 32:17–23, 34:5–11.) Before Judge Bartkowicz ruled, he made clear that he relied on Defendants' representations that the Bankruptcy Court ruling would not have a *res judicata* effect on the Circuit Court issues, stating:

---

*Payton* at 7–9, 11–12.) Curiously, before Judge Bartkowicz's November 12, 2009 ruling, Defendants had insisted the action in Bankruptcy Court was different from the state court case, that it raised "completely" different statute of limitations issues, and that its disposition would not "interfere with your decision here in any way that I know." (11/12/09 State Tr. 33:2–34:11; *see also* Defs.' Mem. in Supp. of their Mot. for Summ. J. in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2009) [165], hereinafter "Defs.' 2009 MSJ," at 8–27 (arguing that the Trustee's breach of contract claim is duplicative of the breach of fiduciary duty claim and hence barred by the five-year limitation for breach of fiduciary duty claims).) Defendants' representation to Judge Bartkowicz is inconsistent with the record: they had indeed argued to the Bankruptcy Court that the breach of contract claim was barred by the Illinois Securities Law's statute of repose. (Defs.' 2009 MSJ at 27–32.) Judge Wedoff rejected the argument (Bankr. Tr., Dec. 23, 2009, 14:18–16:5), and Defendants have not renewed it here. Indeed, though the contract claim brought by the Statutory Investors arguably rested on Defendants' misleading statements in connection with the sale of shares (potentially implicating securities laws), the Trustee's claim here instead charges Defendants with violating specific contract provisions.

"I'm persuaded by your argument that there's nothing that's going to happen in the bankruptcy proceeding that's going to have any effect on this." (*Id.* 38:14–17.) Though given leave to do so, the Trustee informed the Circuit Court on February 18, 2010 that she would not file an amended complaint or a motion for reconsideration of the November 12, 2009 Order, and the Circuit Court dismissed the action with prejudice. (C. Defs.' SOF ¶ 856.)

Though they had argued that the two actions were wholly independent of one another, once Judge Bartkowicz ruled, Defendants promptly reversed course. Just one month after the Circuit Court dismissal order became final, on April 30, 2010, Defendants moved for summary judgment on Plaintiff's claims for breach of contract (Count II) and breach of fiduciary duty (Count I), pending in Bankruptcy Court, arguing that they were barred by *res judicata*. (Defs.' Mot. for Summ. J. in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2010) [321].) In their supporting motion, Defendants argued that the breach of contract claim (as well as the breach of fiduciary duty claim) "were brought against the same director and/or officer defendants and were based upon the same factual allegations—Defendants' alleged misconduct that is alleged to have caused the loss of Emerald's gaming license." (Defs.' Mem. in Supp. of their Mot. for Summ. J. in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2010) [322], hereinafter "Defs.' RJ Mot.," at 2–3.) The Bankruptcy Court denied Defendants' motion, reasoning that Defendants could not assert that *res judicata* barred the Trustee's breach of contract claim because Defendants were judicially estopped from claiming *res judicata* applied after they had argued, in seeking remand, that the claims were different, and because Defendants had acquiesced in the claim splitting.[99] *In re Emerald Casino, Inc.*, 459 B.R. 298 (Bankr. N.D. Ill. 2011).

---

[99] The court rendered its decision on August 26, 2011 two months after the Supreme Court issued its decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011) . Judge Wedoff's written opinion on these *res judicata* arguments contains proposed findings of fact and conclusions of law, leaving it to this court to enter a final judgment.

D.      District court

This court withdrew the reference to the Bankruptcy Court on January 31, 2012.  The parties presented additional evidence at a further bench trial before this court between December 17, 2012 and March 22, 2013.

## DISCUSSION

I.    **Standard of Review**

The court reviews the Bankruptcy Court record *de novo.* The United States Bankruptcy Code authorizes bankruptcy judges to hear and enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11."  28 U.S.C. § 157(b)(1).  Generally, a bankruptcy court's final judgment in a core proceeding is subject to appellate review by the district court.  But in *Stern v. Marshall*, the Supreme Court held that some proceedings, specifically state law counterclaims, although "core" under the statute, may not constitutionally be adjudicated by a bankruptcy court.  131 S. Ct. 2594, 2620 (2011).  The Supreme Court recently explained in *Executive Benefits Insurance Agency v. Arkison*, that when faced with a "core" claim that falls within the scope of *Stern*, the bankruptcy court should simply "treat[] the claim[] as non-core: The bankruptcy court should hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment." 134 S. Ct. 2165, 2173 (2014).

As this court noted in *In re Emerald Casino, Inc.*, "[t]here is no genuine dispute that the Trustee's counterclaims are 'core' proceedings."  467 B.R. 128, 132 (N.D. Ill. 2012).  This court concluded, further, that the Trustee's state law counterclaims for breach of fiduciary duty and breach of contract fall within the scope of *Stern.*  467 B.R. at 133.  Because this court withdrew the reference to the Bankruptcy Court prior to a final determination, the court does not have formal proposed findings of fact and conclusions of law. Nonetheless, following the Supreme Court's instructions in *Arkison*, the court reviews the record and any of the Bankruptcy Court's findings or conclusions *de novo.*

## II.     Count I: Fiduciary Duty

### A.     The Trustee's fiduciary duty claim is barred by the statute of limitations

Defendants urge the court to find that the Trustee's fiduciary duty claim is barred by Illinois's five-year statute of limitations for such claims. *See* 735 ILCS 5/13-206.  Specifically, they argue that, because the Trustee's allegations are based on events leading up to the IGB's revocation of Emerald's license on January 30, 2001, any claims arising out of those events would have to be filed within five years of that date.  Plaintiff filed this suit on December 19, 2008, almost eight years after the IGB revoked the license and three years beyond the limitations period.  For her part, the Trustee acknowledges that her fiduciary duty claim arises from actions that took place more than five years before she filed suit.  She argues, however, that, pursuant to Illinois's doctrine of "adverse domination," the five-year limitations period was actually tolled from January 30, 2001 through the Trustee's appointment on March 20, 2008. (Trustee's Post-Trial Br. at 368.)  Under this theory, the Trustee filed this lawsuit with more than four years to spare.

Defendants point out that adverse domination merely establishes a rebuttable presumption.  They argue that the facts here call for the presumption to be rebutted.  As explained here, the court agrees.  The Creditors' Committee had the knowledge, ability, and motivation to bring suit before December 19, 2003, and the Trustee's breach of fiduciary duty claim is time-barred.[100]

### 1.     Adverse domination

Illinois's doctrine of adverse domination is "an equitable doctrine that tolls the statute of

---

[100]     The court notes that the Bankruptcy Court accepted the Trustee's adverse domination arguments at both the motion to dismiss and summary judgment stages of the proceedings in that court.  Judge Wedoff concluded that the limitations period here did not begin to run until Emerald's bankruptcy was converted to a Chapter 7 proceeding and the Trustee was appointed in late 2008, because prior to that time, no party had the motivation to file suit. (Bankr. Tr., May 20, 2009, 7:21–24; Bankr. Tr., Dec. 23, 2009, 12:20–13:24.)   As explained in the text, this court respectfully disagrees with that analysis.

limitations for claims by a corporation against its officers and directors while the corporation is controlled by those wrongdoing officers or directors." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (quoting *Lease Resolution Corp. v. Larney*, 308 Ill. App. 3d 80, 86, 719 N.E.2d 165, 170 (1st Dist. 1999)). The doctrine "creates a rebuttable presumption that knowledge of the injury will not be available to the corporation as long as the corporation is controlled by wrongdoing officers and directors." *Larney*, 308 Ill. App. 3d at 90, 719 N.E.2d at 173 (citing cases). The presumption is rebuttable, however, and can be overcome "by evidence that someone other than the wrongdoing directors had knowledge of the cause of action and both the ability and the motivation to bring suit." *Id.*

The adverse domination concept is an extension of the Illinois discovery rule, under which the statute of limitations is tolled until a plaintiff knows or should know that he has been injured and that his injury was wrongful. A plaintiff seeking to invoke tolling of the limitations period under this rule has the burden of proving the date of discovery. *Resolution Trust Corp. v. Franz*, 909 F. Supp. 1128, 1137 (N.D. Ill. 1995) (quoting *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 85, 651 N.E.2d 1132, 1138 (1995)). Because a plaintiff-corporation can learn that it has been injured only through the knowledge of its agents, if the agents' interests are adverse to the corporation, the agents' knowledge is not imputed to the corporation. *See Stewart*, 665 F.3d at 935. "The rationale behind this doctrine is 'that control of the board by wrongdoers precludes the possibility for filing suit since these individuals cannot be expected to sue themselves or initiate action contrary to their own interests.'" *Larney*, 308 Ill. App. 3d at 86, 719 N.E.2d at 170 (quoting *FDIC v. Greenwood*, 739 F. Supp. 450, 453 (C.D. Ill. 1989)).

The first and, to the court's knowledge, only Illinois decision applying adverse domination was issued in 1999 by the Illinois Appellate Court in *Larney*. In adopting this doctrine, the *Larney* court also addressed the question of how completely the "wrongdoers" must dominate their corporation in order to trigger tolling. The Appellate Court considered two options adopted

by other jurisdictions: majority domination and complete domination. "Under the majority domination theory, a plaintiff must show only that a numerical majority of the board members were wrongdoers during the period the plaintiff seeks to toll the statute." *Larney*, 308 Ill. App. 3d at 88, 719 N.E.2d at 171 (citing *Franz*, 909 F. Supp. at 1136). The complete domination theory, as its name suggests, requires "a plaintiff who seeks to toll the statute . . . [to] show full, complete, and exclusive control in the directors or officers charged." *Franz*, 909 F. Supp. at 1136 (quoting *FDIC v. Dawson*, 4 F.3d 1303, 1309 (5th Cir. 1993)). In other words, "the plaintiff must negate the possibility that an informed shareholder or director could have induced the corporation to initiate suit." *Resolution Trust Corp. v. Farmer*, 865 F. Supp. 1143, 1156 (E.D. Pa. 1994) (citing *Farmers & Merchs. Nat'l Bank v. Bryan*, 902 F.2d 1520, 1522 (10th Cir. 1990)).[101] The *Larney* court, relying heavily on a district court opinion (*Franz*), adopted the majority domination theory. For its part, the *Franz* court offered three reasons for adopting the majority domination theory: (1) "the majority theory is the majority rule"; (2) "[i]t is reasonable to presume that a culpable majority would act in its own interest [and] that the majority would conceal information and prevail on whether to pursue claims[,] . . . [a]s a result, it [would] be extremely difficult, if not impossible, for the corporation to discover and pursue its rights"; and (3) "nothing in the Illinois discovery rule implies that the Illinois Supreme Court would chose [sic] other than the majority rule." *Franz*, 909 F. Supp. at 1136.

Although the Illinois Supreme Court remains silent on the doctrine, the Seventh Circuit recently embraced *Larney* as well. In *Stewart*, the receiver-appellant argued against the

---

[101]    In practice, the difference between these two theories is simply the placement of the burden. Under majority domination, a plaintiff benefits from a presumption that the corporation is unaware of the injury against it so long as the board is dominated by wrongdoers. A defendant may rebut this presumption, however, by showing that, despite that domination, someone had the knowledge, ability, and motivation to sue. Under complete domination, on the other hand, plaintiffs have the burden of showing that no one could have caused the corporation to sue. In other words, under either version of the doctrine, if a defendant can identify someone other than the director-defendant that was capable of filing suit on behalf of the corporation, then the statute of limitations will not be tolled.

application of *Larney* in that diversity action because *Larney* is an intermediate state court opinion. The Seventh Circuit found, however, that "the district court did exactly what it should have," because "[w]here a state's supreme court has not yet passed on an issue, [courts] examine decisions of the lower state courts to help formulate an answer." *Id.* (quoting *Kaplan v. Shure Bros., Inc.*, 153 F.3d 413, 420 (7th Cir. 1998)). As *Larney* is the only Illinois Appellate Court decision to discuss the adverse domination doctrine and its holding has not been undermined by intervening Illinois precedent, the Seventh Circuit held that it should be given "persuasive weight." *Stewart*, 665 F.3d at 936.

### 2. Pedersen's arguments against tolling

Defendant Pedersen argues that "the doctrine of adverse domination, properly understood, cannot save the Trustee's stale claim in this case." (Def. Pedersen's Post-Trial Br. [240] at 49.) Pedersen urges the court to reject the *Larney* court's adoption of the majority domination brand of the adverse domination doctrine. (*Id.* at 50.) Specifically, Pederson asks the court to spurn *Larney* in favor of *Chapman*, a 1995 opinion from the Central District of Illinois which chose the complete domination theory. (*Id.* at 51) (citing *Resolution Trust Corp. v. Chapman,* 895 F. Supp. 1072, 1079 (C.D. Ill. 1995).) As Pedersen would have it, adverse domination would not apply to the Trustee's claim due to the presence of independent director Eugene Heytow on Emerald's Board. (*Id.* at 49–50.) These arguments are problematic for several reasons.

First, in asking the court to follow *Chapman*, Pedersen ignores the Seventh Circuit's decision in *Stewart*, as well as several cases that post-date *Chapman* and reject its conclusion. *Chapman* was decided in 1995 without the benefit of either the Illinois Appellate Court's 1999 opinion in *Larney* or the Seventh Circuit's 2012 opinion in *Stewart,* both of which found that majority domination is consistent with Illinois law. The *Franz* court itself considered and rejected the conclusion in *Chapman. See Franz*, 909 F. Supp. at 1136.

Even apart from that authority, this court would decline to adopt *Chapman*'s conclusion.

The *Chapman* court chose the complete control theory based on the fact that "[t]he complete domination version of the adverse domination doctrine puts a heavy burden on the [plaintiff]," which "is appropriate because it is the [plaintiff] who is attempting to toll the statute of limitations." *Chapman*, 895 F. Supp. at 1079. Thus, the *Chapman* court seems to suggest, the adverse domination doctrine should, like the Illinois discovery rule that inspired it, place the burden of proof on a plaintiff seeking to toll the limitations period. But copying the placement of the burden under the discovery rule and pasting it onto adverse domination is the wrong approach. A more reasoned tactic is to consider the principles behind the allocation of the burden in the discovery rule context, and then apply that rationale to adverse domination. Burdens of proof and production are ordinarily imposed on the party who is more likely to have access to the necessary information. *See Hecht v. Resolution Trust Corp.*, 333 Md. 324, 352, 635 A.2d 394, 408 (1994) (citing MCCORMICK ON EVID. § 337 at 429–32; 9 WIGMORE ON EVID., § 2486 at 290–91). In the context of the discovery rule, plaintiffs appropriately carry the burden of proving that they did not know that they had been injured, as they are best positioned to prove the veracity of that claim. Conversely, in the context of adverse domination, "[p]lacing [the] burden upon the defendants who control the corporation's information shifts the balance more fairly between the defendants and the corporation." *Hecht*, 333 Md. at 352, 635 A.2d at 408. For these reasons, the majority control theory is the most appropriate form of the adverse domination doctrine under Illinois law.

Second, as Plaintiff points out, even assuming, as Pedersen does, that complete domination is the proper theory of adverse domination under Illinois law, Heytow's presence on the Board would not doom the Trustee's claims.[102] Heytow resigned from the Board on April 15, 2002 (*see* PX 536 at 3; Trustee's Post-Trial Br. at 370); from that date until the Trustee's

---

[102]    Although the court need not address the issue in depth, it shares Plaintiff's skepticism as to Pedersen's characterization of Heytow as an "innocent director who had both the ability and motivation to sue." (Trustee's Post-Trial Br. at 375 n.87.)

appointment in 2008, Defendants completely dominated the Board.  In other words, the Board was completely controlled by Defendants for all but one year, two months, and sixteen days. Thus, under any version of the doctrine, adverse domination tolled the five-year limitations period long before it lapsed.[103]

### 3. Flynn Defendants' arguments against tolling: rebutting the presumption of adverse domination

The remaining Defendants (i.e., Kevin Flynn, Joseph McQuaid, Kevin Larson, John McMahon, Walter Hanley, and Donald Flynn[104]) acknowledge that *Larney* and *Stewart* control. Under Illinois's majority control definition of adverse domination, it is undisputed that Emerald's Board was dominated by Defendants from at least April 15, 2002 onward.  Nonetheless, they argue that the presumption of adverse domination is rebutted here by the presence of persons with the knowledge, ability, and motivation to sue, namely, the Creditors' Committee and Debtor's counsel, both of whom were appointed in 2002.  (Certain Defs.' Post-Trial Mem. [251], hereinafter "C. Defs.' Post-Trial Mem.," at 93.)[105]

---

[103] As the *Larney* court pointed out, it is inconsequential that, in Pedersen's view, the statute of limitations initially began to run before being tolled by Heytow's departure from the board.  *Larney*, 308 Ill. App. 3d at 91, 719 N.E.2d at 173 ("[T]he adverse domination doctrine can remove a cause of action from the statute of limitations for the period of time that the corporate plaintiff is dominated by wrongdoers after the statute has started to run.").

[104] Donald Flynn's estate wrote separately, but adopted the Post-Trial Memorandum of the other Defendants listed here.  (Donald F. Flynn Estate's Post-Trial Br. [248] at 1 n.1.)

[105] The non-director Defendants (i.e., Kevin Flynn, McMahon, and Hanley) also argue that the adverse domination doctrine in Illinois does not apply to defendants who, like them, "were neither directors nor shown to have conspired with the allegedly wrongdoing directors."  (C. Defs.' Post-Trial Mem. at 94, 118.)  They rely on language in *Stewart* in which the court declined to "extend[] the doctrine of adverse domination beyond wrongdoing directors and their co-conspirators."  (*Id.* at 118–19) (quoting *Stewart*, 665 F.3d at 938.)  The court notes, first, that *Stewart* did not require a "formal claim of conspiracy," instead observing that the adverse domination doctrine would toll the limitations period where "a plaintiff's allegations . . . establish that the defendant was complicit in the wrongdoing of the directors . . . ."  *Stewart*, 665 F.3d at 937.  And in declining to "extend[] the doctrine," *Stewart* was addressing the question of whether adverse domination tolls claims against a third-party who benefited from the wrongdoing of defendant directors.  The third party in that case was not an agent of the corporation; thus, that party's knowledge had no bearing on the corporation's knowledge of its

(continued . . . )

As the Trustee points out, this argument is largely identical to the ones made by Defendants in their earlier motion to dismiss and their motion for summary judgment before the Bankruptcy Court. Trustee argues that, because Judge Wedoff rejected Defendants' arguments then (*see* Bankr. Tr., May 20, 2009, 7:21–24; Bankr. Tr., Dec. 23, 2009, 17:17–22), it would be inappropriate for this court to revisit the issue "absent a compelling reason, such as a change in the law or clear error." (Trustee's Post-Trial Br. at 367) (citing *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997)). As *Best* recognizes, however, the law of the case doctrine does not preclude revisitation of an issue by a "superior court within a single judicial system" or when "the second ruling [is] not in the same posture as the first." *Id.* This court is not restricted by Judge Wedoff's oral rulings, which came at very different procedural stages in this litigation. And even if the Bankruptcy Court's rulings were in written form, post-trial, this court would be required to review all of the findings of fact and conclusions of law *de novo*, and does so here, considering each of the disputed elements (knowledge, ability, and motivation) in turn.

### i. Knowledge[106]

As discussed *supra*, the doctrine of adverse domination is based on the discovery rule, which tolls the statute of limitations until the plaintiff knows or should know that she was injured

---

directors' wrongdoing. Officers of the corporation involved in the suit—like Kevin Flynn, McMahon, and Hanley here—are a different matter altogether. Unlike a third party, an officer's knowledge is imputed to the corporation, *Metropulos v. Chi. Art Glass, Inc.*, 156 Ill. App. 3d 727, 739, 509 N.E.2d 1068, 1076 (2d Dist. 1987), thereby implicating the discovery rule at the heart of the adverse domination doctrine. Both *Stewart* and *Larney* explicitly state that officers are included in the adverse domination doctrine: "Under Illinois law, this doctrine is defined as 'an equitable doctrine that tolls the statute of limitations for claims by a corporation against its officers and directors while the corporation is controlled by those wrongdoing officers or directors.'" *Stewart*, 665 F.3d at 934 (quoting *Larney*, 308 Ill App. 3d at 90, 719 N.E.2d at 170). The adverse domination doctrine applies with equal force to Defendants who were officers and those who were directors.

[106] The Trustee takes the position that the Creditors' Committee and Debtor's counsel did not have knowledge of the suit prior to December 19, 2003 (five years before the suit was filed). (Trustee's Post-Trial Br. at 406–08.) Her argument, however, is really about ability rather than knowledge; thus, the court addresses that issue in the ability section below as well.

and that the injury was wrongful.  In Illinois, adverse domination presumes that the wrongdoing remains unknown; and because a corporation can only learn that it has been injured through the knowledge of its agents, where the corporation is dominated by the wrongdoers, the knowledge remains inaccessible to independent actors who have the ability and motivation to sue.

In this case, however, the revocation of Emerald's gaming license was public knowledge, and the Trustee's position is that it was apparent that Defendants' alleged misconduct was the cause for the revocation.  Notably, the fact that their misconduct was so serious as to cause revocation of Emerald's license appears to have been *unknown* to Defendants themselves, who each had an obvious interest in Emerald's success.  But that information, too, soon became a matter of public record:  During the public session of the January 30, 2001 IGB Meeting, Acosta presented the IGB Staff's recommendation to deny Emerald's Renewal Application. (PX135 at 32:23–33:1.)  Acosta explained that "the licensee and certain of its key persons . . . have failed to establish a record of regulatory compliance required under the Board's rules," specifically identifying Kevin Flynn and Donald Flynn. (*Id.* at 33:2–7, 33:12–34:2.)  Based on this recommendation, a majority of the Gaming Board voted to deny Emerald's Renewal Application, and to revoke its license. (*Id.* at 37:16–19.)  The IGB then issued a Disciplinary Complaint seeking to revoke Emerald's license on March 6, 2001, which reiterated in more detail the recommendation presented by Acosta at the January 30, 2001 IGB Meeting.  The Complaint charged "Emerald, by and through certain of its shareholders, directors, representatives and other Key Persons" with violating IGB Rules 140(a), 140(b)(3), 140(b)(5), 235(a)(1), and 110(a) causing revocation of Emerald's license. (PX151 ¶¶ 47–72.)  As of January 30, 2001 (or at least as of March 6, 2001), the Creditors' Committee,[107] along with the rest of the public, had

---

[107]    Interestingly, Connie Payton (on behalf of Walter Payton's Estate) and Albert Johnson, two of the *Payton* Plaintiffs who sued all of the Defendants here except for Pedersen alleging similar claims for breaches of contract and fiduciary duty, were appointed as representatives to the Creditors' Committee. (*See supra* note 88.)  Ms. Payton filed her lawsuit in January 2006, which provides powerful evidence in favor of Defendants' argument on the
(continued . . . )

knowledge that Defendants' alleged wrongdoing caused loss of Emerald's license.

### ii.   Ability

The Trustee makes several arguments about ability.   First, because the Creditors' Committee could only bring a suit on behalf of Emerald against Defendants with the Bankruptcy Court's permission,[108] it did not truly have the "ability" to do so.  (Trustee's Post-Trial Br. at 378–398.)   This understanding of "ability" is far too narrow.   In fact, by this logic, it would be impossible for anyone to rebut the presumption of adverse domination.   If the majority of the board is culpable in wrongdoing and unwilling to sue itself, as required to establish the presumption based on majority domination, no one can "file suit on one's own," as the Trustee would require.  (*Id.* at 380.)  The Trustee admits as much by pointing out that, under its reading of *Larney*, it is "essentially true" that "the presumption of adverse domination can be rebutted only by innocent parties taking control of the board of directors."  (*Id.* at 383.)

At the same time, Trustee argues that allowing the Creditors' Committee's ability to sue to rebut the presumption would eliminate the distinction between the majority and complete domination theories. (Trustee's Post-Trial Br. at 379–80.)   But, as discussed *supra* (*see* note 101), the court finds that the primary distinction between these two theories really concerns which party bears the burden of proof, and that the Creditors' Committee (or another independent director) could rebut the presumption does not eliminate this distinction.   Under both theories, the burden remains with the defendants to identify an independent plaintiff who could sue on behalf of the corporation.

The Trustee also argues that the Creditors' Committee, here, did not have the ability to

---

statute of limitations issue.

[108]    Creditors' committees may bring derivative suits only where: "(a) the [debtor] unjustifiably refuses a demand to pursue the action; (b) the creditor establishes a colorable claim . . . ; and (c) the creditor seeks and obtains leave from the bankruptcy court to prosecute the action for and in the name of the [debtor] . . . ."  *In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990).

bring suit because the Bankruptcy Court indicated that it would not grant the Creditors' Committee leave to pursue a derivative action. (Trustee's Post-Trial Br. at 380–81; *see supra* Background V.B.) When the Creditors' Committee finally expressed its intent to seek leave to file suit in 2008, the Bankruptcy Court converted the bankruptcy to a Chapter 7 proceeding and appointed the Trustee. That decision appears to have been made in response to a concern raised by Richard Friedman, appearing on behalf of the U.S. Trustee, that counsel representing the Creditors' Committee might not get paid if the bankruptcy remained in Chapter 11 (Bankr. Tr., Mar. 19, 2008, 7:6–22), and the court's own concern about a potential conflict of interest for the Debtor's counsel if an action were filed against Defendants (with whom the Debtor's counsel had worked closely). (*Id.* 8:16–9:11.) Judge Wedoff noted that "[t]he circumstance right now is imminently foreseeable that there could be an administrative insolvency," and agreed with Mr. Friedman's assessment that "the cleaner thing is probably just to make it 7." (*Id.* 7:23–8:15, 12:7–22.) It is not at all clear from these circumstances, however, that the Bankruptcy Court would have taken the same course had the Creditors' Committee chosen to pursue a derivative action against Defendants sooner—when there would have been, presumably, a smaller risk of administrative insolvency. Nor is it obvious that no independent party had the ability to pursue an action before December 19, 2003; as noted *supra* the alleged wrongdoing of Defendants was public knowledge, and if the Bankruptcy Court had converted the case to Chapter 7 in lieu of allowing the Creditors' Committee leave to sue Defendants, then the Trustee herself would constitute a party having the knowledge, ability, and motivation to sue.

The Trustee couches her final argument as a dispute over whether the Creditors' Committee had "knowledge" more than five years before the suit was filed. But this argument in fact questions whether "a responsible litigant would have filed suit during 2002 and 2003." (*Id.* at 407.) The Trustee contends that it would not have been possible for any entity appointed in 2002, to file suit by late 2003, because there would not be time to investigate and build a

186

case.[109]  This argument is unconvincing.  The discovery rule and adverse domination are intended to protect plaintiffs without knowledge of their injuries.  By the Trustee's logic, a limitations period would not begin to run until a plaintiff is ready to file her suit.  This is clearly not the law.

### iii.    Motivation

Finally, Trustee argues, and the Bankruptcy Court found, that motivation is lacking in two ways.  First, the Trustee claims, the Creditors' Committee and all other interested parties were not motivated to sue, because they were instead motivated to ensure that Emerald kept its license. (Trustee's Post-Trial Br. at 398–400, 403.)  In addition, Trustee argues, any legal action against Defendants for loss of the license before January 30, 2006 would have directly conflicted with efforts to sell the license, because "the committee would have been advancing a fiduciary breach claim dependent on proving that Defendants violated IGB Rules while at the same time supporting Emerald's efforts to retain that License (which hinged on showing that Emerald did not violate IGB Rules) . . . ." (Trustee's Post-Trial Br. at 403.)  But, such a definition of motivation essentially gives the plaintiff control over when the statute of limitations begins to run, as it tolls the limitations period until the plaintiff decides that filing suit (rather than pursuing other options, such as, in this case, selling the license) is the best course of action.  Under this definition of the "motivation" prong, again, the presumption of adverse domination could never be rebutted; the statute likely would be tolled until the plaintiff established her motivation to sue by suing.

This court declines to adopt the Trustee's strict definition of "motivation" in this context.

---

[109]    The Trustee further argues that, because a creditors' committee can only bring a derivative claim with permission of the bankruptcy court (discussed below), it is even less likely that the Creditors' Committee could have "buil[t] a sufficient case to be able to show the Bankruptcy Court that filing suit on behalf of Emerald . . . was justified" by December 2003.  This argument fails for the same reason.  The question is not whether a lawsuit could readily have been filed; it is whether an injured party had knowledge, ability, and motivation to pursue a lawsuit at all.

A fairer understanding is that the motivation prong is met simply when a person, who is not culpable in the wrongdoing, knows that she has been wronged by the alleged misconduct of the wrongdoing directors. The motivation itself arises from the fact that the person bringing a derivative action has herself been injured, and therefore, presumably would want to (that is, be motivated to) recover from the wrongdoing-defendants for her injury. Such an "independent" party has motivation to sue regardless of whether that same party may recognize a strategic advantage in waiting to file suit.

As the Trustee sees things, only an independent party with a fiduciary duty to file suit has the requisite "motivation" to overcome the presumption. She emphasizes the "discretion" retained by the Creditors' Committee "both to determine what is in creditors' best interests and to decide how to accomplish that objective" and contends that such a Committee, in a Chapter 11 proceeding, is "no different from a shareholder, who also has a right, but no mandatory duty to seek leave to bring a derivative claim." (Trustee's Post-Trial Br. at 386.) The fact that the Creditors' Committee has more than one option does not, however, defeat the conclusion that it has the necessary motivation to bring suit against wrongdoing directors. Requiring an independent party to have a fiduciary duty to sue in order to satisfy the motivation prong is too stringent a test.

Nor does the fact that litigation might have been expensive make a difference. (*Cf.* Trustee's Post-Trial Br. at 406.) The damages award in this case demonstrates that finding counsel on a contingency was likely. Indeed, in this case both the Creditors' Committee and, ultimately, the Trustee did succeed in retaining counsel on contingency. (*See* Bankr. Tr., Mar. 19, 2008, 5:14–7:1; Background V.B.)

The court concludes that the Creditors' Committee had the motivation to sue years before 2008. Emerald went into bankruptcy on June 13, 2002 (Involuntary Pet., *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill. 2002) [1]), and the U.S. Trustee appointed a Creditors' Committee on November 1, 2002. (App't Creditors' Comm.) The Creditors'

Committee retained Gardner Carton & Douglas to serve as its counsel, and the firm's time records indicate that as early as August 2003, the Creditors' Committee's Counsel researched possible derivative claims against Emerald officers. (*See supra* Background V.B.) The creditors represented by the Creditors' Committee obviously were injured by Emerald's loss of license; because of the loss, Emerald was unable to pay them for their services or to redeem their ownership interests. And, as discussed *supra*, that Defendants' conduct caused the revocation of Emerald's license was public knowledge as of January 30, 2001. The Creditors' Committee *chose* not to pursue these claims until March 2008, but the Committee could have brought a derivative action like the one now before the court as early as when it was first appointed, and certainly by December 19, 2003. If the possibility of a sale of a license in the bankruptcy looked like a more attractive result, the Creditors' Committee could have asked for a stay of the litigation, or sought a waiver of the statute of limitations.

The three prongs of the test are met. The court concludes that because the Creditors' Committee had the knowledge, ability and motivation to sue, Defendants have rebutted the presumption of adverse domination, and the Trustee's breach of fiduciary duty claim is barred by Illinois' five-year statute of limitations.

## III.      Count II: Breach of Contract

Trustee alleges that Defendants breached Paragraph Ten of the Amended Shareholders' Agreement, which provides,

> Each Emerald Shareholder shall cooperate with the Corporation to provide any information to the IGB and take any actions necessary to secure the renewal of the Corporation's gaming license. Each Shareholder further agrees to comply with the Act, Rules, and orders of the IGB and shall not commit acts which would jeopardize the license or a renewal thereof.

(PX1008 at 7.) Trustee argues that each Defendant violated IGB rules, and therefore breached the contract, resulting in the loss of Emerald's valuable license. Before turning to the merits of Trustee's claim, the court must consider Defendants' argument that the claim is barred by *res judicata.*

## A. The Trustee's breach of contract claim is not barred by *res judicata*

The full faith and credit clause of the United States Constitution requires courts "to give to a judgment at least the *res judicata* effect which the judgment would be accorded in the State which rendered it." *Durfee v. Duke*, 375 U.S. 106, 109 (1963). This principle extends to federal courts interpreting a state court judgment. 28 U.S.C. § 1738; *Hayes v. City of Chi.*, 670 F.3d 810, 813 (7th Cir. 2012). Under Illinois law, a judgment is given *res judicata* effect, barring the filing of the same claims in a subsequent suit, where: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies." *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302, 703 N.E.2d 883, 889 (1998). Illinois law prevents *res judicata* from barring a subsequent action, however, "where it would be fundamentally unfair to do so." *Nowak v. St. Rita High Sch.*, 197 Ill. 2d 381, 390, 757 N.E.2d 471, 477–78 (2001).

Much ink has been spilled during the years in which the *Payton* claims bounced between the Circuit and Bankruptcy Courts. As a result, addressing the parties' arguments with respect to the *res judicata* issue presents a unique challenge, for in many previous filings the parties asserted arguments opposite to those they now present: Defendants, in seeking remand of the *Payton* claims, and before the Circuit Court had ruled on their motion to dismiss, maintained that such claims were different from the Emerald estate claims, including breach of contract. (Defs.' Remand Mot. at 10–12; Defs.' Remand Reply at 4, 14; 11/12/09 State Tr. 7:15–18, 9:1–3.) The Trustee, in seeking removal of the *Payton* claims, and after remand, in seeking a stay the Circuit Court proceedings, argued that the claims were so similar that resolution of the claims in the bankruptcy proceeding would render the Circuit Court proceedings moot. She urged, too, and that there was a risk of conflicting judgments with the two pending proceedings. (Notice of Removal ¶ 10; Pl.'s Mot. to Stay 1 at 3–4.) Defendants now argue that there is, in fact, *res judicata* effect—that the Circuit Court's decision to dismiss the *Payton* breach of contract claim bars Plaintiff from raising a breach of contract claim here. The Bankruptcy Court concluded that

under the doctrines of judicial estoppel and acquiescence, Defendants are barred from asserting *res judicata*, here, and after de novo review, this court agrees.

### 1. Final Judgment on the Merits

Under Illinois law, a dismissal with prejudice is a final adjudication on the merits. *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 335–36, 665 N.E.2d 1199, 1204–05 (1996). Here, the Circuit Court dismissed the *Payton* breach of contract claim with prejudice on November 12, 2009, holding that it was barred by the statutes of limitations and/or repose contained in the Illinois Securities Law. (11/12/09 State Tr. 10:12–17.) The Trustee did not appeal the decision. Thus, under Illinois law, the Circuit Court's dismissal of the breach of contract claim was a final judgment on the merits. The Trustee argues that there cannot be a final adjudication on the merits where claims have been split. (Trustee's Post-Trial Br. at 449) (citing *Torres v. Rebarchak*, 814 F.2d 1219, 1223, 1225–26 (7th Cir. 1987) and *Zimmerman v. Bankers Life & Cas. Co.*, 324 Ill. App. 370, 58 N.E.2d 267, 268–69 (1st Dist. 1944).) Both of the cases she cites however, appear to be more relevant to whether the claims are the same for the purposes of *res judicata* (making a final judgment on the merits between the same parties binding), and not whether the Circuit Court's decision itself is, under Illinois law, a final judgment on the merits.

In *Torres*, the Seventh Circuit reasoned that under Section 26 of the Restatement (Second) of Judgments, the Illinois prohibition of claim splitting would likely "not apply where the parties have agreed that a plaintiff may split his claim or the court in the first action has expressly reserved the plaintiff's right to maintain the second action," for example, by indicating that the judgment is "without prejudice" with respect to the second action. 814 F.2d at 1224–25. The use of the "term 'with prejudice' clearly means that the judgment bars a later action." *Id.* at 1223. In this case, the Circuit Court dismissed Plaintiff's breach of contract "with prejudice" and used no words of limitation, nor did the Circuit Court express any concerns about the bankruptcy action other than possible preclusive effect of the *Bankruptcy Court's* judgment on

the Circuit Court action. (11/12/09 State Tr. 10:12–17.)  The Trustee also cites *Zimmerman* for

the proposition that "there may be more than one judgment in the same cause" of action. 324 Ill.

App. at 373, 58 N.E.2d at 268–69.  That principle is fully consistent with the doctrine of *res

judicata*, which prohibits only multiple judgments between the same parties concerning the

same issue or claim.

Here, the court finds that under Illinois law, the Circuit Court's decision dismissing the

breach of contract claim was a final judgment on the merits.

2.      **Same claims and same parties**

a.      **The *Payton* and estate breach of contract claims are the
same**

Under Illinois' transactional approach, claims are the same "if they arise from a single

group of operative facts, regardless of whether they assert different theories of relief." *River

Park*, 184 Ill. 2d at 310–11, 703 N.E.2d at 893.  The Bankruptcy Court concluded that

Defendants could not establish that the claims in the *Payton* and bankruptcy actions were the

same on the merits. 459 B.R. at 303–04.  This court parts company on that question, but agrees

with Judge Wedoff that *res judicata* does not bar this case.

Both the Plaintiffs' and the Trustee's breach of contract claims arise from "a single group

of operative facts" because both claims, which contain substantially similar language, allege that

Defendants breached Paragraph Ten of the Amended Shareholders' Agreement by violating

IGB rules causing revocation of Emerald's license. (*Payton* Am. Compl. ¶¶ 57–61; Third Am.

Compl. ¶¶ 120–25.)  Citing *Iovinelli v. Pritchett*, No. 06-cv-6404, 2008 WL 2705446 (N.D. Ill.

2008), the Trustee asserts that the fact that the claims contain nearly identical language, alone,

does not establish that the claims are the same. (Trustee's Post-Trial Br. at 444 n.106.)  In

*Iovinelli*, the plaintiff firefighter sued the Village of Franklin Park and its Department Chief under

§ 1983, alleging that the defendants retaliated against the plaintiff for bringing a suit against the

Village of Franklin Park in state court.  The district court concluded that these claims were

different because they involved different operative facts (the § 1983 case would involve facts concerning the plaintiff's employment history, information that was relevant to the state court case only because it conferred the plaintiff standing to sue), and because they concerned different legal issues ("tax levy and collection issues" in the state court case, and "employment and constitutional claims" in the § 1983 case). No. 06-cv-6404, 2008 WL 2705446 at **1, 9. The case before this court differs from *Iovinelli*, because, here, the operative facts and legal issues are the same: the complaints in both Circuit Court and the Bankruptcy Court alleged that Plaintiffs and Defendants were parties to the Amended Shareholders' Agreement, and that Defendants breached Paragraph Ten of the Amended Shareholders' Agreement by violating IGB rules, causing revocation of Emerald's license. Although the *Payton* Plaintiffs also alleged misleading conduct in connection with the sale of the shares, the primary issue in each of the two cases is whether Defendants' conduct violated Paragraph Ten.

Next, the Trustee argues, and the Bankruptcy Court concluded, that these claims were different because "the central basis for the [*Payton*] claims was that the defendants had not accurately informed the *Payton* Plaintiffs of facts relating to their investments" while "the claims of the Emerald estate have nothing to do with communications between management and individual investors, but rather, with management's dealings with the Illinois Gaming Board." (Trustee's Post-Trial Br. at 443–44) (quoting 459 B.R. at 304 n.3.) The *Payton* Complaint does contain allegations that Defendants "defrauded" each of the *Payton* Plaintiffs through "intentional concealment of . . . facts, conduct and events" that "would have been material to each [*Payton*] Plaintiff" and would have caused each one of them not to entrust money to Emerald."[110] (*Payton* Am. Compl. ¶¶ 1, 51–52.) Yet, significantly, the *Payton* Plaintiffs need not

---

[110] The *Payton* Plaintiffs alleged that Defendants misrepresented or concealed information, such as Emerald's financial condition, its contingency plan in the event that the investors were not approved by the IGB, its alleged secret agreements (with Mayor Stephens, and with Davis), its construction activities, the transfer of Emerald ownership shares, and its disclosures to the IGB. (*Payton* Am. Compl. ¶¶ 51–52.)

have proved their allegation of fraudulent inducement in order to prevail on their breach of contract claim; the *Payton* breach of contract claim, like the estate's breach of contract claim, also alleges that Defendants breached Paragraph Ten of the Amended Shareholders' Agreement by violating IGB rules. (*Payton* Am. Compl. ¶¶ 57–61.) That the *Payton* Amended Complaint contains additional allegations of fraudulent inducement does not require the conclusion that the two breach of contract claims differ for the purposes of *res judicata*.

The Trustee insists the claims do indeed differ. She emphasizes that "the Trustee on behalf of the estate asserts rights under the contract that belonged to Emerald and are different from those she asserted as assignee of the *Payton* Plaintiff claims." (Trustee's Post-Trial Br. at 444–45) (citing *Saxon Mortg., Inc. v. United Fin. Mortg. Corp.*, 312 Ill. App. 3d 1098, 1107, 728 N.E.2d 537, 544–45 (1st Dist. 2000).)[111] It is indeed clear from the Amended Shareholders' Agreement that Emerald had the right to sue shareholders, such as Defendants, for breaches of the contract, but much less clear that the same contract, between Emerald and its shareholders, gave one group of shareholders (the *Payton* Plaintiffs), the right to sue other shareholders (Defendants). The distinction made by the Trustee does not resolve whether the *Payton* Plaintiffs' and estate's breach of contract claims were the same, but does raise the issue of who—the *Payton* Plaintiffs, individually, the estate, or both—had the right to sue.

As this court reads the Amended Shareholders' Agreement, only the estate (or the *Payton* Plaintiffs derivatively) had the right to sue under the contract. The Agreement states

---

[111] In *Saxon*, the Illinois Appellate Court reversed the lower court's determination that a breach of contract was barred by earlier litigation, reasoning that "[t]he fact that the same underlying master Agreement was involved in both cases does not establish that they are the same cause of action; they involve separate transactions, factual situations, time periods, obligations, issues, damages and claims for relief and invoke different provisions of the underlying master Agreement in order to meet the nature and character of each distinctive grievance." 312 Ill. App. 3d at 1107, 728 N.E.2d at 544. Here, in contrast, both claims cite the same provision (Paragraph Ten) of the same contract (the Amended Shareholders' Agreement), alleging the same breach (violating IGB Rules), causing the same injury (revocation of Emerald's license).

that it is between Emerald and current and/or future shareholders. (PX13 at 1) ("THIS AGREEMENT is made and entered into as of the 6th day of August, 1999 between [Emerald], an Illinois corporation . . . and those parties set forth in Exhibit A attached hereto while such party holds Shares . . . and any party who hereafter acquires Shares . . . .") In Paragraph Ten of the Amended Shareholders' Agreement, titled "Additional Agreements of Shareholders," which both the *Payton* Plaintiffs and the Trustee allege Defendants violated, the shareholders promise to "cooperate with [Emerald] to provide any disclosure information to the IGB," to "take any actions necessary to secure the renewal of [Emerald's] gaming license," "to comply with the [Riverboat Gambling Act] and all rules and orders of the IGB," and finally to "not commit any acts which would jeopardize the license or a renewal thereof." (*Id.* at 4.) In allegedly violating this paragraph, Defendants caused harm to Emerald itself by allegedly causing revocation of Emerald's license. Though this, in turn, caused harm to the other shareholders through loss of their investment, the contractual obligation itself is owed only to Emerald, the corporation, and to the shareholders derivatively. The alleged injury—breach of the Amended Shareholders' Agreement causing revocation of Emerald's license—was to Emerald itself, and the shareholders derivatively, not individually.

This distinction (regarding who may sue for breach of contract under the Amended Shareholders' Agreement) is crucial for the purposes of understanding Defendants' positions throughout the Bankruptcy and Circuit Court proceedings, *see supra* note 96, and for understanding the effect of the Circuit Court action for the purposes of *res judicata*. As discussed above, in their motion to remand, Defendants emphasized that the *Payton* claims, brought by the Statutory Investors in their *individual* capacity, were different from any claims that the estate may have. (Defs.' Remand Mot. at 16–17; Defs.' Remand Reply at 5, 20.) After the *Payton* claims were remanded, Defendants moved to dismiss them on two alternative bases: first, that the *Payton* Plaintiffs did not have standing to bring the breach of contract claim in their individual capacity, and second, that if the *Payton* breach of contract claim is, in fact, a

derivative claim, it is duplicative of the estate's breach of contract claim pending in Bankruptcy Court. (Defs.' Mot. to Dismiss *Payton* at 12–13.) The Circuit Court rejected both arguments, but dismissed the breach of contract claim with prejudice on alternative grounds. (11/12/09 State Tr. 10:12–17, 34:12–20.)

The Circuit Court thus appeared to accept the notion that the Statutory Investors had standing to pursue their own claims for breach of contract. This court reads the Amended Shareholders' Agreement differently. In the end, however, it makes no difference for *res judicata* purposes. In support of their successful motion for remand, Defendants urged that the *Payton* claims were distinct from the claims that the estate might pursue. (*See* Defs.' Remand Mot. at 16–17; Defs.' Remand Reply at 5, 20.) Under the doctrine of judicial estoppel, they will not now be heard to argue otherwise.

### b.    The parties may be the same

The final element for enforcing *res judicata* is a showing that parties in the previous case are the same as the ones now before the court. It is undisputed here that the Defendants are the same, but the parties dispute whether the plaintiffs were the same in the *Payton* and estate causes of action for the purposes of *res judicata*. The Trustee filed the *Payton* breach of contract claim as assignee of the *Payton* claims, and the estate's breach of contract claim on behalf of the estate,[112] and as the Bankruptcy Court acknowledged, it is not clear whether,

---

[112]    As an aside, the court notes that in representing Emerald's estate, the Trustee "has the sole responsibility to represent the estate, by bringing actions on its behalf to marshal assets for the benefit of the estate's creditors." *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) (citing 11 U.S.C. § 323). In doing so, then, the Trustee does not represent the corporation Emerald or its shareholders. Rather, the Trustee represents the estate, and is "the only party who can sue to represent the interests of the creditors as a class." *Fisher*, 155 F.3d at 879 (citing *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1342–43 (7th Cir. 1987)). As observed in *Fisher*, however, the Trustee's standing to bring claims on behalf of creditors is limited to general claims where "the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors." 144 F.3d at 879–80. The Trustee may not bring creditors' personal claims, "those in which the claimant is harmed and 'no other claimant or creditor has an interest in the cause'." *Id.* at 879 (quoting *Koch Ref.*, 831 F.2d at 1348). Here, on October 28, 2002, before filing suit each of the *Payton*
(continued . . . )

under Illinois law, the *Payton* Plaintiffs remained the plaintiff party for the purposes of *res judicata* after they assigned their claims to the Trustee. 459 B.R. at 303 n.2.

Illinois courts have yet to address this issue. But, in *Perry v. Globe Auto Recycling, Inc.*, 227 F.3d 950 (7th Cir. 2000), the Seventh Circuit held that, under federal law, *res judicata* did not bar the plaintiff-assignee from litigating a claim that he had purchased from the assignor, though the plaintiff, in his individual capacity, had litigated the same claim against the same defendant to a final judgment. 227 F.3d at 952–53. The court reasoned that the identity-of-parties requirement of *res judicata* was not satisfied because in litigating his individual claim "[the plaintiff-assignee] was not [the assignor's] representative in any sense of the term, and thus [the assignor] would have been fully entitled to bring the present litigation on his own." *Id.* at 953. Defendants attempt to limit *Perry*'s holding only to situations in which the assignee litigated the potentially preclusive claim *before* he acquired the assigned claim. (*See* C. Defs.' Post-Trial Mem. at 135–36), but the language of the *Perry* decision does not suggest such a limitation. So long as the assignee has a right to bring an action in his own name, the court concluded he could transfer that right to an assignee.

---

Plaintiffs filed proofs of claims against the estate as shareholders of Emerald, and in doing so, became creditors of Emerald. (*See* Claims Register in *In re Emerald Casino, Inc.*, No. 02-br-22977 (Bankr. N.D. Ill.)) (Walter Payton c/o Connie Payton for $270,265.56 (claim 16); Myoung Hwa Bae for $2,112,562.22 (claim 17); Ronald Blackstone for $627,020.74 (claim 13); Sandra Degnan for $863,637.31 (claim 14); Maureen S. Flaherty for $470,265.56 (claim 7); Albert W. Johnson for $4,702,655.56 (claim 9); Althea Knowles for $470,265.56 (claim 10); Elizabeth Lucas for $940,531.11 (claim 11); Joan S. Morrissey for $470,265.56 (claim 6); Maureen J. Obermeier for $470,265.56 (claim 5); Ernest J. Ojeda for $1,053,031.1102 (claim 4); Rudolph Rodriguez for $321,999.08 (claim 2); Kathryn V. Shannon for $1,881,062.22 (claim 12); Arthur J. Smith, Sr. for $6,746,743.17, filed by Arthur J. Smith, Jr. (claim 1); Lester McKeever, Jr. for $1,881,062.22 (claim 18); Walter Grady for $562,062.49 (claim 8).) Their breach of contract claim against Defendants (filed in state court) was not unique to them individually, but instead was one that applied generally to all creditors, as evidenced by the Trustee's decision to bring the same claim on behalf of the Estate. In this respect, then, the Trustee's claim (on behalf of the Estate) against Defendants for breach of contract represents the *Payton* Plaintiffs' interests as creditors, regardless of whether the Trustee is the same party for purposes of *res judicata*.

Defendants also cite several Illinois law cases which hold that an entity that controls the litigation, even as a non-party, is in privity with the party controlled. (C. Defs.' Post-Trial Mem. at 137) (citing *Cabrera v. First Nat'l Bank of Wheaton*, 324 Ill. App. 3d 85, 101–02, 753 N.E.2d 1138, 1152 (2d Dist. 2001) and *Fed. Sav. & Loan Ins. Corp. v. Dir. of Revenue of Ill. Dep't of Revenue*, 650 F. Supp. 1217, 1223 (N.D. Ill. 1986).) The Trustee notes only that these cases contradict the holding in *Perry*. (Trustee's Post-Trial Br. at 448.) Regardless how that issue is resolved, the court concludes that Defendants are estopped from asserting *res judicata*.

### 3. Defendants are estopped from asserting *res judicata*

In seeking to bar Plaintiff's claim for breach of contract under *res judicata*, Defendants omit one of the most important facts concerning the state and bankruptcy proceedings—that these "dual proceedings" were of their own making. Defendants argue that the Trustee had an obligation "to amend or dismiss [her] complaints as necessary to get [her] entire cause of action in one suit." (C. Defs.' Post-Trial Mem. at 122) (quoting *Chi. Title Land Trust Co. v. Potash Corp. of Sask. Sales Ltd.*, 664 F.3d 1075, 1081 (7th Cir. 2011).) Yet, unlike the Plaintiffs in *Chicago Title Land Trust*, who chose to file two separate causes of action, the Trustee here did attempt to get her entire case in one suit. She removed the *Payton* claims to Bankruptcy Court, thus seeking to combine the *Payton* and estate's breach of contract claims (and other similar claims) in a single cause of action.[113] Judge Wedoff remanded the *Payton* claims only after Defendants

---

[113] Defendants also argue that it was the Trustee, and not Defendants, who "succeeded in convincing Judge Wedoff that the 'Estate' breach of fiduciary duty claim should go forward." (C. Defs.' Post-Trial Mem. at 126.) In the January 27, 2009 hearing, at which Judge Wedoff remanded the *Payton* claims, he noted that "The decisions on several of [the retained] counts depends on the outcome of the resolution of the other counts, the ones that are being remanded." (1/27/09 Bankr. Tr. 15:3–14.) When the Trustee objected, stating that "the breach of fiduciary duty claim seeks in the trustee's own right on behalf of the estate a monetary judgment," Judge Wedoff responded "I'm not saying all of [the retained counts]," but offered to "suspend proceedings on the remaining counts of the complaint until we find out what happens in the state court." (*Id.* 15:15–16:5.) But, the Trustee sought to proceed with the Estate's breach of fiduciary duty claim only after the Bankruptcy Court determined that the *Payton* claims could be severed from the Estate claims, and remanded the former claims to the Circuit Court. (1/27/09 Bankr. Tr. 13:20–14:3) ("[D]espite the trustee's argument to the contrary, it is quite
(continued . . . )

198

argued, in their motion for remand, that these claims could be severed from the estate claims. (Defs.' Remand Mot. at 16–17; Defs.' Remand Reply at 4, 14.)  By representing to *both* Judge Wedoff before he decided to remand the *Payton* claims, and to Judge Bartkowicz before he ruled on Defendants' motion to dismiss, that these two actions were *different* and would not affect each other, Defendants encouraged these two actions to proceed at the same time.  They may not assert *res judicata* now.

The Bankruptcy Court so concluded, and the court agrees.  459 B.R. at 303–04.  Under the doctrine of judicial estoppel, "a party who prevails on one ground in a prior proceeding cannot turn around and deny that ground in another one." *Butler v. Vill. of Round Lake Police Dep't*, 585 F.3d 1020, 1022 (7th Cir. 2009).  Judicial estoppel "is an equitable concept designed to protect the integrity of the judicial process and to prevent litigants from playing fast and loose with the courts." *Butler*, 585 F.3d at 1022 (internal quotations and citations omitted).  There are three requirements to applying the doctrine: "(1) the later position must be clearly inconsistent with the earlier position; (2) the facts at issue should be the same in both cases; and (3) the party to be estopped must have convinced the first court to adopt its position." *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 527 (7th Cir. 1999).

Each of these three requirements has been satisfied.  Defendants' initial argument, that the *Payton* and estate breach of contract claims were different and, therefore, severable, prevailed when the Bankruptcy Court agreed to remand these claims. In their motion for remand, Defendants maintained that "the causes of action in the [*Payton* Complaint] have no impact on Emerald's bankruptcy estate, and the proofs relative to establishing liability to the estate and the proofs necessary to establishing liability to the *Payton* Plaintiffs on their individual

---

feasible to sever the state law claims in the original *Payton* complaint from the core bankruptcy matters included in the amended complaint. The *Payton* plaintiffs' claims can be conclusively adjudicated in state court, jurisdiction over the core proceedings preserved in this court for later proceedings.")

claims are different and would not overlap." (Defs.' Remand Mot. at 16.) Then in their subsequent motion for summary judgment, Defendants argued to the Bankruptcy Court that the Circuit Court's decision dismissing the *Payton* breach of contract claim barred Plaintiff from litigating the estate's breach of contract claim in Bankruptcy Court because these "[c]auses of [a]ction [a]re [i]dentical." (Defs.' RJ Mot. at 12.) As Judge Wedoff recognized, the "central question" at the time of remand which was "whether the claims could be adjudicated separately." 459 B.R. at 304. Finally, Judge Wedoff noted that "[t]he bankruptcy court expressly accepted" Defendants' argument that the *Payton* claims and the estate claims were different "in severing the claims." 459 B.R. at 304; (*see* 1/27/09 Bankr. Tr. 11:16–12:3.) This court notes that Defendants made similar representations to the Circuit Court even when Judge Bartkowicz explicitly cited *res judicata* concerns, and Judge Bartkowicz expressly relied on Defendants' assertions that the *Payton* and estate claims were different before ruling on the *Payton* breach of contract claim. (*See* 11/12/09 State Tr. 5:11–7:1, 7:15–18, 9:1–3, 31:4–13, 32:17–23, 34:5–11, 38:14–17.)

Moreover, as Judge Wedoff recognized, Defendants acquiesced to splitting the breach of contract claim. 459 B.R. at 305. Under Illinois law, "*[r]es judicata* will not be applied where it would be fundamentally unfair to do so." *Nowak*, 197 Ill. 2d at 390, 757 N.E.2d at 477. Section 26 of the Restatement (Second) of Judgments, which the Illinois Supreme Court has cited with approval, *see Nowak*, 197 Ill. 2d at 393, 757 N.E.2d at 479, outlines several exceptions for the application of *res judicata* when claims have been split, including where "[t]he parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein." RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(a). The Bankruptcy Court concluded that "[b]y moving for remand or abstention with respect to the *Payton* Plaintiff claims, while expressly declining to seek transfer of the Emerald estate claims to state court," Defendants both acquiesced and affirmatively sought to split the *Payton* and estate claims, including the breach of contract claim. 459 B.R. at 305. This court agrees.

Defendants attempt to evade application the doctrines of judicial estoppel and acquiescence here on the ground that "neither the bankruptcy court nor the Defendants nor the Trustee even suggested splitting the contract claim at the time of remand, and . . . the bankruptcy court remanded the contract claim to state court as a single claim."[114] (C. Defs.' Post-Trial Mem. at 121, 141–42.) The record defeats this argument, as well. Defendants are correct that, initially, because the Trustee filed only a single breach of contract claim on behalf of both the *Payton* Plaintiffs and the estate, the entire breach of contract claim was "remanded" to the Circuit Court. (1/27/09 Bankr. Tr. 6:12–17, 14:3–7; *see also id.* 5:5–10; Pl.'s Mot. Am. Compl. ¶ 6.) Yet the breach of contract claim was, in fact, split, with respect to the *Payton* Plaintiffs, in Circuit Court, and the estate, in Bankruptcy Court, for two reasons. First, and significantly, the original *Payton* Complaint never contained a breach of contract claim on behalf of the estate (*Payton* Compl. ¶¶ 39–43), and therefore, was not removed, and could not have been remanded. *See* 28 U.S.C. § 1452. Second, after the *Payton* claims were remanded, the Trustee filed an amended complaint in Bankruptcy Court, which contained a breach of contract claim on behalf of the estate. (Pl.'s Mot. Am. Compl. ¶ 6.) The Defendants[115] did not object to the amendment (2/24/09 Bankr. Tr. 2:9–12), and therefore, as the Bankruptcy Court found, acquiesced to the splitting of claims both initially and when the Trustee later amended her complaint. *See* 459 B.R. at 305.

The court notes, further, that Judge Wedoff evidently intended to remand only those claims that had been removed from the Circuit Court, which did not include the estate's breach of contract claim. Judge Wedoff mistakenly observed that "Counts II through VII of the

---

[114]     The Trustee argues that Defendants waived this argument because they did not raise it before the Bankruptcy Court (Trustee's Post-Trial Br. at 427), but this court reviews the *res judicata* issue de novo, and will consider the merits of Defendants' argument.

[115]     Pedersen's attorney apparently did not attend the hearing, but did not otherwise object. (2/4/09 Bankr. Tr. at 1; Trustee's Post-Trial Br. at 434–35.)

amended complaint *repeat* Counts I through VI of the state court complaint. Counts I, VIII, IX, X, and XI are new." (1/27/09 Bankr. Tr. 5:5–10) (emphasis added.)  In fact, Count III (breach of contract) of the First Amended Complaint was different from Count I (breach of contract) of the *Payton* Complaint, as the First Amended Complaint added language to include the estate. (First Am. Compl. ¶¶ 132–36; *Payton* Compl. ¶¶ 39–43.)  Defendants' remand motion itself was directed only at the *Payton* claims. (*See* Defs.' Remand Mot. at 1 (arguing that the Trustee "is not and never has been a party" to the *Payton* action, though 11 U.S.C. § 323 confers the Trustee with standing to represent the estate, and therefore, she is clearly party to the estate's breach of contract claim); Defs.' Remand Reply at 4–5 (distinguishing between the *Payton* claims and the estate claims).)  Defendants admit as much by noting that "Defendants' remand motion was directed at the removed *Payton* claims because it *had* to be. Defendants could not seek remand of the claims that were not removed from state court." (C. Defs.' Post-Trial Mem. at 138.)  Finally, as Judge Wedoff observed in rejecting Defendants' *res judicata* arguments, "[t]he court would hardly have allowed the claims to go forward in separate courts with the notion of creating a race to judgment between the two." 459 B.R. at 304.

Defendants argue that the issue of splitting the breach of contract claim was never raised, and in fact, that "once the issue was raised, Defendants objected both to the Trustee filing duplicate contract claims *and* to the claims proceeding simultaneously in two courts." (C. Defs.' Post-Trial Mem. at 121.)  Defendants offer no evidence of this, however, and it appears from the record that Defendants argued the claims were duplicative only *after* the *Payton* claims had been remanded, and *after* the Trustee had amended her complaint in Bankruptcy Court to include a breach of contract claim on behalf of the estate.  In February 2009, after the *Payton* claims were remanded, Defendants did not object when the Trustee sought leave to amend her complaint in Bankruptcy Court "[t]o accurately reflect what the Court did in its abstention order" by "*divid[ing]*" the breach of contract claim "into the Estate's claim and the *Payton* Plaintiffs' claim." (Pl.'s Mot. Am. Compl. ¶ 6 (emphasis added); *see* 2/4/09 Bankr. Tr. 2:9–12.)

Defendants nevertheless sought dismissal of the *Payton* breach of contract claim in Circuit Court, in April 2009, urging that the claim was duplicative of the bankruptcy action. (Defs.' Mot. to Dismiss *Payton* at 13.)   Defendants changed their tune yet again in Circuit Court before Judge Bartkowicz ruled on the motion to dismiss, arguing that the Circuit Court action was a "different case" from the bankruptcy action. (11/12/09 State Tr. 7:15–18, 9:1–3.)

The Illinois Appellate Court in *Piagentini v. Ford Motor Co.*, 387 Ill. App. 3d 887, 897, 901 N.E.2d 986, 996 (1st Dist. 2009) observed that "the key element in determining acquiescence is the failure of the defendant to object to the claim-splitting." 387 Ill. App. 3d at 897, 901 N.E.2d at 996.   Interpreting comment a of Section 26 of the Restatement (Second) of Judgments, the Illinois Appellate Court noted that a defendant acquiesces if he "does not make known his objection in either action." 387 Ill. App. 3d at 897, 901 N.E.2d at 996.   Defendants seize on this language, noting that they did object to the claim-splitting in Circuit Court after the claims had been remanded, when they argued that the *Payton* breach of contract claim duplicated the estate's breach of contract claim in Bankruptcy Court, and should be dismissed. (C. Defs.' Post-Trial Mem. at 140.)   The scenario described in the Restatement,[116] however, is one in which "a plaintiff *simultaneously* maintain[s] separate actions based upon parts of the same claim." *Piagentini*, 387 Ill. App. 3d at 897, 901 N.E.2d at 996 (emphasis added).   In this scenario, the defendant could timely object in either proceeding because the origin of the split occurred in either court, upon the plaintiff's filing of the complaints.   But the Appellate Court in *Piagentini* held that "[the defendant's] failure to file a timely objection when plaintiffs refiled their suit constitutes an acquiescence." 387 Ill. App. 3d at 898, 901 N.E.2d at 997.   Similarly, here,

---

[116]      The scenario is as follows: "After a collision in which A suffers personal injuries and property damage, A commences in the same jurisdiction one action for his personal injuries and another for the property damage against B.   B does not make known in either action his objection (usually called "other action pending") to A's maintaining two actions on parts of the same claim.   After judgment for A for the personal injuries, B requests dismissal of the action for property damage on the ground of merger.   Dismissal should be refused as B consented in effect to the splitting of the claim."   RESTATEMENT (SECOND) OF JUDGMENTS § 26, illus. 1 (1982).

the Defendants, and not the Plaintiff, instituted claim splitting in the Bankruptcy Court by moving to remand the *Payton* claims, and if there was any confusion that the breach of contract claim also would be split, it was remedied when Plaintiff moved to amend her complaint in February 2009 to include the estate's breach of contract claim. Defendants' failure to object to separate adjudications, either during remand proceedings or as late as February 4, 2009, when the Bankruptcy Court granted Plaintiff leave to amend her complaint, constituted acquiescence. *Cf. Rein*, 172 Ill. 2d at 342, 665 N.E.2d at 1207 (defendants did not acquiesce to the claim splitting when the plaintiffs voluntarily dismissed some of the split claims, and later re-filed them because "[u]ntil plaintiffs attempted to refile the common law counts, no reason existed for defendants to object. Defendants made a timely objection to the plaintiffs' refiling of the common law counts at the appropriate time-when plaintiffs attempted to refile the common law counts").

Defendants also assert that their objection in Circuit Court under 735 ILCS 5/2-619(a)(3) "precludes a finding of acquiescence." (C. Defs.' Post-Trial Mem. at 139–40 (citing *Treadway v. Nations Credit Fin. Servs. Corp.*, 383 Ill. App. 3d 1124, 1133, 892 N.E.2d 534, 541–42 (5th Dist. 2008)); *see also* Defs.' Mot. to Dismiss *Payton* at 13.) Again, the court disagrees. In *Treadway,* the defendant had initially objected to claim splitting in its answer, but later withdrew that answer and moved to dismiss. Because defendants could still have raised the claim splitting issue in their answer, there was no waiver. 383 Ill. App. 3d at 1133, 892 N.E.2d at 541–42. Here, Defendants' "objection" to splitting the breach of contract claim was not at all timely, and their arguments that the *Payton* and estate breach of contract claims were *different*, before the Bankruptcy Court (seeking remand) and at the Circuit Court hearing (urging Judge Bartkowicz to rule on the motion to dismiss), undermine the credibility of any "objection" they may have had to splitting the claim.

The court finds that Defendants are judicially estopped from asserting that *res judicata* bars the Trustee's breach of contract claim.

## B.    Merits

To prevail on a breach of contract claim in Illinois, a plaintiff must prove (1) the existence of a valid and enforceable contract, (2) plaintiff's performance, (3) breach of the terms of the contract, and (4) damages resulting from the breach.  *Spitz v. Proven Winners N. Am., LLC*, 759 F. 3d 724, 730 (7th Cir. 2014); *Kelly v. Orrico*, 380 Ill. Dec. 513, 520, 8 N.E.3d 1055, 1061 (Ill. App. Ct. 2d Dist. 2014).   For purposes of evaluating "plaintiff's performance," the question is whether Emerald performed, not whether the Trustee performed, because Emerald was the party to the contract and Trustee is only representing Emerald's interests.  In their post-trial briefs, the parties do not dispute that Emerald performed its obligations under the Amended Shareholders' Agreement and there is no evidence that shows any defect in Emerald's performance. The Trustee, therefore, has satisfied this element of her breach of contract claim.

### 1.    The Amended Shareholders' Agreement is a valid and enforceable contract

Defendants argue that there is no "valid and enforceable contract" between Defendants and Emerald for two reasons. First, the Officer Defendants, Kevin Flynn, Joseph McQuaid, John McMahon, Kevin Larson, and Walter Hanley, assert they are not parties to the Amended Shareholders' Agreement because the IGB never approved them as Emerald shareholders. Second, Defendants contend that terms in Paragraph Ten of the Amended Shareholders Agreement are too speculative to be enforceable. The court rejects both arguments.

### a.    Defendants are parties to the Amended Shareholders' Agreement

For their part, Defendants Donald Flynn and Pedersen do not contest that they are shareholders and parties to the Amended Shareholders' Agreement.  (*See* PX880 ¶ 406; D. Flynn's SOF ¶¶ 275–79.)   Defendants Kevin Flynn, McQuaid, McMahon, Larson, and Hanley on the other hand, make the squirrely claim that, despite consistently exercising the powers of shareholders and representing themselves as shareholders, they are not in fact shareholders. The Officer Defendants do not dispute that they executed and signed the Amended

Shareholders' Agreement.  They argue instead that because the IGB never approved them as shareholders, they never became parties to the contract they signed.  (C. Defs.' Post-Trial Mem. at 143.)  This argument is without merit.

The Officer Defendants essentially read the Amended Shareholders' Agreement to contain an implicit condition that shareholders receive IGB approval before they are bound by it. This argument is problematic for three reasons: (1) the terms of the contract do not include a condition requiring IGB approval, (2) Defendants' behavior reveals that they interpreted the Agreement to apply to non-IGB approved shareholders, and (3) even if the terms of the contract supported Defendants' interpretation, Defendants would be estopped from claiming they are not shareholders because of their consistent representations to the Bankruptcy Court and to this court that they are shareholders.

First, the terms of the contract do not support the Officer Defendants' interpretation. The Amended Shareholders' Agreement states that it is an agreement between Emerald "and those parties set forth on Exhibit A attached hereto while such party holds Shares (as defined below) and any party who hereafter acquires Shares (the "Shareholders")."[117]  (PX1008 at 4.)  The Officer Defendants argue that they never "acquired" shares and were only ever prospective shareholders because the IGB did not approve the transfers. Citing IGB Rule 235, (86 ILL. ADMIN. CODE § 3000.235), the Officer Defendants contend now that having the status of shareholder of Emerald is a legal impossibility, absent IGB approval.  (C. Defs.' Post-Trial Mem. at 143.)  IGB Rule 235 states that ownership interests cannot be transferred "without leave of the Board."  86 ILL. ADMIN. CODE § 3000.235(a).   Thus, the Officer Defendants assert, without IGB approval, they were only prospective or contingent shareholders. Because nothing in the contract suggests that "prospective, contingent" shareholders are parties, Defendants continue,

_____

[117]     It is undisputed that Defendants Kevin Flynn, McQuaid, McMahon, Larson and Hanley are not listed on Exhibit A. (PX1008 at 10.)

they were not bound by its terms.  (C. Defs.' Post-Trial Mem. at 147–48.)

The Officer Defendants' argument rests on the assumption that a "shareholder" for purposes of the agreement must be the same as a "shareholder" for purposes of Rule 235(a). The agreement itself does not mention Rule 235, however, nor does it state that it applies only to "IGB-approved shareholders."  Instead, the agreement states that it applies to "any party who hereafter acquires shares (Shareholders)," without further defining that term.  (PX1008 at 4.) Because the contract does not qualify the term "shareholder," or the phrase "any party who hereafter acquires shares," the court declines to read in an additional qualification or limitation and therefore interprets the contract as applying to all categories of shareholders.

This broad reading of the term shareholder is consistent with the remaining terms in the contract, as well. Specifically, Section 4 of the contract conditions certain sales of shares from shareholders to "Outsiders" upon IGB approval.  (*See* PX1008 ¶¶ 4, 4.07) ("[T]he transfer of any Shares pursuant to this Paragraph 4 shall only be effective upon the approval of the IGB and when made in compliance with the Act.")  There is no similar language requiring IGB approval before an individual becomes a shareholder, implying that the parties did not intend to impose a similar requirement on such an individual.

Paragraph 5.01 of the Amended Shareholders' Agreement also supports a broad reading of the term "shareholder."  (PX1008 ¶ 5.01.)  Paragraph 5.01 contemplates what would happen if the IGB disapproved a shareholder after the shareholder had already acquired Emerald shares:  "If the IGB determines . . . that . . . any Shareholder is not an acceptable owner of the Corporation . . . the Shareholder shall promptly sell his Shares to the Corporation or another Shareholder thereof."  (*Id.*)  To give this provision meaning, the term "Shareholder" here must include prospective or contingent shareholders.  Furthermore, a prospective or contingent shareholder subject to Paragraph 5.01 must have previously acquired shares in order to "promptly sell" them back to the Corporation or another shareholder.

This court's reading of Paragraph 5.01 is consistent with Defendants' own understanding

of the IGB's historical use of "economic disassociation" of casino investors. Elsewhere in their briefs, Defendants argue that, despite IGB Rule 235(a), the IGB did not require pre-approval of shareholders and historically had not penalized licensees for voting to sell shares of stock without first obtaining IGB approval. (C. Defs.' SOF ¶¶ 59–62.) Instead, when the IGB found that an individual applicant for ownership in a casino was unsuitable, the IGB required that the individual divest herself of her interest in the casino and that any money the individual had invested be returned. (*See* Tr. 2545:22–2546:13, 2546:22–2547:13, 2548:16–2549:6.) This process was codified in IGB rules in 1998, before the Amended Shareholders' Agreement was executed in August 1999. *See* 86 ILL. ADMIN. CODE § 3000.224 ("Each owner and supplier licensee shall provide a means for the economic disassociation of a Key Person in the event such economic disassociation is required by an order of the Board."). Therefore, despite the Officer Defendant's assertions, the IGB, Emerald, and Defendants themselves contemplated that individuals would own shares while awaiting approval by the IGB. The court concludes that under the terms of the Agreement, the Officer Defendants need not be IGB-approved in order to be shareholders bound by the Agreement.

Even if the Officer Defendants were right that Rule 235(a) makes it a legal impossibility to transfer shares without IGB approval, the Rule would not make such a transfer a factual impossibility. The fact that the Officer Defendants were, in practice, shareholders of Emerald is sufficient for purposes of the Agreement. At the June 23, 1999 Board meeting, the Board of Directors approved a Restricted Stock Award Plan (PX1316 at 130) and several agreements to sell restricted stock under the Plan. (PX521; PX1316 at 113.) The Restricted Stock Award Plan was intended to provide "grants of awards of Restricted stock" to "key officers and employees" as part of their compensation. (PX521 at 2.) By its terms, the Plan would "become effective on June 23, 1999 (subject to approval, to the extent required, by the Illinois Gaming Board or its Administrator)." (*Id.* at 2.) The Officer Defendants each signed a Restricted Stock Agreement on June 23, 1999 under which each was awarded Emerald stock subject to the terms of that

Restricted Stock Award Plan. (*Id.* at 14, 22, 26, 30, 34; Trustee's SOF ¶ 76; C. Defs.' SOF ¶ 155.) Defendants were issued stock certificates, which contained, on the back, the clause "[b]y accepting the shares of the stock evidenced by this certificate, the holder agrees to execute and be bound by the Shareholders' Agreement." (PX1282 at 82, 85, 88, 91, 94.)

After issuing the stock certificates, Defendants and Emerald behaved as though the Officer Defendants had accepted the shares. Emerald treated John McMahon, Kevin Larson, Joseph McQuaid, Kevin Flynn, and Walter Hanley as all other existing shareholders. The Officer Defendants were allowed to attend shareholder meetings and to vote their shares. (PX1127 at 3–5 (completed proxy voting forms for Hanley, McMahon, and Larson); Trustee's SOF ¶ 81; C. Defs.' SOF ¶ 160 (acknowledging that Restricted Stock Plan participants would be allowed to vote their shares).) According to the Emerald bylaws, "each outstanding share, regardless of class, shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders," and "in all elections for directors, every shareholder shall have the right to vote the number of shares owned by such shareholder for as many persons as there are directors to be elected." (PX1317 at 5, 22.) "A rebuttable presumption of shareholder status arises when a person votes shares at a shareholder meeting." *Fourdyce v. Bay View Fish Co.*, 111 Ill. App. 3d 76, 80, 443 N.E.2d 790, 793 (3d Dist. 1982).

Defendants also represented that they were shareholders for tax purposes.[118] Emerald listed Officer Defendants as shareholders on Emerald's subchapter S tax filings for the years 1999 (PX1163 67–69 (McQuaid), 70–72 (Larson), 73–75 (Hanley), 76–78 (McMahon), 79–81

---

[118]    The Trustee argues that based on the June 23, 1999 Restricted Stock transfer, Defendants made a tax election, known as a § 83(b) election under 26 C.F.R. § 1.83-3(b). (Trustee's Post-Trial Br. at 201-04.) The regulation provides that a "transfer" occurs for the purposes of a § 83(b) election when "a person acquires a beneficial ownership interest in . . . property" without regard to any vesting requirements. 26 C.F.R. § 1.83-3(a)(1). The Trustee cites to Emerald's Board minutes to support her assertion. (Trustee's Post-Trial Br. at 203) (quoting PX18 at 8.) The Board minutes do reveal that Emerald valued the stock for the purposes of this tax election, but do not show that any individual Defendants actually made the election on their tax returns or represented themselves as shareholders for this purpose.

(Kevin Flynn)), and 2000[119] (PX1128 at 60–62 (McQuaid), 63–65 (Larson), 66–68 (Hanley), 69–71 (McMahon), 72–74 (Kevin Flynn)).  (*See also* C. Defs.' Post-Trial Mem. at 147.)

The Officer Defendants agree that they executed the stock purchase agreements and signed the stock certificates, but maintain that they never actually accepted the shares.  The Officer Defendants assert instead that the shares were held in escrow.  From what appears in the record, however, the "escrow" did not exist, or was, at best, a mere formality.  Defendants admit that the stock certificates were not held by a neutral third party, but rather were held in Defendant Walter Hanley's own office. (C. Defs.' SOF ¶ 251; *see also* Bankr. Tr. 2745:5–2747:2 (Hanley testifying that the "corporation held the shares").)  This is plainly inconsistent with the common understanding of "escrow."  *See Albrecht v. Brais,* 324 Ill. App. 3d 188, 191, 754 N.E.2d 396, 399 (3d Dist. 2001) (escrow must be held with a third party); *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 272 Ill. App. 3d 370, 379, 649 N.E.2d 511, 517 (1st Dist. 1995) (escrow must be held with "stranger or third party").  The court concludes that the Officer Defendants accepted their shares and became shareholders of Emerald, bound by the Amended Shareholders' Agreement.

Second, the Officer Defendants' treatment of other "prospective" shareholders as though they were bound by the Amended Shareholders' Agreement reveals that the Officer Defendants interpreted the Amended Shareholders' Agreement to apply to prospective shareholders. The Statutory Investors and the Twelve Outsiders were in the same position as the Officer Defendants—they had signed the Amended Shareholders' Agreement (PX1008 at 52–113), and were awaiting IGB approval.  Before the IGB approved the Statutory Investors or the Twelve Outsiders as shareholders, Hanley sent them a letter (Bankr. Tr. 2755:8–2759:10; *see also*

---

[119]    Defendants maintain that Emerald only reported the Officer Defendants as shareholders for tax purposes on the advice of Emerald's auditor, Arthur Andersen. (C. Defs.' Post-Trial Mem. at 147.)  This caveat does not defeat the conclusion that Defendants were, in fact, treated as shareholders for tax purposes.

PX1124), notifying them that "Paragraph 9 of the Company's Shareholders' Agreement provides that 'the Shareholders agree to vote their Shares to elect Donald Flynn, Peer Pedersen and Eugene Heytow as directors of the Corporation.'" (PX322 at 1.) Similarly, proxy forms that Emerald provided to the Statutory Investors and the Twelve Outsiders contained the same direction: that Paragraph 9 of the Amended Shareholders' Agreement bound these individuals to vote for Donald Flynn, Pedersen, and Heytow. (PX1127.) Hanley testified that he provided this notice to the Twelve Outsiders and the Statutory Investors because they qualified as shareholders under Emerald's bylaws. As he explained, "[u]nder the company's bylaws the definition of shareholder is a holder of record of units of proprietary interest in the company. These individuals had proprietary interest in the company." (Bankr. Tr. 2758:17–21.) Hanley further acknowledged his understanding that individuals could act in their capacity as shareholders without IGB approval, once they had submitted their PDF 1s. (Bankr. Tr. 2759:25–60:4.) That is, Hanley recognized that an individual could be, in all practical respects, an Emerald shareholder prior to IGB approval. Hanley's testimony further supports the interpretation that the Amended Shareholders' Agreement applies to all shareholders, not just IGB-approved shareholders*.*

The Officer Defendants try to rebut the weight of this evidence by arguing that Emerald represented that the Officer Defendants were "prospective" shareholders on various occasions. (C. Defs.' Post-Trial Mem. at 150.) Yet, the Officer Defendants cite only two instances when they made such a representation: the Renewal Application, in which Defendants told the IGB the stocks were in "escrow," and a 2002 Settlement Agreement with the IGB (which was signed but never consummated). (C. Defs.' Post-Trial Mem. at 150.) But simply saying that the Defendants were "prospective" shareholders does not make them so. Ultimately the representations on paper were meaningless in practice. Defendants cite no instances in which Emerald or the Officer Defendants acted differently based on the Officer Defendants' status as "prospective" shareholders. The Officer Defendants, therefore, were shareholders within the

meaning of the Amended Shareholders' Agreement and were bound by its terms.

Finally, with the exception of this very adversary proceeding, the Officer Defendants have consistently presented themselves as shareholders in every context, including in the claims process of the bankruptcy proceedings. The Officer Defendants have filed Proofs of Interests with the Bankruptcy Court, each claiming that they owned "common stock" of Emerald. (PX395 (McMahon); PX518 (Larson); PX1192 (Hanley); PX1194 (McQuaid); PX1196 (Kevin Flynn).) Even in this adversary proceeding the Officer Defendants have been inconsistent. For example, in their Post-Trial Memorandum, the Officer Defendants argue that this court should reduce the damages award because the award will simply be "cycled from the *shareholder Defendants*," through Trustee's lawyers and bankruptcy estate, "and back to the Defendant shareholders." (C. Defs.' Post-Trial Mem. at 286) (emphasis added.) The Officer Defendants' brief cites Donald Flynn as the lone example, but their Proofs of Interest in the bankruptcy proceedings demonstrate that each of the five Officer Defendants who deny their shareholder status here expect to be treated as shareholders in the bankruptcy proceedings when it comes time to distribute any remaining funds in Emerald's estate. The Officer Defendants attempt to split hairs, pointing out that their Proofs of Interest refer to their stocks as held by Emerald in book form. Like their escrow arguments, this is unpersuasive; book entries are merely an alternative method of recording stock ownership to certificates. The Officer Defendants are still seeking payment based on an ownership interest in Emerald. The court agrees that the Officer Defendants are shareholders entitled to any remaining distribution of the bankruptcy estate. But the benefits of being a shareholder for the claims process come with the obligations of the Amended Shareholders' Agreement. Under Illinois law, a party who acts as a shareholder and enjoys the benefits of shareholder status is estopped from denying that he or she is a shareholder. *See Wasserman v. Autohaus on Edens, Inc.*, 202 Ill. App. 3d 229, 238–39, 559 N.E.2d 911, 917–18 (1st Dist. 1990); *see also Cashman v. Shinn*, 109 Ill. App. 3d 1112, 1117, 441 N.E.2d 940, 943 (4th Dist. 1982) (party that accepts benefits under a contract is estopped

from denying the validity of the contract). The Officer Defendants are estopped from claiming that they are not shareholders.

For all of these reasons, the court concludes that the Officer Defendants are shareholders of Emerald and bound by the Amended Shareholders' Agreement.

### b. The "comply provision" of Paragraph Ten of the Amended Shareholders' Agreement is enforceable

Defendants argue that two of the three clauses in Paragraph Ten of the Amended Shareholders' Agreement are unenforceable. As Defendants read that paragraph, it imposes requirements in three separate clauses, as follows:

Each Emerald Shareholder shall:

1. ***Cooperate*** with the Corporation to provide any information to the IGB and take any actions necessary to secure the renewal of the Corporation's gaming license [the "Cooperate Provision"]
2. Each Shareholder further agrees to ***Comply*** with the Act, Rules, and orders of the IGB [the "Comply Provision"] and
3. shall not commit acts which would ***jeopardize*** the license or a renewal thereof. [the "Jeopardize Provision"].

(*See* C. Defs.' Post-Trial Mem. at 155–56) (quoting PX1108 at 7.) Defendants argue that the Cooperate and Jeopardize Provisions are "too uncertain to establish an obligation and are therefore, unenforceable." (C. Defs.' Post-Trial Mem. at 156.) Trustee forcefully disputes this reading of Illinois law (*see* Trustee's Post-Trial Br. at 213–18), but her breach of contract claim nevertheless relies primarily on the Comply Provision. Thus, the Trustee urges that Defendants violated (i.e. did not comply) with IGB rules and, as a result, Emerald lost its license. Defendants do not argue that the Comply Provision is unenforceable. (C. Defs.' Post-Trial Mem. at 156.) Because the court can decide the Trustee's breach of contract claim by reference to the Comply Provision, the court need not address whether the remaining provisions are enforceable, as well.

### 2. Defendants breached their obligations under the Amended Shareholders' Agreement

#### a. The Amended Shareholders' Agreement imposes strict liability and does not require proof of Defendants' state of mind

To establish a breach of the Comply Provision, Defendants assert, the Trustee must prove that each Defendant had the requisite state of mind. This is true, Defendants urge, because the contract violation the Trustee has alleged is based on proof of an underlying statutory violation, and there can be no statutory violation without a showing of intent to violate the law. (C. Defs.' Post-Trial Mem. at 157.)

The court concludes that the Trustee has no obligation to prove Defendants' state of mind. First, although Defendants are correct that Trustee's breach of contract claim relies on proving an underlying violation of IGB rules, none of the five IGB rules cited in the Final Board Order contains an intent requirement. *See* 86 ILL. ADMIN. CODE § 3000.110(a)(5) (a holder of a license may face disciplinary action for "for any act or failure to act that is injurious to the public health"); § 3000.140(a) (licensees "shall have a continuing duty to disclose"); §§ 3000.140(b)(3), (b)(7) ("licensees . . . shall periodically disclose"); § 3000.235(a) ("an ownership interest . . . may only be transferred with leave of the Board"). In *Costello v. Grundon*, 651 F.3d 614 (7th Cir. 2011), the case Defendants cite, the Seventh Circuit was evaluating whether the parties had breached their contract by violating a federal regulation. The regulation at issue in that case, however, itself specifically included an intent requirement. 651 F.3d at 641; *see* 12 C.F.R. § 224.1(b)(1) (exempting a borrower from certain requirements "unless the borrower willfully causes the credit to be extended in contravention" of federal regulations).[120] The regulations involved in this case, in contrast, include no intent terms such as "willfully," "purposefully," or

---

[120] The only other case Defendants cite is an unreported case from the Northern District of Texas, which provides no support for Defendants' claim about Illinois law. (*See* C. Defs.' Post-Trial Mem. at 157) (quoting *Alliance Gen. Ins. Co. v. Club Hospitality, Inc.*, No. 3:97-CV-2448-H, 1999 WL 118798 at *5 (N.D. Tex. Mar. 2, 1999).)

"fraudulently." There is no basis for reading an intent requirement into these regulations, which clearly speak in terms of strict liability.

Even in the absence of a statutory intent requirement, Defendants contend, because the Trustee's claim is based on fraud and misrepresentations, she must show that Defendants intended to commit those wrongful acts. (C. Defs.' Post-Trial Mem. at 157–58.) Yet the Trustee's claims are not actually premised on fraud and misrepresentations. True, as Defendants note, the Trustee has alleged (perhaps hyperbolically) that Defendants engaged in a "concerted scheme" to "actively mislead" the IGB, and that their Renewal Application was "fraudulent." (C. Defs.' Post-Trial Mem. at 157–58.) But the use of this language does not transform the nature of Trustee's claim. Peeling back the overstated rhetoric, the Trustee's claim, at base, is that Defendants did not comply with IGB rules and that this failure resulted in the loss of Emerald's valuable license. All that matters is whether Defendants engaged in conduct that violated the IGB rules, and whether that conduct in fact caused the IGB to revoke the license. The subjective reasons for Defendants' failure to comply are, therefore, not relevant to the court's analysis.

This comports with Illinois contract law. Under Illinois law, "[w]hether one intentionally, carelessly, or innocently breaches a contract, he is still considered in breach of that contract, and will be liable to the extent that the other party must be placed in the position he would have been in absent the breach." *Wait v. First Midwest Bank/Danville*, 142 Ill. App. 3d 703, 710, 491 N.E.2d 795, 802 (4th Dist. 1986); *see also Winniczek v. Nagelberg*, 394 F.3d 505, 509 (7th Cir. 2005) ("Since liability for breach of contract is, in general, strict liability, the cause, character, and mental element of the breach usually are immaterial.") (internal citations omitted). The court concludes that the Trustee need not show Defendants' state of mind, only that their conduct did not comply with IGB rules.

### b. Certain Defendants engaged in conduct that caused the IGB to revoke the license

To show breach, the Trustee must establish that each Defendant engaged in conduct that did not comply with (i.e. violated) IGB rules. The IGB Final Board Order listed five rules that Emerald violated and listed the conduct Emerald engaged in, which violated each rule. (PX162 at 32–36; *see* Appendix C). The IGB Final Board Order speaks in terms of Emerald's conduct, but to prove breach, the Trustee must show which of the individual Defendants were responsible for each act or failure to act that the IGB cited. After a careful review of the record, the court concludes that the Trustee has established violations of Rues 140(a), 140(b)(3), 235(a) and 110(a). (*See* Appendix C.) The Trustee did not establish that individual Defendants violated Rule 140(b)(7).

### i. IGB Count I: Rule 140(a)

### (a) Failure to disclose Kevin Flynn's involvement in management and operation of Emerald

|  | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|---|---|---|---|---|---|---|---|---|
| Breached | X | X | X |  | X |  |  | III.C |

The court finds that Defendants Kevin Flynn, Donald Flynn, Joseph McQuaid, and Kevin Larson each told the IGB that Kevin Flynn had no official role managing Emerald before June 1999. (*See supra* Background III.C.) The Trustee has established that Kevin Flynn did actively manage Emerald prior to 1999, however. (*See supra* Background III.C.1.) Therefore, the court concludes that when each of these Defendants stated otherwise to the IGB, each violated Rule 140(a) and breached the contract.

The Trustee has not established that Peer Pedersen violated Rule 140(a), however. The Trustee presented evidence that on October 31, 2000, Pedersen (1) testified that he did not know what Kevin Flynn's role at Emerald was during this time, and (2) recanted an earlier statement to the IGB that Kevin Flynn was active in Emerald's lobbying efforts, testifying instead that he "overstated" Kevin Flynn's role "because it was Joe McQuaid who was involved in that."

(PX1100 at 19–20.) Pedersen's testimony about Kevin Flynn's lobbying efforts is not relevant because the IGB Final Board Order was concerned with Kevin Flynn's role managing Emerald, rather than his lobbying efforts. Pedersen's remaining testimony is wavering and uncertain; it is not a misrepresentation of Kevin Flynn's role.

The court also concludes that John McMahon did not deny Kevin Flynn's role to the IGB prior to January 30, 2001, which is the date that the IGB concluded its investigations and decided to revoke Emerald's license. Although the Trustee presented evidence that McMahon, through Emerald, may have made statements denying Kevin Flynn's involvement (Trustee's SOF ¶ 183), these statements took place during the disciplinary proceedings to appeal the revocation, and could not have been the basis of the revocation itself.

### (b)   Failure to disclose agreements between Emerald and Rosemont

| | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|---|---|---|---|---|---|---|---|---|
| Breached | | | X | X | | X | | II.B.2 |

The court finds that Defendants McQuaid, McMahon, and Hanley breached the contract by failing to provide the Rosemont Letter of Intent, Site Access Agreement, and the three Extension Agreements, in violation of Rule 140(a). (*See supra* Background II.B.2.)

The Trustee contends it was Kevin Flynn who supervised the drafting of a February 14, 2000 letter, which was one of several instances in which Emerald failed to disclose the agreements. As this court reads Kevin Flynn's testimony, however, Kevin Flynn equivocates about whether he was directly involved in collecting the documents. (*See* Bankr. Tr. 990:4–993:19.) The court concludes there is insufficient evidence to establish that Kevin Flynn failed to disclose the agreements. (*See supra* Background II.B.2.)

The Trustee presented no evidence that Defendants Donald Flynn, Larson, or Pedersen had knowledge of the agreements and opportunities to disclose the agreements, and failed to make the required disclosures. (*Id* .)

217

**(c)    Failure to disclose agreements between Emerald and various construction professionals and subcontractors**

|          | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|----------|----------|----------|---------|---------|--------|--------|----------|----------|
| Breached |          |          | X       |         |        | X      |          | III.B    |

The court concludes that McQuaid and Hanley failed to disclose various construction agreements to the IGB.  (*See supra* Background III.B.4.)

Although Kevin Flynn and John McMahon were also involved in meeting with construction professionals and entering into the contracts, the Trustee has failed to show that Kevin Flynn and McMahon had an opportunity to disclose the agreements and failed to make the required disclosures. (*Id.*)

The Trustee also alleges that other Defendants helped to prepare the Renewal Application which was silent concerning several then-existing construction agreements. (Trustee's SOF ¶¶ 633–37.)   Because the Trustee has not established which Defendants completed which portions of the Renewal Application, however, she has not proven which of the Defendants are responsible for the inadequacies of the Renewal Application.

**(d)    Rule 140(a) violations for which the Trustee has not established Defendants' conduct**

The IGB found that Emerald violated Rule 140(a) in several other ways. The court concludes that Trustee has failed to establish that individual Defendants engaged in the conduct cited by the IGB.

First, the IGB found that Emerald failed to disclose various transfers of shares of Emerald.  (PX162 at 33, Count I(a).)   Yet, as the court finds above, although Defendants sometimes delayed their disclosures, they did not fail to disclose the transfers. (*See supra* Background IV.E.2.)

Next, the IGB found that Emerald failed to disclose agreements or understandings to sell ownership interests in Emerald. (PX162 at 33, Count I(b).)  This conclusion, however, rested on the IGB's determination that an agreement existed between the Davis Companies, Duchossois

and Kevin Flynn acting on behalf of Emerald. The court has concluded that there is insufficient evidence that an agreement or understanding existed (*See supra* Background II.A.2.); accordingly, Defendants are not liable for failing to disclose any such agreement.

Finally, the IGB also cited the failure to disclose the status of construction in Rosemont. (PX162 at 33 Count I(d).) As explained earlier, however, there is ample evidence that the IGB was aware of the construction activities at the Rosemont site, and insufficient evidence that any Defendants made efforts to conceal the construction activities themselves. (*See supra* Background II.B.1.c.ii.)

### ii. IGB Count II: Rule 140(b)(3)

#### (a) Failure to disclose agreements between Emerald and Rosemont

| | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|---|---|---|---|---|---|---|---|---|
| Breached | | | X | X | | X | | II.B.2 |

The court finds that Defendants McQuaid, McMahon, and Hanley breached the contract by failing to provide the Rosemont Letter of Intent, Site Access Agreement, and the three Extension Agreements, in violation of Rule 140(a). (*See supra* Background II.B.2.)

#### (b) Failure to disclose agreements between Emerald and various construction professionals and subcontractors

| | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|---|---|---|---|---|---|---|---|---|
| Breached | | | X | | | X | | III.B |

The court concludes that McQuaid and Hanley failed to disclose various construction agreements to the IGB. (*See supra* Background III.B.4.)

#### (c) Rule 140(b)(3) violations for which the Trustee has not established Defendants' conduct

The IGB once again cited the failure to disclose the status of construction in Rosemont, but as explained above, the IGB was aware of the construction activities. (*See supra* Background II.B.1.c.ii.)

### iii. The Trustee has not established that any Defendants have violated IGB Count III, Rule 140(b)(7)

|  | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|---|---|---|---|---|---|---|---|---|
| Breached |  |  |  |  |  |  |  | IV.E.2 |

The court concludes that the Trustee has failed to establish that the individual Defendants engaged in any of the conduct the IGB cited in Count III.

First, the IGB again cited Emerald's failure to disclose transfers of shares of Emerald. (PX162 at 33 Count III(a).)  As explained earlier, the court has concluded there was no failure to disclose these transfers.  (*See supra* Background IV.E.2.)

Next, the IGB once again cites the failure to disclose "agreements or understandings" to sell Emerald ownership interests, referencing the alleged Davis and Duchossois deal. That claim fails, again, because there is insufficient evidence to establish that any such deal existed. (*See supra* Background II.A.2.)

Finally, the IGB cites specifically the agreement or understanding to transfer an ownership interest to Mayor Stephens. Yet, since this was purportedly part of the Davis and Duchossois agreement, the court concludes there is insufficient evidence to find a rule violation or breach of contract on this basis, either.  (*Id.*)

### iv. IGB Count IV: Rule 235(a)

The IGB Final Board Order found that three transfers of shares violated Rule 235(a) because Emerald had not obtained pre-approval for the transfers of shares.  Both parties agree that the IGB did not approve the transactions between Donald Flynn and the Twelve Outsiders and Five Insiders prior to the transfers.  As the court concludes above, Defendants did not obtain official IGB pre-approval for the transfer of shares to the Statutory Investors.  (*See supra* Background IV.E.1.)   The only question remaining on this issue is which Defendants were involved in these transactions.

### (a)  Transfer of shares between Donald Flynn and the Twelve Outsiders without IGB prior approval

|  | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|---|---|---|---|---|---|---|---|---|
| Breached |  | X |  |  |  |  |  | IV.C |

The Trustee has established only that Donald Flynn was involved in this transfer of shares because the sale was from Donald Flynn to the Twelve Outsiders. The Trustee asserts that McQuaid was involved in the sales, in that he maintained a list of interested investors. McQuaid's record-keeping activities are insufficient, in this court's view, to show that he participated in the sales themselves. (*See supra* Background IV.C.)

### (b)  Transfer of shares between Donald Flynn and the Five Insiders without IGB prior approval

|  | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|---|---|---|---|---|---|---|---|---|
| Breached |  | X |  |  |  |  | X | IV.C |

The court concludes that Donald Flynn and Pedersen arranged a sale of shares from Five Insiders, including Pedersen, to Donald Flynn. The parties do not dispute that Pedersen and Donald Flynn failed to obtain IGB pre-approval, which the IGB concluded was a violation of Rule 235(a). (*See supra* Background IV.C.)

### (c)  Transfer of shares between Emerald and the Statutory Investors without IGB prior approval

|  | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|---|---|---|---|---|---|---|---|---|
| Breached |  |  | X |  |  |  |  | IV.D |

The court concludes that Joseph McQuaid is responsible for the violation of Rule 235(a) with respect to the sales of shares to the Statutory Investors because he identified and interviewed prospective shareholders. He also sent them each a blank subscription agreement, the Amended Shareholders' Agreement, a questionnaire, and a PDF 1. He instructed prospective shareholders to send their PDF 1s directly to the IGB, but to return a completed application with a check to him. McQuaid also reported to Emerald's Board about the sale of shares. Therefore, McQuaid was the officer at Emerald responsible for completing the transfers

of shares to the Statutory Investors. (*See supra* Background IV.D.)  The IGB found that the transfer of shares without IGB pre-approval violated Rule 235(a), which states that shares "may only be transferred with leave of the Board."  86 ILL. ADMIN. CODE § 3000.235(a).

With respect to John McMahon, the Trustee has established only that he provided information to Paul Donnelly to conduct a valuation of the shares. This does not support the conclusion that he transferred shares without IGB pre-approval.  Nor is the Trustee's evidence sufficient to support a finding against Hanley on this score; the only evidence of his involvement in the sales is that Hanley presented information to the Emerald Board about the issuance of stock.  That conduct does not constitute a violation of IGB Rule 235(a).

### v.    IGB Count V: Rule 110(a)

#### (a)    Failure to fully, truthfully, timely, and accurately disclose information to the IGB

|          | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|----------|----------|----------|---------|---------|--------|--------|----------|----------|
| Breached | X        |          | X       |         |        | X      |          | III.A; III.C.2 |

The court finds that Kevin Flynn failed to disclose the Field Street Agreement until June 29, 2000 in violation of Rule 110(a). Although the Trustee presented some evidence that Kevin Larson also knew about the Field Street Agreement, the court concludes that Larson was not obligated to disclose it, and therefore his failure to disclose the agreement did not violate any IGB Rule or breach the contract.  (*See supra* Background III.C.2.)

It was Joseph McQuaid who was responsible for the incomplete Renewal Application. As the court concluded above, the Renewal Application failed to disclose several pieces of information, including the agreements between Emerald and Rosemont, as well as various construction agreements.  (*See supra* Background III.A.)  McQuaid was in charge of preparing the application and was the Emerald official who signed and submitted the document.  (*Id.*) Therefore, the court finds that McQuaid is responsible for Emerald's failure to include the relevant information in the Renewal Application in violation of Rule 110(a).

The court finds that Hanley was also responsible for failing to disclose the Rosemont

222

agreements in the Renewal Application. (*See supra* Background III.A.2; III.A.4.)

### (b) Failure to disclose Kevin Flynn's involvement in management and operation of Emerald

|          | K. Flynn | D. Flynn | McQuaid | McMahon | Larson | Hanley | Pedersen | Bkgd. §§ |
|----------|----------|----------|---------|---------|--------|--------|----------|----------|
| Breached | X        | X        | X       |         | X      |        |          | III.C    |

The court finds that Defendants Kevin Flynn, Donald Flynn, Joseph McQuaid, and Kevin Larson each told the IGB that Kevin Flynn had no official role managing Emerald before June 1999. (*See supra* Background III.C.)

### (c) Rule 110(a) violations for which the Trustee has not established Defendants' conduct

Once again, in Count IV, the IGB cited Emerald's failure to disclose the status of construction in Rosemont, the transfer of shares between Donald Flynn and other investors, and the alleged agreement to allow Mayor Stephens to receive or sell shares. (PX162 at 36.) The court has previously concluded there is insufficient evidence to show Defendants engaged in this conduct. (*See supra* Discussion III.B.2.b.i(d) (Count I: Rule 140(a).)

The IGB cited several other violations, as well. Three related to organized crime (*See* PX162 at 36, Count V (c), (d) and (j)), but the Illinois Appellate Court overturned those findings as against the manifest weight of the evidence (PX1233 at 105), and this court need not address them further.

The IGB also pointed to two problems with the Lease and Development Agreement. The first was that the Agreement included a term which required Emerald to fund a parking garage absent financing. (PX162 at 35 (Count V (i) and (k).) The court concludes from its own review of the contract that no such term exists. The Trustee therefore did not establish that Defendants improperly included this term in the Agreement. (*See supra* Background II.B.3.)

Second, the IGB found that the Agreement violated Rule 110(a) because it included a term that permitted Rosemont to "waive" the requirement that the IGB pre-approve construction activities. Putting to one side the question whether it is reasonable to conclude any contract

provision could enable Rosemont to "waive" an IGB requirement, the court is unable to find a breach of Defendants' obligations on this basis. The Trustee has not established which, if any, Defendants included this term in the Agreement, which was a product of negotiation between Rosemont and several of Defendants as well as attorneys for both parties. (*See supra* Background II.B.3.)

Finally, the IGB cited Emerald for "failing to cooperate fully with the IGB's investigation of Emerald and its Key Persons." (PX162 at 35 (Count V(a).) The IGB's Final Board Order does not offer specifics concerning which conduct supported this broad and general conclusion. And in the case before this court, the Trustee likewise failed to identify and prove incidents of specific conduct that caused the IGB to find that individual Defendants failed to cooperate fully with the IGB.

\* \* \*

In sum, the court concludes that the Defendants breached the following rules:

- Kevin Flynn:        140(a) and 110(a)
- Donald Flynn:       140(a), 235(a) and 110(a)
- Joseph McQuaid:  140(a), 140(b)(3), 235(a) and 110(a)
- John McMahon:    140(a) and 140(b)(3)
- Kevin Larson:       140(a) and 110(a)
- Walter Hanley:      140(a), 140(b)(3), and 110(a)
- Peer Pedersen:    235(a)

### 3.        Defendants' breach caused the loss of the license

The final element of Trustee's breach of contract claim is to show "damages resulting from the breach." *Spitz v. Proven Winners N. Am., LLC*, 759 F. 3d 724, 730 (7th Cir. 2014); *Kelly v. Orrico*, 380 Ill. Dec. 513, 520, 8 N.E.3d 1055, 1061 (Ill. App. Ct. 2d Dist. 2014). Illinois law requires proof of causation for breach of contract claims as in tort claims. *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 58, 643 N.E.2d 734, 746 (1994) (quoting *Town of Thornton v. Winterhoff*, 406 Ill. 113, 119, 92 N.E.2d 163, 166 (1950)) ("It is a fundamental principle applicable alike to breaches of contract and to torts," that "the injury suffered by the plaintiff

must be the natural and not merely a remote consequence of the defendant's act.").  Proof of causation in Illinois requires proof of both "cause in fact" and "legal cause." *Thacker v. UNR Indus. Inc.,* 151 Ill. 2d 343, 354, 603 N.E.2d 449, 455 (1992).

### a.    Cause in fact

Illinois courts use two tests to determine if there is cause in fact: (1) the "but for" test; and (2) the "substantial factor" test.  *City of Chi. v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395, 821 N.E.2d 1099, 1127 (2004).  First, under the "but for" test, courts ask whether the injury would have occurred absent the defendant's conduct.  213 Ill. 2d at 395, 821 N.E.2d at 1127. That test is met here: absent Defendants' violations of IGB rules, the IGB would not have revoked the license. Second, where, as here, "there are multiple factors that may have combined to cause the injury, [courts] ask whether defendant's conduct was a material element and a substantial factor in bringing about the injury."  213 Ill. 2d at 395, 821 N.E.2d at 1127.

For the purposes of causation, then, the court must determine which rule violations were material elements or substantial factors in the IGB's decision to revoke the license.  The IGB stated that it had the authority to revoke the license on the basis of any single rule violation. Yet, the IGB also made clear that the totality of Emerald's conduct was an important factor in its decision to revoke the license rather than impose a smaller penalty, such as a fine:

> The Board has discretion to judge the seriousness of the transgressions and the fitness of the penalty that should be applied. The Board notes that the transgressions committed by Emerald in this action occurred while Emerald was not operating or generating revenue, against which, pursuant to the Act, monetary fines against Owner Licensees are normally calculated. *Moreover, the evidence in this case does not remotely compare to any disciplinary action referenced by Emerald.* The fact that no owner license has been revoked before does not cause the revocation authority of the Board to lapse.

(PX162 at 30) (emphasis added.)  The court also notes that the IGB's primary concern appears to have been the connections to organized crime.  Defendants' less-than-forthcoming behavior throughout their interactions with the IGB seems to have exacerbated those concerns by creating the misimpression that Defendants were colluding to hide mischievous conduct.  The

court concludes that Defendants' failures to disclose information in violation of Rules 140(a), 140(b)(3), and 110(a) were substantial factors in the IGB's decision to revoke the license. These failures to disclose were repeatedly cited in the IGB Final Board Order because the conduct violated multiple IGB rules. The court concludes that the IGB attached significant weight to these violations in making its determination to revoke the license.

The court is unable to conclude, however, that the violation of Rule 235(a) caused the loss of the license. The IGB Final Board Order concludes that certain transfers of shares, without IGB pre-approval, were in violation of Rule 235(a). As noted above, the parties do not dispute that Defendants failed to obtain pre-approval for these transfers. Yet, the court takes note that the IGB had a long history of overlooking, and even condoning the practice of obtaining IGB approval only after transferring shares. In fact, the IGB had a specific policy, referred to as "economic disassociation," to address the problem that arose when a proposed shareholder was later disapproved by the IGB. (Tr. 734:9–13.)

Historically, the IGB did not require pre-approval of shareholders and had not disciplined licensees for voting to sell shares of stock. (*See* Tr. 2545:22–2546:13, 2546:22–2547:13, 2548:16–2549:6.) Instead, when the IGB found that an individual applicant for ownership in a casino was unsuitable, the IGB required that the individual divest him/herself from the casino and any money invested would be returned to the investor. (Tr. 734:9–13, 2533:5–20.) This process was codified in IGB rules in 1998 and remains the law today. *See* 86 ILL. ADMIN. CODE § 3000.224 ("Each owner and supplier licensee shall provide a means for the economic disassociation of a Key Person in the event such economic disassociation is required by an order of the Board.").[121]

Notably, on January 30, 2001 at the same meeting where the IGB revoked Emerald's

---

[121] The court notes that this rule might also apply in situations when an investor, who was previously approved by the IGB, is subsequently disapproved. Yet, the record is full of evidence that economic disassociation was used for prospective shareholders as well.

license, the IGB approved a Settlement Agreement with Empress Joliet Casino that involved economic dissociation of an investor that the IGB had disapproved. (PX858 at 870–73.) In that instance, the investor was a significant shareholder—Attorney Michael Ficaro testified that the investor had a ninety-eight percent interest in the casino—and the IGB allowed him to divest through the economic disassociation process. (Tr. 1965:24–1966:10, 2536:20–25.) That this was the IGB's longstanding practice is confirmed by the fact that the IGB approved the transaction between Donald Flynn and the Five Insiders after the transfer had been completed. (C. Defs.' SOF ¶¶ 335, 339; D. Flynn's SOF ¶ 174.) In the IGB Staff's supplemental report to the IGB Board, the Staff noted that the "failure to disclose the purchase of shares by Donald Flynn from Peer Pedersen," was one of the issues that had "either been resolved" or "determined to be irrelevant." (DX678 at 5, n.1.) The IGB Staff concluded that the issue had been resolved because "staff were notified of this fact on December 2, 1999, approximately one month after the sale took place." (*Id.*) That conclusion confirms the understanding that notification after-the-fact is sufficient to comply with IGB requirements. Although the IGB Final Board Order referenced this failure to disclose, the Staff report, which recommended revocation without reference to this violation, shows that the transaction between Donald Flynn and Pedersen was not a substantial factor in the IGB's decision. Furthermore, given the IGB's long history of economic dissociation, the court concludes that none of the violations of Rule 235(a) were substantial factors in the IGB's decision to revoke the loss of the license. Therefore, the court does not assign liability to Defendants based on the transfers of shares without pre-approval.

It follows from this finding that Peer Pedersen is not liable for the loss of the license. With respect to Pedersen, Trustee has established only that he violated Rule 235(a). Because the court concludes the violation of Rule 235(a) was not a substantial factor in the IGB's decision, the Trustee has failed to prove that Peer Pedersen's conduct was a "cause in fact" of the loss of the license. The Trustee has established that the remaining Defendants, Kevin

Flynn, Donald Flynn, McQuaid, McMahon, Larson, and Hanley, violated other rules that were a substantial factor in the IGB's decision.

### b. Legal cause

"The second requirement, legal cause, is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Beretta U.S.A. Corp.*, 213 Ill. 2d at 395, 821 N.E.2d at 1127. As the Illinois Supreme Court explained, "[t]he proper inquiry regarding legal cause involves an assessment of foreseeability, in which [courts] ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct." 213 Ill. 2d at 395, 821 N.E.2d at 1127.

Defendants argue that the harm for which the Trustee holds them responsible was unforeseeable because the IGB had never before enforced their rules so stringently. (*See* C. Defs.' Post-Trial Mem. at 246–51; D. Flynn's SOF ¶¶ 284–85.) Defendants point out that the IGB changed its interpretation and enforcement of rules relating to (1) pre-approval for construction, (2) using financing from prospective shareholders, and (3) requesting disclosure of draft contracts. The court acknowledges the history of inconsistent IGB enforcement, but does not conclude that it excuses the violations for purposes of the Trustee's breach of contract claim.

The Riverboat Gambling Act gives the Board the wide discretion and authority to "suspend, revoke or restrict licenses, to require the removal of a licensee or an employee of a licensee for a violation of this Act or a Board rule." 230 ILCS 10/5(15). The IGB also reiterated its authority to revoke a license when it promulgated Rule 140: "The failure to meet the requirements of subsection (a), (b) or (c) may result in discipline up to and including revocation of a license." 86 ILL. ADMIN. CODE § 3000.140(d). Furthermore, agencies with broad discretion are generally entitled to change their pattern of enforcement or interpretation of rules. *See Hawthorne Race Course, Inc. v. Ill. Racing Bd.*, 366 Ill. App. 3d 435, 443, 851 N.E.2d 214, 221 (1st Dist. 2006) (quoting *Hazelton v. Zoning Bd. of Appeals*, 48 Ill. App. 3d 348, 351–52, 363

N.E. 2d 44, 47 (1st Dist. 1977) ("An administrative body has the power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding"); *see also Kozminski v. Ret. Bd. of Firemen's Annuity & Benefit Fund of Chicago,* 2012 IL App (1st) 111808-U (1st Dist. 2012) ("[A]dministrative agencies, which govern our public regulation, must be free to change their standards (as long as these changes are not arbitrary and capricious) so they can adjust our public policies in light of our ever-changing experiences. To hold otherwise absolutely binds our administrative agencies to their prior determinations, foreclosing any chance at necessary change."). This is one of the risks of operating a business in a regulated industry.  In light of the clear language in the IGB rules, a reasonable person would understand that the revocation of a license is a likely or at least a possible result of violating an IGB rule.

This conclusion is bolstered by the Illinois Supreme Court's explanation that the question of proximate cause "is one of policy—How far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?"   *Beretta U.S.A. Corp.*, 213 Ill. 2d  at 395, 821 N.E.2d at 1127.  As relevant here, the Illinois General Assembly and the Illinois Gaming Board have made their policy choice explicit: a gaming licensee's responsibility for violating any IGB rule extends to the revocation of the license. The Illinois Appellate Court agreed, finding that "Emerald had fair and ample warning" of the possibility its license would be revoked.  (PX1233 at 107.)

In sum, the court concludes that the violations of Rules 140(a), 140(b)(3), and 110(a) were the cause in fact and legal cause of Emerald's loss of its license. Therefore, the following Defendants are liable for the loss of the license based on the following violations:

- Kevin Flynn:        140(a) and 110(a)
- Donald Flynn:       140(a), 235(a) and 110(a)
- Joseph McQuaid: 140(a), 140(b)(3), 235(a) and 110(a)
- John McMahon:   140(a) and 140(b)(3)
- Kevin Larson:      140(a) and 110(a)
- Walter Hanley:     140(a), 140(b)(3), and 110(a)

4.   **The court denies Defendants' motion for leave to file third-party complaint against Eugene Heytow**

Defendants Donald Flynn, Kevin Larson, and Joseph McQuaid urge this court to reconsider their Motion for Leave to File Third-Party Complaint against Eugene Heytow. (C. Defs.' Post-Trial Mem. at 285 n.52.)  This court denied the motion without prejudice on April 23, 2012 but reserved the possibility of reconsideration in the event of a judgment against Defendants.  (Minute Entry, Apr. 23, 2012 [126].)   Because the court has concluded that Defendants Donald Flynn, Kevin Flynn, Joseph McQuaid, John McMahon, Kevin Larson and Walter Hanley are liable for the loss of the license, the court addresses their argument that Heytow must be part of the mix, as well.

Eugene Heytow was one of the original founders of Emerald, along with Peer Pedersen, and served as a Director from 1991 to April 19, 2002.  (Certain Defs.' Mem. In Supp. of their Mot. for Leave to File Third-Party Complaint [76], hereinafter "C. Defs.' Mot. in Supp. of TPC," at 4.) Specifically, he was on Emerald's Board during the important August 12, 1999 and December 22, 1999 meetings, at which the Board voted to (1) authorize sales of Emerald stock without IGB pre-approval, (2) authorize construction plans and start of construction without IGB approval, and (3) authorize financing of construction with funds from the Statutory Investors. (C. Defs.' Mot. in Supp. of TPC at 23.)   The court has not, however, found violations of IGB rules based on these decisions.  Defendants assert they are "entitled to equitable contribution from Heytow for his proportionate share of any amount for which [Defendants] may be held liable as a result of actions by the Emerald Board to which Heytow assented."  (C. Defs.' Mot. in Supp. of TPC at 1.)

To emphasize their point, Defendants note that "Pedersen and Heytow are indistinguishable for purposes of the Trustee's allegations." (C. Defs.' Mot. in Supp. of TPC at 13.)  The court agrees.  But it has declined to find Pedersen liable for the loss of the license based on his votes at Board meetings.  Instead, the court has found other Defendants liable

based on other individual conduct. Therefore, the court denies the motion for leave to file a third-party complaint against Eugene Heytow.

## IV.    Count IV: Equitable Subordination

The Trustee urges the court to subordinate Defendants' claims on the bankruptcy estate. The Bankruptcy Code allows the court to "reprioritize a claim if it determines that the claimant is guilty of misconduct that injures other creditors or confers an unfair advantage on the claimant." *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008) (discussing 11 U.S.C. § 510(c)). Equitable subordination generally requires the Trustee to satisfy three conditions "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) subordination must not be inconsistent with the provisions of the Bankruptcy Act." *In re Kreisler*, 546 F.3d at 866 (internal quotations omitted). The first step of the inquiry is to identify inequitable conduct. "If there is none, then a bankruptcy court cannot subordinate a claim." *In re Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997).

The Trustee urges this court to find inequitable conduct on the basis that Defendants violated IGB rules. To support this argument, she cites *In re Lifschultz Fast Freight*, 132 F.3d 339 (7th Cir. 1997). The *Lifschultz* court explained that the type of conduct that has been considered "inequitable" generally falls within the following categories: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego." 132 F.3d at 345. Trustee seizes on the word "illegality" and argues that any finding that Defendants violated an IGB rule is sufficient to show inequitable conduct.

Trustee's reading is much too broad. To find inequitable conduct, "[t]he creditor must have done something inequitable—a wrong or an unfairness or, at the very least, a masquerade of something for what it is not." *Id.* at 344. The Trustee contends here that conduct that violates a state regulation is sufficient to show inequitable conduct, but in the cases she cites, in which bankruptcy courts subordinated claims, the unlawful conduct at issue was a crime. First, in *In re*

*Mid-American Waste Systems, Inc.*, the creditor was a former officer of the debtor corporation who bribed a public official. 284 B.R. 53, 74 (Bankr. D. Del. 2002). In *Roberts v. Geremia (In re Roberts, Inc.),* the creditor was the president and sole shareholder of a corporation who was indicted on fourteen counts of conspiracy, concealing corporate assets, removing evidence, offering a bribe, and obstructing justice. 15 B.R. 584, 585 (Bankr. D.R.I. 1981). He pleaded guilty to several charges and was sentenced to prison. The court found that "there could hardly be a stronger argument for subordination." *Roberts*, 15 B.R. at 586.

Defendants' failure to disclose certain agreements between Emerald and Rosemont, and between Emerald and various construction professionals, and failure to inform the IGB of Kevin Flynn's role managing Emerald, are civil regulatory violations and plainly are not comparable to the egregious and criminal acts in these cases. The Trustee has presented no support for her claim that civil regulatory violations are sufficient to support equitable subordination. Furthermore, inequitable conduct, alone, does not necessitate the application of equitable subordination. "[E]quitable subordination is applied only to the extent necessary to undo the effect of the misconduct on other creditors." *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008) (quoting *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 701 (5th Cir.1977)).

In this case, the court is not satisfied that IGB rules violations constitute inequitable conduct for purposes of the Bankruptcy Code. The Trustee has established that Defendants breached the contract, but as explained above, such a breach is a strict liability violation; it is not dependent on Defendants' state of mind. (*See supra* Discussion III.B.2.a.) A showing that Defendants breached a strict liability obligation, without more, is insufficient to establish a "wrong," an "unfairness," or a "masquerade." Defendants may well have "played fast and loose" with the IGB rules in an attempt to move quickly and avoid the delay of regulatory scrutiny. (Trustee's SOF ¶ 826) (quoting PX162 at 37.) Their conduct is disappointing, but not startling: the IGB appears to have decided, under Administrator Acosta's watch, to beef up enforcement, and perhaps to make an example out of Emerald. Defendants' conduct appears to have been

careless or sloppy, and their disclosures were incomplete; but there is no credible basis to conclude that they were being dishonest or deliberately deceptive. Indeed, the Trustee has presented no explanation of what would motivate Defendants to undertake an elaborate and concerted effort to deceive the IGB, the regulatory body that Defendants obviously knew controlled the fate of a license worth millions of dollars to each of them. In other words, the Trustee has not explained why Defendants would try to kill the goose that laid the golden egg. Defendants violated the Amended Shareholders' Agreement by violating IGB rules, but the court declines to find their conduct "inequitable." The Trustee's claim for equitable subordination, therefore, fails at the first step.

## V.     Damages

The court has found that the individual Defendants breached the Amended Shareholders' Agreement by engaging in conduct that caused the IGB to revoke Emerald's license; the remaining questions are what damages flow from this breach and whether Defendants are jointly or severally liable. The court turns to the second issue first.

### A.     Defendants are severally liable

In a breach of contract claim, defendants who are parties to a joint contractual obligation are ordinarily jointly and severally liable for breach. *See Codest Eng'g v. Hyatt Int'l Corp.,* No. 94-c-7335, 1995 WL 683505, at *6 n.5 (N.D. Ill. Nov. 15, 1995) ("Under Illinois law, all joint contractual obligations are joint and several obligations."); *Pritchett v. Asbestos Claims Mgmt. Corp.*, 332 Ill. App. 3d 890, 898, 773 N.E.2d 1277, 1283 (5th Dist. 2002) ("If two or more parties to a contract owe a joint and several duty of performance to another party to the contract and the duty is not performed, each may be liable for the entire damages resulting from the failure to perform."). In some circumstances, however, liability for breach is several. "Whether a contractual obligation is joint and several, or only several, depends upon the intentions of the parties, as revealed by the language of the contract and the subject matter to which it relates." *Brokerage Res., Inc. v. Jordan*, 80 Ill. App. 3d 605, 608, 400 N.E.2d 77, 80 (1st Dist. 1980).

Determining whether Defendants' liability is joint or several begins with the language of the Amended Shareholders' Agreement. The question has been presented in one case already: In *Flynn v. Levy*, 832 F. Supp. 2d 951 (N.D. Ill. 2011) (Castillo, J.), all Defendants in this case, except for Pedersen, filed an action seeking equitable contribution from Eugene Heytow. *Id.* at 952. Heytow was one of the original founders, shareholders, and directors of Emerald. Heytow served on Emerald's Board through April 19, 2002 and participated in several votes that the Trustee has alleged were violations of the Amended Shareholders' Agreement. Under Illinois law, the right to equitable contribution arises when a statute or agreement creates a joint financial obligation to a third party. *Id.* at 955. Defendants here—Plaintiffs in the action before Judge Castillo—argued that "each of Emerald's directors owed common and joint obligations to the corporation under the Shareholders' Agreement both individually, and when acting as directors, jointly as a Board." *Id.* at 956. Therefore, they argued, any liability for breach of contract in this case should entitle them to contribution from Heytow.

Judge Castillo analyzed the terms of the Agreement and ultimately concluded it did not create any joint obligation. Specifically, he observed that "[u]nlike [the situation of] co-signors on a promissory note, or parties to mortgage agreements or apartment leases, where the parties agree to be jointly liable for a financial obligation, nothing in the Shareholders' Agreement supports [the] position that it created anything other than an individual obligation between each shareholder and Emerald." *Id.* at 956. He found "no legal support" for "reading a joint obligation into a Shareholders' Agreement written in individual terms," despite the fact that some actions that might create liability under the Agreement were products of Board decisions. *Id.* at 956.

The court agrees with Judge Castillo's reading of the contract and finds that the Shareholders' Agreement does not create the necessary joint obligation. A joint obligation for the purposes of joint and several liability is created by a promise of a joint performance or by providing joint consideration. *See Pritchett*, 332 Ill. App. 3d at 898, 773 N.E.2d at 1283 ("Here

the defendants acted collectively, through their agent, in promising a single performance (the payment of one undivided sum to the plaintiff)."). "Parties to a contract are more likely to have a joint and several contractual obligation if they have a joint or identical interest in the contract or its subject matter, instead of diverse interests." *Brokerage Res.*, 80 Ill. App. 3d at 608, 400 N.E.2d at 80. The terms of the Agreement that each Defendant (as well as Heytow) signed in this case are the same, and shareholders have similar interests in the contract. Yet there was fundamentally no collective action or joint promise here. The promised performance was unique to each shareholder that signed the contract. That is, each shareholder promised to conform his or her own behavior to IGB rules. As Judge Castillo noted, the contract speaks only in terms of individual obligations. *Id.* at 956 (noting the contract speaks in terms of "each shareholder"). The "intention[] of the parties, as revealed by the language of the contract," therefore, was to create individual commitments and consequently several liability. *Brokerage Res., Inc.*, 80 Ill. App. 3d at 608, 400 N.E.2d at 80.

The Trustee's motivations for not naming Mr. Heytow as an additional Defendant may reasonably be questioned. Heytow was as involved (or uninvolved) as several of the named Defendants were in reviewing Emerald's submissions to the IGB and in taking action as a member of Emerald's Board. Defendants contend the real reason he is not a named Defendant here is that an attorney who acted as Heytow's proxy at several Emerald Board meetings is a partner at the law firm which represents the Trustee. (C. Defs.' SOF ¶¶ 827–30.) Whatever her motivations may be, the Trustee has not argued that the Amended Shareholders' Agreement creates a joint obligation among these Defendants, nor has she otherwise explained why the breach of contract claim (as distinct from the breach of fiduciary duty claim) should support joint and several liability.

The court recognizes that one Illinois case has adopted the theory of "concurrent breach of contract." *See InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 364 Ill. Dec. 451, 467, 976 N.E.2d 1014, 1030 (Ill App. Ct. 1st Dist. 2012) *reh'g denied* (Oct. 10, 2012), *appeal denied*, 982

N.E.2d 769 (Ill. 2013). As the Illinois Appellate Court explained,

> Under the doctrine of concurrent breach of contract, "[w]here A and B owe contract duties to C under separate contracts, and each breaches independently, and it is not reasonably possible to make a division of the damage caused by the separate breaches closely related in point of time, the breaching parties, even though they acted independently, are jointly and severally liable.

*InsureOne Indep.* 364 Ill. Dec. at 467, 976 N.E.2d 1014 at 1030. At first blush, this doctrine appears to fit the facts of this case well. The *InsureOne* court acknowledged, however, that its holding was the exception from the rule that "in general 'defendants who have separate and distinct contracts with a common entity cannot be subject to joint liability for breach of contract.'" 364 Ill. Dec. at 466, 976 N.E.2d 1014 at 1029. Furthermore, *InsureOne* relied exclusively on non-Illinois cases for support, *see* 364 Ill. Dec. at 467, 976 N.E.2d 1014 at 1030, and no other Illinois courts have applied the doctrine of concurrent breach of contract. "[I]n a case in federal court in which state law provides the rule of decision, the federal court must predict how the state's highest court would decide the case, and decide it the same way." *MindGames, Inc. v. W. Pub. Co.*, 218 F.3d 652, 655–56 (7th Cir. 2000). Given that only one Illinois Appellate Court has extended the doctrine of concurrent breach to Illinois, the court is not convinced that the Illinois Supreme Court would adopt this new approach and therefore applies the general rule that independent contractual obligations do not give rise to joint and several liability.

The court therefore apportions damages among the six Defendants who breached the contract: Kevin Flynn, Donald Flynn, Joseph McQuaid, John McMahon, Kevin Larson, and Walter Hanley. The degree of liability for each Defendant might be said to differ; but the court concludes that each Defendant is equally liable for the loss of the license. Gaming Board rules, the Riverboat Gambling Act, and the language of the Amended Shareholders' Agreement, all appear to permit revocation for a single rule violation. As discussed earlier, while "organized crime" appeared to be the IGB's primary concern, Defendants' repeated violations of Rules 140(a), 140(b)(3), and 110(a) were also significant reasons for the revocation of Emerald's license. (*See supra* Discussion II.B.2.b.) Though it appears from this record that it was the

totality of Defendants' conduct that was deemed so egregious that revocation, rather than a smaller disciplinary action, was appropriate (*see* PX162 at 31), the court cannot ignore language in the IGB's Final Board Order announcing that each rule violation "alone supports revocation of Emerald's license." (PX162 at 33–35, 37.) The Illinois Appellate Court affirmed the revocation. (PX1233 at 107.) Accordingly, for the purposes of apportioning damages, the court takes the IGB at its word and weighs each violation equally. As described above, the court has identified conduct of each of the six Defendants that violated an IGB rule and caused the loss of the license:

- Kevin Flynn failed to disclose his role in managing Emerald, and failed to disclose the Field Street agreement.
- Donald Flynn failed to disclose Kevin Flynn's role managing Emerald in Donald Flynn's testimony to the IGB. The IGB relied explicitly on Donald Flynn's statements to support the conclusion that the record was "replete" with evidence that Emerald dissembled about Kevin Flynn's role. (PX162 at 19.)
- Joseph McQuaid failed to disclose Kevin Flynn's role in managing Emerald, failed to disclose agreements between Rosemont and Emerald, failed to disclose construction agreements, and failed to make full disclosures in Emerald's Renewal Application.
- John McMahon failed to disclose agreements between Emerald and Rosemont.
- Kevin Larson failed to disclose Kevin Flynn's role managing Emerald in a September 28, 2000 interview with the IGB. When asked about Kevin Flynn's role, Larson flatly denied Kevin Flynn's involvement: "Kevin had no role in HP Inc." (PX803 at 1.)
- Walter Hanley failed to disclose agreements between Rosemont and Emerald, and failed to disclose construction agreements.

Each Defendant is liable for an equal proportion of the value of the lost license.

### B.     The value of Emerald's license

The Trustee is seeking damages equal to the value of the license (Trustee's SOF ¶ 849), which she calculates in three different ways, relying on expert testimony, on market evidence, and on Defendants' own statements. Before addressing these categories of evidence, the court considers Defendants' objection that the Trustee's theory of damages has been a "moving target." (C. Defs.' Post-Trial Mem. at 269.) Specifically, Defendants argue that the Trustee shifted from a lost-profits theory to a theory based on the loss of an income-producing asset.

(*Id.*)  In other words, Defendants claim the Trustee initially sought to recover the revenue Emerald would have earned from operating a casino in Rosemont but now seeks to recover the price Emerald could have obtained by selling the license to another company.  Defendants' only support for this claim is that the Trustee presented expert evidence that projected "future cash flows of a casino in Rosemont over ten years," and then discounted the cash flow to present value.  (*Id.*)  Defendants urge that such expert testimony is essentially a lost-profits calculation that the Trustee is attempting to re-characterize as evidence of the market price of the license.

Defendants' objection ignores substantial additional evidence that the Trustee has offered.  That evidence falls into three categories:  First, she did present the expert testimony of Mr. Steven Rittvo, who opined in his report (PX445), that the value of the license as of November 30, 2010 was $519,573,342.  As explained below, the court has concerns about that determination; but to the extent Mr. Rittvo's analysis depended on projecting future cash flows and discounting them to present value, the court concludes he did so in an effort to calculate the value of the license rather than to calculate damages.  That analysis, in short, is consistent with the Trustee's market-price theory of damages, not an impermissible departure from the Trustee's theory.  In addition to Rittvo's projection testimony, the Trustee presented market evidence of the value of the license, specifically offers from sophisticated companies seeking to purchase Emerald's license in a series of structured sales and auctions between 2001 and 2008.  The offers ranged from $272 million to $615 million.  Third, the Trustee presented evidence of Defendants' own statements about the value of the license.  Adopting the estimate of Mr. Rittvo, Trustee requests damages equal to $519,573,342.

Defendants did not present their own evidence regarding the value of the license. They do object to the Trustee's request on several grounds.  First, they raised a *Daubert* objection to the admissibility of Mr. Rittvo's testimony during the bankruptcy proceedings which must now be addressed by this court.  (Defs.' Mot. to Strike the "Expert" Aff. of Steven M. Rittvo, in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2009) [197]; Certain Defs.' Mot. to Preclude the Trial

Test. of Consultant Steven M. Rittvo Designated by the Trustee as a Bus. Valuation Expert, in *Gecker v. Flynn*, No. 08-ap-00972 (Bankr. N.D. Ill. 2010) [480]; C. Defs.' Post-Trial Mem. at 270–73.)   Second, Defendants claim that Mr. Rittvo's testimony should also be excluded because Mr. Rittvo improperly included prejudgment interest in his valuation.   (Certain Defs.' Proposed Findings of Fact & Conclusions of Law at 282 [252], hereinafter "C. Defs.' PCOL," ¶¶ 120–23; C. Defs.' Post-Trial Mem. at 273.)   Third, Defendants argue that Trustee has not proven damages to a reasonable degree of certainty.   (C. Defs.' PCOL ¶¶ 123–136; C. Defs.' Post-Trial Mem. at 279–84.)   Finally, Defendants contend that using the principles of equity, the court should limit the damages award to the value of the creditors' claims eventually allowed in the bankruptcy proceedings and to the minority interests of non-Defendant shareholders of Emerald.   (C. Defs.' PCOL ¶ 137; C. Defs.' Post-Trial Mem. at 285–89.)   The court considers these arguments below.

## 1.      Testimony of Steven M. Rittvo

The Trustee's expert witness, Steven Rittvo, estimates that the loss of Emerald's license resulted in damages equal to $519,573,342.   Defendants challenged the admissibility of that estimate under *Daubert*.

### a.      *Daubert* challenge remains pending

The Trustee asserts that the Bankruptcy Court resolved the *Daubert* challenge and that decision should be binding on this court.   (Trustee's Post-Trial Brief at 307–08.)   The Trustee points to the Bankruptcy Court's oral ruling on October 27, 2010:

> [Mr. Rittvo] has established an expertise in the area of the valuation of casinos, and that expertise has been relied on by any number of actual participants in the industry.   So as to say that he is without qualification to give an opinion here would be inaccurate.   And to the extent that we are dealing with a fairly unique asset, a gambling casino license of a limited quantity—since there are only a certain number that can operate in any given area in Illinois—the expertise that Mr. Rittvo has in this particular area may give him a particular qualification that other general business valuation experts would not have.

(Bankr. Tr., Oct, 27, 2010, 7:13–8:1.)   Without further elaboration, the Bankruptcy Court

permitted Mr. Rittvo to testify on the strength of his qualifications, but recognized that the *Daubert* objection remained an "open issue" that would be "addressed at trial." (10/27/10 Bankr. Tr. 8:21–24.)  As this court reads that language, though Judge Wedoff did specifically address Mr. Rittvo's qualifications, he did not fully resolve the issue of reliability.  Under *Daubert*, a court must determine not only that the witness is qualified but also that the testimony also is reliable and relevant. FED. R. EVID. 702. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592–93 (1993).

In fact, immediately after Mr. Rittvo's testimony regarding his qualifications, Defendants renewed their pre-trial objection (Bankr. Tr. 2990:6–10), and the Bankruptcy Court made clear that the objection was preserved.  (Bankr. Tr. 2990:11–13) ("[B]y no means does your failure to raise that objection again constitute any kind of waiver of the objection you've already made.")  The Bankruptcy Court also acknowledged that the Defendants had not "waived any argument [Defendants] have against the reliability of the opinions." (Bankr. Tr. 2990:8–14.)  At the close of Mr. Rittvo's testimony the Bankruptcy Court concluded, "I'll accept [Mr. Rittvo's testimony] for what value it has consistent with what I've seen before."   (Bankr. Tr. 3253:12–14.)   In explaining its inclination to admit the testimony without further analysis, the court invoked judicial efficiency and the unique nature of a bench trial:

> The point I made before was that in the context of a bench trial, the sort we're engaged in now, it is duplicative to have separate *Daubert* hearings and hearings at the time of trial.  You'll make your arguments on the testimony that's being given now and the conclusions that are being presented are not well supported.  And to the extent I agree with that, I will not put weight on those opinions, which will have very much the same effect.  But I think in the interest of brevity, this is the better way to proceed, and I will proceed in that direction.

(Bankr. Tr. 2990:20–2991:7.)  The Seventh Circuit has acknowledged this approach to *Daubert* hearings during a bench trial.  *See In re Salem,* 465 F.3d 767, 777 (7th Cir. 2006) (noting that if "the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened.") (citation omitted).  Therefore, the fact that the Bankruptcy Court heard the testimony does not reflect a final ruling.  In any event,

this court's review of the bankruptcy proceeding is *de novo*.  *See Executive Benefits*, 134 S. Ct. at 2173 (2014).

### b.    *Daubert* standards

In *Daubert*, the Supreme Court explained that district courts serve as gatekeepers with respect to expert testimony.  509 U.S. at 592–93.  Although *Daubert* concerned the admissibility of scientific evidence, its standards and description of the district courts' gatekeeping function apply equally to all expert testimony.  *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 148 (1999).  To determine the admissibility of expert testimony, courts engage in a three-part analysis: (1) a witness must demonstrate his/her expertise "by knowledge, skill, experience, training or education," Fed. R. Evid. 702; (2) the reasoning or methodology employed by the expert must be reliable, *Daubert,* 509 U.S. at 592; and (3) the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702.  In other words, the witness must be qualified and the testimony must be reliable and relevant.

### c.    Mr. Rittvo is qualified

Judge Wedoff found Mr. Rittvo qualified, and this court agrees.  Mr. Rittvo is President and Founder of the Innovation Group, an international financial forecasting, feasibility analysis, and market research firm specializing in the gaming, hospitality, and leisure industry.  (PX445 at 16; Bankr. Tr. 2956:24–2957:10.)  He has been a consultant to the gaming industry since 1993, specializing in the areas of financial analysis, market feasibility, project development, and marketing.  (Bankr. Tr.  2957:14–2958:1).  In that role, he has conducted or supervised more than 550 financial analyses, market assessments, and feasibility studies for commercial gaming establishments, investment banks, and local, state, or national governments.  (PX445 at 17; *see also* PX1266 at 18, 21–49; Bankr. Tr. 2977:16–2980:19.)  He has also either conducted or been responsible for more than 275 financial analyses, market assessments, and feasibility studies for Native American gaming facilities, including both new and existing facilities.  (PX445 at 17.)  His clients include more than a dozen of the most well-recognized casino companies and state

and local gaming associations in the nation.  (Bankr. Tr. 2959:24–2960:12, 2961:16-19.)

Defendants contend that the market assessments Mr. Rittvo performed for these clients are distinct from the type of valuation involved in this case (C. Defs.' SOF ¶ 914), and Mr. Rittvo admitted that a market assessment is only "an input or an element to a valuation."  (Bankr. Tr. 3162:4–7.)

Significantly, however, Mr. Rittvo had personal experience with valuing the very license at issue in this case years ago.  In 2004, he consulted with Midwest Gaming and Entertainment LLC ("Midwest Gaming") (controlled by Neil Bluhm) to help prepare the application to purchase Emerald's license in the 2004 auction.  (Bankr. Tr. 2984:2–18.)  In 2008, Mr. Rittvo was retained by Mr. Bluhm "not to prepare a bid, [but] to do a market analysis to determine revenues, and again participate in the discussions and preparing of the bid" (Bankr. Tr. 2984:21–2985:1) when Midwest Gaming submitted its winning bid to obtain the Tenth Illinois license, in 2008.  (Bankr. Tr. 2984:2–2985:15.)

Mr. Rittvo's educational background is as an engineer (PX445 at 17; Bankr. Tr. 2963:17–21), and his early employment history involved municipal transportation planning, first in New York and later in New Orleans.  (Bankr. Tr. 2964:8-2965:5.)  In New Orleans, his consulting firm was hired by the Port Authority to conduct a traffic study to determine how to accommodate six new riverboat casinos.  (Bankr. Tr. 2965:13–18, 2966:11–18.)  To complete that project Mr. Rittvo, developed a model to project the number of vehicles that would come to the casino.  (Bankr. Tr. 2967:7–12.)  Based on his own projections of the number of visitors and revenues, Mr. Rittvo decided to personally invest in a riverboat casino in Louisiana, but later sold that interest.  (Bankr. Tr. 2968:12–17; 2968:18–2969:24.)

Mr. Rittvo then pioneered the use, in the casino industry, of the "gravity model" that he had used as a transportation engineer and urban planner. (Bankr. Tr. 2971:14–17.)  "Gravity models utilize the gravitational force concept as an analogy," to explain human behavior through a mathematical formula that determines the "gravitational force" between two objects.  1 THE

PRINCETON ENCYCLOPEDIA OF THE WORLD ECONOMY 567 (Kenneth A. Reinert, Ramkishen S. Rajan eds., 2009). In the transportation context, gravity models are used to predict trips to a particular destination, for example trips to a new supermarket or a new ATM. U.S. DEP'T. OF TRANSP., CALIBRATING & TESTING A GRAVITY MODEL FOR ANY SIZE URBAN AREA III-9 (1983) *available at* http://ntl.bts.gov/DOCS/CAT.html (last visited Sept. 22, 2014), hereinafter "DOT GRAVITY MODEL". To adapt Newton's gravity equation, the model replaces mass with an attraction factor that indicates how likely individuals are to travel to a destination. *Id.* at I-2. The gravity model is therefore a "distribution model," which begins with a population of people who will take a trip and assigns the trips to possible destinations to determine how many people will go to each specific destination. (Bankr. Tr. 2971:20–23.) Mr. Rittvo was the first to apply the gravity model, which has been used in other commercial settings and specifically in the transportation settings, to casinos. (Bankr. Tr. 2971:11–13, 2971:4–11.)

For four years ending in 2002 or 2003, Mr. Rittvo was the author of the Global Gaming Almanac, an inventory of all the gaming markets in the United States, their specific revenues and operations from the past year, and a forecast of each of those markets' revenues. (PX445 at 17; Bankr. Tr. 2981:2–13.) Kevin Flynn's company, EVI, relied on the 1998 Global Gaming Almanac in making a projection about the Chicagoland market. (PX317 at 20.) Mr. Rittvo has made presentations at more than 30 gaming conferences on topics including casino market assessments, financial feasibility, financial marketing, Native American casino development, and gaming patron consumer research. (PX445 at 17.) Mr. Rittvo has also served on committees in academia that concern the gaming industry, specifically for Tulane University and the University of Denver. (Bankr. Tr. 2983:1–6.)

Defendants note that Mr. Rittvo does not have any education specific to financial accounting. (Bankr. Tr. 3154:18–3155:25; C. Defs.' SOF ¶¶ 914-20.) He is not a Certified Public Accountant, a valuation analyst, or a chartered financial analyst, and does not belong to any accredited valuation or appraisal organizations. (Bankr. Tr. 3154:18–3155:25.) This need

not defeat his qualifications, however, as Rule 702 recognizes that experts may be qualified not only through education, but also through "knowledge, skill, and experience." The Seventh Circuit has "recognized that while extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience [as well]." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2005). The court is satisfied that Mr. Rittvo is qualified to testify regarding the value of an Illinois gaming license.

### d.     Mr. Rittvo's testimony is relevant

The court concludes, further, that Mr. Rittvo's testimony regarding the valuation of Emerald's license at the time of revocation is indeed relevant. Under *Daubert,* testimony is relevant where it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." *Daubert,* 509 U.S. at 591 (citing FED. R. EVID. 702). Testimony regarding the value of an Illinois gaming license would greatly assist the court here in determining a material fact—specifically the value of the license. Business valuation generally, and of gaming licenses specifically, is not within common knowledge, and expert testimony could elucidate how much the license was worth when the IGB revoked it.

### e.     Mr. Rittvo's testimony is not sufficiently reliable

The crux of Defendants' *Daubert* objection is that Mr. Rittvo's testimony is unreliable. *Daubert* and Federal Rule of Evidence 702 outline four, flexible and non-exhaustive "guideposts" to consider in evaluating expert testimony: "(1) whether the scientific theory on which the expert's testimony is based can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known and potential rate for error; and (4) whether the theory has been generally accepted in the relevant scientific, technical, or professional community." *United States v. Mire,* 725 F.3d 665, 674–75 (7th Cir. 2013). "The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if

it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire* 526 U.S.at 152). A court may exclude the testimony of an expert who does not satisfy the standards for relevance and reliability.

Mr. Rittvo utilized a discounted cash flow analysis ("DCF") to estimate the value of the Emerald license as of January 31, 2001. (PX445 at 2, 6, 23, 96.) DCF is a method of predicting future revenue streams of a company and then discounting the value of the future revenue to determine present value. The DCF analysis theoretically represents what a willing buyer would have paid to a willing seller to purchase Emerald's license on February 1, 2001. (Bankr. Tr. 2985:22–2992:17; Trustee's SOF ¶ 782.) There are essentially four steps to a discounted cash flow analysis. The analysis starts with a base-year or baseline revenue. (*See* PX445 at 82) ("[T]he first step . . . is to establish the market share potential of the Emerald location in its first stabilized year of operation.")[122]

Second, after computing the base-year revenue, projections for future years are calculated for a limited "forecast period." (*See* PX445 at 90 (applying general Illinois casino market trends to Emerald's base-year revenue to derive the 2003 through 2005 revenue estimates."); *id.* at 92 (applying Elgin's casino historical trends to base-year revenue to derive 2006–07 revenues); *id.* at 93 (applying Elgin trends for years 2008–09); *id.* at 94–95 (applying general market trends for Emerald's 2010 revenue estimate).) The future revenue streams are discounted to reflect their present value. (*Id.* at 97.) This produces the "present value of cash flows." (*Id.* at 99.)

Third, in addition to calculating revenues for the forecast period, DCF analysis assesses the "terminal" or "residual" value of a company. (PX445 at 99.) This value accounts for the fact

---

[122]    Because Emerald never operated a casino at Rosemont, there is no actual baseline revenue for the first year, or any year, of operations. There is, thus, a sense in which Mr. Rittvo's projections run afoul of the prohibition on awarding lost profits for a new business. The court addresses that concern below.

that businesses will continue to produce income streams beyond the forecast period. (*Id.* at 99.) The sum of "present value cash flow" and "terminal value" is enterprise value; from that figure, the company's existing debts are subtracted to determine a net present value of the company. (*Id.* at 99.)

The key building block for the Discounted Cash Flow analysis, therefore, is the base-year revenue, from which all the future revenue streams are derived. (*See* Bankr. Tr. 3210:9–21.) If the base-year revenue is wrong, it will influence all the subsequent calculations including the final conclusion. (Bankr. Tr. 3210:17–21.) Mr. Rittvo used his own methods to calculate the base-year revenue (Bankr. Tr. 3210:9–16), and Defendants object to those methods. (C. Defs.' SOF ¶¶ 894–902.) They also allege that Mr. Rittvo deviated from traditional DCF analysis, impermissibly using hindsight to project cash flows for years 3-10 (2003–2010). (C. Defs.' SOF ¶ 906.)

### i.       Flaws in base-year revenue calculations

To calculate the base-year revenues, Mr. Rittvo used his gravity model to predict the number of gaming visitors a casino located in Rosemont would likely draw in one year, and multiplied that number of visitors by a "win per visit" amount, to generate an estimate of gross revenues. (Bankr. Tr. 3033:21–23) (testifying that he "applied that win per visit per patron to the attendance forecast and developed the revenue for Rosemont.") Then, he used a proprietary model to calculate the casino's estimated operating costs, and deducted those costs from the gross revenues in order to arrive at the base-year revenue. (PX445 at 95–96.)

This methodology is flawed, Defendants contend, in several ways. First, they argue that the use of the "gravity model" to project first-year visits is unreliable because the gravity model has not been and cannot be empirically tested. (C. Defs.' SOF ¶¶ 925–32.) Second, they argue that there is no basis for Mr. Rittvo's "win per visit" rate. (*Id.* at ¶¶ 903-05.) Third, they argue that Mr. Rittvo's calculation of operating expenses is unreliable because it is proprietary and therefore, has not been empirically tested or peer reviewed. (*Id.* at ¶¶ 939-40.)

### (a) Use of the gravity model to predict attendance data

First, the gravity model:  The Trustee relies heavily on the assertion that Mr. Rittvo's model is now widely accepted and commonly utilized when evaluating various casino projects. (Trustee's SOF ¶ 773; *see also* Bankr. Tr. 2974:24–2975:2.)  Mr. Rittvo believes that other casino consultants and various states, including Iowa, Kansas, and Missouri, have used the gravity model to help make decisions about the expansion of gaming.  (Bankr. Tr. 2974:9– 2975:7-21; *see also* PX1266 at 4–5, 4 n.1.).  Defendants, on the other hand, emphasize Mr. Rittvo's statement that "gravity modeling, to the best of my knowledge, has not been certified in a valuation organization."  (C. Defs.' SOF ¶ 929) (citing Bankr. Tr. 3167:10–14.)  This particular criticism is misplaced.  The gravity model is not a valuation tool itself, but rather a distribution model used to predict an input for the subsequent valuation—specifically how many visitors a casino will have in a given timeframe.  (*See* Bankr. Tr. 3167:15–18, 3167:20–21.)  According to the Trustee and Mr. Rittvo, gravity models have been used in other businesses such as "grocery stores, health care businesses, ATM operations, and other retail businesses," to select the optimal locations based on projected visitors.  (PX1266 at 3, ¶ 9.)  Mr. Rittvo also identified several state regulators, federal agencies, and private companies that rely on gravity models as a method for calculating distributions of trips to casinos and traffic patterns more generally. (PX1266 at 4–5, 4 n.1.) (citing reports from the Ohio Office of Budget and Management, the Ohio Department of Taxation, Ameristar Casinos, Inc., Cummings Associates, Strategic Economics Group, and the U.S Department of Transportation, Federal Highway Administration.) Gravity models are commonly used in transportation planning, DOT GRAVITY MODEL at I-2, and in the field of economics due to their "fortunate empirical validity."  PRINCETON ENCYCLOPEDIA OF WORLD ECONOMY at 568.  In fact, because "[i]n many instances, gravity models have significant explanatory power," one economist "refer[red] to them as a 'fact of life.'"  *Id.* at 567.  The court finds that a wide variety of gravity models have been the topic of academic and professional

publications in different disciplines, satisfying the second *Daubert* factor. The model also appears to be generally accepted within the relevant professional community—specifically the gaming industry as well as others. (PX1266 at 4–5, 4 n.1.)

Were this the end of the inquiry, the court would be satisfied that the gravity model is reliable because it satisfies two *Daubert* criteria.[123] As Defendants point out, however, Mr. Rittvo utilizes his own variation of the gravity model, which has not been subject to peer review or empirically tested for its reliability. (Bankr. Tr. 3212:19–3220:9.) Mr. Rittvo has submitted his projections to the IGB to calculate his error rate, but he does not know whether the error rates are publicly available (Bankr. Tr. 3217:21–3218:3; 3218:24–3219:6), and the court itself has no access to the data to evaluate the error rate. The Trustee stands by the reliability of Mr. Rittvo's model, pointing out that he tested it in Iowa, predicting revenue streams for casinos in Iowa in 2004 and then tracking the data through 2008, yielding forecasts that were within two percent of the actual results. (Bankr. Tr. 3023:14–25.) Impressive as those results are, they appear to involve just a single analysis by Mr. Rittvo himself and his colleagues, and do not satisfy the court that his model is reliable for the purposes of this case.

Defendants also point to flaws in Mr. Rittvo's calculations specific to the Rosemont casino. The Trustee brushes past those concerns, noting that Mr. Rittvo used the same base-year gravity modeling technique to make projections as part of his work for Midwest Gaming at the time Midwest Gaming bid on the license in 2004. (Bankr. Tr. 3010:3–16; Trustee's SOF ¶ 215.) Again, Mr. Rittvo's successful use of his methodology in a related "real world" context is helpful, but it does not eliminate the need for scrutiny. Although the goal of the inquiry is to ensure that the expert employs "in the courtroom the same level of intellectual rigor that

---

[123] A methodology need not meet all four *Daubert* criteria to be admissible. *See Kumho Tire,* 526 U.S. at 141 ("*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.") (emphasis in original); *Lapsley,* 689 F.3d at 810; *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002).

characterizes the practice of an expert in the relevant field," a trial court "exercising its gatekeeping function, must examine (among other things) the expert's qualifications, the methodologies . . . and the relevance of the final results."  *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 423 (7th Cir. 2000) (quoting *Kumho Tire*, 526 U.S. at 152).

In meeting its obligation to analyze Mr. Rittvo's methodologies, the court first examines the key building block of Mr. Rittvo's analysis: the base-year revenues.  To calculate those revenues, Mr. Rittvo first determined the estimated number of visitors to the proposed Rosemont casino, using zip code data to identify a base population.  (PX445 at 25; Bankr. Tr. 3011:22–3012:8.)  From that base population, he determined what percentage of the population would likely visit a casino (the "propensity"), and how often they would do so (the "frequency"). (PX445 at 25; Bankr Tr.  3012:14–20.)  Mr. Rittvo then scaled the estimated number of casino visits per zip code based on the Simmons Market Penetration Index.  (Bankr. Tr. 3014:8–3015:9.)   Simmons, a national market research company, uses consumer survey data to quantify consumption differences between consumers based on such attributes as education, ethnicity, and family composition.  (Bankr. Tr. 3014:9–17.)  The market penetration index for gaming indicates how much gaming the population in a given zip code utilizes, relative to the national average.  (Bankr. Tr. 3014:21–3015:12.)  Mr. Rittvo utilizes the Simmons data to scale the estimated number of casino visits in his model based on the relevant zip codes and generate an estimated number of casino visits per zip code per year.  Defendants assert that (1) the propensity and frequency factors are entirely subjective, (2) various additional factors that serve as inputs in the model were subjectively increased or decreased based solely on Mr. Rittvo's professional judgment and (3) Mr. Rittvo artificially increased the number of visits that the Rosemont casino could realistically handle.  The court addresses each in turn.

> **(1)    Mr. Rittvo did not specify his methods for calculating the propensity and frequency factors**

Defendants critique the propensity factor and the frequency factors because, although

Mr. Rittvo testified that they are based on "national surveys" (Bankr. Tr. 3012:24–3013:7), his initial valuation report did not cite to those surveys and the surveys were not produced in discovery. (C. Defs.' SOF ¶ 894.) Mr. Rittvo's valuation report lists only "Innovation Group," his company, as the source for these figures, without any explanation of how they were calculated. (PX445 at 82, 85.) Furthermore, as he testified that these factors were based, in part on his "professional judgment" (Bankr. Tr. 3152:21–3153:1), the court does not know precisely what methodology was used to calculate these two factors. Without more information, the court cannot conclude that these factors were selected according to reliable, well-established methodologies.

### (2) Mr. Rittvo's method for calibrating the model is sufficiently reliable

The next step in Mr. Rittvo's analysis was to take the number of estimated casino visits per zip code and assign them to the available casinos in the market. (Bankr. Tr. 3016:6–7.) This process involves inputting a distance factor and an "attraction factor" for each casino in the Chicagoland market—the logic being that people will generally go to the closest casino, but may also prefer one casino over another based on the availability of certain amenities, for example, convenient parking. (Bankr. Tr. 3016:7–3017:16.)

With these inputs, the gravity model generates an estimate of the expected number of visits per casino. (Bankr. Tr. 3018:23–3019:1.) Mr. Rittvo then checks that estimate against the actual attendance data reported by the IGB. (Bankr. Tr. 3019:7–11.) If the numbers do not match, he makes several adjustments. First, to adjust the attendance data, he adjusts the attraction factor so that the model accurately predicts the reported data. (Bankr. Tr. 3019:7–1.) He also sets the model to account for just 96–97% of the attendance and revenues that the IGB reports, in order to account for some 3% of the visitors who, Mr. Rittvo estimates, come from out of town. (Bankr. Tr. 3024:7–22, 3025:3–7.)

Defendants criticize these calibrations as nothing more than Mr. Rittvo's "subjectively

increasing or decreasing factors to create a result which he believed was realistic." (C. Defs.' SOF ¶ 895.) This characterization is unfair. Mr. Rittvo's model relies on an estimated "attraction factor" to account for a variety of amenities at each casino. Because even a sophisticated estimate is unlikely to perfectly predict consumer behavior, Mr. Rittvo appropriately relied on historical data about casino attendance to inform his model and create a better model of consumer preferences. Finally, calibrating to 96–97% is not simply a "subjective" adjustment. Rather, it is derived from data based on other casino attendance. (Bankr. Tr. 3024:19–22, *see also* PX445 at 83 (comparing the model visits and revenues to actual visits and revenues in 2002).) If this court were satisfied by Mr. Rittvo's propensity and frequency inputs, it would approve these methods for calibrating the model as well.

### (3)  The "Rittvo Effect" is not sufficiently reliable

Defendants take issue with one other aspect of Mr. Rittvo's calculation of projected visitors: what he calls a "baseline equalizer," or, more colloquially, the "Rittvo Effect." (Bankr. Tr. 3214:9–12, 3215:8–18.) In Illinois, each casino is limited to roughly 1,320 seats for customers (each seat is called a "gaming position"). (Bankr. Tr. 3215:19–22.) The baseline equalizer "artificially increase[s]" the number of gaming positions in the model to roughly 1,920. (Bankr. Tr. 3021:23–24, 3216:3–14.) Defendants argue this is an unreliable way to project visitors because it ignores the fact that casino seats are limited. (C. Defs.' SOF ¶¶ 899–902.)

But Mr. Rittvo uses the extra seats as a proxy for additional, non-gaming revenue, rather than as an attempt to accurately predict attendance. (Bankr. Tr. 3012:3–8.) The initial revenue calculation (number of visits multiplied by the casino's win-per-visit) is too low, he explained, because it captures only the revenues derived from gaming, without including non-gaming sources of revenue (for example, from food sales or other retail sales). (Bankr. Tr. 3012:3–8.) Furthermore, Mr. Rittvo noted, demand for gaming in Chicago greatly exceeds the available supply, and each seat is therefore likely to be more productive than in other markets. (Bankr.

Tr. 3021:9–3022:9.)  To correct for these factors, Mr. Rittvo adds 600 additional seats to every casino in the model.  (Bankr. Tr. 3022:15–24.).

Defendants note that the "Rittvo Effect" has not been published, is not used by anybody else in the casino industry, and has never been empirically tested for reliability.  (C. Defs.' SOF ¶ 902) (citing Bankr. Tr. 3216:21–3217:5.)  The Trustee points out that Mr. Rittvo has consistently used the 600-seat addition to capture the additional revenues generated by casinos in other projects when evaluating the Chicagoland market.  (Bankr. Tr. 3022:19–3023:7.)  Mr. Rittvo conceded that "nobody else uses the Rittvo Effect," though he believes "that they have their own proprietary elements that make modifications to allow for" the additional revenue sources.  (Bankr. Tr. 3217:1–7.)  He admitted, as well, that the Rittvo effect has not been tested empirically by anyone outside of his company.  (Bankr. Tr. 3217:6–9.)  Mr. Rittvo's rationale is sound; the model needs to capture additional revenues derived from a casino's other amenities beyond the gaming positions.  Mr. Rittvo has not explained why or how he selected the 600-seat increase, however; nor has he explained why this approach is more reliable or accurate than other methods of calculating additional revenues (for example, extrapolating from historical data, as he has done in other parts of the model).  The court concludes, therefore, that the use of the Mr. Rittvo's baseline equalizer is not sufficiently reliable under *Daubert*.

### (b)     The win-per-visit amount is not sufficiently reliable

Defendants also contend that errors in Mr. Rittvo's methods for calculating revenues exacerbate the flaws in his calculations of the number of visits to the proposed Rosemont casino. (C. Defs.' SOF ¶¶ 903–05.)  Once Mr. Rittvo calculated the number of visits through the use of the gravity model, he multiplied that number by a "win-per-visit" rate.  (Bankr. Tr. 3033:21–23) (testifying that he "applied that win-per-visit per patron to the attendance forecast and developed the revenue for Rosemont.")  The win-per-visit is the amount of money the casino wins for every patron who comes to the casino (or, alternatively, the amount that each

visitor to a casino loses on average). (Bankr. Tr. 2968:2–6.) Defendants allege that Mr. Rittvo's win-per-visit amount rate is a subjective number that is based only on his "professional judgment." (C. Defs.' SOF ¶ 904.) The valuation report he prepared does present the win-per-visit rate without any explanation of how it was calculated, and the charts simply identify only "the Innovation Group" as the source for the data. (PX445 at 82, 85.)

Mr. Rittvo's testimony provided a bit more insight. He testified he obtained attendance and revenue data from the Illinois and Indiana Gaming Commissions. (Bankr. Tr. 3032:19–22.). Though his testimony was less than explicit, it appears that he simply divided annual revenues by number of visits to determine the win-per-visit rate for each casino.[124] (*See* Bankr. Tr. 3032:11–3033:4; *see also* PX445 at 25 ("Win per visit is the average amount of revenues per gamer visit (or entrance to a casino by a patron) retained by the casino").) The win-per-visit values he calculated ranged from $72 to $136. (PX445 at 82, 83.) Then, based on this historical data from other Chicagoland casinos, Mr. Rittvo assigned "slightly higher revenues in win per position, again, because the demand was so great"—that is, due to the high demand expected for gambling in the Rosemont location, Rittvo assumed that the casino would charge higher prices. (Bankr. Tr. 3033:10–13.) He adopted a win-per-visit rate of $128.41 (PX445 at 86; Bankr. Tr. 3034:17–18), a number clearly within the range from the other casinos. Mr. Rittvo explained that he chose a value towards the high end of that range because Rosemont was a very profitable location. Without more details, however, the court cannot conclude that Mr. Rittvo used a sufficiently reliable method to compute the "win-per-visit" rate for a proposed Rosemont casino.

---

[124] The court notes that if the win-per-visit rate is calculated based on *total* revenues reported for a casino (gaming and non-gaming) then the win-per-visit rate should implicitly incorporate non-gaming sources of revenue, which leads the court to further question why the 600-seat upward adjustment, or "Rittvo Effect" is necessary.

### (c) The proprietary model for operating expenses is not sufficiently reliable

One of the final steps in Mr. Rittvo's calculations of a base-year revenue amount was to subtract from gross revenues the operating expenses for the year, using a proprietary expense model to predict those operating expenses. (PX445 at 24, 95.) The model "accounts for all departmental payroll, cost of goods, and other operating expenses" as well as "land lease costs of $4 million, property taxes, insurance, and utilities." (PX445 at 95, 96.) Mr. Rittvo's report simply identified "operating expenses" in a generic way, and Mr. Rittvo did not explain how he determined the payroll, the costs of goods, utilities, or insurance. Mr. Rittvo admitted at the bankruptcy proceedings that the expense model had not been tested or replicated anywhere. (Bankr. Tr. 3221:11–3222:9.) Without more information on the specifics of the expense model, the court cannot conclude that the use of Mr. Rittvo's proprietary model is a sufficiently reliable methodology.

### ii. Mr. Rittvo did not account for specific risks that existed as of February 2001, which would have reduced the value of Emerald's license at that time

In addition to the flaws in calculating the base-year rate, Defendants argue that Mr. Rittvo's projections of future revenues are flawed. They argue that Mr. Rittvo improperly used hindsight to predict revenue streams and did not take account of (a) the then-existing risk of the casino not being licensed in Rosemont and (b) pending litigation against Emerald.

The Discounted Cash Flow analysis is intended to produce a value at which a willing seller would sell to a willing buyer. (Bankr. Tr. 2992:14–17; Trustee's SOF ¶ 210.) Therefore, DCF analysis should account for the fact that that a willing buyer would discount the purchase price for risks that existed at the time of the valuation. Mr. Rittvo's valuation was based on a presumed opening date of February 1, 2001, and he asserts that although he used hindsight, he "did not consider any positive post-February 2001 events; only negative events." (PX1266 at 9, ¶ 24.) Specifically, he considered (1) a gaming tax increase that occurred in June 2002; (2) a

ban on smoking in Illinois implemented in January 2008; and (3) the economic recession. (*Id.* at 9, ¶ 23.) As a result, Mr. Rittvo contends, that the only effect of his hindsight "has been to substantially lower the valuation and, hence, the Trustee's loss." (*Id.* at 9, ¶ 24.)

Mr. Rittvo admitted, however, that his analysis did not take into account certain risks that existed on January 30, 2001. (Bankr. Tr. 3191:8–16). As Defendants point out, there was a significant risk that the IGB would not approve a move of Emerald's casino to Rosemont. At the time the license was revoked, there was also considerable uncertainty as to whether the IGB would renew Emerald's license or allow it to relocate at all, and an ongoing lawsuit to determine the meaning of Section 11.2. (*See* Trustee's SOF ¶ 147.) Though the language appeared to state otherwise, the IGB took the position at this time that it was not required to renew Emerald's license and had discretion to reject the location Emerald had selected. (PX858 at 806–07.) The Illinois courts ultimately concluded that the IGB lacked discretion to deny the renewal and relocation application. *Emerald Casino, Inc. v. Ill. Gaming Bd.*, 346 Ill. App. 3d 18, 22, 33–35, 803 N.E.2d 914, 917, 926–28 (Ill. App. Ct. 1st Dist. 2003). That result was not inevitable, however. Yet, Mr. Rittvo did not make any adjustment for the risk of an adverse result. (Bankr. Tr. 3093:17–94:15, 3182:7–19, 3191:8–16.)

The Trustee argues that Mr. Rittvo's approach was nevertheless fair because the "point of Rittvo's analysis was to value what Emerald would have had if Defendants had obeyed the law." (Trustee's Post-Trial Br. at 316.) That argument assumes that Defendants' misconduct was the only reason the IGB was skeptical of Rosemont and interpreted Section 11.2 to give it discretion to deny the Renewal Application. The court is far less certain. It is not at all clear that the IGB would have interpreted the legislation differently in the absence of Defendants' conduct. The IGB had also rejected offers to relocate the license to Rosemont, even with a different company at the helm. (*See, e.g.*, DX697 at 3–4.) At a minimum, the court believes that a willing buyer in 2001 would have taken into account the risk that the pending litigation over the meaning of Section 11.2 would be resolved in favor of the IGB, when determining the price she

would be willing to pay.

The use of selective hindsight in DCF analysis undermines the reliability of that analysis. Indeed, the Seventh Circuit has recognized the malleability of DCF analysis, observing that it is "highly sensitive to assumptions about the firm's costs and rate of growth, and about the discount rate. It is a simple matter to increase or reduce the outcome of a cash flow analysis by 200% by making changes in assumptions that appear by themselves to be insignificant." *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 835 (7th Cir. 1985). The Seventh Circuit has also cautioned that "hindsight bias is to be fought rather than embraced" when valuing a company. *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010). In more colorful language, the Seventh Circuit recently described the process of discounted cash flow analysis as "something of a black art" and "almost impossible for private companies, for which uncertainties abound." *Olsen v. Floit*, 219 F.3d 655, 658 (7th Cir. 2000).

Given the malleability and sensitivity of DCF analysis, the court concludes that the combination of undisclosed and flawed inputs in Mr. Rittvo's analysis renders his report unreliable.

### iii.    Other alleged flaws in Mr. Rittvo's calculations

Defendants have identified other flaws in Mr. Rittvo's report. The court need not consider their concerns in depth, but will address them briefly.

### (a).    Improper factual underpinnings

Defendants assert that Mr. Rittvo improperly assumed that Rosemont would be the location of the casino, and that this assumption inflated his final projections due to his belief that Rosemont was the most profitable location in the Chicagoland area. Defendants also challenge Mr. Rittvo's assumed start date of February 1, 2001 (Bankr. Tr. 3207:23–3208:4), noting that on that date they were still appealing the denial of the Renewal Application, and the casino could not have begun operating that quickly. (C. Defs.' SOF ¶ 911.)

The court concludes these concerns go to the weight of the evidence, not its

admissibility.  The Rosemont location and the February 2001 start date are factual assumptions underlying Mr. Rittvo's analysis, which were provided to him by the attorneys litigating this case. (Bankr. Tr. 3206:23–3207:4, 3207:12–18 (start date); Bankr. Tr. 3187:11–14 (Rosemont location).)  But, "the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."  *Smith v. Ford Motor Co.*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 586–87 (7th Cir. 2000) (when addressing whether expert testimony is reliable the district court should not consider the "'factual underpinnings' of the testimony but should determine whether the expert employed a proper methodology.").

### (b).      Improper inclusion of prejudgment interest

Defendants also urge the court to reject Mr. Rittvo's testimony because Mr. Rittvo's valuation improperly included prejudgment interest.  Mr. Rittvo determined that Emerald's license was worth roughly $342.8 million as of January 31, 2001.  Mr. Rittvo then calculated what that sum would be worth as of November 2010, when the bankruptcy trial began. Specifically, he calculated "what I believe is the current value had somebody received that money [the $342 million] on . . . February 1, 2001, and invested it in risk-free interest rate. That's what I believe the value of that would be now."  (Bankr. Tr. 3146:11–15).  The final result was a valuation equal to $519,573,342 as of November, 2010.

Trustee asserts that this amount is not prejudgment interest but rather is a necessary adjustment to place Emerald "in the same position it would have occupied at the time of judgment had Defendants not breached their contract."  (Trustee's Post-Trial Br. at 318.)  The Trustee argues a license valued at $342 million in 2001 would now be worth much more.  (*Id.*) Although the Trustee argues that the $519 million figure is merely the present-value of Emerald's loss, Mr. Rittvo's report and testimony belie the notion that interest had nothing to do with this; in fact Mr. Rittvo's report explained that the figure was calculated based on a "risk-free

interest rate." (PX445 at 11.) The court concludes that the additional amount is prejudgment interest. *See Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 886 (N.D. Ill. 2012) ("Although labeled a 'present value calculation,' this is, in effect, merely a different way of accounting for prejudgment interest, which is not recoverable in this case."); *Euroholdings Capital & Inv. Corp. v. Harris Trust & Sav. Bank*, 602 F. Supp. 2d 928, 940 (N.D. Ill. 2009) (finding that plaintiff's computations "present-valuing its losses" constituted prejudgment interest which were not allowed).

"In Illinois, the general rule is that prejudgment interest cannot be awarded unless provided by statute or agreement of the parties." *In re Air Crash Disaster Near Chi., Ill., on May 25, 1979*, 644 F.2d 633, 638 (7th Cir. 1981). The Illinois Supreme Court has confirmed that "[i]t is well settled that interest is not recoverable absent a statute or agreement providing for it." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 257, 856 N.E.2d 389, 412 (2006) (quoting *City of Springfield v. Allphin*, 82 Ill. 2d 571, 576, 413 N.E.2d 394, 396 (1980). The Trustee does not argue that any statute or agreement entitles her to prejudgment interest in this case. (*See* Trustee's Post-Trial Br. at 317–18.)

Instead, the Trustee argues that Mr. Rittvo's calculation is appropriate because under Illinois law, the proper measure of damages is the time of judgment, not the time of breach. That argument is at odds with the longstanding principle in Illinois that "the proper date for determining damages in a breach of contract action is the date of the breach, not the date of trial." *Sys. Dev. Integration, LLC*, 886 F. Supp. 2d at 886. "The requirement of establishing fair market value on the date of the breach relates to the proposition that a damage award should place the nonbreaching party into the position he would have been in had the contract been performed but not in a better position." *1472 N. Milwaukee, Ltd. v. Feinerman*, 374 Ill. Dec. 957, 964, 996 N.E.2d 652, 658-59 (Ill. App. Ct. 1st Dist. 2013) (internal citations omitted).

The Trustee's challenge to this principle rests on three Illinois appellate decisions: *Nilsson v. NBD Bank of Ill.*, 313 Ill. App. 3d 751, 731 N.E.2d 774 (1st Dist. 1991), *Mercantile*

258

*Holdings, Inc. v. Keeshin*, 261 Ill. App. 3d 546, 633 N.E.2d 805 (1st Dist. 1993), and *Am. Nat'l Bank & Trust Co. v. Erickson*, 115 Ill. App. 3d 1026, 452 N.E.2d 3 (1st  Dist. 1983).  Each of those cases deals with the situation in which a plaintiff loses an opportunity to sell stock at a higher price when forced to sell stock as a consequence of a breach of contract.  These cases rest on specific contractual language and reflect the exception, not the rule.  *See Santorini Cab Corp. v. Banco Popular N. Am.*, 376 Ill. Dec. 403, 409–412, 999 N.E.2d 46, 52–55 (Ill. App. Ct. 1st Dist. 2013) (distinguishing *Erickson*, *Mercantile Holdings*, and *Nilsson* from the general rule that damages are determined at the time of breach).

The cases Trustee cites cannot overcome the "well-settled" principle that the proper date for determining damages is the date of breach, and that prejudgment interest is not allowed. The Illinois Supreme Court has been explicit that, in an action at law, a plaintiff is not entitled to prejudgment interest "notwithstanding that an injured party who is eventually compensated may suffer detriment from the inability to use the money from the date of loss to the date of compensation."  *Tri–G*, 222 Ill. 2d at 258, 856 N.E.2d at 412.  Therefore, the Trustee is only entitled to recover the value of the license as of February 1, 2001, the date of breach.

The court has declined to adopt Mr. Rittvo's valuation, but if it had done so, it would nevertheless decline to adopt the prejudgment interest calculation.  *See Euroholdings Capital & Inv. Corp.*, 602 F. Supp. 2d at 942–43 (allowing the expert valuation in, but disregarding the prejudgment interest calculation).

### 2.    New business rule

As noted earlier, some of Mr. Rittvo's analysis may be understood as running afoul of the rule that bars recovery of lost profits for a new business.  Defendants urge the court to reject Mr. Rittvo's testimony altogether on this basis.  (C. Defs.' PCOL ¶ 114.)  Indeed, at least some of Mr. Rittvo's calculations rely on his projections of a future income stream—a stream which assumes that the new casino in Rosemont would be profitable.  Defendants urge that the court must disregard *any* evidence that incorporates a projection of lost profits, including evidence of

bids and offers to purchase Emerald's license. (C. Defs.' SOF ¶ 127.) As explained below, however, although it has rejected a valuation based upon these projections, the court concludes that the Trustee may fairly rely on evidence of other offers and bids for the purchase of Emerald.

The Trustee urges that this court may not even address the "new business" issue because the Bankruptcy Court decided it. (Trustee's Post-Trial Br. at 362–63.) Again, this court disagrees. When first confronted with the issue, the Bankruptcy Court determined the challenge was "premature." (12/23/2009 Bankr. Tr. 10:11.) The Bankruptcy Court later characterized the new business rule as one of the "open issues" that it "expect[ed] to be addressed at trial." (10/27/2010 Bankr. Tr. 8:21–22). The Bankruptcy Court did suggest that the "context of a casino license . . . has certain unique qualities," including "the somewhat monopolistic nature of the license," which "may have an impact on the new value rule," suggesting that a profits-based evaluation of the casino might be admissible in spite of the new business rule problem. (10/27/2010 Bankr. Tr. 8:8–20.) In any event, although the reasoning of the Bankruptcy Court is useful, this court is under an obligation to conduct a *de novo* review of the record. The Bankruptcy Court concluded that the new business rule is inapplicable here; though this court is less certain with respect to Mr. Rittvo's testimony, the court concludes that the Trustee's other evidence of the value of the license is a proper basis for an award of damages.

Under Illinois law, "as a general rule, expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery." *TAS Distrib. Co. v. Cummins Engine Co.,* 491 F.3d 625, 633 (7th Cir. 2007). The rule recognizes that calculating the profits that a new business might earn often requires speculation, and thus violates the principle that damages must be proven to a reasonable degree of certainty. *Cement-Lock v. Gas Tech Inst.*, 618 F. Supp. 2d 856, 868 (N.D. Ill. 2009) (quoting *TAS Distrib Co.*, 491 F.3d at 634–35.) The new business rule would ordinarily preclude an award of lost profits for a new business, which is, Defendants insist, precisely what the Trustee is seeking. (*See* C. Defs.' Post-Trial Mem. at 269.) The Trustee maintains that she is advancing a theory based on the loss of the license

itself and is seeking to recover the value of that license. (Trustee's SOF ¶ 854; Trustee's Post-Trial Br. at 320–21.) What she has offered, she asserts, is market evidence, not lost-profit evidence, and is not barred by the new business rule.

The Trustee is correct that market evidence, such as past sales or offers to purchase an asset, is distinct from evidence of lost profits. The Illinois Supreme Court specifically distinguished fair market value of property from the projections of lost profits in *People v. Stevens*, 358 Ill. 391, 193 N.E. 154 (1934). In that early case, the defendant was charged with embezzling funds from a life insurance company and using those funds to keep his business, the Stevens Hotel, afloat. 358 Ill. at 398–99, 193 N.E. at 157. As part of its case, the prosecution offered expert testimony about the value of the Hotel in an effort to prove that the defendant knew the enterprise was insolvent. The expert calculated income from the projected occupancy of the hotel over a thirty-five year period, and added that income to the projected value of the hotel, reduced to its present day value. In rejecting this evidence, the court stated:

> [T]he testimony of the People's witnesses concerning the value of the assets of the hotel company was incompetent. In civil cases the rule is that fair cash market value of property on the date under inquiry is its value for the highest and best use for which it is adapted, and evidence tending to show profits from the operation or volume of business, or contingencies of future profits, is too speculative and remote to be considered.

358 Ill. at 406, 193 N.E. at 160. Although not originally a new business rule case, Illinois appellate courts have relied on the reasoning of *People v. Stevens* to support the application of the new business rule. *See SK Hand Tool Corp. v. Dresser Indus., Inc.*, 284 Ill. App. 3d 417, 426, 672 N.E.2d 341, 347 (1st Dist. 1996) (citing *Stevens* for the proposition that "Illinois courts have long rejected the use of speculative, inaccurate or false projections of income in the valuation of a business."); *Reynolds v. Coleman*, 173 Ill. App. 3d 585, 595–96, 527 N.E.2d 897, 904–05 (1st Dist. 1988) (quoting *People v. Stevens* in support of application of the new business rule).

The case law recognizes a distinction between projections of lost profits and evidence of

market value. In the cases cited by Defendants to support the application of the new business rule, the rule is consistently applied to evaluate whether projections and estimates of future profits are too speculative, rather than to evaluate historical offers to purchase a lost asset. In this case, similar considerations rendered Mr. Rittvo's own calculations of the propensity and frequency factors, and the operating expenses, unsatisfying, at least in part because they could not be anchored in the experience of a functioning casino. *See TAS Distrib. Co.*, 491 F.3d at 635-636 (rejecting evidence of sales projections used during contract negotiations and evidence of a competitor's sales); *M.S. Distrib. Co. v. Web Records, Inc.*, No. 00-cv-1436, 2003 WL 21087961, at *10 (N.D. Ill. May 13, 2003) (rejecting testimony by the defendant calculating lost profits based on estimates of lost sales of new recording artists' albums); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 315–18, 515 N.E.2d 61, 66–67 (1987) (rejecting testimony of plaintiff's accountant and expert witness that hotel lost revenues due to exclusion from hotel guide based on projected occupancy rates); *SK Hand Tool Corp.*, 284 Ill. App. 3d at 428, 672 N.E.2d at 349 (rejecting expert testimony valuing a division of a business because it was based on an hypothetical assumption "not supported by the evidence"); *Nordhem v. Harry's Cafe, Inc.,* 175 Ill. App. 3d 392, 396–98, 529 N.E.2d 988, 991–92 (1st Dist. 1988) (rejecting testimony by plaintiff's accountant estimating lost profits from missed business opportunity); *Reynolds v. Coleman,* 173 Ill. App. 3d 585, 595–96, 527 N.E.2d 897, 904–05 (1st Dist. 1988) (rejecting valuation based on projected income); *F.L. Walz, Inc. v. Hobart Corp.,* 157 Ill. App. 3d 334, 339–41, 510 N.E.2d 1248, 1252–53 (3d Dist. 1987) (rejecting testimony and study of a certified public accountant comparing "actual sales with expected sales."). *But see Milex Prods. v. Alra Labs., Inc.,* 237 Ill. App. 3d 177, 191–93, 603 N.E.2d 1226, 1236–37 (2d Dist. 1992) (allowing recovery of lost profits based on expert testimony projecting sales of new drug). The logic of the new business rule operates to bar consideration of speculative projections of profits.

Evidence that, in the past, third-parties were willing to purchase Emerald's license at a particular price at a particular time does not suffer from these uncertainties, however. Notably,

too, no case cited by the parties, or identified by the court, applies the new business rule to a situation where a plaintiff lost a previously-owned asset which had the potential to produce income in the future. Two cases address situations where the plaintiff was unable to sell some portion of inventory due to the defendant's actions and lost the ability to derive profits from the sales. *See Tri-G, Inc.*, 222 Ill. 2d at 247–48, 856 N.E.2d at 406–07 (seeking lost profits for the expected sales of homes that were never constructed due to inappropriate distribution of trust funds); *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 331, 770 N.E.2d 177, 182 (2002) (seeking lost profits for misallocation of cars from Toyota distributor to car dealership). These cases involve circumstances where plaintiffs were unable to derive income from the sale of lost assets, but in both of them, the plaintiffs had existing profitable businesses and past sales data from which lost profits could be calculated without undue speculation. In *Belleville Toyota, Inc.*, the Illinois Supreme Court allowed recovery based on testimony from a damages expert that translated lost vehicle units into lost profits, which could be determined from "data contained in plaintiff's financial statements that represented the difference between the customer price" and plaintiff's expenses. 199 Ill. 2d at 359, 770 N.E.2d at 198. Similarly, in *Tri-G, Inc.*, the court allowed recovery based on testimony about anticipated profits from the expected sales of homes, had they been completed, when that testimony was combined with evidence of the cost of construction and sales prices from actually completed homes in the same development. 222 Ill. 2d at 248–50, 856 N.E.2d at 407–08 (2006). These cases illustrate the distinction between a lost-profits theory of damages and a theory of damages based on the market value of an asset. The new business rule precludes expert speculation about possible lost profits where there is no historical data. It does not exclude historical evidence of the price an asset sold in the market. Here, the court declines to consider speculation about lost profits at Rosemont. What it can consider is the Trustee's evidence of the sales history of Emerald's license.

Finally, other courts that have considered the topic have drawn clear distinctions

between damages based on lost profits and damages based on an asset's market value.  The Second Circuit addressed the issue in a breach of contract case where plaintiffs alleged that the breach caused a corporation to lose an exclusive television programming license.  *Schonfeld v. Hilliard,* 218 F.3d 164 (2d Cir. 2000).  The parallels to this case make the Second Circuit's decision particularly instructive.  In *Schonfeld*, the court concluded that under New York's new business rule, the plaintiffs were not entitled to recover lost profits because the profits were "purely hypothetical."  *Id.* at 173.  The court did not bar the plaintiffs from recovering damages altogether, however, instead distinguishing between "damages for the market value of a lost income-producing asset and lost profits."  *Id.* at 175.  As the Second Circuit explained:

> lost profits are not the only kind of consequential damages.  A defendant's breach of contract may also cause a plaintiff to lose an asset that was in its possession prior to the breach.  In some instances, the asset lost is an *income-producing* asset, the fair market value of which may be based, in whole or in part, on a buyer's projections of what income he could derive from the asset in the future.

*Id.* at 176 (emphasis in original).  Although the market value may be based in part on projections about future income, the two categories "remain analytically distinct."  *Id.* at 177.  This is because market value "represents what a buyer is willing to pay for *the chance* to earn the speculative profits."  *Id.* (emphasis in original).  The fact that the market value represents what a willing buyer would pay at a single point in time makes it "inherently less speculative than lost profits," and therefore this evidence does not trigger the logic of the new business rule.  *Id.* The Third Circuit reached the same result in *Edwards v. Wyatt*, 330 F. App'x 342, 350 (3d Cir. 2009), recognizing a "crucial" difference between seeking "lost profits" damages and damages arising from the loss of an "income-producing asset with an ascertainable market value."  The Eighth Circuit also adopted this approach in *Matrix Group Ltd. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 593–94 (8th Cir. 2007).  The distinction is critical here, as well: Emerald lost its license—an asset with the potential to produce income in the future—which various third-parties offered to purchase for the *opportunity* to build and run a casino.  The court concludes that

market value damages are distinct from lost-profit damages, and that market value damages are not barred by the logic of the new business rule.

The court pauses for one final caveat before evaluating Trustee's market value evidence. In Illinois, where an expert's purported market valuation was based on lost-profit projections, Illinois courts have extended the new business rule to exclude such expert testimony. *See SK Hand Tool Corp.*, 284 Ill. App. 3d at 426, 672 N.E.2d at 347 (excluding evidence of a business's resale value because it was premised on the theory that plaintiff "would have made a larger gain on the resale of the business *if SK had not lost incremental sales and profits.*") (emphasis in original.) This is exactly what this court did in *Cement-Lock v. Gas Technology Institute*, 618 F. Supp. 2d 856 (N.D. Ill. 2009). In *Cement-Lock*, this court held that despite plaintiff's efforts to characterize her expert's testimony as describing the lost value of an asset, "the logic of the new business rule was nevertheless triggered once [plaintiff's expert] admitted that his current-day valuation of the [asset] is an approximation of the profits [plaintiff] might earn from that [asset]." 618 F. Supp. 2d at 868. Yet, even in that case, this court recognized a distinction between an "income approach" based on lost profits and a "market approach" to valuation based on prior sales of an asset. *Id.* at 864. As this court recognized, the market approach "values an intangible asset by ascertaining and comparing what others have paid for comparable assets in a free and competitive *market* place." *Id.* at 865 (emphasis added). The court did not apply the new business rule to evidence of actual offers or sales of the asset. *See id.* at 865 (describing evidence of purchase agreements used in market-approach valuation). What the *Cement-Lock* court took issue with was the expert's current-day valuation of the technology which "relie[d] exclusively on" an analysis of projected incomes, "as opposed to a market-based measure." *Id.* at 867. Illinois's new business rule prohibits plaintiffs from proving market value through expert projections of lost profits, but does not prevent the Trustee from presenting other evidence of market value, which is exactly what Trustee has done

here. [125]

### 3. Evidence showing the market value of Emerald's license

The court turns to evaluate the Trustee's evidence of the fair market value of the license. The parties agree that the Trustee must show that the license has a "determinable" market value. (Trustee's Post-Trial Br. at 326; C. Defs.' Post-Trial Mem. at 275); *see Schonfeld*, 218 F.3d at 177. That requirement cannot be met, Defendants argue; because the IGB had the authority to revoke the license, and the license is not transferable, they contend, it was merely a revocable privilege, not marketable property, and therefore there was no market for the license. (C. Defs.' Post-Trial Mem. at 275.) [126] The record contradicts this assertion. First, as the Trustee points out, IGB Rule 235 permits the transfer of the license through mergers. 86 ILL.

---

[125]     Although Mr. Rittvo's testimony is separately inadmissible under *Daubert*, the court notes that Mr. Rittvo's testimony bears a strong resemblance to the expert testimony this court excluded in *Cement-Lock*. Simply because Mr. Rittvo's report was purportedly an analysis of market value cannot hide the fact that his analysis was grounded in measuring lost-profits of a Rosemont casino.

[126]     Defendants cite case law in other states concluding that a revocable license has no determinable market because it is not a property interest. (C. Defs.' Post-Trial Mem. at 275–76.) These cases are not persuasive. First, as noted in text, there was a rather robust market for the license in Illinois. Second, the two Louisiana cases are easily distinguishable. *Louisiana v. Guidry*, 489 F.3d 692, 704 (5th Cir. 2007) held that the State of Louisiana could not recover the value of a gaming license because the license was not property of the State and the State's interest in the license was regulatory, not proprietary. *Copeland v. Treasure Chest Casino, LLC*, 822 So. 2d 68, 71 (La. Ct. App. 2002), held that a party who alleged tortious interference with the acquisition of a license could not recover the value of the gaming license because he failed to show it was his property. That case is easily distinguishable, because the plaintiff in that case never actually acquired the license. In any event, Seventh Circuit precedent makes clear that a statement in a state statute that a license "is not property" is not determinative on the question of whether a license is in fact "'property' in a functional sense." *Reed v. Vill. of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983). The IGB could not technically revoke a license at will, but had to present evidence "sufficient to support the seizure of a gaming device," 86 ILL. ADMIN. CODE § 3000.1110, and provide the licensee with an opportunity to be heard and challenge the grounds for revocation. *See* 86 ILL. ADMIN. CODE §§ 3000.1126–1155. These factors are similar to ones that the Seventh Circuit considered when finding that a liquor license was a property interest. *Reed*, 704 F.2d at 948 ("[T]he license is good for one year and during that time, clearly, it is securely held, for it can be revoked only for cause, after notice and hearing, and subject to judicial review."). The court therefore rejects Defendants' argument that the Trustee cannot recover because the license is merely a "revocable privilege" that has no market.

ADMIN. CODE § 3000.235. In fact, as the record in this case reveals, the IGB initially issued Emerald's own license to the Jo Daviess Joint Venture in 1992. (Trustee's SOF ¶ 89; C. Defs.' SOF ¶ 40.) Defendants acquired the license in 1994 through a merger, approved by the IGB, with the Jo Daviess Joint Venture. (Trustee's SOF ¶ 91; C. Defs.' SOF ¶ 64.) To assert now that no market exists because licenses are not transferrable ignores Emerald's own history.

Furthermore, between 1999 and 2008, several different companies performed valuations of Emerald and made offers to purchase Emerald and to acquire its license based on those valuations. This evidence is useful. Again, as the Second Circuit explained:

> If, fortunately, the asset at issue has a sales history, then despite the lack of a traditional market, it is easier for the court to determine the asset's market value as of the time it was lost. Indeed, it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the "best evidence" of its market value.

*Schonfeld,* 218 F.3d at 178; *see also Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 741–42 (1997) ("[T]he very best evidence of the value of [plaintiff's intangible assets] might be their actual selling price (assuming, of course, that the sales were made in good faith and at arm's length)."). The court concludes that there was a market for Emerald's license and is comfortable determining a market value from the history of bids, offers, and ultimately a sale.

Defendants next contend that even if the court considers the market evidence, the series of offers and bids is not a reliable basis for valuation. They make two general arguments. First, they urge that the offers and bids must be understood as measuring the value of Emerald as a whole, rather than the value of Emerald's license specifically. Second, they argue that several of the valuations assume a casino based in Rosemont, a location the IGB never approved, and which would have been more valuable than a license located elsewhere. (C. Defs.' SOF ¶¶ 953, 956, 959–60, 962.)

Defendants' first argument is not persuasive. As the Trustee points out, when Emerald stopped operating the Silver Eagle in 1997 it began disposing of its tangible operating assets. The license was Emerald's only significant asset during the valuations. (Trustee's SOF ¶ 708.)

Defendants do not contest this claim, and the evidence supports it: Emerald's December 31, 1999 financial statement lists no tangible assets. (PX406 at 3.) McMahon also testified at the bankruptcy trial that during the 2004 bidding process, the license was Emerald's only significant asset. (PX393 at 5 (85:17–19); Bankr. Tr. 1416:8–16.) Defendants have not identified any other components of Emerald that would give it value, beyond the license.

Instead, Defendants attempt to distinguish between a bid on Emerald's "equity interests" and the license itself, urging that while an equity interest can be sold, with IGB approval, the license cannot be sold under any circumstances. (C. Defs.' Post-Trial Mem. at 280) (citing ILL. ADMIN. CODE §§ 3000.235(a), 3000.250.) As explained above, the license can be sold through a merger. Furthermore, the distinction breaks down in this case when the license was Emerald's only asset. Valuation of its equity therefore primarily reflects the value of the license. The fact that the IGB would have to approve the transfer of equity or any merger does not alter that conclusion.

Defendants' second argument, however, is more compelling. The IGB expressed clear hostility towards a casino in Rosemont throughout Emerald's efforts to sell the license. (PX858 at 1977, 1979, 1982–83, 1985–86.) The IGB also prevented a sale of Emerald that was contingent on a Rosemont location. (*See, e.g.*, DX697 at 3–4.) The Trustee cannot show that Emerald lost the opportunity to operate a casino in Rosemont because the Trustee has not shown that but for Defendants' conduct, the IGB would have approved a Rosemont location. Defendants have presented compelling evidence that the IGB had other concerns about licensing a casino in Rosemont that would have existed absent Defendants' conduct— specifically, concerns (however vague) about connections to organized crime and the integrity of Rosemont's leaders. (PX858 at 1977, 1979, 1982–83, 1985–86.) The IGB did select a Rosemont casino as the winner of one round of bidding in 2004, but the Attorney General publicly opposed the transaction and prevented the sale, for those same reasons. (DX467 at 2– 5.) In light of the IGB and Attorney General's hostility to a casino in Rosemont, the court cannot

place great weight on Rosemont valuations.

Defendants urge the court to go further and disregard all evidence that assumes a location other than East Dubuque. (C. Defs.' PCOL ¶ 125.) They argue that because the IGB never approved the relocation of Emerald's license to any other location, the Trustee's evidence rests on a false assumption. (*Id.*) Yet, this ignores the unique advantage that Emerald held after the 1999 legislation. Although the IGB had not approved relocation, and its willingness to do so was uncertain, it remains the case that Emerald held the only license authorized by statute to relocate. (C. Defs.' SOF ¶ 144.) The IGB did ultimately approve a bid for a casino in Des Plaines. That approval is not conclusive, but it does provide evidence that the IGB would have approved some non-East Dubuque locations for Emerald. (PX858 at 1986; C. Defs.' SOF ¶ 971.) The court finds the evidence of bids and valuations based on locations other than Rosemont to be persuasive.

### a.    Rosemont valuations

Although the valuations based on a non-Rosemont location are more persuasive evidence of the value of Emerald's license, the court nevertheless begins with the Rosemont valuations.

### i.    August 1999 EVI valuation

In August 1999, Emerald's Board approved a valuation of Emerald that was commissioned in order to determine how much to charge when selling twenty-percent of Emerald stock to the Statutory Investors. (PX20 at 2–3; Bankr Tr. 1327:11–21, 1330:4–8.) That valuation was done by Kevin Flynn's company, EVI (PX20 at 2–3; Trustee's SOF ¶ 714) and was unanimously approved at the August 12, 1999 Emerald Board meeting. (Trustee's SOF ¶ 714.) Donald Flynn, Kevin Larson, Peer Pedersen, and Joseph McQuaid all served on the Board at the time. (PX20 at 2.) Defendants Kevin Flynn, John McMahon and Walter Hanley also were present at the August 12, 1999 meeting in their capacities as officers of Emerald. (*Id.* at 1.)

Using a Discounted Cash Flow Analysis, EVI calculated Emerald's aggregate fair market value at $307.5 million as of July 31, 1999. (PX317 at 2, 25–26, 33.) The EVI appraisal complied with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. (*Id.* at 5.)

Despite their past reliance on the valuation, Defendants now argue that the EVI report is not reliable evidence. They contend the EVI valuation was based on a non-controlling portion of stock of the enterprise, rather than the value of the owner's license. (C. Defs.' SOF ¶ 954.) As explained above, this is not a meaningful distinction. Furthermore, the valuation appears expressly to constitute a valuation of Emerald as a whole: the report first calculates the fair market value of the controlling, marketable equity of Emerald—i.e., a 100% interest. (PX317 at 33.) To the overall value of Emerald, the report then applies a series of "discounts" to account for the unique nature of the stock that was being sold. Specifically, the report included a 50% discount based on the "non-controlling" nature of the stock. Absent a discount, 20% of the stock would equal $61,500,000 (or 20% of the enterprise value). But with the 50% discount, as the report concluded, 20% of Emerald stock was valued at $30,750,000 (or 10% of the total value of the company). (*Id.* at 34.) While Defendants are correct that the ultimate valuation is based on a portion of the stock, the report bases that calculation on a valuation of Emerald as a whole. Given that the only significant asset Emerald had at the time was its owner's license, the court finds that this is a reasonably reliable valuation of the license.

Furthermore, the evidence shows that Defendants were successful at selling stock based on this valuation. By December 22, 1999, Emerald had sold approximately $26.7 million in common stock to the Statutory Investors based on the EVI valuation. (PX25 at 1.) Recognizing that the assumption of a Rosemont location may have inflated the valuation, the court nevertheless concludes that these completed transactions constitute additional market evidence that supports the reliability of the valuation.

### ii. 2000 valuation for the *Davis* litigation

In 2000, attorneys representing Donald Flynn, Kevin Flynn, Joseph McQuaid, and Emerald as defendants in the *Davis* litigation commissioned the firm Jay Alix & Associates to prepare a valuation of Emerald on three different dates: July 1, 1999; October 18, 1999; and June 1, 2000. (PX653 at 3, 24–25, 27–28, 30–31.) The report was submitted on behalf of Defendants Donald Flynn, Kevin Flynn, Joseph McQuaid and Emerald. (*Id.* at 2; Trustee's SOF ¶¶ 723–24.) Using a DCF income analysis approach and a market approach based on a casino located in Rosemont (PX653 at 3, 5–6; C. Defs.' SOF ¶ 956), the report found that Emerald was worth $268–$272 million as of July 1, 1999 (PX653 at 24–25); $286–$295 million as of October 18, 1999 (*id.* at 27–28); and $308–$310 million as of June 1, 2000 (*id.* at 30–31).

This report has minimal credibility. To the extent it is useful at all, that is only because it was prepared on behalf of certain Defendants in a situation where Defendants had an incentive to present a modest valuation in order to reduce their potential liability in the *Davis* litigation. Like the EVI valuation, this one makes the potentially unwarranted assumption of a casino based in Rosemont. Furthermore, because this valuation was not used to support an offer or bid to purchase Emerald, it is not market evidence.

### iii. 2001 MGM Mirage offer

In 2001, the Flynn family retained Jefferies & Company, Inc. to serve as exclusive financial advisor in connection with a potential sale of Emerald. (PX1137 at 1.) The Emerald Board authorized officers to work with Jefferies. (*Id.* at 1–2.) Jefferies solicited bids by sending a confidential memo to potential buyers. (PX1302.) In response, Jefferies received four bids from (1) MGM Mirage, (2) Harrah's, (3) Isle of Capri/Bluhm and (4) Park Place. (PX1288 at 8–9). The initial bids ranged from $455 million to $550 million. (*Id.* at 8–9.)

The Jefferies process ultimately resulted in a final offer from MGM Mirage of $615 million, plus other consideration, including the assumption of all of Emerald's debt, in exchange for 100% of the stock in Emerald, resulting in estimated total value of the MGM offer to the

selling shareholders of approximately $716 million. (PX443 at 3; PX632 at 5.) MGM's offer was contingent on the Rosemont location. (PX442 at 2; PX1150 at 28, 45.) Emerald agreed to consider the MGM offer, and the parties proceeded to draft an "Agreement and Plan of Merger Agreement." (PX1316 at 190; PX1150.) Following this presentation, the Board, including Defendants Donald Flynn, Kevin Larson, and Joseph McQuaid, voted to proceed with the MGM-Mirage agreement. (PX1316 at 192–93.) The IGB was opposed to the transaction, however, and issued a press release criticizing the negotiation process. (PX697 at 4.) The sale was never completed. (C. Defs.' SOF ¶ 961.)

This offer is somewhat useful to the court because it represents an offer from a willing buyer that was accepted by the Emerald Board. The report also reflects Emerald's value from the time period immediately surrounding the revocation of the license. Yet, the transaction was never completed, in large part because of IGB resistance. The evidence also indicates that the purchase price was elevated in order to address concerns about that resistance. (*See* PX443 at 1–2) (discussing that the up-front purchase price is an attempt to assuage Emerald's concerns about IGB approval.) Therefore, the court recognizes that this offer, although proximate in time, may be substantially inflated due to the Rosemont location assumption.

### iv.    2004 Rothschild auction and Isle of Capri bid

On October 29, 2002, the Emerald Board passed a resolution to retain Rothschild, Inc. as Emerald's investment banker and financial advisor in connection with the sale, merger, or other disposition of Emerald. (PX1316 at 227.) The Rothschild bidding process produced bids from seven bidders: (1) Caesars Entertainment, to build a casino in Rosemont; (2) Harrah's Entertainment, to build a casino in Waukegan; (3) Isle of Capri Casinos Inc., to build a casino in Rosemont; (4) Mandalay Hyatt LLC, to build a casino in Summit; (5) Midwest Gaming Entertainment LLC, to build a casino in Des Plaines; (6) Penn National Gaming to build a casino in Rosemont; and (7) Southland Development Group, to build a casino south of Chicago. (PX1214.) From those initial bidders, three final bidders, Harrah's (Waukegan), Isle of Capri

(Rosemont), and Midwest Gaming (Des Plaines) were chosen to participate in the auction process to purchase Emerald. (PX1215 at 2–3.)

On March 10, 2004, Rothschild conducted an auction. (PX578 at 1.) The procedures required, among other things, that prospective bidders submit "Binding Proposals" which had to be "definitive non-contingent offer[s]" with at a minimum thirty days to close. (PX578 at 123–25, 132 ¶ 4.) At the conclusion of the multiple rounds of bidding, Rothschild requested that each bidder submit a "sealed, highest, best, and final bid." (*Id.* at 107.) The three final bidders submitted final sealed bids: Midwest Gaming bid $476 million; Isle of Capri bid $518 million; and Harrah's bid $520 million. (*Id.* at 111–12.)

On March 15, 2004, the IGB selected Isle of Capri as the winning bidder. (PX628 at 3.) Isle of Capri apportioned $488 million of the $518 million purchase price to the License. (PX1217 at 7.) The Isle of Capri bid was to construct a casino in Rosemont. (PX 858 at 1313.) Although the IGB selected Isle of Capri as the winner, the Illinois Attorney General publicly opposed this bid and filed a lawsuit to enjoin the IGB from approving the transaction. (DX 467, 485.) Under pressure from the Attorney General, the IGB withdrew its approval. (C. Defs.' SOF ¶ 967; *see* Bankr. Tr. 3186:7–9.)

Like the MGM offer, the Isle of Capri bid is useful because it represents an amount that a willing buyer would pay. The court also finds the separate pricing of the license and bid price instructive. Again, however, in light of the strong opposition by the Illinois Attorney General due to the Rosemont location, the Isle of Capri offer is entitled to less weight.

### b. Non-Rosemont bid from Midwest Gaming in 2008

In 2008, the IGB contracted with Credit Suisse to put Emerald's license up for bid. (PX858 at 1973; PX1236 at 1.) The IGB received seven applications and selected three finalists. (PX1236 at 1.) The finalists were: (1) Trilliant Gaming, which bid $406 million to build a casino in Rosemont, (2) Midwest Gaming, which bid $272 million to build in Des Plaines, and (3) Waukegan Gaming, which bid $216 million to build in Waukegan. (PX1237 at 2.)

Ultimately, the IGB awarded the License to Midwest Gaming. (PX1237 at 1.) According to the IGB, the majority of factors favored the Midwest Gaming proposal. (*Id.* at 2.) The Midwest Gaming bid was contingent on a Des Plaines, Illinois location, and IGB members specifically noted the importance that location played in their decision. (PX858 at 1977, 1979, 1982–83, 1985–86.)

The court finds this bid to be the most reliable evidence of Emerald's value and accordingly awards damages equal to $272,000,000. This is the only sale that was ever completed. Defendants do not challenge this bid under the new business rule. (*See* C. Defs.' PCOL ¶¶ 127–30) (challenging only the 1999 EVI and 2000 *Davis* litigation valuations based on the new business rule.) Finally, this bid represents the actual sale price of the license, which is likely the best evidence of fair market value. *Schonfeld*, 218 F.3d at 178; *see also Suitum,* 520 U.S. at 741–42.

As further support for relying on this bid as a measure of damages, the court notes that the 2008 Midwest Gaming bid falls just below the valuations of Emerald that were prepared closer to the date of breach. The EVI valuation prepared in 1999 was for $307.5 million and the valuations prepared by certain Defendants in the *Davis* litigation ranged from $268 to $310 million. These similar bids bolster the conclusion that the Midwest Gaming bid is an appropriate basis for determining the market value of the license.

The Trustee's evidence of the higher offers in 2001 and 2004 are not persuasive because they assume a Rosemont location and are based on offers for sales that were never completed. Although the Trustee asserts that the offers were final and binding, and therefore competent evidence of market value, the court finds the completed sale price more persuasive, due to the IGB's obstinate opposition to a Rosemont casino. The fact that Defendants themselves invoked these higher valuations does not alter the court's analysis.

Finally, the Trustee points out that John McMahon listed the value of Emerald's license at "$850,000,000 (enterprise value – MGM offer – subject to further investigation)" in the

Schedule of Assets and Liabilities that was submitted in the bankruptcy proposal. (PX624 at 5; Trustee's SOF ¶ 711.) But there is no evidence or explanation as to how this value was calculated and the proposed value is well outside the range of bids offered in any other context. The Trustee implicitly acknowledges that this statement is not persuasive by her own request for a $519 million damage award. The court accords no weight to the $850 million figure in the bankruptcy schedules.

Dividing the total damages amount ($272,000,000) by six, the court determines that Kevin Flynn, Donald Flynn, John McMahon, and Kevin Larson are each liable for $45,333,333.33 and Joseph McQuaid and Walter Hanley are each liable for $45,333,333.34.

### 4. The Trustee proved damages with a reasonable degree of certainty

In Illinois, in order to recover for breach of contract, a plaintiff must establish both "that he sustained damages . . . [and] he must also establish a reasonable basis for computation of those damages." *Ellens v. Chi. Area Office Fed. Credit Union,* 216 Ill. App. 3d 101, 106, 576 N.E.2d 263, 267 (1st Dist. 1991). Defendants here argue that the claim for damages is too speculative and that Trustee has failed to meet her burden to prove damages to a "reasonable degree of certainty." (C. Defs.' Post-Trial Mem. at 270) (quoting *TAS Distrib. Co.*, 491 F.3d at 632.) This argument is largely an extension of Defendants' arguments against lost-profit damages and, as explained earlier, the court's award rests instead on evidence of market value.

The court concludes that the Trustee has proven damages in that amount to a reasonable degree of certainty. The history of offers and bids, and specifically the 2008 Midwest Gaming bid, establish a reasonable basis for the computation of damages. As explained above, the Illinois Supreme Court has indicated that evidence of market value is sufficiently reliable to support damage awards. *See Belleville Toyota, Inc.*, 199 Ill. 2d at 331, 770 N.E.2d at 182; *Tri-G, Inc.*, 222 Ill. 2d at 257, 856 N.E.2d at 412. Furthermore, the Seventh Circuit has stated that "the agreed-upon purchase price is likely to represent a reasonably accurate estimation of the present value." *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996).

Finally, none of Defendants' arguments cast doubt on the reliability of the 2008 Midwest Gaming sale. Defendants argue that Trustee's evidence is too speculative for three reasons: (1) the valuations based on projected income are unreliable because of the logic of the new business rule, (2) unconsummated bids or offers are unreliable precisely because they were never finalized, and (3) statements by Defendants are unreliable. (C. Defs.' PCOL ¶¶ 124–25.) As noted, however, Defendants did not challenge the Midwest Gaming sale as unreliable under the new business rule; the offer was consummated; and the Midwest Gaming bid does not rest on any statement made by Defendants. In fact, Defendants' only argument against the reliability of this evidence is the conclusory statement that "[t]he Midwest Gaming transaction is not evidence of the intrinsic value of Emerald's license to a reasonable degree of certainty." (C. Defs.' SOF ¶ 973.) The court disagrees with Defendants and determines that the Midwest Gaming bid is a reasonable basis on which to base the court's damage award.

### 5. The principles of equity do not support a reduction of damages

Defendants request that even if this court finds that relief is appropriate, the court should "defer any award pending the administration of the claims process" in the bankruptcy proceeding to ensure that the damages amount in this case is limited to the amount owed to the creditors. (C. Defs.' Post-Trial Mem. at 285.) Defendants urge that reduction in the damages award is appropriate to avoid a massive windfall to the Trustee, and to avoid a process in which money would cycle through the estate and back to the Defendant shareholders. (*Id.* at 286–87.) Although the court is sympathetic to Defendants' request, the court declines to adopt their suggestion.

First, Defendants' argument that Trustee would receive a windfall is not compelling. As the Trustee notes, this argument conflates collecting estate assets with the process of distributing the estate assets. The Trustee's obligation is to "collect and reduce to money the property of the estate." 11 U.S.C. § 704(a)(1). The Seventh Circuit explained in *In re FBN Food Services., Inc.*, that "[o]nce the whole transfer has been pulled into the estate, the money is

distributed according to the priorities established by the Code and the debtor's own commitments." 82 F.3d 1387, 1396 (7th Cir. 1996). Although defendants in that case tried to limit the award to the "amount of debt senior to the defendant in the preference-recovery action," the court concluded that the trustee's recovery "has nothing to do with identifying who gets how much when the estate distributes its assets." *Id.* This court, similarly, declines to anticipate the distribution phase of the bankruptcy proceeding when evaluating the recovery appropriate for Defendants' breach of contract.

The breach of contract claim arises under state law. Although federal law determines what claims are included within the bankruptcy estate, "[t]he basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 20 (2000) (internal punctuation and citations omitted). Indeed, that has been the standard since the Bankruptcy Act of 1898. *Butner v. United States*, 440 U.S. 48, 54 (1979). "Unless some federal interest requires a different result, there is no reason why the state interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Raleigh*, 530 U.S. at 20.

Defendants' only counter-argument is that the district court is authorized to exercise the equitable powers of the bankruptcy court under 11 U.S.C. § 105(a). (C. Defs.' PCOL ¶ 138–39, 144.) *See, e.g.*, *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 444 (1st Cir. 2000) ("[S]ection 105(a) empowers the bankruptcy court to exercise its equitable powers—where 'necessary' or 'appropriate'—to facilitate the implementation *of other Bankruptcy Code provisions* . . . . [A] court may invoke § 105(a) 'if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code' . . . .") (emphasis added).

None of the cases Defendants cite suggest that a bankruptcy court may use its equitable powers under § 105(a) when implementing the requirements of state law. In fact, most of Defendants' cases do not address circumstances where bankruptcy courts are evaluating state

law claims. *See In re Airadigm Comm., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008) (though the Bankruptcy Code is silent, § 105(a) grants bankruptcy courts the power to release third parties from a creditor's claims without the creditor's consent, in order to facilitate reorganization plans under § 1123(b)(6) of the Bankruptcy Code); *Bessette*, 230 F.3d at 446 (§ 105 of the Bankruptcy Code provides a bankruptcy court with statutory contempt powers and powers to administer sanctions in order to enforce violations of § 524 of the Bankruptcy Code).

The only case Defendants cite that speaks to the interplay of state-law claims and the exercise of equitable powers supports the conclusion that district courts should follow state law when evaluating state claims. In *In re Memorial Estates, Inc.*, a bank with a secured loan sought, in state court, to have a receiver appointed to protect its collateral, a right it had under state law. 797 F.2d 516, 517 (7th Cir. 1986). The creditor subsequently went bankrupt and the case was removed to the bankruptcy court. *Id.* at 518. Upon the recommendation of the bankruptcy court, the district court appointed a receiver, an appointment that the Seventh Circuit upheld as an exercise of *state* equitable power, not a bankruptcy court's equitable power under § 105(a):

> When the bank moved in state court for the appointment of a receiver, it was not asking for the appointment of a bankruptcy receiver; the case was not a bankruptcy case . . . it was a simple foreclosure action. When the case was removed to federal court because the defendant had declared bankruptcy, all the bank wanted was an equity receiver . . . When a suit is removed from state to federal court, the federal court has . . . all the powers that the state court would have had to preserve the rights of the parties pending final judgment, including the power to appoint a receiver, and *it was that power that the district court exercised when it appointed the receiver*.

*Id.* at 519 (emphasis added) (internal citations omitted). In fact, *In re Memorial Estates* makes no mention of the equitable powers granted to under § 105(a); it refers only to 11 U.S.C. § 105(b), which is a limitation on a bankruptcy court's power that prohibits a bankruptcy court from appointing a receiver. *Id.* at 520.

If this court were exercising its power under the Bankruptcy Code to decide the distribution of claims, the court would indeed be authorized to invoke its equitable powers under 11 U.S.C. § 105(a). But, as the Defendants note, the court does not have the distribution proceedings before it. (*See* C. Defs.' PCOL ¶ 144) ("[T]he Bankruptcy Court has not administered the claims process, so at this point there is no way to know for certain the identity of the allowed claimants and the amounts of the respective allowed claims.") Instead, the court is evaluating Trustee's state-law claim in an adversary proceeding and therefore follows Illinois law.

Under Illinois law, "[t]he measure of damages for breach of contract is the amount that will compensate the aggrieved party for the loss 'which either fulfillment of the contract would have prevented or which the breach of it has entailed.'" *Santorini Cab Corp.*, 376 Ill. Dec. at 409, 999 N.E.2d at 52 (quoting *LeFevour v. Howorka*, 224 Ill. App. 3d 428, 430–31, 586 N.E.2d 656, 658 (1st Dist. 1991)). Put another way, "[t]he purpose of damages is to place the nonbreaching party in a position that he or she would have been in had the contract been performed." *GK Dev., Inc. v. Iowa Malls Fin. Corp.*, 378 Ill. Dec. 239, 251, 3 N.E.3d 804, 816 (Ill. App. Ct. 1st Dist. 2013.) The damage award of $272,000,000.00 is the amount that will compensate Emerald for the loss of the license. Defendants have not cited Illinois case law that supports their appeal to equity, and the court declines to use equity powers to deviate from what Illinois law requires.

Finally, Defendants' joint roles as officers, directors and shareholders of Emerald should not justify a reduction in the damage award. As explained above, Defendants individually made a promise—a rather unforgiving one—to Emerald to comply with IGB rules. The IGB found that Defendants had breached that contract, and the reviewing court affirmed that determination. Emerald lost its valuable license as a consequence. Defendants may have been acting reasonably and in good faith. They had no obvious motivation to jeopardize the casino license and may well not have foreseen the IGB's harsh reactions to their conduct. As the court has

concluded they did in fact breach the contract, it finds them liable for the following losses:

- Kevin Flynn: $45,333,333.33
- Donald Flynn: $45,333,333.33
- Joseph McQuaid: $45,333,333.34
- John McMahon: $45,333,333.33
- Kevin Larson: $45,333,333.33
- Walter Hanley: $45,333,333.34

## CONCLUSION

For the reasons stated, Kevin Flynn, Donald Flynn, Joseph McQuaid, John McMahon, Kevin Larson, and Walter Hanley are liable for the claim of breach of contract (Count II). The court will therefore enter judgment on that claim in favor of the Trustee and against Kevin Flynn, Donald Flynn, John McMahon, and Kevin Larson in the amount of $45,333,333.33 and against Joseph McQuaid and Walter Hanley in the amount of $45,333,333.34 for a total judgment of $272,000,000.00. Claims against Defendant Peer Pedersen are dismissed. The court finds Count I, the breach of fiduciary duty claim, is barred by the statute of limitations. And the court declines to subordinate Defendants' claims (Count IV).

Donald F. Flynn Estate's motion to dismiss the Trustee's claims for the imposition of joint liability and for punitive damages [64] is denied as moot. The court finds only several liability and the court dismissed the breach of fiduciary duty claim as barred by the statute of limitations, which was the only claim that could support punitive damages.

As the court has dismissed Count I, Defendants' motion to dismiss Count II of the Third Amended Complaint as duplicative [113] is denied.

Defendants' motion for judgment as a matter of law on Counts I & II [246] is granted with respect to Count I and denied with respect to Count II.

Defendants' motion [72] for leave to file a third-party complaint against Eugene Heytow is denied.

The court reserves judgment on Counts III, V, and VI and will set a status hearing to determine the appropriate method for resolving those claims.

ENTER:

Dated: September 30, 2014

_____

REBECCA R. PALLMEYER
United States District Judge