**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE, | ) |
| | ) |
| **EMERALD CASINO, INC.,** | ) **Chapter 7** |
| | ) **02 B 22977** |
| **Plaintiff, Debtor** | ) **Bankr. Adv. No. 08 A 00972** |
| | ) |
| _____ | ) |
| | ) |
| **FRANCES GECKER, not individually but** | ) |
| **solely as chapter 7 trustee for the** | ) |
| **bankruptcy estate of Emerald Casino, Inc.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) **No. 11 C 4714** |
| | ) |
| **DONALD F. FLYNN, KEVIN F. FLYNN,** | ) **Judge Rebecca R. Pallmeyer** |
| **KEVIN LARSON, JOHN P. McMAHON,** | ) |
| **JOSEPH F. McQUAID, WALTER HANLEY,** | ) |
| **and PEER PEDERSEN,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Emerald Casino, Inc. ("Emerald") was building a casino in Rosemont, Illinois when the

Illinois Gaming Board revoked its gaming license. The loss of the license forced Emerald into

bankruptcy. Plaintiff Frances Gecker is the Trustee appointed by the Bankruptcy Court on

behalf of Emerald. She brought this adversary proceeding against seven former directors and

officers of Emerald, alleging that they breached their fiduciary duty to Emerald (Count I) and

violated Emerald's Amended Shareholders' Agreement (Count II), causing the loss of the

license. She also challenged the proofs of claim filed by each of the Defendants in the

underlying bankruptcy proceeding. Specifically, the Trustee urged the court to disallow the

claims under 11 U.S.C. § 502(d) until Defendants satisfy any judgment (Count III); to equitably

subordinate Defendants' claims against the estate (Count IV); to recharacterize as equity certain

loans made by Donald Flynn and Peer Pedersen in 1996 and 1997 (Count V); and to disallow

claims submitted by Donald Flynn, Kevin Flynn, and Walter Hanley for amounts Emerald owes

them under a 2002 settlement agreement because that agreement never became effective (Count VI).

On September 30, 2014, this court set forth its findings of fact and conclusions of law on Counts I, II, and IV. As set forth in its opinion, *In re Emerald Casino, Inc.*, ___B.R.___, 2014 WL 4954453 (N.D. Ill. Sept. 30, 2014), the court found that six Defendants—Donald Flynn, Kevin Flynn, Walter Hanley, Kevin Larson, John McMahon, and Joseph McQuaid—are liable under Count II for breach of the Amended Shareholders' Agreement. The court entered judgment against those six Defendants in the amount of $45,333,333.33 each. The court dismissed claims against the seventh Defendant, Peer Pedersen. The court concluded that Count I was time-barred and that Defendants' conduct did not warrant equitable subordination of their claims (Count IV). The court reserved ruling on Counts III, V, and VI. After the September 30 opinion, the court accepted additional briefing on the remaining counts, and the Trustee moved the court, pursuant to Rule 54(b), to enter final judgment on Counts I, II, and IV. The court is now prepared to resolve the remaining counts. For the reasons explained below, the court grants judgment to the Trustee on Counts III and VI. Because the Trustee has not met her burden of establishing that the loans from Donald Flynn and Peer Pedersen should be recharacterized as equity, however, she is not entitled to judgment on Count V. As the court has decided all of Trustee's claims and will enter final judgment, the Trustee's motion for a Rule 54(b) final judgment [316] is denied as moot.

## **BACKGROUND**[1]

In addition to their roles as managers of Emerald and Defendants in the Trustee's claims of mismanagement, each of the seven Defendants is also a creditor in Emerald's underlying

---

[1] The court assumes familiarity with the factual findings of the September 30, 2014 opinion and does not repeat those findings here. The court presents only the facts necessary to resolve the remaining three counts.

bankruptcy proceedings. The Officer Defendants[2] submitted claims based on unpaid salaries (*see* Claims Register in *In re Emerald Casino, Inc.,* No. 02-br-22977 (Bankr. N.D. Ill.), hereinafter "Claims Register") (Kevin Larson (claim 58); Walter Hanley (claim 80); Jospeh McQuaid (claim 81); Kevin Flynn (claim 91); John McMahon (claim 100)). Peer Pedersen and Donald Flynn submitted claims based on money they loaned to Emerald. (PX529; PX1208.) Finally, all seven Defendants submitted proofs of interest based on the number of Emerald shares they own. *In re Emerald Casino, Inc.*, — B.R.—, 2014 WL 4954453, at *105 (N.D. Ill. Sept. 30, 2014); (Claims Register, Peer Pedersen (claim 35); Donald Flynn (claim 71).)

In addition to these claims, Donald Flynn, Kevin Flynn, and Walter Hanley each submitted a notice that he might have another claim if the Bankruptcy Court's approved an August 2002 settlement agreement. Donald Flynn's proof of claim states:

> In the event that the Bankruptcy Court approves the Settlement Agreement among the Debtor, the Illinois Gaming Board, and certain shareholders of the Debtor dated as of August 8, 2002 . . . or approves a Plan of Reorganization that incorporates the terms of the Settlement Agreement, the Creditor may have a claim against the Debtor in the amount of $4,309,872 subject to the terms and conditions of the Settlement Agreement.

(PX529 at 2.) Kevin Flynn and Walter Hanley submitted Proofs of Claim with the same language, but for lesser amounts—$2,778,721 and $69,727, respectively. (PX1198 (Kevin Flynn); PX1197 (Walter Hanley).) The parties agree that the Settlement Agreement was not approved by the Bankruptcy Court and never became effective: Hanley testified that the August 8, 2002 Settlement Agreement "was not consummated." (Bankr. Tr. 1434:10–11; *see also* Trustee's Proposed Findings of Fact & Conclusions of Law, *Gecker v. Flynn*, 08-ap-00972 [765], hereinafter "Trustee's SOF," ¶ 902; Estate of Donald Flynn's Mem. on Counts III, V, and VI of the Third Am. Compl. [324], hereinafter "Flynn Mem.," 15.)

---

[2]     The Officer Defendants include Kevin Flynn, Kevin Larson, John McMahon, Joseph McQuaid, and Walter Hanley, who were serving as officers of Emerald when its license was revoked. Donald Flynn and Pedersen served on the Board of Directors, but were not officers during the relevant timeframe. *In re Emerald Casino,* 2014 WL 4954453, at *10.

The Trustee also challenges several claims that arise from loans made by Donald Flynn and Pedersen. In his proof of claim, Donald Flynn asserts that he loaned Emerald a total of $20,155,538.33, before interest, and that with accrued interest, he has a claim for $31,278,901.33. (PX529 at 2.) With the exception of a Shareholder Credit Facility from August 2002, Donald Flynn's claims are based on loans he made to Emerald in 1996 and 1997:

| Date | Principal Amount | Name |
|------|------------------|------|
| 7/96 | $407,569 | Shareholders Promissory Note |
| 8/96 | $880,000 | Vessel Loan Agreement |
| 8/96 | $2,622,305 | 1996 License Renewal Credit Facility |
| 9/96 | $633,822 | Original Note |
| 9/96 | $11,806,270 | Bank of America |
| 5/97 | $805,572.33 | Convertible Note |
| 8/02 | $3,000,000 | Shareholder Credit Facility |

(PX529 at 2.)

Pedersen's claims, similarly, all stem from loans, totaling $4,822,100, that he made to Emerald between 1996 and 1997.

| Date | Principal Amount | Name |
|------|------------------|------|
| 8/96 | $183,000 | 1996 License Renewal Credit Facility |
| 9/96 | $633,822 | Original Note |
| 9/96 | $3,883,565 | Bank of America |
| 5/97 | $121,713 | Convertible Note |

(PX1208 at 5.) With interest, his claims now total $7,623,785. (PX1208 at 5.)

The Trustee maintains that each of these transactions was actually an equity contribution disguised as a loan. Though the record in this case is voluminous, the parties' Statements of Facts present relatively little detail concerning these transactions. The parties agree that Donald Flynn and Peer Pedersen provided significant financing to Emerald between 1996 and 1997, but disagree about the nature of those transactions. The court has gleaned the following from the record:

Emerald was struggling financially due to competition from casinos in Iowa, and was forced to shut down its East Dubuque, Illinois gaming operations by December of 1995. *In re Emerald Casino,* 2014 WL 4954453, at *5. In early 1996, Donald Flynn made a series of loans

which enabled Emerald to resume operations in May or June of that year. *In re Emerald Casino,* 2014 WL 4954453, at *6; (PX125 at 2 (describing a May 1996 loan and option agreement between Emerald and Flynn).) After Emerald re-opened, Flynn continued to support the company's operations: First, in July 1996, Emerald executed two promissory notes to Donald Flynn totaling $450,000. (PX511; PX512; Trustee's SOF ¶ 107 ("Donald Flynn lent Emerald $450,000 pursuant to two promissory notes dated July 3, 1996 and July 17, 1996.").) In a July 3 Note, Emerald agreed to pay Donald Flynn the principal amount of $200,000 plus interest accruing at 10% annually. (PX511.) Emerald agreed to repay Flynn an additional $250,000 in a July 17 Note, again with interest accruing at 10% annually. (PX512.) Each Note also established that payments would be made quarterly, but that the entire unpaid balance would become due upon the earlier of (i) Emerald's bankruptcy, (ii) approval to relocate the license, or (iii) the issuance of any Emerald "equity interests." (PX511; PX512.)

The following month, Donald Flynn made two additional loans. The first of these was in response to a condition for continued licensure imposed on Emerald by the Illinois Gaming Board ("IGB"). Specifically, the IGB required that Emerald obtain a "Credit Facility . . . in the form of a line of credit from a financial institution or in the form of a loan from [Emerald]'s shareholders," based on the IGB's "concerns regarding [Emerald]'s ability to remain adequately capitalized, and remain financially viable throughout the period of licensure." (PX527 at 1; Trustee's SOF ¶ 108.) The IGB outlined the requirements for this line of credit in the Financial Obligation and Licensure Agreement executed by Emerald and the IGB on July 29, 1996. (PX527 at 1.) That Agreement required Emerald to borrow funds from its shareholders to pay its long-term, third-party debts. (PX527 at 1–2.) In furtherance of the goal of paying long-term debt, the IGB prohibited Emerald from making any "payments to stockholders for principal or interest on stockholder loans without the express written approval of the Administrator, except to convert such loans to equity in [Emerald]." (PX527 ¶ 2(h).)

Pursuant to this Financial Obligation and Licensure Agreement, Donald Flynn, Pedersen, and Eugene Heytow[3] signed a "Credit Agreement" on August 15, 1996, providing Emerald with $3,000,000 in credit. (PX531 at 1.) Heytow agreed to provide up to $1,354,348, Flynn agreed to provide $1,462,652, and Pedersen committed to provide $183,000. (PX531 at 1, ¶ 1.) The Credit Agreement set August 1, 1997, or the date of any default, as the date on which the principal amounts were due and payable. It provided, further, that the advances would accrue interest at a rate of 12.5% annually, unless Emerald defaulted on the loan, in which case, the interest rate would increase by 2%. (PX531 ¶¶ 3–4.) Emerald listed this loan as an outstanding liability on its 1996 financial statements. (PX867 at 13.)

Donald Flynn made yet another loan on August 26, 1996. On that date, after receiving IGB approval, Donald Flynn entered into a "Loan Agreement," promising to lend up to $4,000,000 in the event that Emerald relocated its riverboat, the Silver Eagle, to Michigan City, Indiana, where another of Pedersen's casino projects was located. (PX532 ¶ 1; PX906); *see In re Emerald Casino,* 2014 WL 4954453, at *6. That loan would cover the "lease payments for a replacement vessel to operate in East Dubuque, Illinois for up to a one-year period."[4] (PX532 ¶ 1.) At this time, the IGB took the position that it lacked authority to permit relocation of Emerald's license and that Emerald's operations were confined to East Dubuque. *In re Emerald Casino,* 2014 WL 4954453, at *5. In the same August 26 Loan Agreement, Flynn also promised to provide up to $1,000,000 in the event that the IGB changed its position and "approve[d] the operation of the License at a location other than East Dubuque, Illinois at any time prior to December 31, 1996." (PX532 ¶ 1.)

---

[3]     Eugene Heytow was one of the original founders of Emerald, along with Peer Pedersen, and served as a Director from 1991 to 2002. *In re Emerald Casino,* 2014 WL 4954453, at *115. Like Flynn and Pedersen, Heytow invested heavily in Emerald. Though he served on Emerald's Board of Directors, and engaged in conduct similar to that of Pedersen, the Trustee did not name Heytow as a Defendant in this adversary proceeding.

[4]     It was not until 1999 that the Illinois General Assembly passed legislation permitting Emerald to relocate its license. *In re Emerald Casino,* 2014 WL 4954453, at *8.

Also on August 26, 1996, Donald Flynn entered an "Option Purchase Agreement," which provided Flynn with the "option to purchase up to 12.5% of the issued and outstanding common stock . . . of the Company." (PX908 at 1.) That agreement was made "in consideration of [Donald Flynn's] willingness to enter into the Loan Agreement and the payment of the purchase price," (PX908 at 1), which was defined as "$125,000 in cash." (PX908 at 1–2.)

On September 6, 1996, after obtaining IGB approval, Flynn, Pedersen, and Heytow agreed to personally guarantee an outstanding loan that Emerald owed to Bank of America. Bank of America Illinois had initially loaned Emerald funds[5] pursuant to a May 17, 1994 written agreement. (PX425 at 7; PX858 at 409.) By December 31, 1995, the balance on the loan was $21,700,000 and the maturity date was scheduled for August 1, 1996. (PX867 at 13.) Due to Emerald's financial difficulties at that time,[6] Emerald and Bank of America entered into negotiations to modify the loan, which resulted in the September 6, 1996 restated loan agreement. (*See* PX284.) Flynn, Pedersen, and Heytow agreed to personally guarantee the debt, and the parties further agreed to extend the maturity date by one year to August 1, 1997 and to modify the interest rates.

In April of 1997, after personally guaranteeing the Bank of America loan, Flynn, Pedersen, and Heytow loaned Emerald the funds to pay the remaining balance on the Bank of America loan. By that time, the balance had been reduced to $14.3 million (presumably Emerald had made payments between September 1996 and April 1997; the parties do not explain how the balance was reduced). The IGB approved the $14.3 million loan on April 22, 1997. (PX858 at 471; PX938.) Those loans were documented with promissory notes. (*See* PX932; PX938.) Both before and after Flynn, Pedersen, and Heytow paid the Bank of America debt, Emerald listed that debt as one of its current liabilities in its audited financial statements.

---

[5]     The original amount of the loan is unspecified.

[6]     Though the casino had re-opened in May or June of 1996, it was generating very little revenue due to competition from Iowa casinos. *In re Emerald Casino,* 2014 WL 4954453, at *5–*6.

(PX867 at 5, 13; PX189 at 4, 8, 10.) Finally, on May 14, 1997, after receiving IGB approval, Emerald executed a $2.5 million[7] Credit Agreement with Donald Flynn. (PX534; PX858 at 471; PX933.)

The parties agree that Emerald made no payments on any of the loans the court has just described. (T. SOF ¶¶ 107, 896; D. Flynn's Ans. to Compl. *Gecker v. Flynn*, 08-ad-00972 [90] ¶¶ 63–65, 71–73, 79–81, 104–105; Pedersen's Ans. to Compl., *Gecker v. Flynn*, 08-ad-00972 [96] ¶¶ 71–73, 88–90, 96–98, 104–106.)

Though the IGB had approved a $2 million loan on April 22, 1997, just two months later, on June 24, 1997, the IGB unanimously voted to deny Emerald's application to renew its license. The IGB focused on Emerald's financial difficulties, but also noted that Emerald had "[s]ubmitted a non-responsive application," that the company showed "significant compliance shortcomings," and that Emerald did "not adhere to the overall requirements of the [Riverboat Gambling] Act." *In re Emerald Casino,* 2014 WL 4954453, at *7 (quoting PX129 at 2). Following notice of the IGB's decision, Emerald ceased operations on July 29, 1997. *Id.* Between 1997 and 1999, while Emerald appealed the IGB's decision, Defendants focused their efforts on lobbying the Illinois General Assembly to amend the Riverboat Gambling Act to permit relocation of Emerald's license. *Id.* at *8. Those efforts were ultimately successful and on May 25, 1999 the Illinois General Assembly amended the Riverboat Gambling Act to allow Emerald's relocation. *Id.*

Just a few weeks after the Illinois General Assembly amended the Act, Donald Flynn exercised several stock options, including the August 26, 1996 Option. On June 10, 1999, Donald Flynn exercised the August 26, 1996 Option, requesting 3,490 shares of stock, which, according to his calculations, was equal to 12.5% of Emerald's outstanding stock. (PX987.) He

---

[7]     The IGB approved a $2 million loan on April 22, 1997 with the same terms as the August 15, 1996 Credit Agreement. (PX858 at 471; PX933.) The parties have not explained why the May 14, 1997 credit agreement was for $2.5 million when the IGB approved only $2 million.

also requested "to convert the entire outstanding principal amount owed to me ($2,231,802) under the Credit Agreement dated May 14, 1997 . . . into equity." (PX983.) Around the same time, Pedersen, and another shareholder, Howard Warren, also attempted to exercise certain options or convert debt to equity. (PX899 at 200.)

Flynn, Pedersen, and Warren's efforts to obtain Emerald stock were challenged by other (unidentified) Emerald shareholders. (*See* PX899.) The dispute was ultimately resolved in a settlement agreement executed on July 15, 1999. (PX899 at 200–04.) In that settlement, Flynn agreed to "return to [Emerald] all shares of [Emerald] previously issued to him pursuant to . . . an exercise of an option to purchase under the . . . August Option Agreement. [Emerald] shall forthwith cause said shares to be canceled." (PX899 at 200, ¶ 1; *see also* PX1282 at 4 (Emerald stock ledger showing cancelled share transfers).) Flynn was awarded 893 shares "in full satisfaction of any rights Flynn may have to acquire shares pursuant to either the May Option Agreement[8] or the August Option Agreement and in consideration of the exercise price[9] previously paid by Flynn to [Emerald]." (PX899 at 201, ¶ 6.) The Settlement Agreement does not identify the number of shares Flynn was awarded pursuant to each Option Agreement, but Emerald's stock ledger shows that Donald Flynn received 195 shares for a May 17, 1996 Option Agreement and 698 for the August 26, 1996 Option Agreement. (PX1282 at 5.) That

---

[8] The "May Option Agreement" refers to a May 17, 1996 Option Agreement to purchase 5% of Emerald's stock that Flynn received in exchange for a $1,000,000 loan to the company. (PX899 at 200.) Donald Flynn has not submitted any claims against the estate related to the May 1996 Option Agreement.

[9] The settlement agreement does not describe what "exercise price" was previously paid. According to the terms of the August 26, 1996 Option Agreement, Flynn paid "$125,000 in cash" for the option itself, and the purchase price was defined as "equal to $1,000 multiplied by the percentage of the Interest to which the exercise relates, such that upon the exercise of 100% of the Interest, the aggregate purchase price paid by the Optionee shall equal $1,000." (PX908 at 14, ¶ 3.) The May 17, 1996 Option Agreement establishes that Flynn received the May 1996 Option in exchange for a $1,000,000 loan to Emerald (PX897 at 1), and similarly defines the purchase price for the May 1996 Option as "$1,000,000 multiplied by the percentage of the Interest to which the exercise relates, such that upon the exercise of 100% of the Interest, the aggregate purchase price paid by the Optionee shall equal $1,000,000." (PX897 at 5.)

agreement shows that Flynn actually converted only $1,426,229.51 of the principal under the May 14, 1997 loan to 1,740 shares—leaving $805,572 in principal on his loan. (PX899 at 201, ¶ 7.)

On December 31, 1999, Flynn and Heytow executed an agreement in which Heytow assigned his rights under the August 15, 1996 Credit Agreement and the Amended and Restated Term Loan Agreement with Bank of America to Donald Flynn. (Extension Agreement, Ex. N to Am. Compl., *Gecker v. Flynn*, 08-ap-972 [60-14], hereinafter "Extension Agreement," ¶ 2.) The parties do not explain specifically why Flynn and Heytow entered this agreement, but the written agreement states that Heytow and Flynn disputed the amount that Flynn owed Heytow pursuant to a July 8, 1999 letter in which Flynn had guaranteed "the payment of certain obligations (referred to herein as 'Flynn's Obligation')." (Extension Agreement at 1.) The December 31, 1999 agreement resolved that dispute: Flynn and Heytow agreed that the total principal and interest due on Flynn's Obligation was $8,468,592, a sum Flynn agreed to pay on or before March 31, 2000.

## DISCUSSION

The seven Defendants in this case are also creditors of Emerald's estate: The Officer Defendants filed proofs of claim based on unpaid salaries; Donald Flynn and Pedersen submitted claims based on money loaned to Emerald; and Kevin Flynn, Donald Flynn, and Walter Hanley each filed a notice of a potential claim based on a 2002 settlement agreement. The Trustee now challenges all of Defendants' claims on the estate: She contends that under 11 U.S.C. § 502(d), the court must disallow the claims of each of the six Defendants the court found liable until he satisfies the judgment entered against him (Count III). She also asks the court to recharacterize as equity the loans made by Donald Flynn and Peer Pedersen in 1996 and 1997 (Count V), and to disallow the three claims submitted by Donald Flynn, Kevin Flynn, and Walter Hanley based on the 2002 settlement agreement, which never became effective (Count VI). The court considers each of these arguments in turn.

## I.     Count III: Disallowance under section 502(d)

The Trustee urges the court, first, to disallow the six liable Defendants' claims pursuant to 11 U.S.C. § 502(d).  Section 502(d) provides that:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542 . . . of this title . . . unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 542 . . . of this title.

11 U.S.C. § 502(d).  As a result of the findings made by this court, the six Defendants each "owe[] a debt that is property of the estate and that is matured, payable on demand, or payable on order."  11 U.S.C. § 542(b).  The Trustee urges that "[u]ntil those debts are paid, any claim held by a . . . Defendant against Emerald's bankruptcy estate is disallowed."  (Trustee Resp. to Flynn Mem. [349], hereinafter "Trustee Resp.," 2.)

The Defendants concede that they owe a debt that is property of the estate, but contend they are entitled to a setoff (also called an "offset") under § 553.[10]  Section 542(b) requires Defendants to pay their debt to the estate "except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b).  A setoff under § 553 "generally permits a creditor to offset, on a dollar-for-dollar basis, a debt it owes to the bankrupt party on a pre-commencement debt that the bankrupt owed to the creditor."  *In re United Air Lines, Inc.*, 438 F.3d 720, 730 (7th Cir. 2006) (quoting *United States v. Maxwell*, 157 F.3d 1099, 1100 (7th Cir. 1998)).  Defendants urge they are entitled to such an offset and,

---

[10]     The Trustee urges that Defendants have waived this, and several other arguments, by failing to raise them in their post-trial briefs.  The court permitted additional briefing on the three outstanding counts after its September 30, 2014 opinion, and sees no impropriety in that ruling.  Entertaining additional briefs was not an abuse of discretion.  Moreover, in this case, it has proved helpful in identifying the relevant law in Count III.  With respect to Count V, the court notes that it was not until the parties submitted additional briefing that any party linked Flynn and Pedersen's claims against the estate to particular exhibits documenting the transactions.  (*See* Estate of Donald F. Flynn's Consolidated Reply to the Trustee's Responses to its Mem. of Law on Counts III, V, and VI of the Trustee's Third Am. Compl. [362], 18–19.)

therefore, their debts are not "recoverable" under § 542.  Because the debts are not recoverable under § 542, they continue, the claims ought not be disallowed under § 502(d).

Importantly, § 553 does not create a right to an offset.  Instead, § 553 preserves any setoff right Defendants may have under state law.  11 U.S.C. § 553(a); *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995).  The state law setoff right is limited, however, by 11 U.S.C. § 553(a)(1), which expressly provides that a creditor may not exercise a right of setoff if "the claim of such creditor is disallowed."  11 U.S.C. § 553(a)(1).  The statutory language, thus, leads the court in a circular analysis:  to determine whether a claim is "disallowed" under § 502, the court must evaluate which claims are "recoverable" under § 542.  Section 542 instructs that some funds may not be recoverable if they are offset under § 553; but whether the debt can be offset hinges on whether the Defendants' claim is disallowed, which brings the court back to § 502.  *See* Lawrence Kalevitch, *Setoff and Bankruptcy*, 41 Clev. St. L. Rev. 599, 620 (1993) ("drafters expected readers to understand 'disallowed' [in §553(a)(1)] as at least a reference to § 502, the code's most general provision on allowance of claims.").

The order of analysis is, therefore, decisive.  The Trustee asserts that the court must first determine whether the claims are disallowed under § 502(d) before it can possibly evaluate whether the debt Defendants owe can be offset by that claim.  Defendants, on the other hand, contend that the court must first analyze their right to a setoff under § 553 before it can decide that the full amount of their debt is "recoverable" under § 542, rather than set off against their own claims against the estate.

There is little guidance from case law regarding the order in which the court should proceed.  Defendants cite several cases that uphold the right of setoff, but none specifically address the intersection of § 553 and § 502(d).  For example, in *Citizens Bank of Md. v. Strumpf*, the Supreme Court considered whether a creditor-bank's use of an administrative hold on the debtor's account violated the automatic stay requirements of the Bankruptcy Code.  516 U.S. 16, 18 (1995).  The bank had put a hold on the debtor's account in the amount of the

debtor's unpaid debt to the bank.  *Id.*  Noting that the administrative hold was temporary, the Supreme Court concluded it was not a violation of the Code's automatic stay provisions, because the bank's actions did not constitute a setoff;  a setoff, under § 362(a)(7), it held, requires an intent to permanently settle accounts.  *Id.* at 19.  It further reasoned that § 542 expressly excuses the bank from "pay[ing] a claim to which a defense of setoff applies," and reasoned that reading the automatic stay provisions to preclude the bank's use of an administrative hold would force "the creditor [the bank] to pay *its* debt immediately," and "would divest the creditor of the very thing that supports the right of setoff."  *Id.* at 20.  It cautioned that such a reading would "eviscerate §542(b)'s exception to the duty to pay debts.  It is an elementary rule of construction that the act cannot be held to destroy itself."  *Id.*  Thus, as Defendants emphasize, *Strumpf* underscored the importance of the setoff right; it did not, however, directly address the intersection of § 553 and § 502.[11]

The right to setoffs is obviously significant, but the court ultimately agrees with the Trustee on this issue.  As the Trustee notes, *Strumpf* does not address a circumstance where the creditor's claims are potentially disallowed under § 502(d).  Indeed, *Strumpf* does not cite § 502 or discuss disallowance at all: the Bank's claim was presumed valid.  Section 502(d), however, explicitly contemplates what §§ 542 and 553 do not: a requirement that a creditor pay its debt immediately even where it also has a claim on the estate.  *See* 4 Norton Bankruptcy L.

---

[11]    Defendants cite several other cases that explain how setoffs typically function and describe the general principles behind setoffs, without reference to § 502:  *see Studley v. Boylston Nat. Bank of Boston*, 229 U.S. 523, 529 (1913); *In re United Air Lines, Inc.*, 438 F.3d 720, 730 (7th Cir. 2006); *Darr v. Muratore*, 8 F.3d 854, 860 (1st Cir. 1993); *S.E.C. v. Elliott*, 953 F.2d 1560, 1572 (11th Cir. 1992).  Defendants also direct the court to *In re Malden Mills Indus., Inc.*, in which a Massachusetts bankruptcy court analyzed the interaction between setoffs and § 502(b)(7).  302 B.R. 408, 413 (Bankr. D. Mass. 2003).  After noting "the absence of caselaw on point," the court relied on the text of the statute and concluded that "the Court must first determine the allowable claim for termination damages as of the petition date."  *Id.*  The creditor was entitled to offset his debt based on the allowable claim and "[o]nly then should the § 502(b)(7) cap be applied."  *Id.  In re Malden Mills* provides little guidance for the question before the court:  it addresses the relationship between a damages cap and a setoff.  Insofar as it is instructive, it cuts in the Trustee's favor because the court noted that it "must first determine the allowable claim" under § 502(d) and only then apply the setoff.  *Id.*

and Practice § 73:8 (3d ed. 2011) ("Code § 502(d) provides an added impetus to creditors to settle setoff disputes by requiring the creditor to turn over any property which is the subject of the setoff dispute *before* the court may allow a setoff claim of the creditor.") (emphasis added). This conclusion is bolstered by the plain language of § 553(a)(1): That section extinguishes any state law right to a setoff if a creditor's claim is disallowed, suggesting that the court must first analyze whether Defendants have an allowed claim before determining whether that claim entitles them to a setoff. *See In re Aureal, Inc.*, 279 B.R. 573, 580 (Bankr. N.D. Cal. 2002) (Because "the language of 11 U.S.C. § 553(a)(1) is clear and does not limit its application to claims that have been disallowed on the merits [but applies to claims disallowed for procedural reasons], the Court concludes that [creditor] is not entitled to assert a defense of setoff to reduce its indebtedness to [debtor].").

Finally, this approach makes intuitive sense. The setoff right presumes a valid claim: a creditor may not offset debt unless he or she first has a valid claim. That is, determining whether Defendants' claims are allowed is logically antecedent to evaluating whether those claims can offset their debt. A Virginia Bankruptcy Court reached the same conclusion in *In re Paschall*, noting that the creditor:

> is barred from setting off the judgment for the avoided transfers against any claims she may have against the estate by the plain language of § 553(a)(1). . . . § 502(d) requires the Court to disallow any claim of any entity from which property is recoverable under § 550 until the property or the value of the property is turned over to the Trustee. Until [creditor] delivers the estate's interest in the Properties to the Trustee, any and all prepetition claims . . . are disallowed and cannot be used to set off any obligation of [creditor] to the estate.

No. 07-32048, 2011 WL 5553483, at *8 (Bankr. E.D. Va. Nov. 15, 2011); *cf. In re Airadigm Commc'ns, Inc.,* 616 F.3d 642, 658 (7th Cir. 2010) ("Determining whether a claim should be recharacterized as an interest thus comes logically prior to determining whether a claim should be subordinated: equitable subordination presumes that the claim is in fact a 'claim' within the meaning of the Code.").

Defendants' citation to *In re Lambert Oil Co., Inc.*, 347 B.R. 508 (W.D. Va. 2006) does not alter the court's conclusion. In that case, Nick J. Lambert, the sole shareholder and director of Lambert Oil, owed a debt to the estate for money he had borrowed from the company for his personal expenses. *Id.* at 512. After bankruptcy proceedings commenced, Lambert sold a property he owned, which had secured a loan from Highland Bank to Lambert Oil. *Id.* Lambert paid the proceeds of the sale to the Bank, which applied the funds to the outstanding balance of Lambert Oil's loan. *Id.* The bankruptcy court held that Lambert was entitled to offset the outstanding balance on his shareholder loan by the amount of debt he had paid to the Bank: Lambert otherwise would have had a claim on the estate for the amount of the canceled debt based on his right of reimbursement as a guarantor on the loan between the Bank and Lambert Oil. *Id.* at 512. The bankruptcy court and the district court rejected the trustee's argument that § 502(d) precluded the setoff, explaining that, because Lambert was entitled to the setoff under Virginia law, the proceeds from the sale of the property were "not 'recoverable under § 542' within the meaning of § 502(d) and thus not disallowed thereby." *Id.* at 523. The court, therefore, appears to have applied the setoff provision prior to analyzing whether Lambert's potential claim for reimbursement was allowed under § 502(d). Even if the logic of this case might otherwise apply, it is factually distinguishable. Lambert was in a materially different position than Defendants here: he had sold a property he owned and used the proceeds to pay off a loan on which the estate was otherwise obligated. When the bankruptcy court considered the transaction, Lambert had already made the payment to the Bank, and he received a setoff in exchange for effectively cancelling a portion of the estate's debt. In this case, on the other hand, Defendants have made no payments to the estate, or otherwise benefited the estate. Moreover, unlike *In re Lambert*, this court encounters the parties before any setoff transaction has occurred and must determine which statutory provision to apply first.

The court chooses to rely on the plain language of § 502(d) which states that "the court *shall* disallow" any claim until Defendants have paid that amount, and § 553(a)(1), which

extinguishes the right to a setoff for claims that are "disallowed." Because their claims are disallowed under § 502(d), Defendants are not entitled to offset their claims. The Defendants claims are therefore disallowed until the Trustee recovers the judgments in this case. *See In re Miszkowicz*, 513 B.R. 553, 565 (Bankr. N.D. Ill. 2014) (conditioning disallowance on creditor's repayment of preferential transfers).

## II. Count V: Recharacterization of Donald Flynn's and Peer Pedersen's loans

In Count V, the Trustee seeks an order recharacterizing as equity certain loans that Donald Flynn and Peer Pedersen made to Emerald. Don Flynn submitted claims against Emerald totaling $31,278,901.33, plus indemnified fees and expenses. (PX529 at 2.) Flynn's claims are based largely on money he loaned Emerald in 1996 and 1997. He submitted an additional claim for a "Shareholder Credit Facility" dated August 2002 and a conditional claim based on the August 2002 settlement agreement between the IGB and Emerald which was pending approval of the Bankruptcy Court when the claim was submitted. (PX529 at 2.) Pedersen also submitted claims based on loans he made to Emerald between 1996 and 1997. (PX1208 at 5.) The Trustee urges that the loans made by Flynn and Pedersen between 1996 and 1997 were actually, in substance, capital contributions. If treated as equity, rather than debt, these claims would be paid only after the claims of Emerald's creditors are paid in full. *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 658 (7th Cir. 2010) ("Equity holders receive nothing unless all creditors are paid in full.") (quoting *In re Insilco Techs., Inc.*, 480 F.3d 212, n.10 (3rd Cir. 2007)).

### A. This court has the authority to recharacterize Defendants' loans as equity

The parties now dispute whether the Trustee's claim for recharacterization has a valid legal basis. The circuits are split: The Trustee urges this court to adopt the majority position that bankruptcy courts have equitable authority under 11 U.S.C. § 105 to recharacterize loans as equity. Flynn and Pedersen argue for the minority approach, which concludes that under § 502(b)(1), bankruptcy courts have the power to recharacterize only insofar as state law

recognizes such recharacterization.[12]  The Seventh Circuit has not decided what authority, if

any, bankruptcy courts have to recharacterize loans.  *In re Airadigm Commc'n, Inc.*, 616 F.3d

642, 657 n.11 (7th Cir. 2010) ("This Court has . . .  never definitively stated whether we

recognize a cause of action for recharacterization.").  The Court of Appeals did note that "[t]he

overwhelming weight of authority supports the proposition that bankruptcy courts act within their

equitable powers when they recharacterize loans as infusions of equity."  *In re Airadigm*, 616

F.3d at 657 (noting that the Third, Fourth, Sixth, and Tenth Circuits have adopted this

approach).

Though the Seventh Circuit has not explicitly adopted the majority approach, this court

finds the reasoning supporting that approach persuasive.  As the Seventh Circuit explained in

*Airadigm*:

> Invariably citing the seminal case of *Pepper v. Litton*,[13] 308 U.S. 295, 60 S. Ct.
> 238, 84 L.Ed. 281 (1939), these cases reason that bankruptcy courts should look
> to the substance rather than the form of transactions.  Likewise, these cases
> reason that courts have equitable authority to properly characterize a transaction
> because the term "claim" is a Bankruptcy Code term of art (see 11 U.S.C.
> § 101(5)), and allowed claims in bankruptcy receive better treatment than equity
> interests.

616 F.3d at 657–58.  The court agrees that a bankruptcy judge (or this court) has this authority.

Whether a particular transaction is a loan or capital contribution determines whether it qualifies

as a "claim" under the Bankruptcy Code or as an interest; the equitable authority to characterize

---

[12]      Notably, in his Proposed Findings of Fact and Conclusions of Law, Donald Flynn appeared to agree with the Trustee that bankruptcy courts have equitable authority to recharacterize loans.  (D. Flynn's SOF [247], ¶¶ 307–10) (quoting the eleven-factor test, used by the majority approach, as outlined in *In re Gluth Bros. Constr., Inc.*, 424 B.R. 379, 395 (Bankr. N.D. Ill. 2009).)

[13]      In *Pepper v. Litton*, the Supreme Court determined that a bankruptcy court has the power to disallow a salary claim submitted by a controlling stockholder even though the stockholder had already obtained a state court judgment in his favor.  308 U.S. at 296.   In reaching that conclusion, the Court reasoned that bankruptcy courts, as courts of equity, have "the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty to do so is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder."  *Id.* at 307–308.

loans as equity is, therefore, "necessary to enforce the Code" and falls within the bankruptcy court's equitable authority under § 105. *See In re Fesco Plastics Corp., Inc.*, 996 F.2d 152, 157 (7th Cir. 1993). *Cf. United Airlines, Inc. v. HSBC Bank USA, N.A.,* 416 F.3d 609, 612 (7th Cir. 2005) ("[i]t is unlikely that the [Bankruptcy] Code makes big economic effects turn on the parties' choice of language rather than the substance of their transaction.").

Notably, the minority approach also recognizes a court's power to recharacterize, but grounds that authority in state law, rather than federal law. Those cases reason that a bankruptcy court may disallow a claim insofar as it "is unenforceable against the debtor . . . under any agreement or applicable law . . . " 11 U.S.C. § 502(b), and that "applicable law" refers to state law. *See Butner v. United States*, 440 U.S. 48, 54 (1979). Recharacterizing a loan as equity is therefore appropriate "where the reason for . . . disallowance is that state law classifies the interest as equity rather than debt." *In re Lothian Oil Inc.*, 650 F.3d 539, 543 (5th Cir. 2011). In those circumstances, "implementing state law as envisioned in *Butner* requires different treatment than simply disallowing the claim. . . . recharacterizing the claim as an equity interest is the logical outcome of the reason for disallowing it as debt." *Id. See also In re Fitness Holdings Int'l*, 714 F.3d 1141 (9th Cir. 2013).

Some bankruptcy courts have followed the minority approach; Defendants highlight Judge Wedoff's recent opinion in *SGK Ventures, LLC*, which concluded that "it is unlikely that the Seventh Circuit would find that the equitable power of a bankruptcy court allows treating a creditor's claim in a manner not stated in the Code," 521 B.R. 842, 861 (Bankr. N.D. Ill. 2014). But, as the Trustee notes, Judge Wedoff has also recognized, and this court's research confirms, that "Illinois law . . . provides that nominal loans may be recharacterized as contributions of equity if the circumstances of their creation and enforcement indicate that they were intended as equity contributions." *In re SGK Ventures, LLC*, 521 B.R. 842, 861 (Bankr. N.D. Ill. 2014) (citing *Estate of Kaplan*, 67 Ill. App. 3d 818, 828, 384 N.E.2d 874, 881 (Ill. App. Ct. 1st Dist. 1978). *See also Kramer v. McDonald's System*, 77 Ill. 2d 323, 330–31, 333, 396

18

N.E.2d 504, 507 (Ill. 1979) ("we think that the pleadings, depositions, affidavits and documents on record clearly evince that the $90,000 was intended as a contribution to the capital of the limited partnership. . . . In light of our determination that the $90,000 is a capital contribution, we disagree with the appellate court's statement that the promissory note is enforceable"); *Reese v. Melahn*, 45 Ill. App. 3d 585, 594, 359 N.E.2d 1248, 1254 (Ill. App. Ct. 2nd Dist. 1977) ("Normally the question of whether the payments were intended as loans would be a question of fact[,]" but in this case, because there was "no evidence that the defendant had agreed to invest even as much as $100,000 as stated capital rather than loans, we rule, as a matter of law, that the amounts paid . . . were . . . loans.").

Though the court finds the reasoning of the majority approach more persuasive, it appears that there is little practical difference between the majority and minority approaches in this case. The minority approach gives deference to state law, but relevant state law in this case is that of Illinois, which evaluates disputed transactions similarly to federal bankruptcy courts. Federal bankruptcy courts look to a wide range of factors when evaluating a particular transaction:

> (1) the names given to the instruments evidencing indebtedness; (2) the presence of a fixed maturity date and schedule of payments; (3) the presence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) any security for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence of a sinking fund to provide repayments.

*In re Gluth Bros. Const., Inc.*, 424 B.R. 379, 395 (Bankr. N.D. Ill. 2009). The inquiry is highly fact-specific, and no single factor is determinative. *In re Kids Creek Partners*, L.P., 212 B.R. 898, 931 (Bankr. N.D. Ill. 1997). The central question is whether the transaction "had the substance and character of an equity contribution or of a loan." *Id.*

Illinois courts undertake a similar analysis. In *Estate of Kaplan*, for example, the court concluded that the substance-over-form analysis that governs tax cases was a useful

framework for analyzing a disputed transaction.  67 Ill. App. 3d at 829, 384 N.E.2d at 882 (citing *Raymond v. United States*, 511 F.2d 185 (6th Cir. 1975); *Tyler v. Tomlinson*, 414 F.2d 844, 850 (5th Cir. 1969); *Wood Preserving Corporation of Baltimore v. United States*, 347 F.2d 117 (4th Cir. 1965)).  The cases it cited emphasize substance: they focus on the lender's "failure to insist on regular interest payments," and the "pro rata loans by shareholders," which allowed "the equity benefit derived from the additional investment in debt form" to mirror what "it would have been if all the shareholders had bought additional equity."  *Tyler v. Tomlinson*, 414 F.2d 844, 849 (5th Cir. 1969).  In *Estate of Kaplan*, the Illinois Appellate Court also relied on *Raymond v. United States*, in which the Sixth Circuit focused a variety of factors, several of which mirror the factors listed in *Gluth Brothers*:

> the presence or absence of a maturity date of the obligation, the name given to the writing (if any) evidencing the claimed obligation, the source of payments and repayments, the adequacy or inadequacy of capitalization, identity (or lack of identity) of interest between creditor and stockholder, the corporation's ability to obtain financing from independent lending institutions, and the timing of the advance with reference to the organization of the corporation.

511 F.2d 185, 190 (6th Cir. 1975).

Pedersen attempts to distinguish *Estate of Kaplan* from this case, noting that in *Kaplan* there was no note evidencing the loan, nor any interest charged.  (Pedersen Mem. of Law Regarding Disposition of Count V [318], 7.)  But those distinctions do not bear on whether Illinois courts permit loans to be recharacterized as capital contributions in the first place.  Pedersen also argues that the test for recharacterization is more stringent in Illinois law, given Illinois courts' strong presumption in favor of the validity of promissory notes.  *See H. Watson Dev. Co. v. Bank & Trust Co. of Arlington Heights*, 58 Ill. App. 3d 423, 431, 374 N.E.2d 767, 774 (1st Dist. 1978) ("A promissory note absolute on its face creates, in itself, the presumption that a debt is owing from the maker to the payee. This presumption is rebuttable. However . . . the rebuttal evidence must be of a very clear and cogent nature.") (citing *Steiner v. Rig-A-Jig Toy Co.*, 10 Ill. App. 2d 410, 418, 135 N.E.2d 166, 170 (1st Dist. 1956)).  The court does not see

such a sharp distinction between the federal and state tests: The Illinois Supreme Court in *Kramer v. McDonald's System* specifically concluded that a promissory note was unenforceable because the evidence showed that it was intended as a capital contribution. 77 Ill. 2d 323, 330–31, 333, 396 N.E.2d 504, 507–09 (Ill. 1979). In reaching that conclusion, the court examined the timing of the transaction, noting that it occurred at the formation of a limited partnership, and emphasized how the transferor treated the transaction on his tax returns. 77 Ill. 2d at 330–31, 396 N.E.2d at 507–508. Based on this evidence, the court concluded that the transfer "was intended to be, was treated by the parties as, and must be considered to be an initial capital contribution to the limited partnership." 77 Ill. 2d at 332, 396 N.E.2d at 508.

Even in the case Pedersen cites, *Steiner v. Rig-A-Jig Toy Co.*, 10 Ill. App. 2d 410, 416, 135 N.E.2d 166, 169 (Ill. App. Ct. 1st Dist. 1956), the Illinois court examined whether the parties received company stock and evaluated the parties' intention for the transaction. In *Steiner*, the court noted that the parties referred to the transactions as "capital contribution[s]" in their conversations and written correspondence. 10 Ill. App. 2d at 416, 135 N.E.2d at 169. Though the court in *Steiner* concluded that the transactions were more appropriately characterized as loans, rather than capital contributions, it reached that conclusion by considering the intent of the parties and the essential character of the transaction. The court is confident that under either majority or minority approach, whether recharacterization is appropriate turns on whether the transactions have the characteristics of loans or equity contributions. The court turns next to that issue.

**B.    The Trustee has not met her burden of establishing that the loans should be recharacterized**

The Trustee urges that all of Flynn's and Pedersen's loans should be recharacterized based on these circumstances: when the loans were made Emerald was in financial trouble; it would have been difficult for Emerald to obtain funding from an outside investor; Flynn and Pedersen could not have expected to be paid back unless the company succeeded; and as

directors and officers, Flynn and Pedersen had an identity of interest with the company. (Trustee's SOF ¶¶ 897–901; Trustee's Resp. to Defs.' Flynn and Pedersen's Opp. to Count V [348], hereinafter "Trustee's Resp. to Count V," 11–15.)  The Trustee notes that, when Flynn and Pedersen agreed to lend funds to Emerald, Emerald's audited financial statements contained a "going concern" qualification, which reflected the auditors' recognition of "substantial doubt about the Company's ability to continue as a going concern."  (PX867 at 3.) The IGB expressed similar concerns about Emerald's ability to remain adequately capitalized and financially viable and therefore mandated that Emerald enter into the Financial Obligation and Licensure Agreement.  (PX527 at 1.)  On June 24, 1997, the IGB voted not to renew Emerald's license, in part because it "lack[ed] financial viability," but also because Emerald had submitted a non-responsive application, exhibited "significant compliance shortcomings," and failed to "adhere to the overall requirements of the Act."  (PX333 at 10–11.)  Finally, the Trustee argues that it would have been difficult for Emerald to obtain outside financing.  (Bankr. Tr. 1592:1–5, 1592:23–93:4) (Larson testifying that he agrees that "based upon [his] prior experience as a commercial banker, it would have been very difficult for Emerald to obtain these loans from a commercial bank at that time without personal guaranties from the shareholders.")

Defendants do not dispute that Emerald was in dire financial straits when Flynn and Pedersen made these loans, but they contend that the Trustee's general recitations of Emerald's financial trouble do not, by themselves, establish that the transactions were intended as capital contributions.  The court also is unwilling to assume that every transaction between insiders and Emerald that occurred while Emerald was struggling financially and was undercapitalized must be deemed a capital investment.  Though the Seventh Circuit has not specifically addressed recharacterization, it has held that undercapitalization, by itself, is insufficient to justify equitable subordination of an insider loan. *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997).  Instead, some showing of bad faith or deception is required:

The insiders here contributed fresh working capital. They were under no obligation to do so. Assuming there was no deception, we see no reason to treat an insider's loan to a company more poorly than that of a third party's. To hold otherwise would discourage those most interested in a corporation from attempting to salvage it through an infusion of capital. If the court incorrectly disregards a bona fide transaction, it commits a double wrong. First, the court has upset the legitimate expectations of a claimant, which in this case would be . . . the insiders[]. The second wrong is less visible, but just as significant. Wrongful or unpredictable subordination spawns legal uncertainty of a particular type: the risk that a court may refuse to honor an otherwise binding agreement on amorphous grounds of equity. If a court wrongly subordinates a claim, other investors are sure to take heed. An investor will see that the chance she might not get her money back has gone up slightly. She will be less willing to lend or invest in the future; and the cost of credit will rise for all.

*Matter of Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997). The logic applies equally in this case: As with equitable subordination, in order to seek recharacterization the Trustee must show something more than an infusion of funds from an insider while a company is undercapitalized. For an equitable subordination claim, that something more is a showing of deception or bad faith dealing. In the context of recharacterization, the Trustee must present additional evidence that the transaction in question is a loan in form only. *See In re Official Comm. Of Unsecured Creditors for Dornier Aviation (N. Am.), Inc,* 453 F.3d 225, 234 (4th Cir. 2006) ("a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business . . . However, when other factors indicate that the transaction is not a loan at all, recharacterization is appropriate.") The Trustee's contention—that a loan from an insider to a financially challenged entity must be recharacterized—would have the "unfortunate" effect of discouraging loans from the very persons "who are most likely to have the motivation to salvage a floundering company." *In re Octagon Roofing*, 157 B.R. 852, 858 (N.D. Ill. 1993). *See also Kids Creek Partners*, 212 B.R. at 932 ("Some other conduct must also be found for undercapitalization to constitute a basis for recharacterizing debt into equity, lest insiders and others shy away from lending to a corporation in financial distress or a venture at higher than usual risk.").

This same reasoning leads the court to reject the Trustee's argument that the transactions should be recharacterized because repayment depended on the success of the business. (*See* Trustee's Resp. to Count V at 14.) "All extensions of credit depend on the debtor's success; it does not make them capital contributions." *In re Liberty Brands, LLC*, 2014 WL 4792053, at *4 (Bankr. D. Del. Sept. 25, 2014). The cases the Trustee cites describe a different phenomenon: In *Autostyle Plastics* and *Lothian Oil,* the courts discussed transactions for which royalties were the only source of repayments. As the *Lothian Oil* court explained, the main motivation for recharacterization was "the inclusion of a royalty payment, which depended on the success of [debtor]'s business, *instead of a prescribed interest rate.*" *Lothian Oil,* 650 F.3d at 544 (emphasis added); *see also AutoStyle Plastics,* 269 F.3d at 751 (The fact that [lender] and the defendants were to be paid out of AutoStyle's earnings indicates that they were dependent on the success of AutoStyle's business.") The loans Flynn and Pedersen made, however, are documented by notes, which outline payment schedules, maturity dates, and fixed interest rates. The source of repayments is not limited in any way, and as reflected in *Autostyle Plastics* and *Lothian Oil*, these factors weigh strongly in favor of treating the transactions as loans. That the loans were risky, therefore, does not automatically transform the transactions into capital contributions.

The Trustee also emphasizes the fact that Emerald made no payments on any of the loans, and that Pedersen and Flynn did not attempt to enforce the loans. (Trustee's SOF ¶¶ 107, 896.) But that is not surprising: As directors and officers, Flynn and Pedersen knew about Emerald's lack of assets, which would render any attempts to collect the payments futile.[14] This failure to collect on the payments also appears to be explained by the Financial Obligation and Licensure Agreement, which required Emerald to pay its long-standing debt

---

[14] Notably, the Trustee explains that Bank of America, a sophisticated third-party lender, similarly agreed to extend the maturity date for the loan it had previously made "undoubtedly because it knew it would be unable to collect if it pressed for immediate payment." (Trustee's Resp. to Count V at 13.)

obligations before paying any shareholder loans and prohibited Emerald from making any payments on shareholder loans without IGB approval.  (PX527 at 2.)

The Trustee responds that the IGB's prohibition in the Financial Obligation and Licensure Agreement is itself a reason to recharacterize the loans:  That Agreement, the Trustee continues, shows that the IGB understood the transactions were, in fact, capital contributions.  (Trustee's Resp. to Count V at 17.)  The Trustee emphasizes the Fifth Circuit's explanation in *AutoStyle Plastics* that "subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans."  269 F.3d at 752.  Had Pedersen and Flynn willingly subordinated their loans, this factor might carry more weight, but here that subordination was a condition of Emerald's continued licensure:  The court is unwilling to recharacterize every one of Flynn and Pedersen's transactions as equity because the IGB required, as a condition of continued licensure, that Emerald repay its third-party debts first.  In any event, the IGB explicitly required a "line of credit" or a "loan" rather than a capital contribution.  The Trustee has not explained why the IGB would explicitly require a loan, when it in fact intended a capital contribution.  The IGB's insistence that Emerald obtain a loan or a line of credit weighs in favor of treating the transactions as debt.

The Trustee's evidence up to this point shows that Emerald was struggling financially at the time the transactions were executed.  To succeed on her recharacterization claim, however, the Trustee must also present specific evidence that the particular transactions she challenges were intended as capital contributions.  The Trustee argues that the court should treat Donald Flynn's transactions as equity because he "did so himself, obtaining stock for his advances in July, 1999."  (Trustee's Resp. to Count V at 11.)  The Trustee does not specify which "advances" Flynn's stock purchases correspond to, but rather cites several exhibits: PX897, PX908, PX983, PX987 and PX988.  The court notes first that PX897 and PX988 refer to a separate transaction, for which Donald Flynn has not submitted a claim:  PX897 refers to a Promissory Note executed May 17, 1996 for $1,000,000, and PX988 is a letter Donald Flynn

wrote, electing to receive common stock of Emerald pursuant to "Option Purchase Agreement dated May 17, 1996"—executed in conjunction with the $1,000,000 promissory note. Donald Flynn did not submit a claim for the May 17, 1996 note, and the Trustee has not explained how these exhibits are otherwise relevant.

That leaves the court with PX908, PX983, and PX987. PX908 is the "Option Purchase Agreement" entered into on August 26, 1996 in conjunction with the Loan Agreement. PX987 presents the June 10, 1999 letter, in which Donald Flynn exercised his option under the August 26, 1996 Option Purchase Agreement. Finally, PX983 is a June 2, 1999 letter in which Flynn requested to convert "the entire outstanding principal amount owed to me ($2,231,802) under the Credit Agreement dated May 14, 1997 . . . into equity." At best, these exhibits shows that two of Flynn's claimed loans—the claim from August 1996 for $880,000 (the "Vessel Loan Agreement") and the claim from May 1997 for $805,572.33 (the "Convertible Note")—were converted to equity. They do not establish that Flynn's remaining loans were intended or treated as capital contributions or that any of Pedersen's loans were ever converted.

But these three exhibits do not satisfy the court even that these two loans should be recharacterized. First, though Donald Flynn admittedly exercised the August 26, 1996 Option Purchase Agreement on June 10, 1999, his exercise of that option did not automatically convert the debt created through August 26 Loan Agreement into equity. As the court understands her argument, the Trustee contends that the inclusion of the Option Agreement shows that the true nature of the Loan Agreement was a capital investment. The court disagrees. It is not unusual for investors to structure their investments using hybrid instruments that have elements of equity and debt. *See* Nathan R. Christensen, *The Case for Reviewing Debt/Equity Determinations for Abuse of Discretion*, 74 U. CHI. L. REV. 1309, 1312 (2007) ("The line between [debt and equity] is often blurred by the imprecise and convoluted financial arrangements that firms adopt in practice. Thus it may be that debt and equity are best represented along a continuum, in which the ends are easily identifiable but the middle ground is comprised of unfamiliar hybrids

featuring elements of both debt and equity.")  Rather than reflecting that the entire deal was intended as equity, the court is persuaded by Flynn's argument that the Option is more appropriately characterized as an "equity kicker" to a debt instrument.  An equity kicker "is an additional amount paid to an investor to compensate that investor for an increased risk for holding certain investments."  Roger M. Groves, *More Private Equity, Less Government Subsidy, and More Tax Efficiency in Urban Revitalization: Modeling Profitable Philanthropy and Investment Incentives*, 8 FLA. ST. U. BUS. REV. 93, 125 (2009).  *See also In re Kids Creek Partners, L.P.*, 212 B.R. 898, 930 (Bankr. N.D. Ill. 1997) (equity kicker was used to induce lending); Paul M. Goldschmid, *More Phoenix Than Vulture: The Case for Distressed Investor Presence in the Bankruptcy Reorganization Process*, 2005 COLUM. BUS. L. REV. 191, 245 (2005) ("Lenders willing to take higher risks may require warrants or other equity-type 'kickers' in the reorganized firm.")  The use of these hybrid features provides investors "with a more customizable mix of risk and reward that pure debt or pure equity cannot offer."  Jeanne A. Calderon, *Structuring Mezzanine Investments with Hope of Achieving Long Term Capital Gains Tax Treatment*, 33 REAL EST. L.J. 9, 9 (2004).

The inclusion of the Option Agreement as part of the overall deal does not, therefore, require the conclusion that the Loan Agreement was intended as a capital contribution.  *In re Kalisch*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008) ("the only hint of equity in the transaction is an 'equity kicker' feature. This yield enhancement measure does not alter the essential character of the Loan. The equity component was an inducement to . . . make the Loan, and was never a substitute for repayment.")  Recharacterization turns on what the parties intended at the time the agreements were executed and whether the transaction bears the earmarks of a capital contribution *rather than* a loan.  The court is wary of the Trustee's request for wholesale treatment of a nuanced transaction displaying elements of both equity and debt, and is sensitive to the Seventh Circuit's warning about upsetting legitimate expectations.

Second, though the Trustee presented evidence that Flynn requested to convert the debt Emerald owed him under the May 14, 1997 Credit Agreement, she has not directed the court to evidence that shows Flynn actually received the shares he requested. Moreover, the July 15, 1999 settlement agreement suggests that only a part of that debt was actually converted to stock. The settlement agreement states that "the principal balance of the advances made by Flynn pursuant to the [May 14, 1997] Credit Agreement shall be reduced from $2,231,802 to $805,572.49 as a result of the shares issued pursuant to paragraph 3 of this Settlement Agreement." (PX899 at 201, ¶ 7.) Donald Flynn claims that the estate owes him the remaining $805,572. He has not submitted a claim for the portion of that debt that was in fact converted to equity. The Trustee has presented no evidence that this remaining principal was ever converted to equity.[15]

Finally, the Trustee argues that no one at Emerald treated the loans as debt.[16] In support, she cites only to the testimony of Kevin Larson, who held the title of President and signed the loan documents, but testified that he had no "involvement with" the notes "other than signing [his] name to [them]." (Bankr. Tr. 1589:19–22, 1591:8–11, 1592:15–18; 1594:14–19; 1595:5–12.) In its earlier opinion, the court noted that Kevin Flynn appeared to have taken on Larson's job responsibilities, in fact concluding that "Kevin Flynn negotiated loan financing with

---

[15] Peer Pedersen similarly submitted a claim based on the remaining principal allocated by the July 15, 1999 settlement agreement. The settlement provides that "[t]he principal balance of the advances made by Pedersen pursuant to the [May 14, 1997] Credit Agreement shall be reduced from $152,861 to $121,713.46 as result of the shares issued pursuant to paragraph 5 of this Settlement Agreement." (PX899 at 201, ¶ 7.) Pedersen submitted a claim based on the May 14, 1997 Credit Agreement for $121,713. (PX1208 at 5.)

[16] The Trustee also notes that "Pedersen & Houpt attorney [Thomas] Brett testified that in June and July, 1999, he reviewed the corporate files related to these loans and concluded it was unclear whether the loans were debt or equity." (Trustee's SOF ¶ 900.) The court does not find this evidence persuasive: First, the testimony does not clarify which files Brett reviewed or exactly which transactions he was discussing. (See Bankr. Tr. at 2430:13–18.) Second, Brett's uncertainty suggests that the transactions are somewhat of a hybrid between debt and equity, but as explained in the text, the Trustee must show more: the Trustee must show that the transactions' true character is that of a capital contribution in the form of a loan.

Bank of America," and was "actively involved in negotiating the terms of the loan." *In re Emerald Casino,* 2014 WL 4954453, at *58. It is troubling that Larson was so uninvolved in Emerald's operations, but this fact does not bear on the character of the transactions themselves. Moreover, as described above, there is also evidence that Emerald listed several of the loans as current liabilities in its audited financial statements. (*See* PX867 at 5, 13.)

The evidence regarding recharacterization is at best mixed, and the Trustee bears the burden of proof on this issue. At bottom, the Trustee asks the court to recharacterize these loans because Emerald was struggling financially when they were made. The Trustee has failed to present additional evidence specific to each transaction she challenges, and her claim for recharacterization of the loans is denied.

### III.     Count VI: Claims based on the IGB settlement agreement

The Trustee also seeks to disallow claims arising out of the August 8, 2002 settlement agreement entered into between the IGB and Emerald. The analysis of this argument is straightforward. Donald Flynn, Kevin Flynn, and Walter Hanley each submitted a notice identifying a potential claim based on the settlement (*see* PX529 at 2; PX1198 at 2; PX1197 at 2), but the agreement was not approved by the Bankruptcy Court and never became effective. (Trustee's SOF ¶ 902; D. Flynn Mem. on Counts III, V, and VI [324], 15.) Donald Flynn has confirmed that the settlement agreement never became effective (Flynn Mem. at 15), and Hanley testified that the August 8, 2002 settlement agreement (PX138) "was not consummated." (Tr. 1434:10–11.) Kevin Flynn did not submit separate briefing related to Count VI. Accordingly, the court enters judgment on Count VI against Defendants Donald Flynn, Kevin Flynn, and Walter Hanley, disallowing any claims based on the August 2002 settlement agreement.

### CONCLUSION

Pursuant to 11 U.S.C. § 502(d), each Defendant's claims are temporarily disallowed until he satisfies the judgment (Count III). The claims of Walter Hanley, Kevin Flynn, and Donald

Flynn based on the August 8, 2002 settlement agreement are also disallowed (Count VI). The Trustee has not established that the various loans made by Donald Flynn and Peer Pedersen in 1996 and 1997 should be recharacterized as equity, and the court declines to enter judgment for the Trustee on Count V. As the court is now prepared to enter final judgment, subject to outstanding motions for reconsideration, the Trustee's motion [316] for a Rule 54(b) judgment on Counts I, II, and IV is denied as moot.

ENTER:

Dated: April 21, 2015

_____
REBECCA R. PALLMEYER
United States District Judge