# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE | |
| EMERALD CASINO, INC., | Chapter 7 |
| | 02 B 22977 |
| Plaintiff, Debtor | Bankr. Adv. No. 08 A 00972 |
| | |
| FRANCES GECKER, not individually but solely as chapter 7 trustee for the bankruptcy estate of Emerald Casino, Inc., | |
| Plaintiff, | |
| v. | No. 11 C 4714 |
| DONALD F. FLYNN, KEVIN F. FLYNN, KEVIN LARSON, JOHN P. McMAHON, JOSEPH F. McQUAID, WALTER HANLEY, and PEER PEDERSEN, | Judge Rebecca R. Pallmeyer |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Emerald Casino, Inc. ("Emerald") was building a casino in Rosemont, Illinois when the Illinois Gaming Board ("IGB") revoked its license, forcing Emerald into bankruptcy. Plaintiff Frances Gecker, the Trustee appointed by the Bankruptcy Court on behalf of Emerald, brought this adversary proceeding against seven former directors and officers of Emerald, alleging that they breached their fiduciary duty to Emerald (Count I) and violated Emerald's Amended Shareholders' Agreement (Count II) causing the loss of its license. In the remaining four counts, she challenged the proofs of claims filed by each of the Defendants in the underlying bankruptcy proceeding. On September 30, 2014, after a bench trial, this court set forth its findings of fact and conclusions of law on Counts I, II, and IV. As set forth in its opinion, *In re Emerald Casino, Inc.*, 530 B.R. 44 (N.D. Ill. 2014), the court found that six Defendants—Donald Flynn, Kevin Flynn, Walter Hanley, Kevin Larson, John McMahon, and Joseph McQuaid—were liable under Count II for breach of the Amended Shareholders' Agreement. The court determined that the

value of the lost license was $272 million, based on the price of the most recent sale of that license from the IGB to Midwest Gaming. Having concluded that the six Defendants who breached the Agreement were equally responsible for the lost license, the court apportioned damages equally among them, awarding $45,333,333.33 as to each. The court dismissed claims against the seventh Defendant, Peer Pedersen.

The Trustee and the six Defendants found liable each ask this court to reconsider aspects of its damages analysis. The Trustee urges that the court incorrectly awarded damages *pro rata*, rather than holding each Defendant liable for the full value of the license. The Defendants urge that the actual market value of the license is $125 million, not $272 million as the court concluded in its earlier opinion. As explained below, the motions [319, 323] are denied.

## **BACKGROUND**

The facts of this case are set forth in the September 30, 2014 ruling, *see In re Emerald Casino*, 530 B.R. 44 (N.D. Ill 2014), and the court recites only those facts necessary to resolve the motions for reconsideration before the court. Defendants are former officers, directors, and shareholders of Emerald Casino, Inc., which was initially created to operate a riverboat casino in East Dubuque, Illinois. As shareholders, each Defendant signed an Amended Shareholders' Agreement, in which he agreed "to comply with the [Riverboat Gambling] Act, Rules, and orders of the IGB." *Emerald*, 530 B.R. at 59–60, 68. The riverboat casino was struggling financially, confined to its East Dubuque location, and Defendants successfully lobbied the Illinois legislature to permit Emerald to re-locate its gaming license. *Id.* at 61, 64–65. Emerald immediately began taking steps to relocate to Rosemont, Illinois, but on January 30, 2001 the Illinois Gaming Board ("IGB")—the state agency responsible for regulating casinos—revoked Emerald's license after an unprecedented investigation. *Id.* at 68–71. The IGB's primary concern appears to have been that "organized crime" was somehow involved in Emerald's proposed new location, and Emerald's less-than-forthcoming communications with the IGB

heightened the regulators' suspicions. *Emerald*, 530 B.R. at 58. Ultimately, the IGB concluded that, by repeatedly failing to disclose information, Emerald had violated several IGB Rules. For the first time in the IGB's history, the IGB revoked a gaming license as a sanction. *Id.* The license was Emerald's only significant asset, and when Emerald was stripped of it, bankruptcy proceedings swiftly followed.

Plaintiff Frances Gecker, the Trustee on behalf of Emerald, brought this adversary proceeding alleging, among other things, that Defendants breached their obligation under the Amended Shareholders' Agreement to comply with IGB Rules. The Trustee established that each of the seven Defendants had violated IGB Rules, and had therefore breached the Agreement. *Id.* at 202. The court then turned to causation and damages.

First, the court assessed whether each Defendant's breach caused the loss of the license. The court began by analyzing the Final Board Order, the written decision explaining the IGB's reasons for revoking the license. The IGB emphasized its "authority to revoke the license on the basis of any single rule violation," but this court concluded that other language in the Final Board Order "made clear that the totality of Emerald's conduct" was central to the IGB's decision to revoke the license rather than impose some lesser penalty, such as a fine. *Emerald*, 530 B.R. at 203, 210. Because "multiple factors . . . may have combined to cause the injury," the court asked "whether [each] defendant's conduct was a material element and a substantial factor in bringing about the injury." *Id.* at 203 (quoting *City of Chi. v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395, 821 N.E.2d 1099, 1127 (Ill. 2004)). The court found that the IGB's decision to revoke the license was motivated in substantial part by the Defendants' "failures to disclose information," conduct which "violated multiple IGB rules"—specifically Rules 140(a), 140(b)(3), and 110(a)[1]—and concluded that the IGB attached "significant weight" to the violations of these

---

[1] These Rules impose a duty to disclose various information to the IGB, and in some instances, require pre-approval for certain actions. The full text of these Rules is included in Appendix B to the court's earlier opinion. *See Emerald*, 530 B.R. at 246–47.

three Rules. *Id.* Though the IGB noted violations of Rule 235(a), which prohibits the transfer of shares without IGB approval, the court concluded that these violations were not substantial factors in the IGB's decision because "the IGB had a long history of overlooking, and even condoning" such transfers. *Id.* at 203–04.

After identifying the three Rules that were material elements and substantial factors in the IGB's decision to revoke Emerald's license, the court identified which Defendants were responsible for violating those three Rules. The IGB's Final Board Order stated only that "Emerald" had violated each of the Rules, without specifying whose conduct was at issue. *Emerald*, 530 B.R. at 197. The court concluded that the Trustee established that six Defendants violated those three Rules that were material elements in IGB's decision to revoke the license. With respect to Peer Pedersen, however, the Trustee established only that he violated Rule 235(a), which the court found was not a substantial factor. *Id.* at 203. Thus, the court concluded that Peer Pedersen's breach did not cause the loss of the license, and dismissed claims against him. *Id.* at 204.

The court then turned to damages. The court concluded that the Amended Shareholders' Agreement created several liability only because "[t]he promised performance was unique to each shareholder that signed the contract. That is, each shareholder promised to conform his or her own behavior to IGB rules." *Emerald*, 530 B.R. at 209. Defendants, thus, are not liable for breaches by other shareholders, and each Defendant may be held liable only for the proportion of damages he individually caused. To apportion responsibility for the loss of the license among the Defendants, the court again considered the IGB's findings, noting that:

> The degree of liability for each Defendant might be said to differ; but the court concludes that each Defendant is equally liable for the loss of the license. Gaming Board rules, the Riverboat Gambling Act, and the language of the Amended Shareholders' Agreement, all appear to permit revocation for a single rule violation. As discussed earlier, while "organized crime" appeared to be the IGB's primary concern, Defendants' repeated violations of Rules 140(a), 140(b)(3), and 110(a) were also significant reasons for the revocation of Emerald's license. Though it appears from this record that it was the totality of Defendants' conduct that was deemed so egregious that revocation, rather than

4

> a smaller disciplinary action, was appropriate, the court cannot ignore language in the IGB's Final Board Order announcing that each rule violation 'alone supports revocation of Emerald's license.' The Illinois Appellate Court affirmed the revocation. Accordingly, for the purposes of apportioning damages, the court takes the IGB at its word and weighs each violation equally.

*Id.* at 210. Thus, the court determined that each of the six Defendants who breached the Agreement would be liable for an equal proportion of the value of the lost license. *Id.* at 210–11.

Finally, the court decided the value of the license. The Trustee presented three different methods of calculating the value of the license: by "relying on expert testimony, on market evidence, and on Defendants' own statements." *Emerald*, 530 B.R. at 211. Defendants did not present their own evidence regarding the value of the license, but made several objections, including challenging the admissibility of Trustee's expert, Mr. Steven Rittvo, under *Daubert* and urging that his report improperly included prejudgment interest.[2] *Id.* at 211–12. The court agreed with Defendants that Mr. Rittvo's testimony was inadmissible, *id.* at 222–23, and relied instead on the Trustee's market evidence to determine the value of the license. *Id.* at 227, 229.

The court reviewed evidence of several offers and bids to buy Emerald's license. In light of the IGB's hostility towards Rosemont, the court gave little weight to offers or bids assuming that location. *Emerald*, 530 B.R. at 230. Instead, the court relied on the 2008 sale of the license to Midwest Gaming. *Id.* at 233–34. The court examined the January 14, 2009 IGB Decision titled "The Re-Issuance of the 10th License" (*see* PX1237), which is the official report of the IGB concerning the December 22, 2008 decision to sell the license to Midwest Gaming. That Decision states that the "highest bid offered" was a $406 million offer from Trilliant Gaming for a casino in Rosemont, while "Midwest Gaming [was] second at $272 million." (PX1237 at 2.) The court noted that "this [Midwest Gaming] bid represents the actual sale price of the license,

---

[2] Defendants also argued (1) that the Trustee failed to prove damages to a reasonable degree of certainty and (2) asked the court to use its equitable powers to limit the damages to the value of the creditors' claims eventually allowed in the bankruptcy proceedings. *Emerald*, 530 B.R. at 211–12. The court rejected these two objections, *id.* at 234–37, and Defendants do not ask the court to reconsider that decision.

5

which is likely the best evidence of fair market value." *Id.* at 234. Though the sale occurred in 2008, seven years after the IGB revoked Emerald's license, the court found "further support for relying on this bid as a measure of damages," in "valuations . . . that were prepared closer to the date of breach," which had similar estimates. *Id.* at 234. Specifically, a valuation prepared by Kevin Flynn's company, EVI, in August 1999, when Emerald's only significant asset was its license, placed the enterprise value at $307.5 million. *Id.* at 231, 234. As part of other litigation, Defendants had also prepared valuations measuring Emerald's worth on three different dates: July 1, 1999; October 18, 1999; and June 1, 2000. Those valuations ranged from $268–$272 million on July 1, 1999 to $308–$310 million by June 1, 2010. Accordingly, the court pegged the value of the license at $272 million an awarded damages in that amount.

## DISCUSSION

The parties challenge two aspects of the court's damages analysis: The Trustee urges that the court's conclusion that Defendants are severally liable is inconsistent with its determination to apportion damages equally among the six liable Defendants. Defendants assert that the court misunderstood the evidence regarding the value of the license. The $272 million figure, they note, is comprised of two components: A set of payments from Midwest Gaming totaling $125 million, and a promise by Des Plaines to allocate $10 million dollars annually to the state over 30 years—an income stream with a net present value of $147 million. Defendants now contend that the actual purchase price of the license is limited to the $125 million that Midwest Gaming paid.

Motions for reconsideration "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (citation omitted). A motion for reconsideration "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Bordelon v. Chicago Sch. Reform Bd. of*

6

*Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (internal quotation marks and citation omitted); *see also Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 956 (7th Cir. 2013) (A "party may not use a motion for reconsideration to introduce new evidence that could have been presented earlier."). The court will, however, grant a motion to reconsider when it "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted).

I.  **Trustee's motion to reconsider *pro rata* damages award**

The Trustee asks the court to reconsider its decision to award damages on a *pro rata* basis and instead find each Defendant liable for the full value of the license. As the Trustee reads the court's decision, the court "reduc[ed]" each Defendant's liability based on its conclusion that "liability under the Emerald Shareholders Agreement was "several" and not "joint and several." (Trustee's Mot. to Reconsider Pro Rata Damages [319], hereinafter "Trustee's Mot.," 2.) Initially, without challenging the finding of several liability, the Trustee contends that a *pro rata* division of damages is legal error because it conflates two distinct questions: (1) whether Defendants are jointly or merely severally liable, and (2) what injuries each Defendant proximately caused Emerald to suffer. (*Id.*) The Trustee maintains that the court found that "each Defendant engaged in conduct that by itself caused Emerald to lose its *entire* License," and, therefore, each should be responsible for the full value of the license. (Trustee's Mot. at 3) (emphasis in original.) Defendants respond that the Trustee misreads the court's analysis of causation. According to Defendants, "[a]t no point in its Opinion did the Court conclude that any individual Defendant's conduct was, standing on its own, the cause-in-fact of the loss of Emerald's license." (Defs.' Resp. to Trustee's Mot. [343], hereinafter "Defs.' Resp.," 4.) The court agrees with the Trustee that the question of several liability and causation are distinct— though necessarily related—inquiries and that the "critical question is what were the damages

7

that each Defendant proximately caused Emerald to suffer." (Trustee's Mot. at 8.) But the court, for the most part, agrees with Defendants' characterization of its causation findings.[3]

### A. The court's causation analysis

The court's decision that the Amended Shareholders' Agreement creates only several liability required the court to apportion responsibility for the loss of the license among Defendants. Because the Agreement does not create a joint obligation, Defendants are liable only for their own conduct; they are not vicariously liable for the misconduct of other parties to the Agreement. The court therefore, as the Trustee correctly notes, had to determine what damages each Defendant caused.

The court did not conclude, as the Trustee asserts, that "each Defendant engaged in conduct that by itself caused Emerald to lose its entire License." (Trustee's Mot. at 3.) Rather, the court highlighted language in the IGB's decision suggesting that the "totality" of Emerald's conduct motivated its decision, and explained that the facts showed that "there are multiple factors that . . . combined to cause the injury." *Emerald*, 530 B.R. at 203 (quoting *City of Chi. v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395, 821 N.E.2d 1099, 1127 (Ill. 2004)). In those circumstances, to evaluate cause in fact, Illinois courts ask "whether defendant's conduct was a material element and a substantial factor in bringing about" that injury. *Id.* The court reviewed

---

[3] Defendants did not move for reconsideration of the court's proximate cause findings, but devote a section of their brief to re-hashing their earlier arguments against finding proximate cause in this case. (*See* Defs.' Resp. at 7–9.) They contend that because the IGB had discretion to decide whether or not to revoke the license, and had never before revoked a license, it was unforeseeable that the agency would revoke Emerald's license. Defendants rely on the same arguments and cases presented in their post-trial briefs, which this court previously considered and rejected: The court disagreed that the IGB's discretion rendered the harm unforeseeable. The court emphasized that the risk of revocation was apparent because Emerald had warning from the Riverboat Gambling Act, and IGB regulations that revocation was a sanction available for Rule violations, and agencies are free to change their pattern of enforcement. *Emerald*, 530 B.R. at 205. Moreover, the court relied on the Illinois Appellate Court's factual finding that "Emerald had fair and ample warning" that it might lose its license. Thus, the court concluded, the evidence established that the risk of harm was foreseeable and constituted legal cause. *Emerald*, 530 B.R. at 205.

8

the evidence and concluded that Defendants' violation of three Rules, related to failures to disclose information to the IGB—Rules 140(a), 140(b)(3), and 110(a)—were substantial factors in its decision to revoke the license. *Id.* at 203. Each of these violations was indeed a substantial factor, but the court made no finding that a single violation, by itself, caused the loss of the license.

The Trustee's assertion that the court found that each Defendant individually caused the loss of the license conflates the court's (1) breach, (2) causation, and (3) damages analysis. The Trustee urges that the court's individualized findings that each Defendant *breached* the contract, by violating certain IGB Rules, implies that the court found that each of these individual violations *caused* the loss of the license. (*See* Trustee's Reply in Supp. of Mot. for Reconsideration [359], hereinafter "Trustee's Reply," 4) (quoting the court's breach findings). But the court's individualized analysis of breach is not a reflection of its causation findings. Rather, the court's individualized breach findings were necessary because the IGB Final Board Order spoke only in terms of "Emerald's" Rule violations without identifying which officers or directors were responsible. "[B]ut to prove breach, the Trustee" was required to "show which of the individual Defendants were responsible for each act or failure to act that the IGB cited." *Emerald,* 530 B.R. at 197. The court, therefore, correlated the IGB's findings with the Trustee's individualized evidence of Defendant's misconduct and concluded that all seven Defendants had violated at least one IGB Rule.

The court then, separately determined which of those individual Rule violations *caused* the loss of the license. The court found that, while the Trustee established that each Defendant breached the Agreement, it was the "totality" of their various Rule violations that caused the IGB to revoke Emerald's license, rather than impose some smaller sanction. *Emerald*, 530 B.R. at 203, 210. The IGB's concern about organized crime—which was documented in Board meeting minutes, *id.* at 161, and in the Final Board Order, *id.* at 201—was exacerbated by "Defendants' less-than-forthcoming behavior." *Id.* at 203. The IGB made its concerns about Emerald's failure

to disclose information known in various meetings and letters. *Emerald*, 530 B.R. at 99–100. "These failures to disclose were repeatedly cited in the IGB Final Board Order because the conduct violated multiple rules." *Id.* at 203. Based on the these facts, the court concluded that "the Defendants' failure to disclose information in violation of Rules 140(a), 140(b)(3), and 110(a) were substantial factors in the IGB's decision to revoke the license." *Id.* Contrary to the Trustee's assertions, the court did not find that any individual Defendant's failure to disclose a piece of information would have, by itself, prompted the IGB investigation and revocation proceedings. Rather, the court determined that the IGB was motivated by its "misimpression that Defendants were colluding to hide mischievous conduct." *Id.*

The Trustee asserts, however, that the court necessarily found each Defendant individually caused the loss of the license because the court "recognized that it could not ignore the language in the IGB's Final Board Order announcing that each rule violation 'alone supports revocation of Emerald's license.'" (Trustee Reply at 4) (quoting *Emerald*, 530 B.R. at 210.) But here the Trustee quotes language from the court's *damages* analysis to support her argument about *causation*. The court's opinion made clear that it was only "*for the purposes of apportioning damages*, [that] the court takes the IGB at its word and weighs each violation equally." *Emerald*, 530 B.R. at 210. In fact, the court specifically rejected reading the language the Trustee emphasizes as evidence that the IGB would have revoked the license based on any individual rule violation. The IGB Final Board Order identified violations of Rule 235(a), as well, but the court concluded that those violations not only did not independently cause the loss of the license, but were not even substantial factors in the IGB's decision. *Id.* at 203–04. The IGB had a long history of condoning violations of Rule 235(a) and the IGB staff concluded that those violations had "either been resolved" or "determined to be irrelevant." *Id.* at 204. That evidence persuaded the court that, despite the IGB's statement that it has authority to revoke a license based on a single rule violation, the violation of Rule 235(a) was not, in fact, a "substantial factor" or "material element" in the IGB's decision. In sum, the court's analysis of causation

depended on its finding that the IGB was motivated to revoke the license by the Defendants' repeated failures to disclose information, not by any single Defendants' misconduct.

### B. The court's decision to apportion damages

The court's findings pertaining to causation necessarily influenced its evaluation of damages. The evidence presented a scenario where "each defendant's act makes the injury to the plaintiff a little worse and it is the combination of the acts of separate defendants that does him in." *Richman v. Sheahan*, 512 F.3d 876 (7th Cir. 2008). In those circumstances, "each defendant is liable only for the increment of harm that he caused." *Id.* That is, the court's decision to apportion damages at all—rather than assign full responsibility for the loss of the license—was rooted in its causation findings.

The decision to apportion damages *equally* among the six liable Defendants was based on the IGB Final Board Order, which provided no basis for weighing Defendants' violations of Rule 140(a), 140(b)(3), and 110(a) differently. The court found that the six Defendants were liable for the following misconduct:

- Kevin Flynn failed to disclose his role in managing Emerald, and failed to disclose [a consulting and lobbying agreement].

- Donald Flynn failed to disclose Kevin Flynn's role managing Emerald in Donald Flynn's testimony to the IGB. The IGB relied explicitly on Donald Flynn's statements to support the conclusion that the record was "replete" with evidence that Emerald dissembled about Kevin Flynn's role.

- Joseph McQuaid failed to disclose Kevin Flynn's role in managing Emerald, failed to disclose agreements between Rosemont and Emerald, failed to disclose construction agreements, and failed to make full disclosures in Emerald's Renewal Application.

- John McMahon failed to disclose agreements between Emerald and Rosemont.

- Kevin Larson failed to disclose Kevin Flynn's role managing Emerald in a September 28, 2000 interview with the IGB. When asked about Kevin Flynn's role, Larson flatly denied Kevin Flynn's involvement: "Kevin had no role in [Emerald]."

- Walter Hanley failed to disclose agreements between Rosemont and Emerald, and failed to disclose construction agreements.

11

*Emerald*, 530 B.R. at 210–11 (internal citations omitted). As the court's recitation reveals, Defendants participated in similar conduct, and that conduct violated multiple rules. The court recognized that the "degree of liability for each Defendant might be said to differ," but the court could not "ignore language in the IGB's Final Board Order announcing that each rule violation 'alone supports revocation of Emerald's license.' . . . Accordingly, for the purposes of apportioning damages, the court takes the IGB at its word and weighs each violation equally." *Emerald*, 530 B.R. at 210. Though the court did not read the IGB's language to mean that any individual violation would have caused the IGB to revoke the license, the court did infer from this language that the IGB was equally troubled by each of the Defendants' failures to disclose the above information. Based on that factual finding, the court determined that a reasonable basis for apportioning damages would be to assign equal responsibility to each Defendant. *Id.* at 210–11.

### C. Indivisible harm

The Trustee argues, as she did in her post trial brief (*see* Trustee's Post Trial Br. [255], 353–55), that apportioning the damages was inappropriate because the loss of Emerald's gaming license is an indivisible harm. In tort cases where multiple Defendants cause an indivisible harm, the Trustee continues, Illinois courts hold each Defendant liable for the full amount. The Trustee cites two torts cases—*Bd. of Trustees of Comm. College Dist. No. 508, Cty. of Cook v. Coopers Lybrand*, 208 Ill. 2d 259, 278-81, 803 N.E.2d 460, 471-73 (Ill. 2003), *Richman v. Sheahan*, 512 F.3d 876, 884 (7th Cir. 2008)—for the proposition that it was legal error to apportion damages when Emerald suffered an indivisible harm. In her motion, the Trustee contends that Illinois courts apply the same approach in contract cases where there is an indivisible harm. (Trustee's Mot at 9–10) (citing *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 364 Ill. Dec. 451, 466-67, 976 N.E. 2d 1014, 1029-30 (Ill. App. 1st Dist. 2012).)

Given that Emerald suffered an indivisible harm, the Trustee continues, Defendants must be liable for the full value of the license. (*Id.* at 10.)

The court previously considered and rejected this argument. As noted in the earlier opinion, it is not certain that the Illinois Supreme Court would extend the "indivisible harm" approach from torts to contract cases. Though the Trustee is correct that Illinois courts treat the question of proximate causation similarly in tort and contract cases (*see* Trustee Mem. at 9), the analysis of joint and several liability is markedly different: in tort cases, joint or several liability turns on the nature of the harm (indivisible or not) and facts surrounding causation (multiple sufficient causes or multiple contributing factors). That is, in a tort case, where multiple defendants contribute to a single indivisible harm, courts in effect merge the joint liability and causation questions. Illinois law is clear, however, that in contract cases, joint and several liability is created only by statute or through the contract itself. *Emerald*, 530 B.R. at 208 (citing *Codest Eng'g v. Hyatt Int'l Corp.,* No. 94-c-7335, 1995 WL 683505, at *6 n.5 (N.D. Ill. Nov. 15, 1995); *Pritchett v. Asbestos Claims Mgmt. Corp.*, 332 Ill. App. 3d 890, 898, 773 N.E.2d 1277, 1283 (5th Dist. 2002); *Brokerage Res., Inc. v. Jordan*, 80 Ill. App. 3d 605, 608, 400 N.E.2d 77, 80 (1st Dist. 1980)). The Illinois Supreme Court has never embraced an approach that creates joint and several liability for a breach of contract based on the type of harm the plaintiff suffered, and it is not immediately clear, based on its prior precedents, how the Illinois Supreme Court would approach these facts.

The Trustee urges, as she did in her post-trial briefs, that this distinction between tort and contract cases is a "distinction without a difference." (Trustee's Mot. at 9.) But the importance of respecting the legitimate expectations of contracting parties suggests that courts should not create joint and several liability ex post where the parties did not intend joint and several liability ex ante. This principle does create some tension in cases where multiple, but individual, breaches contribute to a single indivisible harm, and responsibility cannot be reasonably apportioned among defendants. As the court previously discussed, one Illinois

Appellate Court that confronted these "unique factual circumstances," adopted a "concurrent breach" theory, which would allow for joint and several contractual liability in the face of an indivisible harm, even where contract language created only several liability. *InsureOne*, 364 Ill. Dec. at 467, 976 N.E.2d at 1030. But this court declined to follow that approach, reasoning that

> [t]he *InsureOne* court acknowledged . . . that its holding was the exception from the rule that 'in general defendants who have separate and distinct contracts with a common entity cannot be subject to joint liability for breach of contract.' Furthermore, *InsureOne* relied exclusively on non-Illinois cases for support, and no other Illinois courts have applied the doctrine of concurrent breach of contract.

*Emerald*, 530 B.R. at 209–210 (quoting *InsureOne*, 364 Ill. Dec. at 466–67, 976 N.E.2d at 1029–30). The Trustee again urges the court to follow *InsureOne*, but has identified no new case suggesting that the Illinois Supreme Court has or would apply a concurrent breach theory. (Trustee's Mot. at 9–10; Trustee's Reply at 9.) As this court previously explained, unless and until the Illinois Supreme Court adopts such a theory—and this court still has doubts about whether it will do so—the court cannot hold Defendants vicariously liable for an entire, indivisible harm, of which they were only one of multiple contributing causes.

Moreover, even if the court were to apply the torts framework in this case, it would adhere to the decision to apportion damages. Trustee relies heavily on *Coopers Lybrand*, but that case confirms that in tort cases, damages should "be apportioned among two or more causes where (a) there are distinct harms, *or* (b) there is a reasonable basis for determining the contribution of each cause to a single harm." 208 Ill. 2d at 279, 803 N.E.2d at 472 (quoting Restatement (Second) of Torts § 433(A) (1965)) (emphasis added). That is, to assign joint liability there must be both a single, indivisible harm and also no reasonable basis for dividing responsibility. Thus, not every indivisible harm requires joint and several liability: It is only where apportionment would be "arbitrary" or where the court lacks a "logical or reasonable basis" for dividing responsibility that courts impose joint and several liability. *Coopers Lybrand*, 208 Ill. 2d at 279–80, 803 N.E.2d at 472 (quoting Restatement (Second) of Torts § 433(A) Comment *i* at 439–40 (1965)).

The Trustee also directs the court to *Richman v. Sheahan,* 512 F.3d 876 (7th Cir. 2008), but that case similarly suggests that not every indivisible harm results in joint and several liability. In *Richman*, the Seventh Circuit identified four possible approaches to assigning damages in tort cases where a plaintiff suffers a single harm caused by multiple defendants. Two of these approaches do result in joint and several liability. First, when "each defendant might by his own act have inflicted the entire injury, in the sense that, had he not committed the act, the injury would have been no less grave than it was, as when two persons shoot a third and each wound would have been fatal by itself," both defendants are jointly and severally liable. *Id.* at 884. Alternatively, joint and several liability arises when "each defendant might have committed an act that is a tort when injury results . . . but it is unclear which defendant's act was the one that inflicted the injury—both shot at the plaintiff, one missed, but we do not know which one missed." *Id.* But neither of these scenarios fits the facts of this case: that is, no individual Defendant's misconduct was the equivalent of a fatal shot. Rather, a third approach applies to cases like this one, where "each defendant's act makes the injury to the plaintiff a little worse and it is the combination of the acts of separate defendants that does him in."[4] 512 F.3d at 884. In that case, "each defendant is liable only for the increment of harm that he caused." *Id.*

Thus, even if the court applied the tort framework for joint and several liability in this case, it would reach the same conclusion: The facts provided the court with a reasonable method to apportion responsibility for the loss of the license. Though the harm is in some sense indivisible—there was only one license and the Trustee is correct that Defendants could not have caused loss of 1/6 of a license—the Defendants were liable only for the increment of harm each caused and the court had a reasonable basis for apportioning damages.

---

[4] The final scenario the Seventh Circuit identified relates to the duty to rescue and is not applicable here. *Richman,* 512 F.3d at 885.

The Trustee makes two additional policy arguments in support of joint and several liability among the six liable Defendants. First, she argues that the court's approach produces an absurd result: The Trustee contends that had she sued "only one of the Defendants, she would have received a $272 million judgment; had she sued two of the Defendants, she would have received two $136 million judgments, and so on." (Trustee's Mem. at 10.) The Trustee's argument again relies on a misreading of the court's causation analysis. Had the Trustee established, as she did here, that six individuals were equally liable for the loss of the license, but named only two as Defendants, the court would have awarded two $45 million judgments. There was no evidence here that other non-party individuals were responsible for the loss of the license. In fact, the court did consider whether Eugene Heytow—an Emerald director who participated in relevant board decisions, but was not named as a Defendant—was partly responsible for the loss of the license. *Emerald*, 530 B.R. at 206. But the court concluded that, like Pedersen, Heytow's conduct was not a proximate cause of the lost license. Thus, the court did not confront the hypothetical the Trustee has proposed.

The Trustee next argues that Defendants have obtained a "super-right" of contribution because, by apportioning damages among Defendants, they have obtained contribution— before paying the judgment—to which they are not entitled. Again, this argument presupposes that the Defendants are liable, either directly or vicariously, for the full value of the license, which the court concluded they are not.

D. **The Amended Shareholders' Agreement creates several liability only**

Finally, in the alternative, the Trustee urges the court to reconsider its conclusion that the Amended Shareholders' Agreement creates only several liability. The Trustee urges that, "[t]o the extent that the Court deems it necessary to find that the Emerald Shareholders Agreement creates joint obligations to hold each Defendant fully liable for the damages his own breach caused, the record in this case amply supports that finding." (Trustee Mot. at 13.) The court declines this invitation. As the court explained previously, whether a contract creates a

16

joint obligation "depends on the intentions of the parties, as revealed by the language of the contract." *Emerald*, 530 B.R. at 208 (quoting *Brokerage Res.*, 80 Ill. App. 3d at 608, 35 Ill. Dec. at 943). The court previously analyzed the language of the Amended Shareholders' Agreement and concluded that it does not reflect an intention to create a joint promise, despite the identical language appearing in each agreement. *Id.* at 209. As the court explained in that opinion, "there was fundamentally no collective action or joint promise here. The promised performance was unique to each shareholder. That is, each shareholder promised to conform his or her own behavior to IGB rules." *Id.* Despite the Trustee's assertions, the Defendants in no way promised "the same performance." (Trustee's Mot. at 7; Trustee's Reply at 1, 8.) In fact, if the court found a joint obligation in the Amended Shareholders' Agreement, all of Emerald's shareholders—whether officers, or directors, or neither—who signed the same Agreement could be held vicariously liable for the misconduct of these six Defendants. The court found no evidence in the Agreement to support that conclusion, and the Trustee has presented no new evidence or arguments that alter the court's analysis. The Trustee's motion for reconsideration is denied.

## II. Defendants' motion to amend damages amount

Defendants also take issue with the court's damages analysis. They contend that the court made an error in determining the value of the license and urge the court to amend the total damages from $272 million to $125 million. (Defs.' Reply in Supp. of Mot. to Amend Damages [355], hereinafter "Defs.' Reply," 2; *see* Defs.' Mot. to Amend Damages [323], hereinafter "Defs.' Mot.," 1.) The $272 million figure, they note, is comprised of two components: A $125 million payment by Midwest Gaming, and a promise by Des Plaines to allocate $10 million dollars annually to the state over 30 years—an income stream with a net present value of $147 million. (Defs.' Mot. at 2.) Defendants contend that only the sum paid by Midwest Gaming constitutes the "actual sale price." (Defs.' Reply at 2; Defs. Mot. at 2.)

Defendants' motion fails for two reasons. First, the Motion impermissibly relies on evidence that was not identified in the post-trial proceedings. Defendants chose not to present their own evidence of damages, though they had ample opportunity to do so, choosing instead to argue that any damages award would be impermissible because the value of the license is too speculative. *Emerald*, 530 B.R. at 211–12. In his post-trial brief, Donald Flynn raised no arguments pertaining to damages, focusing instead on arguments that he did not breach his fiduciary duty or the Agreement. (*See generally* D. Flynn's Post-Trial Br. [248].) In their post-trial brief, the remaining five liable Defendants devoted seventeen pages to their arguments about damages (*see* C. Defs.' Post-Trial Br. [244], 269–85), and criticized several of the valuations the Trustee offered as evidence of market value (*id.* at 279–83), but never contested the $272 million figure. The court relied on the IGB's January 14, 2009 Board Decision, which Defendants acknowledge "characterized" Midwest Gaming's bid as $272 million. (Defs.' Mot. at 2; *see also* Defs.' Reply at 2 ("[T]he IGB . . . stated that the total *value* of the transaction was $272 million[.]") Defendants have not identified any evidence in the voluminous record that the court failed to review. Instead, they attach to their motion for reconsideration the IGB's Annual Report from 2009, which states:

> Midwest Gaming agreed and has paid $2.5 million within 10 days of its initial selection as the winning applicant. Midwest has agreed to pay an additional $47.5 million within 60 days of being found suitable. Midwest Gaming will also pay the state an additional $75 million when it is licensed by the Board, which would coincide with operations commencing. The host municipality, Des Plaines, will redirect $10 million per year in local gaming taxes to the state over a 30-year period.

(2009 IGB Annual Report, Ex. A to Defs.' Mot [323-1].) Defendants assert that the "report is the proper subject of judicial notice and indeed was relied on by the Trustee's proposed damages expert in his report." (Defs.' Mot. at 3 n.2.) But a motion for reconsideration "does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (internal quotation marks and citation omitted); *see also*

18

*Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 956 (7th Cir. 2013) (A "party may not use a motion for reconsideration to introduce new evidence that could have been presented earlier.") The court declines to take judicial notice of this report and will not amend its opinion on this new, belated argument.

Second, even had Defendants properly preserved this argument, the IGB's Annual Report would not alter the court's conclusion. Market value is what a willing buyer would pay to a willing seller. *Malik v. Falcon Holdings*, LLC, 675 F.3d 646, 648 (7th Cir. 2012). Defendants argue that because Des Plaines's promised payments did not come at Midwest Gaming's expense, those payments were not part of the "actual sale price." (Defs.' Mot. at 3.) That is, they argue that Midwest Gaming—which they characterize as the willing buyer—was willing to pay only $125 million. (*See* Defs.' Reply at 2) ($125 million "was *all* that Midwest Gaming paid.") (emphasis in original). This formulation, however, ignores the "willing seller" component of the equation. The IGB's 2009 Annual Report does not suggest that it would have sold the license to Midwest Gaming without Des Plaines's promise to provide the 30-year income stream. In fact, the IGB's characterization of the total price as $272 million in its January 2009 Order reflects the fact that it considered both Des Plaines's promised income stream and Midwest Gaming's payments as part of the package of consideration in exchange for re-issuing the license.

In their reply brief, Defendants attempt to rebut this evidence by re-characterizing the transaction. They argue that the IGB actually sold, and Midwest Gaming and Des Plaines purchased, two different assets: (1) Midwest Gaming purchased the license to operate a casino, while (2) Des Plaines bought the collateral benefits of having a casino. (Defs.' Reply at 3–4.) Emerald only lost the license itself, Defendants urge, and so the price Midwest Gaming paid, rather than the value of the whole transaction, should be the measure of its value. (*Id.* at 4.) Defendants' attempt to disassociate the value of the license from its geographical location is unsupported in the record. As the court has previously noted, the value of the license

necessarily depends on where the casino is located. In fact, the court accepted Defendants' argument that the court must consider the geographic location when valuing the license because "valuations [that] assume a casino based in Rosemont, a location the IGB never approved . . . would have been more valuable than a license located elsewhere." *Emerald*, 530 B.R. at 230. Defendants cannot, now, argue instead that the license's value can be separated from its geographical location: Midwest Gaming could not have purchased the license without a commitment by Des Plaines to host the casino, or without its promised future payments. It is, therefore, much more accurate to characterize the transaction as two buyers—Des Plaines and Midwest Gaming—pooling finances to purchase a single asset: a license for a casino in Des Plaines. The court's decision to rely on the total value of that transaction, which had a net present value of $272 million dollars, was not error. Defendants' motion is denied.

## CONCLUSION

The parties have identified no basis for the court to alter its initial opinion and order. The Trustee's request for joint and several liability is based on a misreading of the court's causation findings, while Defendants' motion to amend damages improperly raises new arguments and is unsupported in the record. The motions for reconsideration [319] and [323] are denied.

ENTER:

July 14, 2015

_____
REBECCA R. PALLMEYER
United States District Judge