**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE ) | |
| ) | |
| EMERALD CASINO, INC., ) | Chapter 7 |
| ) | 02 B 22977 |
| Plaintiff, Debtor ) | |
| ) | |
| _____ ) | |
| ) | |
| FRANCES GECKER, not individually but ) | |
| Trustee for EMERALD CASINO, INC., ) | |
| ) | Bankr. Adv. No. 08 A 00972 |
| Plaintiff, ) | |
| v. ) | No. 11 C 4714 |
| ) | |
| ESTATE OF KEVIN F. FLYNN, *et al.*, ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Frances Gecker, the Chapter 7 bankruptcy trustee for Emerald Casino, Inc., has a $219 million judgment against the Estate of Kevin Flynn, Emerald's former CEO. *See In re: Emerald Casino, Inc.*, 867 F.3d 743 (7th Cir. 2017). Because the Estate is worth far less than $219 million, the Trustee hopes to partially satisfy her judgment with assets Kevin previously transferred to third parties. To this end, she issued citations to discover assets to numerous individuals and institutions, including Kevin's surviving spouse Susan Flynn. The Trustee subsequently moved to compel turnover of certain assets in Susan Flynn's possession, but this court denied that motion because the Trustee had not alleged a basis on which Kevin's transfer of the assets to Susan could be voided. *See In re Emerald Casino, Inc.*, No. 11 C 4714, 2018 WL 527925, at *2 (N.D. Ill. Jan. 24, 2018). The Trustee has now filed a "renewed motion" to compel turnover of the same assets, arguing that Kevin fraudulently transferred them to Susan. For the reasons explained below, the Trustee's motion [679] is granted.

## BACKGROUND

On August 11, 2017, the Trustee filed a motion to compel Susan Flynn to turn over certain assets that had come to light as a result of the Trustee's citations. These assets consist of (1) an option to purchase 60,000 shares of LKQ Corporation, which LKQ granted to Kevin Flynn on January 9, 2009; (2) 1,261 "restricted share units" (RSUs) of LKQ stock, which LKQ granted to Kevin on May 12, 2011; and (3) 4,078 additional RSUs that LKQ granted to Kevin on May 12, 2013. Kevin was awarded all of these assets pursuant to LKQ's "1998 Equity Incentive Plan," and, on June 3, 2009, he designated Susan Flynn as the primary beneficiary of that plan in the event he died before "receiv[ing]" distributions under the plan to which he was entitled. *In re Emerald Casino*, 2018 WL 527925, at *2.

Susan Flynn argued in her August 11 motion, and the Trustee conceded, that this beneficiary designation qualifies as a "registration" of the assets in "beneficiary form" pursuant to the Illinois Uniform Transfer on Death (TOD) Security Registration Act, 815 ILCS 10/1-10/12. Under the terms of that statute, ownership of the assets passed to Susan Flynn, outside of probate, immediately upon Kevin's death on August 12, 2013. The Trustee contended that the assets were nevertheless available to satisfy her subsequent judgment against Kevin's estate because the TOD Security Registration Act expressly states that it "does not limit or expand the rights of creditors of security owners against beneficiaries and other transferees under other laws of this State." 815 ILCS 10/9(b). But neither the Trustee's turnover motion nor her reply brief in support of that motion identified any "other law[ ] of this State" that allegedly provided the estate's creditors with a such a right against Susan Flynn (i.e., the beneficiary of the registration). As a result, the court denied the motion. The court did not, however, dismiss the Trustee's citation or supplementary proceeding to enforce the Trustee's judgment against Kevin Flynn's estate.

The Trustee has now filed a "Renewed Motion for Turnover of Fraudulent Transfer of LKQ Stock." [679] In this motion, the Trustee argues that Susan Flynn became the owner of

2

the LKQ stock options and RSUs by way of a constructive fraudulent transfer under the Illinois Uniform Fraudulent Transfer Act (UFTA), 740 ILCS 160/1-160/12, and that these assets are therefore available to satisfy the Trustee's judgment.

## **DISCUSSION**

The Illinois UFTA describes circumstances under which a debtor's transfer of assets will be deemed fraudulent:

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6(a). The transferor need not intend for the transfer to hinder his or her creditors in order for the transfer to be voidable under this provision. *See Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 719 (7th Cir. 2002) ("When a person transfers money or other property to another person without receiving anything in return, and the transferor is insolvent (or made insolvent by the transfer), the transfer is voidable even if there was not intent to hinder creditors.").

Susan Flynn does not dispute that the Trustee was a "creditor" of Kevin Flynn "whose claim arose before" the assets at issue were transferred to her. Nor could she credibly dispute this point. The Illinois UFTA defines a "creditor" as "a person who has a claim," and defines "claim" as "a right to payment, *whether or not the right is reduced to judgment*." 740 ILCS 160/2(c)-(d) (emphasis added).[1] *See also DFS Secured Healthcare Receivables Tr. v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 349 (7th Cir. 2004) (interpreting similar language in Indiana UFTA and concluding that a judgment holder was a "present creditor" for purposes of

---

[1] The Trustee herself suggests that this court's January 24 opinion "question[ed] the Trustee's status as a creditor because she did not hold a judgment on the date of Kevin Flynn's death." (Reply Br. 5). But that opinion did not reach the question of whether the Trustee was a "creditor" of Flynn for the purposes of the constructive fraudulent transfer statute, because the Trustee did not allege that Kevin fraudulently transferred the assets at issue to Susan.

3

that statute even though it "did not receive a court judgment until after the asset transfer" in question). Susan Flynn also does not argue that she received anything of "reasonably equivalent value in exchange for" the relevant assets.

Rather, Susan opposes the Trustee's "renewed motion" on the following grounds: (1) The Trustee's motion is procedurally improper, either (a) because there is no such thing as a "renewed motion" under state or federal law, or (b) because there are no extraordinary circumstances that would justify reconsideration of the court's January 24 order denying the Trustee's original motion; (2) Kevin Flynn did not "make" any "transfer" for the purpose of a fraudulent transfer claim, because the securities at issue passed to Susan by operation of law at Kevin's death; (3) even if Kevin did "transfer" the securities to Susan, Kevin was solvent at the time of the transfer and was not made insolvent by the transfer; and (4) even if the transfer was constructively fraudulent, an order voiding the transfer would simply restore to Kevin's estate an unvested interest equivalent to that which Kevin possessed the moment before he died. This unvested interest would then be unreachable by the Trustee. The court considers these arguments in turn.

I.  **Alleged procedural impropriety**

Susan Flynn first suggests that the court must treat the Trustee's "renewed motion" as a motion to reconsider, subject to the "stringent standards for reconsideration under Rule 60," because no federal or local rule specifically provides for the filing of a "renewed" motion. (Def.'s Resp. Br. 3 n.2.) She then cites caselaw stating that "[r]econsideration is not an appropriate forum for . . . arguing matters that could have been heard during the pendency of the previous motion," *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996), and that "a motion for reconsideration is an improper vehicle . . . to tender new legal theories," *Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 404 (7th Cir. 1986). According to Susan, "[t]he Trustee fully briefed her original turnover motion when she filed it," and "chose" not to argue in that motion that Susan owns the assets at issue by way of a constructive fraudulent

transfer. (Def.'s Resp. Br. 4-5.) The Trustee cannot now ask the court to "reconsider" her fraudulent transfer argument, as the court never considered it in the first place. Even if it had, Susan continues, the Trustee has not identified any extraordinary circumstances—such as an intervening change in the law or newly discovered evidence—that would justify reconsideration.

The court need not decide whether the prerequisites for reconsideration are satisfied here, because the court is not, in fact, obligated to treat the Trustee's "renewed motion" as a motion for reconsideration. Under Rule 69(a), supplementary proceedings to enforce a money judgment are governed by the law of the forum state, unless an applicable federal statute provides otherwise. *Laborers' Pension Fund v. Pavement Maintenance, Inc.*, 542 F.3d 189, 191 (7th Cir. 2008); *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993). Illinois law, in turn, "leave[s] the procedure to be followed in [supplementary proceedings] largely to the judge's discretion," so long as the requirements of due process are satisfied. *Resolution Trust Corp.*, 994 F.2d at 1226-27. The Illinois supplemental proceedings statute "gives courts broad powers to compel the application of discovered assets or income to satisfy a judgment," and "[i]ts provisions are to be liberally construed." *Star Ins. Co. v. Risk Mktg. Grp. Inc.*, 561 F.3d 656, 662 (7th Cir. 2009) (quoting *Kennedy v. Four Boys Labor Svc, Inc.*, 279 Ill. App. 3d 361, 366, 664 N.E.2d 1088, 1091 (2d Dist. 1996)). Nothing in that statute, or in the related Illinois Supreme Court rule governing supplementary proceedings, expressly prohibits a judgment creditor from filing a second motion to compel turnover of the same assets that were the subject of a previous, unsuccessful turnover motion in the same supplementary proceeding. *See* 735 ILCS 5/2-1402; ILCS S. Ct. Rule 277. In any event, because "the draftsmen of Rule 69" did not intend "to put the judge into a procedural straitjacket, whether of state or federal origin," this court need not "apply[ ] every jot and tittle of Illinois procedural law." *Resolution Trust Corp.*, 994 F.2d at 1226-27; *see also U.S. ex rel. McCandliss v. Sekendur*, 631 Fed. App'x 447, 449 (7th Cir. 2015) (noting that Illinois courts themselves "do not interpret [ILCS S. Ct. Rule 277(f)] rigidly").

To be sure, the Trustee could have and should have raised her fraudulent-transfer argument in her original motion. Including that argument in a "renewed" motion is an inefficient use of the court's time and resources, and, as the parties recognize, it raises questions about finality and repose. But the doctrines of *res judicata* and collateral estoppel are not applicable here, because the court's denial of the Trustee's original motion was not a final judgment that disposed of all the issues raised in the Trustee's collection proceeding against Susan Flynn. *See Nat'l Life Real Estate Holdings, LLC v. Int'l Bank of Chicago*, 2016 IL App (1st) 151446, 51 N.E. 3d 934, 938 (1st Dist. 2016) (denial of motion for entry of judgment against third-party citation respondent was not final for purposes of appeal, because it "did not 'ultimately foreclose' [the judgment debtor] from collecting against [the citation respondent] or prohibit [the judgment debtor] from continuing with its citation efforts").[2] Nor is the law-of-the-case doctrine applicable here, as that doctrine applies only where a court revisits the same *issue* it decided earlier in the same case. *See United States v. Robinson*, 724 F.3d 878, 886-87 (7th Cir. 2013). As Susan herself points out—repeatedly—the Trustee's original turnover motion did not raise the issue of whether Kevin Flynn fraudulently transferred the assets in his 1998 Equity Incentive Plan to Susan.

The Trustee's failure to raise the fraudulent-transfer argument in her original turnover motion does not preclude the court from considering it in a "renewed" motion. Nor is the court precluded from considering such a "renewed" motion in the first place. The court therefore

---

[2] Susan cites *In re Joint Easter & Southern Districts Asbestos Litigation*, 22 F.3d 755 (7th Cir. 1994), to support her contention that the court's denial of the original turnover motion was a "final, appealable order." (Def.'s Resp. Br. 3 n.2.) That case notes the existence of "exception[s] to the general rule" that a post-judgment order in the context of collection proceedings is final for purposes of appeal when it "conclude[s] the collection proceeding." *Id.* at 761-62. This court's denial of the original turnover motion did not conclude the collection proceeding against Susan, and Susan does not explain why she believes an exception to the general rule deeming such an order to be non-final should apply here. The court sees no reason to apply an exception.

6

rejects Susan's argument that it would be "procedurally improper" to decide the Trustee's motion on the merits.

## II. Existence of a Transfer

Susan's second argument is that no "transfer" was "made" for purposes of the Illinois UFTA. Kevin did not "make" any transfer when he executed the beneficiary registration form in June 2009, she suggests, because Kevin's interests in the assets were not yet vested at that point and his agreements with LKQ barred him from transferring the assets before his interests vested. Although Susan concedes that Kevin's death caused any remaining unvested interests to vest immediately, she argues that Kevin did not "make" a transfer at this point in time either—he simply died, and "[t]he stock options and restricted stock units at issue then passed to Susan by operation of law." (Def.'s Resp. Br. 7-8).

There does not appear to be any case law addressing the question of whether assets passing outside of probate pursuant to the TOD Security Registration Act are "transfers" within the meaning of the Illinois UFTA. At oral argument, Susan repeatedly cited this absence of case law as evidence that they are not. But the absence cuts both ways: the Trustee has no case law to support her argument that the transactions are subject to the Illinois UFTA, but Susan cannot point to any cases in which a court held that transfers pursuant to the TOD Securities Registration Act are *not* subject to the Illinois UFTA.

The text of the Illinois UFTA undermines Susan's position. That statute defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest with an asset." 740 ILCS 160/2(*l*). This definition is broad enough to encompass a two-step "transfer," in which a grantor executes a beneficiary designation form at one point in time, and then at a later point, upon the grantor's death, that action causes assets of the grantor to pass automatically to the beneficiary. Although Kevin took steps to initiate the transfer in June 2009, when he executed the beneficiary designation form, he "made" the transfer at the time of his death in 2013. 740 ILCS

7

160/7(a)(2) (transfer of property other than real property "is made" for purposes of fraudulent transfer claim "when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under this Act that is superior to the interest of the transferee.").

Susan contends that the TOD Securities Registration Act exempts transfers made pursuant to that statute from the Illinois UFTA. But the TOD Securities Registration Act plainly does not establish such an exemption. It states that "[t]his Act *does not limit or expand* the rights of creditors of security owners against beneficiaries and other transferees *under other laws of this State.*" 815 ILCS 10/9(b) (emphasis added). The Illinois UFTA is an "other law[ ] of this State," and the text of the TOD Securities Registration Act makes it fully applicable to securities that pass outside of probate from a judgment debtor to a third party by way of a beneficiary registration. Susan suggests that the Illinois legislature's decision *not* to adopt Section 9(c) of the Uniform TOD Securities Registration Act[3] demonstrates the legislature's intent to insulate beneficiaries from creditors' claims against grantors and their estates. But the Illinois legislature presumably knew that the Illinois UFTA existed when it enacted language making beneficiaries and other transferees of a TOD security registration liable to "creditors of security owners" under "other laws of this State." Susan's speculation about the legislature's rationale for not adopting certain other language cannot defeat the plain meaning of the text it did adopt.

The court concludes, for the purpose of the Trustee's fraudulent-transfer claim, that Kevin Flynn transferred the assets at issue to Susan Flynn.

## III. Solvency at the time of the transfer

Susan next argues that the Trustee's claim fails because Kevin was solvent at the time of the transfer and was not made insolvent by the transfer. "Insolvency is defined by [the Illinois

---

[3] This section states, *inter alia*, that "[a] transferee of a nonprobate transfer is subject to liability to any probate estate of the decedent for allowed claims against that estate." *See* UNIF. TOD SECURITY REGISTRATION ACT (1989/1998) § 9(c) (UNIF. LAW COMM'N 2014).

8

UFTA] as having a balance sheet on which liabilities exceed assets." *Baldi v. Samuel Son & Co.*, 548 F.3d 579, 581 (7th Cir. 2008) (citing 740 ILCS 160/3(a)).  In this case, the solvency question is primarily a legal one, as its answer depends on how the court values the Trustee's legal claim against Kevin, which was pending at the time of the transfer.  If the court values the Trustee's claim at the full amount of the judgment she eventually received—$219 million—then Kevin was insolvent[4] and the transfer at issue was constructively fraudulent.  But if the court discounts the value of the Trustee's claim based on the possibility, at the time of the transfer, that the claim would fail, it is at least possible that Kevin was solvent.

As a general rule, the value of a contingent liability must be discounted "by the probability that the contingency will occur and the liability become real."  *Baldi*, 548 F.3d at 582 (quoting *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988)).  In *Baldi*, for example, the defendant had a contingent obligation to cover a third-party's pension liabilities in the event of a future default by that third party.  *Id.*  But it is not obvious that a pending judgment is "contingent" in this sense.  The *Baldi* defendant's liability was contingent because future events unrelated to the judicial process would determine whether or not any actual obligation to pay existed.  In the case of pending litigation, by contrast, the events giving rise to a party's liability have already occurred, and a subsequent judgment simply confirms the existence of that liability.  *See DFS Secured Healthcare Receivables Tr. v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 349 (7th Cir. 2004) (judgment holder was a "present creditor" for purposes of the Indiana UFTA, even though it "did not receive a court judgment until after the asset transfer" in question, because "the court judgment simply made official the obligation with respect to which DFS had been trying to recover long before the asset transfer"); *In re Babcock & Wilcox Co.*, 274 B.R. 230, 257-58 (Bankr. E.D. La. 2002) ("[A] judgment is not a debt in the strict sense of the term.  It is but the recognition of the pre-existence of a debt or obligation.") (quoting *Holland*

---

[4] Neither the Trustee nor Susan identifies the precise value of Kevin's assets—excluding the Trustee's pending judgment—at the time of his death, but Susan never suggests that Kevin was worth more than $219 million.

*v. Gross*, 195 So. 828, 833 (La. Ct. App. 1939)); *In re Imagine Fulfillment Svcs., LLC*, 489 B.R. 136, 150 (Bankr. C.D. Cal. 2013) ("[B]ecause the events giving rise to the Judgment occurred pre-petition and prior to each of the transfers at issue, the Judgment is not a contingent debt and was not contingent as to any of the relevant transfers.").

It is true, as Susan points out, that at least one court has classified pending litigation as a contingent asset for purposes of a claim under the Illinois UFTA. *See In re Apex Automotive Warehouse, L.P.*, 238 B.R. 758, 771-72 (Bankr. N.D. Ill. 1999).[5] In that case, the recipient of an alleged fraudulent transfer argued that the transferor was solvent at the time of the transfer because it held an asset in the form of a pending lawsuit it had filed against a third party. In assessing the transferor's solvency, the bankruptcy court treated this pending suit as a contingent asset because the transferor "had no certainty that [it] would win" the suit "or how much [it] could recover, or if and when [it] would be able to collect." *Id.*

*Apex* bears some similarity to the facts here, but there is an important difference between the two cases. Unlike the relevant lawsuit in this case, the pending lawsuit in *Apex* had not yet produced a judgment at the time the bankruptcy court was called upon to assess the transferor's solvency. *Id.* As a result, there was no formal "recognition of the pre-existence of a debt or obligation" for the bankruptcy court to rely on, *In re Babcock & Wilcox*, 274 B.R. at 257-58. The *Apex* court faced a choice of whether to accept the defendant's and the transferor's own representations about the value of the transferor's legal claim, or to discount that value based on the court's assessment of the claim's likelihood of success. The fact that the *Apex* court chose to discount in those circumstances does not mean that this court must do so in this case, where there has already been a judicial determination that Kevin Flynn's conduct leading

---

[5] Susan also cites *In re Estates of Markert*, 385 Ill. App. 3d 232, 898 N.E. 2d 715 (4th Dist. 2008) to support her argument, but that case involved a true contingent asset—$200,000 which the transferor would receive as part of his inheritance from his parents' estate only in the unlikely event that other parties chose not assert their own claims against that estate. Future decisions by third parties would determine whether the transferor in fact took ownership of the asset, not the transferor's own past conduct.

up to the 2001 revocation of Emerald Casino's license made him liable for more than $200 million. At least one other court applying Illinois law has declined to discount the value of a legal claim that, like the Trustee's here, was pending at the time of an alleged fraudulent conveyance and was subsequently reduced to judgment. *See Tcherepnin v. Franz*, 457 F. Supp. 832, 840 (N.D. Ill. 1978) (transferor's "belief as to the likelihood of liability" on a tort claim pending at the time of alleged fraudulent conveyance was "irrelevant to a determination of the legal effect of his conveyance . . . [T]he subsequent judgment shows that the property retained was not sufficient to discharge the tort claim.").

This court concludes that the Trustee's legal claim was not a contingent liability for purposes of her fraudulent transfer claim, and thus need not be discounted in value based on the probability of its success. Because Susan never suggests that Kevin was worth more than $219 million at the time of the transfer, and because Kevin received nothing of reasonably equivalent value in return, the transfer was constructively fraudulent under 740 ILCS 160/6(a).

### IV.     Remedies

Finally, Susan Flynn contends that the court's only remedy, if it finds that the assets at issue were fraudulently transferred to Susan, is to restore the assets to their status and position before the transfer was made. This would mean returning the assets to Kevin's estate, which, according to Susan, would have the same unvested interest in them that Kevin did the moment before he died. This argument makes little sense on its own terms. Even if it were true that the court's remedial power is limited to voiding the transfer and returning the assets to Kevin's estate, voiding the transfer and returning the assets to the estate would not somehow undo the vesting of the assets pursuant to the terms of Kevin's agreements with LKQ. In any event, the court's remedial power is *not* limited to voiding the transfer and returning the assets to Kevin's estate, *see* 740 ILCS 160/8, and the court orders Susan Flynn to turn over the assets identified in the Trustee's renewed motion, or the cash equivalent thereof, in satisfaction of the Trustee's judgment against the Estate of Kevin Flynn.

11

## **CONCLUSION**

Kevin Flynn's transfer of the assets at issue to Susan Flynn was constructively fraudulent, so the Trustee's renewed motion to compel turnover [679] is granted.

ENTER:

Dated: June 13, 2018

_____
REBECCA R. PALLMEYER
United States District Judge